Appeal No. 22-4045

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

COLE MATNEY, individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, *Defendants-Appellees*

Appeal from the United States District Court for the District of Utah,
The Honorable Tena Campbell, Presiding
2:20-cv-275-TC-CMR

**BRIEF OF PLAINTIFFS-APPELLANTS**

Mark K. Gyandoh
Donald R. Reavey
Gabrielle Kelerchian
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
Tel: (610) 890-0200
Fax: (717) 233-4103
Email: Markg@capozziadler.com
Email: Donr@capozziadler.com
Email: Gabriellek@capozziadler.com

David K. Isom (Utah 4773)
**ISOM LAW FIRM, PLLC**
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Tel: (801) 209-7400
Email: david@isomlawfirm.com

Attorneys for Plaintiffs-Appellants

August 31, 2022                **ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CITATIONS .................................................................iv

STATEMENT OF RELATED CASES...........................................x

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT .................................................3

STATEMENT OF ISSUE .................................................................4

STATEMENT OF THE CASE ..........................................................5

I.     Procedural History.................................................................6

II.    Statement of Facts ................................................................8

       A.    The Barrick Retirement Plan ..........................................9

       B.    Defendants Breached Their Fiduciary Duties in Failing to
             Investigate and Select Lower Cost Alternative Funds ...............10

             i.    Failure to Utilize Lower Fee Share Classes........................11

             ii.   Failure to Investigate Availability of Lower Cost
                   Collective Trusts ................................................12

             iii.  Several of the Funds in the Plan had Lower Cost Better
                   Performing Alternatives in the Same Investment Style ......13

       C.    Defendantss Failed to Monitor or Control the Plan's
             Recordkeeping Expenses...........................................14

III.   The District Court's Dismissal of the Amended Complaint ..............18

       A.    Circumstantial Evidence of Imprudent Process ..........................18

             1.    Excessive Investment Fund Management Fees..................18

2.      Share Class Allegations ....................................................18

3.      Collective Trusts...............................................................19

4.      Actively-Managed and Passively-Managed Funds ...........20

5.      Recordkeeping Fees...........................................................20

6.      Duty of Loyalty .................................................................21

7.      Failure to Adequately Monitor Other Fiduciaries.............21

SUMMARY OF ARGUMENT ....................................................................22

STANDARD OF REVIEW ..........................................................................23

ARGUMENT................................................................................................ 26

I.      The District Court Failed to Consider Changes in the Law When It
        Dismissed Plaintiffs' Amended Complaint.........................................26

        A.      *Hughes v. Northwestern University* Represents A Change
                in the Contolling Law ................................................26

        B.      The District Court Relied on Outdated Authority From A
                District Court Within the Ninth Circuit Yet Failed to
                Consider Two Recent Ninth Circuit Opinions.........................28

II.     The District Court Erred In Prohibiting Plaintiffss From Filing A
        Second Amended Complaint ................................................31

III.    Plaintiffs Plausibly Alleged Defendantss Implemented A Flawed
        Process For Selecting The Plan's Investment Options and Thus
        Breached Their Fiduciary Duties Under ERISA.................................32

        A.      Defendantss Breached Their Duty By Maintaining Higher
                Cost Mutual Fund Shares When Identical Lower Cost
                Shares Were Available ................................................34

        B.      ERISA Required Defendantss to Offer Collective
                Investment Trusts (CITs) Under the Prevailing
                Circumstances ................................................38

C.    ERISA Required Defendantss to Investigate the Prudence of Offering Passively Managed Investments as an Alternative to Actively-Managed Counterparts ....................... 41

D.    The Fee and Performance Benchmarks for the Plan's Funds Are Plausibly Alleged ..................................... 46

    i.    The ICI Chart is a Useful Measurement ............................ 46

IV.    Defendantss Breached Their Fiduciary Duties In Failing To Monitor the Plan's Recordkeeping Fees ............................................... 48

A.    The Proposed Second Amended Complaint Demonstrates The Plan's Recordkeeping Fees Were Excessive Based On Market Comparisons of Similarly Sized Plans ........................ 48

B.    Defendantss Failed to Stay Informed About Overall Trends In the Marketplace Regarding Recordkeeping Fees ................ 50

C.    The Reasonableness of Defendants'Purported Fee Negotiations With Fidelity Is A Finding of Fact Inappropriate for Consideration at the Pleading State ............. 52

V.    The Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor ................................................................ 54

CONCLUSION ................................................................................................ 54

ORAL ARGUMENT STATEMENT ............................................................... 54

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) ................................................................ 55

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS ................................................................................................ 55

CERTIFICATE OF SERVICE ........................................................................ 56

ADDENDUM INDEX ..................................................................................... 56

ADDENDUM 1 – Judgment in a Civil Case, dated 4/22/22, Dkt. 62 .......... 57

ADDENDUM 2 – Order and Memorandum Decision, dated 4/21/22, Dkt. 61 ............................................................................................................. 57

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Bangalore v. Froedtert Health, Inc.*,
2022 WL 227236 (E.D. Wis. Jan. 26, 2022) ............................................................ 36

*Bell v. Pension Comm. of ATH Holding Company, LLC*,
2017 WL 1091248 (S.D. Ind. March 23, 2017) ...................................................... 51

*In re Biogen, Inc. ERISA Litig.*,
2021 WL 3116331 (D. Mass. July 22, 2021) ............................................................ 43

*Blackmon, et al v. Zachry Holdings, Inc.*,
No. 5:20-cv-988-DAE (W.D. Tex. April 22, 2021) ................................................ 43

*Bouvy v. Analog Devices, Inc.*,
2020 WL 3448385 (S.D. Cal. June 24, 2020) .......................................................... 47

*Braden v. Wal-Mart Stores, Inc*,
588 F.3d 585 (8th Cir. 2009) .................................................................. 23, 24, 33

*Brotherston et al. v. Putnam Investments,* LLC,
907 F.3d 17 (1st Cir. 2018), *writ of certiorari denied* 2020 WL 129535 (2020) ..... 44

*Brotherston v. Putnam Investments LLC*,
2016 WL 1397427 (D. Mass. April 7, 2016) ............................................................ 38

*Cassell v. Vanderbilt Univ.*,
285 F.Supp.3d 1056 (M.D. Tenn. 2018) .................................................................. 35

*Conkle v. Potter*,
352 F.3d 1333 (10th Cir. 2003) ...................................................................... 4, 5, 23

*Coviello et al. v. BHA Management, Inc. et al.*,
No. 3:20-cv-30198 (D. Mass. June 9, 2022) ............................................................ 33

*Cryer v. Franklin Templeton Resources Inc.*,
2017 WL 818788 (N.D. Cal. Jan. 17, 2017) ............................................................ 42

*Cunningham v. Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ......................................................... 45

*Davis v. Magna Int'l. of Am., Inc.*,
2021 WL 1212579 (E.D. Mich. Mar. 31, 2021) ................................................. 47, 53

*Davis v. Salesforce.com*,
2022 WL 1055557 (9th Cir. Apr. 8, 2022) ....................................................... Passim

*Davis, et al. v. Washington U.*,
960 F.3d 478 (8th Cir. 2020) ....................................................................... 3,, 24, 49

*Disselkamp v. Norton Healthcare, Inc.*,
2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) .................................................... 35, 37

*Divane v. Northwestern Univ.*,
953 F.3d 980 (7th Cir. 2020) ................................................................................. 27

*Falberg v. Goldman Sachs Group, Inc.*,
2020 WL 3893285 (S.D.N.Y. July 9, 2020) ........................................................... 40

*Feinberg v. T. Rowe Group, Inc.*,
2018 WL 3970470 (D. Md. Aug. 20, 2018) ............................................................ 42

*Garcia, et al. v. Alticor, Inc., et al.*,
No. 1:20-cv-1078 (W.D. Mich. Aug. 23, 2022) ..................................................... 53

*George v. Kraft Foods Glob., Inc.*,
641 F.3d 786 (7th Cir. 2011) ................................................................................. 52

*Hall v. Bellmon*,
935 F.2d 1106 (10th Cir. 1991) ............................................................................. 23

*Harbor Air Service, Inc. v. Cheynne Airport Board*,
2010 WL 11507677 (D. Wyo. Oct. 26, 2010) ........................................................ 31

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ..................................................................... 27

*Huang v. TriNet*,
2022 WL 93571 (M.D. Fla. Jan. 10, 2022).......................................... 42, 46

*Hughes v. Northwestern Univ.*,
142 S. Ct. 737 (2022) ...............................................................2, 7, 24, 25

*Hughes v. Northwestern Univ.*,
No. 19-1401, 142 S.Ct. 737, 2022 WL 199351 (2022) .....................................Passim

*Intravaia, et al., v. National Rural Electric Cooperative Assoc.*,
2020 WL 58276 (E.D.Va. Jan. 2, 2020) ................................................... 49

*Johnson, et al. v. Fujitsu Technology and Business of Am., Inc.*,
250 F. Supp. 3d 460 (N.D. Cal. Apr. 11, 2017)................................... 38, 54

*Johnson et al. v. The PNC Financial Services Group, Inc. et al.*,
No. 2:20-CV-01493 ................................................................................. 50

*Jones v. Coca-Cola. Consolidated, Inc.*,
2021 WL 1226551 (W.D.N.C. Mar. 31, 2021)........................................ 43

*Kendall v. Pharmaceutical Product Development*,
2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ........................................ 53

*Kong v. Trader Joe's Co.*,
2022 WL 1125667 (9th Cir. Apr. 15, 2022) ....................................Passim

*Krueger v. Ameriprise Fin., Inc.*,
2012 WL 5873825 (D. Minn. Nov. 20, 2012) ................................... 37, 47

*Kruger, et al. v. Novant Health, Inc.*,
131 F.Supp.3d 470 (M.D.N.C. 2015) ...................................................... 36

*Loomis v. Exelon Corp.*,
658 F.3d 670 (7th Cir. 2011) ................................................................... 27

*In re M&T Bank Corp. ERISA Litig.*,
2018 WL 4334807 (WDNY Sept. 11, 2018) ............................................................ 40

*Main v. Am. Airlines, Inc.*,
248 F.Supp.3d 786 (N.D. Tex. 2017) ...................................................................... 42

*Marks v. Trader Joe's Co.*,
2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ........................................................ 30

*Marshall v. Northrop Grumman Corp.*,
No. 16-6794, 2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ............................ 44, 46

*McCool v. AHS Mgmt. Company, Inc.*,
2021 WL 826756 (M.D. Tenn. Mar. 4, 2020) ................................................... 47, 53

*In re MedStar ERISA Litig.*,
2021 WL 391701 (D. Md. Feb. 4, 2021) .................................................................. 43

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ............................................................................ 37, 42

*Meiners v. Wells Fargo & Co.*,
2017 WL 2303968 (D. Minn. May 25, 2017) ..................................................... 46, 47

*Miller v. AutoZone, Inc.*,
2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ..................................................... 53

*Moreno v. Deutsche Bank*,
2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) .......................................................... 38

*Nicolas v. Trustees of Princeton Univ.*,
2017 WL 4455897 (D.N.J. Sept. 25, 2017) ................................................. 38, 42, 50

*In re Omnicom ERISA Litig.*,
No. 20-cv-4141 (CM) (S.D.N.Y. Aug. 2, 2021) ...................................................... 43

*Parmer v. Land O'Lakes, Inc.*,
518 F.Supp.3d 1293 (D. Minn. 2021) ..................................................................... 53

*Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*,
2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) ......................................................Passim

*Price v. Kansas*,
670 Fed.Appx. 660 (10th Cir. 2016) ..................................................................... 4, 23

*In re Prime Healthcare ERISA Litig.*,
2021 WL 3076649 (C.D. Cal. July 16, 2021) ........................................................... 43

*In re Quest Diagnostics, Inc. ERISA Litig.*,
2021 WL 1783274 (D.N.J. May 4, 2021) ................................................................. 43

*Ramos et al. v. Banner Health, et al.*,
2017 WL 4337598 (D. Col. Sep. 29, 2017) ......................................................... 23, 52

*Reetz v. Lowe's Companies, Inc.*,
2019 WL 4233616 (W.D.N.C Sept. 6, 2019) ........................................................... 37

*Ridge at Red Hawk, LLC v. Schneider*,
493 F.3d 1174 (10th Cir. 2007) ............................................................................ 23

*Rohan v. Saint Luke's Health Sys., Inc.*,
2020 WL 8410451 (W.D. Mo. June 22, 2020) ......................................................... 54

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) ............................................................................ 2, 25, 33

*Schapker v. Wadell & Reed Financial, Inc., et al.*
2018 WL 1033277 (D. Kan. Feb. 22, 2018) ........................................................... 41

*Shaw v. Quad/Graphics, Inc.*,
2022 WL 227502 (E.D. Wis. Jan. 26, 2022) ........................................................... 36

*Short v. Brown U.*,
320 F.Supp.3d 363 (D.R.I. July 11, 2018) ............................................................. 51

*Silva v. Evonik Corp.*,
2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020) ...................................... 44, 47

*Southern Utah Wilderness Alliance v. United States Dept. of the Interior*,
2015 WL 4389580 (D. Utah July 17, 2015) ............................................................ 23

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................................ 24

*Sweda v. Univ. of Pennsylvania,*
923 F.3d 320 (3d Cir. 2019)............................................................Passim

*The Tool Box, Inc. v. Ogden City Corp.*,
419 F.3d 1084 (10th Cir. 2005) ............................................................ 31

*Tibble v. Edison Int'l,*
575 U.S. 523 (2015)............................................................ 2, 25, 26, 27

*Tibble v. Edison Int'l,*
2017 WL 3523737 (C.D. Cal. Aug. 16*, 2017)*............................................................ 35

*Tibble v. Edison Int'l,*
843 F.3d 1187 (9th Cir. Dec. 30, 2016) (*en banc*) *(Tibble V)* .................... 1, 2, 3, 40

*Tibble, et al. v. Edison Int. et al.*,
No. 07-5359, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017) ("*Tibble VI*").............37

*Tracey v. MIT,*
2017 WL 4453541 (D. Mass. Aug. 31, 2017) ............................................................ 40

*Troudt v. Oracle Corp.*,
2017 WL 1100876 (D. Col. Mar. 22, 2017) ............................................................ 35

*Varity Corp. v. Howe*,
516 U.S. 489 (1996)............................................................ 39

*Wildman v. Am. Century Servs., LLC*,
No. 4:16–737, 2017 WL 839795 (W.D. Mo. Feb. 27, 2017) .................................. 48

**Statutes**

Fed. R. Civ. P. 12(b)(6)............................................................22, 23, 24

Fed. R. Civ. P. 15(a) ............................................................................... 31

Fed. R. Civ. P. 59(e) ............................................................................ 8, 31

Fed. R. Civ. P. 60(b) ............................................................................... 31

28 U.S.C. § 1291 ....................................................................................... 4

28 U.S.C. § 1331 ....................................................................................... 3

29 U.S.C. § 1104(a)(1)(B) .............................................................. 6, 39, 51

29 U.S.C. § 1132(e)(1) and (f) ................................................................. 3

**Other Sources**

*401k Averages Book* ................................................................................ 21

*Assembling a Robust Investment Policy Statement for Endowments and Foundations*, THE PNC FINANCIAL SERVICES GROUP INC., Jan. 8, 2020 ................. 45

Employee Retirement Income Security Act of 1974 ....................................... Passim

Restatement (Third) of Trusts § 100 cmt. b(1) .................................... 40, 44

Uniform Prudent Investor Act, § 7 ......................................................... 25

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

**INTRODUCTION**

Plaintiffs-Appellants Cole Matney and Paul Watts (collectively, "Plaintiffs") brought this action on behalf of current and former employees of Barrick Gold of North America, Inc. ("Barrick Gold") who during the putative Class Period (April 24, 2014 through the date of judgment)[1] participated in the Barrick Retirement Plan (the "Plan"), which is governed by the Employee Income Security Act of 1974 ("ERISA"). The Plan is a defined contribution retirement plan Barrick Gold maintains for its employees.

Fiduciary duties under ERISA are among "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*) (*Tibble V*). As such, Defendants-Appellees ("Defendants")[2] were required to (1) prudently select and monitor the Plan's investments; (2) ensure the Plan paid no more than reasonable compensation for any of the recordkeeping and administrative services provided to the Plan; and (3) ensure the Plan was administered in accordance with the terms of ERISA.

---

[1] Capitalized and undefined terms shall be ascribed the same meaning provided in the Amended Complaint ("AC"). Any references to the Amended Complaint (Aplt. App. I, 097, ECF No. 21) will be indicated herein as "AC, ¶." (Appellants' Appendix I).

[2] "Defendants" refers to Barrick Gold of North America, Inc. ("Barrick Gold"), The Board of Directors of Barrick Gold of North America, Inc. ("Board"), and the Barrick U.S. Subsidiaries Benefits Committee ("Committee").

Plaintiffs' primary claim is that throughout the putative Class Period, Defendants selected a slate of investment options for the Plan that were imprudent due to their high investment management fees where ***identical*** alternative funds – differing only in price – were available in the marketplace.  Having control of an over $619 million plan required the fiduciaries to leverage the Plan's considerable size – among the largest in the country – to obtain better investment products that were available.  Simply put, "a trustee cannot ignore the power the trust wields to obtain favorable investment products … substantially identical – other than their lower cost – to products the trustee has already selected." *Tibble V*, 843 F.3d at 1198.

Plaintiffs' claims are in line with the Supreme Court's pleading requirements in *Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022).  In *Hughes*, the Supreme Court implored lower courts to apply the teachings of *Tibble v. Edison Int'l*, 575 U.S. 523, 529-530 (2015) where the Supreme Court "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'"  *Hughes*, 142 S.Ct. at 741 (quoting *Tibble*, 575 U.S. at 530).  Moreover, the District Court's decision runs counter to the Second, Third, Eighth, and Ninth Circuits, which all have upheld analogous share class claims.  *See Sacerdote v. New York Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quotations omitted)

(finding claim that "the only difference between the various share classes is fees, and that large investors like the Plans can obtain [institutional] share classes with far lower costs than retail mutual fund shares […] was adequately pled"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble V*, 843 F.3d at 1198) ("a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected."); *Davis, et al. v. Washington U*., 960 F.3d 478, 483 (8th Cir. 2020) (upholding claim that Defendants breached their fiduciary duty in failing to replace certain shares with their lower-cost counterparts because higher fees led to lower overall returns); *Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022) (same); *Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (same).

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Utah had federal question jurisdiction under 28 U.S.C. § 1331 and subject matter jurisdiction under 29 U.S.C. § 1132(e)(1) and (f).  The venue was proper because Defendants are headquartered and transact business in the District, reside in the District, and/or have significant contacts with the District.

The United States Court of Appeals for the Tenth Circuit has jurisdiction over this appeal under 28 U.S.C. § 1291 because it is an appeal from an April 22, 2022 Judgment dismissing the case with prejudice.  (Aplt. App. II, 562, ECF 62.)  Plaintiffs timely filed a notice of appeal on May 20, 2022.  (Aplt. Appl. III, 655, ECF 64.)

## STATEMENT OF ISSUE

1.      Whether the District Court erred in determining Plaintiffs' AC failed to plead adequately Defendants breached their fiduciary duties under ERISA by employing an imprudent process in selecting investment options for the Plan where the AC enumerated several *indicia* of imprudent conduct, including Defendants' selection of retail-class shares of mutual funds that charged higher investment management fees than otherwise identical, institutional-class shares of the same funds.  (Aplt. App. I, 102 ¶22).

Review is *de novo*.  *Price v. Kansas*, 670 Fed.Appx. 660, 661 (10th Cir. 2016) (citing *Conkle v. Potter*, 352 F.3d 1333, 1335 (10th Cir. 2003)).

2.      Whether the District Court erred in determining the AC failed to plead adequately Defendants breached their fiduciary duties under ERISA by failing to monitor the Plan's excessive recordkeeping fees at the expense of the Plan's participants.  (Aplt. App I, 135, ¶127).

4

Review is *de novo*.  *Price*, 670 Fed.Appx. at 661 (citing *Conkle*, 352 F.3d at 1335).

3.      Whether the District Court erred in determining the AC failed to plead adequately Defendants breached their fiduciary duty of loyalty under ERISA.  (ER 014-015).

Review is *de novo*.  *Price*, 670 Fed.Appx. at 661 (citing *Conkle*, 352 F.3d at 1335).

4.      Whether the District Court erred in determining the AC failed to plead adequately Defendants breached their fiduciary duties under ERISA by failing to monitor the Plan's fiduciaries.  (Aplt. App. 137, ¶39(b)).

Review is *de novo*.  *Price*, 670 Fed.Appx. at 661 (citing *Conkle*, 352 F.3d at 1335).

5.  Whether the District Court erred in denying Plaintiffs' motion for reconsideration and denying the request to file a Second Amended Complaint.

Review is *de novo*.  *Price*, 670 Fed.Appx. at 661 (citing *Conkle*, 352 F.3d at 1335).

## STATEMENT OF THE CASE

This case concerns the failure of Defendants, each of whom served as a Plan fiduciary, to protect the interests of the Plan and its participants and their beneficiaries in violation of Defendants' fiduciary obligations under ERISA.  The

Defendants-fiduciaries allowed the Plan to offer high-cost funds when lower share counterparts identical in all ways except price existed and failed to monitor and control the Plan's excessive recordkeeping fees. ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

## I.    Procedural History

Plaintiffs filed their original Complaint on April 24, 2020 in the District of Utah. (Aplt. App. I, 022, ECF 2)  On June 26, 2022, Defendants filed their Motion to Dismiss. (Aplt. App. I, 065, ECF No. 19.)  Plaintiffs filed an Amended Complaint on July 17, 2020. (Aplt. App. I, 097, ECF No. 21.)  Defendants then filed their Motion to Dismiss Plaintiffs' Amended Complaint ("Motion to Dismiss") on August 3, 2020 (Aplt. App. I, 142, ECF No. 24.)  On August 31, 2020, Plaintiffs filed their Brief In Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. (Aplt. App. I, 174, ECF No. 25.)  On September 21, 2020, Defendants filed their Reply In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint. (Aplt. App. I, 208, ECF No. 28.)  Both Parties filed multiple notices of supplemental authorities and responses in support of their positions on Defendants' Motion to Dismiss. (Aplt. Apps. I and II, 228, 224, 250,

269, 276, 288, 301, 313, 371, 421, 465, ECF Nos. 31, 33, 34, 35, 37, 39, 40, 41, 42, 46, 47.)  On May 27, 2021, the Parties appeared via ZOOM for oral argument on Defendants' Motion to Dismiss the Amended Complaint.

On December 21, 2021, the Parties filed a Stipulated Motion to Stay Pending Motion to Dismiss Decision and United States Supreme Court Decision asking the District Court to stay and suspend all deadlines pending the District Court's decision on Defendants' Motion to Dismiss and the Supreme Court of the United States' decision in the case captioned *Hughes v. Northwestern University*, No. 19-1401, 141 S. Ct. 2882 (July 2, 2021).  (Aplt. App II, 514, ECF No. 56.)  On January 24, 2022, the Supreme Court issued an opinion in the *Hughes* matter.  *See Hughes v. Northwestern Univ.*, No. 19-1401, 142 S.Ct. 737, 2022 WL 199351 (2022).   Then on January 26, 2022, the District Court entered an Order for Supplemental Briefing on Defendants' Motion to Dismiss to enable the Parties to address the impact of the Supreme Court's decision in *Hughes*.  (Apt. App. II, ECF No. 58.) On February 23, 2022, Plaintiffs filed their supplemental brief.  (Aplt. App. 523, ECF No. 59.)   Defendants also filed their supplemental brief on February 23, 2022.  (Aplt. App. II, 529, ECF No. 60.)  On April 21, 2022, the District Court entered an Order and Memorandum granting Defendants' Motion to Dismiss the Amended Complaint with prejudice.  (Aplt. App. II, 535, ECF No. 61.)  On April 22, 2022, the District Court entered a Judgment In A Civil Case

confirming that the case is dismissed with prejudice. (Aplt. App. II, 562, ECF No. 62.)

On May 19, 2022, Plaintiffs filed their FED. R. CIV. P. Rule 59(e) Motion for Reconsideration of the Court's April 21, 2022 Order and Opinion. (Aplt. App. III, 571, ECF No. 63.) In the Motion for Reconsideration, Plaintiffs asked the Court to permit them to file a Second Amended Complaint ("SAC") to address the District Court's finding that Plaintiffs did not allege meaningful benchmarks regarding the recordkeeping claim, and attached as an exhibit to the Motion for Reconsideration, a proposed Second Amended Complaint. (Aplt. Ap. III, 571, ECF No. 63-1.) The SAC included numerous additional facts to comply with the pleading standard set forth in *Hughes*. Plaintiffs filed a Notice of Appeal on May 20, 2022. (Aplt. App. III, 644, ECF No. 64.) On June 6, 2022, Defendants filed Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee's Response In Opposition to Plaintiffs' Motion for Reconsideration. (Aplt. App. 68, 675, ECF No. 68.) On June 21, 2022, the District Court entered an Order denying Plaintiffs' Motion for Reconsideration. (Aplt. App. 71, ECF No. 71.)

## II.    Statement of Facts[3]

---

[3] Because the Amended Complaint (ECF No. 21) was filed July 17, 2020 – over two years ago and long before the Supreme Court addressed the pleadings standards in ERISA fiduciary breach cases in its *Hughes* decision – Plaintiffs will refer to the Second Amended Complaint ("SAC") (Aplt. App. 571, ECF No. 63-1)

### A. The Barrick Retirement Plan

Barrick Gold is the sponsor and/or administrator of the Plan, a defined contribution or individual account Plan governed by ERISA § 3(34), 29 U.S.C. § 1002(34).  (Aplt. App. 097, AC ¶¶ 26-30; Aplt. App. 571, SAC ¶¶ 26-30.)  The Plan is one of the largest in the country having over $560,000,000 in assets under management at the end of 2018.  (Aplt. App. 097, AC ¶52; Aplt. App. 571, SAC ¶ 58.)

Plaintiffs participated in the Plan investing in the options offered by the Plan, and were subject to the Plan's excessive administration and recordkeeping costs.  (Aplt. App. 097, AC ¶¶ 19-20; Aplt. App. 571, SAC ¶¶ 20-21.)  Benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  (Aplt. App. 097, AC ¶ 40; Aplt. App. 571, SAC ¶ 47.)

The Defendants' fiduciary status is not in dispute.  As a fiduciary of the Plan, Barrick Gold made discretionary decisions, including appointing the Barrick U.S. Subsidiaries Benefits Committee as the Plan Administrator.  (Aplt. App. 097, AC ¶ 28; Aplt. App. 571, SAC ¶ 28.)  The Board had a fiduciary duty to monitor the activities of the Committee and, together with the Barrick Gold, appointed the Committee.  (Aplt. 097, AC ¶ 32; Aplt. App. 571, SAC ¶ 32.)  The Committee and

_____

in this Statement of Facts.  The cited paragraphs of the SAC will be indicated as "SAC, ¶."  Any references to the Amended Complaint (Aplt. App. 097, ECF No. 21) will be indicated herein as "AC, ¶."

its members were fiduciaries of the Plan and had discretionary authority to select, and accordingly, the fiduciary duty to prudently select and monitor Plan investments.  (Aplt. App. 097, AC ¶ 34; Aplt. App. 571, SAC ¶ 34.)  The Committee is also responsible for selecting and monitoring the Plan's recordkeeper.  (Aplt. App. 097, AC ¶ 34; Aplt. App. 571, SAC ¶ 34.)

Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  (Aplt. App. 097, AC ¶ 22; Aplt. 571, SAC ¶ 62.)  By way of illustration of the difficulty of obtaining such information, several weeks prior to filing the initial complaint, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  (Aplt. 097, AC ¶ 23; Aplt. App. 571, SAC ¶ 63.)  Their request for meeting minutes was denied.  (*Id*.)

### B. Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

Defendants' breaches of their fiduciary duties, relating to their overall decision-making resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the Plan and participants' assets

because of unnecessary costs.  (Aplt. App. 097, AC ¶ 71; Aplt. App. 571, SAC ¶ 67.)  One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  (Aplt. App. 097, AC ¶ 74; Aplt. App. 571, SAC ¶ 70.)  Between 2014 and 2018 the Plan included only four passively managed funds.  (*Id*.)

Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets).  (Aplt. App. 097, AC ¶ 75; Aplt. App. 571, SAC ¶ 71.)  In 2018, for example, excluding the target date offerings, which are discussed *infra*, the expense ratios for a majority of the remaining eighteen funds in the Plan (61%) were in some cases up to ***167%*** (in the case of the Royce Opportunity Instl) above the median expense ratios in the same category.  (Aplt. App. 097, AC ¶ 76; Aplt. App. 571, SAC ¶ 72.)

### i.    Failure to Utilize Lower Fee Share Classes

In 2015, the Plan transitioned to JPMorgan target date funds utilizing the I share versions of the fund which had expense ratios ranging from .61% to .70% as

of 2019 (the expense ratios would have been even higher in 2015). (Aplt. App. 097, AC ¶ 82; Aplt. App. 571, SAC ¶ 79.) In 2017, the Plan's fiduciaries converted from I share to R5 shares which had lower expense ratios but were still more expensive than the R6 share class. (Aplt. App. 097AC ¶ 82; Aplt. App. 571, SAC ¶ 79.) In sum, the I share and R5 share classes were more expensive than the R6 shares and all three share classes – identical in all respects other than price – had been available during the Class Period. (Aplt. App. 097, AC ¶ 82; Aplt. App. 571, SAC ¶ 79.) Defendants' failure to select the R6 share class was an indication of their failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.). (Aplt. App. 097, AC ¶ 83; Aplt. App. 571, SAC ¶ 80 (listing 9 funds).)

The funds in the Plan cost anywhere from 20% (in the case of the JPMorgan SmartRetirement 2030 R5 fund compared to the JPMorgan SmartRetirement 2030 R6 fund) to 24% (in the case of the JPMorgan SmartRetirement Income R5 compared to the JPMorgan SmartRetirement Income R6 fund) more than their identical lower cost counterparts. (Aplt. App. 097, AC ¶ 83; Aplt. App. 571, SAC ¶ 80 (listing 9 funds).) By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. (Aplt. App. 097, AC ¶ 89; Aplt. App. 571, SAC ¶ 86.)

   ii. **Failure to Investigate Availability of Lower Cost Collective Trusts**

Another indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts. (Aplt. App. 097, AC ¶ 95; Aplt. App. 571, SAC ¶ 92.) Beginning on July 22, 2016, JPMorgan offered trust versions of its target date funds, which had no *minimum investment* requirement. (Aplt. App. 097, AC ¶ 95; Aplt. App. 571, SAC ¶ 92 (emphasis in original).) A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity. (Aplt. App. 097, AC ¶ 95; Aplt. App. 571, SAC ¶ 92.) Additionally, during the Class Period, the Plan's recordkeeper, Fidelity Investments Institutional ("Fidelity") offered collective trust formats for its "Freedom" index and blend target-date funds which had the same investment goals as the JPMorgan trust funds utilized by the Plan. (Aplt. App. 097, AC ¶ 96; Aplt. App. 571, SAC ¶ 93.) Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. (Aplt. App. 097, AC ¶ 99; Aplt. App. 571, SAC ¶ 96.) By failing to investigate the use of alternative investments such as collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. (Aplt. App. 097, AC ¶ 99; Aplt. App. 571, SAC ¶ 96.)

      **iii.**    **Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

Defendants failed to replace several of the higher cost and underperforming funds.  (Aplt. App. 571, SAC ¶ 97.)  These funds had nearly identical lower cost better performing alternatives during the Class Period.  (Aplt. App. 571, SAC ¶ 97.)  During the Class Period, there were, at least, hundreds of superior performing less expensive alternatives available during the Class Period.  (Aplt. App. 571, SAC ¶ 99.)  The expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  (Aplt. App. 097, AC ¶ 103; Aplt. App. 571, SAC ¶ 100.)  These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.  (Aplt. App. 097, AC ¶ 103; Aplt. App. 571, SAC ¶ 100.)  The alternative funds also had better performances than the Plan's funds in their 3 and 5 year average returns as of June 2020.  (Aplt. App. 097, AC ¶ 103; Aplt. App. 571, SAC ¶ 100.)  A prudent fiduciary should have been aware of these better performing lower cost alternatives and switched to them at the beginning of the Class Period.  (Aplt. App. 097, AC ¶ 107; Aplt. App. 571, SAC ¶ 104.)

### C. Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses

The Plan's recordkeeper during the Class Period was Fidelity.  (Aplt. App. 097, AC ¶ 109; Aplt. App. 571, SAC ¶ 106.)  The term "recordkeeping" is a

catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." (Aplt. App. 097, AC ¶ 110; Aplt. App. 571, SAC ¶ 107.) All national recordkeepers have the capability to provide the same recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. (Aplt. App. 571, SAC ¶ 112.) Here, Fidelity provided services in line with the routine services provided by other recordkeepers. (SAC ¶ 113.)

The cost of providing recordkeeping services depends on the number of participants in a plan. (Aplt. App. 097, AC ¶ 112; Aplt. App. 571, SAC ¶ 115.) Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. (Aplt. App. 097, AC ¶ 112; Aplt. App. 571, SAC ¶ 115.) Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). (Aplt. App. 097, AC ¶ 113; Aplt. App. 571, SAC ¶ 116.) Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devasting for Plan participants. (Aplt. App. 097, AC ¶ 114; Aplt. App. 571, SAC ¶ 118.) During the Class Period, many of the Plan's funds paid revenue sharing to the Plan's recordkeeper. (Aplt. App. 097, AC ¶ 117; Aplt. App. 571, SAC ¶ 117.)

Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") process in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  (Aplt. App. 097, AC ¶ 116; Aplt. App. 571, SAC ¶ 121.)  The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid above-market prices in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals. (Aplt. App. 097, AC ¶ 121; Aplt. App. 571, SAC ¶ 122.)

The Plan's per participant administrative and recordkeeping fees were unreasonably high when benchmarked against similar plans:

| Year | Number of Participants | Indirect | Per Participant Cost prior to credits |
|------|------------------------|----------|---------------------------------------|
| 2016 | 4,669 | $739,485 | $158 |
| 2015 | 5,270 | $773,341 | $147 |
| 2014 | 5,259 | $907,307 | $173 |

(Aplt. App. 097, AC ¶ 117; Aplt. App. 571, SAC ¶ 123.)  In 2014 and 2015, Fidelity deposited $375,000 and $320,000, respectively in a revenue sharing account ("Revenue Credit Account") to be purportedly used to defray costs for recordkeeping and administration costs.  (Aplt. App. 097, AC ¶ 118; Aplt. App.

571, SAC ¶ 124.)  Even accounting for the Revenue Credit Account, the cost per participant was $101 in 2014 and $85 in 2015.  (Aplt. App. 097, AC ¶ 118; Aplt. App. 571, SAC ¶ 124.)    Beginning on January 1, 2017, Fidelity purportedly charged a flat $68 per participant annually and $53 per participant as of April 2020.  (Aplt. App. 097, AC ¶ 119; Aplt. App. 571, SAC ¶ 125.)  But Fidelity *still continued to collect* revenue sharing which was deposited into a revenue sharing account.  (Aplt. App. 097, AC ¶ 119; Aplt. App. 571, SAC ¶ 125 (emphasis in original).)  Based on the Plan's 2018 Form 5500, for the years ended December 31, 2018 and 2017, $45,719 and $53,178 of the Revenue Credit Account were used to pay plan administrative expenses, respectively.  (Aplt. App. 097, AC ¶ 119; Aplt. App. 571, SAC ¶ 125.)  Revenue sharing collected for 2018 was $664,000.  (Aplt. App. 097, AC ¶ 119; Aplt. App. 571, SAC ¶ 125.)  That means over $600,000 in collected revenue sharing never made it back to the pockets of the Plan participants in 2018.  (Aplt. App. 097, AC ¶ 119; Aplt. App. 571, SAC ¶ 125.)

During the Class Period, the Plan was paying higher recordkeeping fees than its peers (plans with between 5,000 and 10,000 participants) with per participant recordkeeping amounts derived from Form 5500 filings.  (Aplt. App. 571, SAC ¶ 128 (listing comparator plans).)  In fact, at least two of the plans cited in the SAC used Fidelity as the recordkeeper and had per participant costs of $36 which is a fraction of the amount being charged to the Plan's participants.  (Aplt. App. 571,

SAC ¶ 129.)  Some authorities from as far back as six years ago recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.  (Aplt. App. 571, SAC ¶ 129.)  Thus, the Plan should have been able to negotiate a recordkeeping cost in the high $20 to mid $30 range from the beginning of the Class Period to the present.  (Aplt. App. 571, SAC ¶ 130.)

### III.    The District Court's Dismissal of the Amended Complaint

#### A. Circumstantial Evidence of Imprudent Process

##### 1.  Excessive Investment Fund Management Fees

The District Court rejected Plaintiffs' use of the ICI Study in their comparison of the 2019 expense ratios for eleven of the Plan's funds with the median and average fees of funds in the same investment categories.  (Aplt. App. 535, ECF No. 61 at 11.)  The District Court concluded, "expense ratios from the ICI Study do not allow a meaningful analysis" because "the ICI Study itself clarifies that the broad one-size-fits-all investment categories have limited utility." Aplt. App. 535, ECF No. 61 at 11-12.)  The District Court also noted "Plaintiffs do not discuss Plan options that have lower expense ratios."  (Aplt. App. 535, ECF No. 61 at 12.)

##### 2.  Share Class Allegations

The District Court rejected Plaintiffs' allegations that Defendants failed to monitor the Plan and determine if the Plan's funds were invested in the lowest-cost share class available to the Plan.  (Aplt. App. 535, ECF No. 61 at 13.)  The District Court deemed Plaintiffs' comparisons between the share classes as "problematic" and reasoned, courts have often held that '[a]lleging only the inclusion of more expensive share classes is not enough' to suggest imprudence."  (Aplt. App. 535, ECF No. 61 at 13-14 (citing Kurtz, 511 F.Supp.3d at 1199).)  Additionally, the District Court took issue with Plaintiffs' numbers and relied on judicially noticed documents to conclude "Plaintiffs' comparison of share classes relies on incorrect information about actual fees paid by the Plan's participants."  (Aplt. App. 535, ECF No. 61 at 14.)  Specifically, the District Court reasoned, "[t]aking into account the 15-basis-point revenue credit that Defendants negotiated for the JPMorgan funds' R5 share class, the Plan's expense ratio for each JPMorgan R5 fund was actually less than the R6 funds' expense ratios upon which Plaintiffs rely."  (Aplt. App. 535, ECF No. 61 at 14.)

### 3.  Collective Trusts

The District Court dismissed Plaintiffs' claim that Defendants failed to identify and select lower cost collective trusts (CITs) in lieu of mutual funds concluding, with respect to the JPMorgan mutual funds compared to the JPMorgan CITs, "Defendants provide a corrected chart showing the expense ratio is actually

lower because the Plan received the 15-basis-point revenue credit." (Aplt. App. 535, ECF No. 61 at 14.)  Additionally, the District Court rejected Plaintiffs' comparisons of the 2019 JPMorgan funds' expenses ratios to the Fidelity Freedom CITs' lower expense ratios finding, "Plaintiffs did not apply the 15-basis-point revenue credit" and "the 0.32% expense ratio Plaintiffs drew from the Fidelity CIT 2019 fact sheet for comparison is not the CIT's actual expense ratio; it is an estimate." (Aplt. App. 535, ECF No. 61 at 15.)  Lastly, the District Court concluded "CITs are not comparable investments" as "there are substantive differences between mutual funds and CITs." (Aplt. App. 535, ECF No. 61 at 15.)

### 4.  Actively-Managed and Passively-Managed Funds

The District Court rejected Plaintiffs' arguments that Defendants failed to select more passively-managed funds and cheaper actively-managed funds finding Plaintiffs comparisons of the Plan's investment options' expense ratios to the expense ratios of passively-managed and actively managed alternative funds failed to apply the 15-basis-point revenue credit.  (Aplt. App. 535, ECF No. 61 at 17-18.) Additionally, the District Court concluded "[a]s for the types of investments Plaintiffs choose (sic) for comparison, some of the funds have different investment strategies." (Aplt. App. 535, ECF No. 61 at 18.)

### 5.  Recordkeeping Fees

The District Court rejected Plaintiffs' challenge of the Plan's recordkeeping fees to Fidelity finding "Plaintiffs have not created a reasonable inference that the Committee violated the duty of prudence through its fee arrangement with Fidelity" as "revenue sharing is not per se imprudent."  (Aplt. App. 535, ECF No. 61 at 23.)  The District Court likewise determined Plaintiffs' comparisons of the Plan's recordkeeping fees to the *401k Averages Book* did not "provide a meaningful benchmark."  (Aplt. App. 535, ECF No. 61 at 23.)  The District Court also accepted Defendants' argument that they "did manage, and reduce Fidelity's fees over the years" at face value.  (Aplt. App. 535, ECF No. 61 at 23.)  The District Court further rejected Plaintiffs' arguments related to Defendants' failure to regularly engage in a prudent RFP process finding, "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval."   (Aplt. App. 535, ECF No. 61 at 24.)

### 6.  Duty of Loyalty[4]

The District Court dismissed Plaintiffs' duty of loyalty claim finding "Plaintiffs essentially conflate their duty of prudence claim with their duty of loyalty claim."  (Aplt. App. 535, ECF No. 61 at 25.)

### 7.  Failure to Adequately Monitor Other Fiduciaries

---

[4] Plaintiffs omit the duty of loyalty claim from the Proposed SAC.  *See, e.g.*, ECF No. 63-1.

The District Court dismissed Plaintiffs' failure to monitor claim finding, "[b]ecause Plaintiffs have not adequately alleged a claim for breach of the duty of prudence or the duty of loyalty, the court dismisses their derivative monitoring claim." (Aplt. App. 535, ECF No. 61 at 27.)

## SUMMARY OF ARGUMENT

In dismissing Plaintiffs' Amended Complaint and, alternatively, prohibiting Plaintiffs from filing a Second Amended Complaint, the District Court ignored Supreme Court precedent regarding ERISA's continuing duty to monitor investments and remove imprudent ones.

Instead of reading the facts in the AC as a whole, the District Court parsed the AC piece by piece to determine whether each allegation, in isolation, is plausible.  The Court also relied on judicially noticed documents submitted by Defendants to improperly draw conclusions on disputed issues of fact – such as the validity of Defendants' affirmative defenses with respect to Plaintiffs' lowest cost share class allegations – effectively converting the motion to dismiss into a motion for summary judgment.  Among other things, the District Court read and interpreted the Master Trust Agreement between Barrick and Fidelity, submitted by Defendants, in Defendants' favor.  (Aplt. App. 535, ECF No. 61 at 14.)  Such a conclusion flies in the face of longstanding precedent that when considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), "[a] court reviewing the

sufficiency of a complaint presumes all of Plaintiffs' factual allegations are true and construes them in the light most favorable to the Plaintiffs." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991) (international citations omitted).

For these reasons, the Court should vacate the District Court's dismissal.

## STANDARD OF REVIEW

The Court reviews *de novo* dismissals pursuant to FED. R. CIV. P. 12(b)(6). *Price v. Kansas*, 670 Fed.Appx. 660, 661 (10th Cir. 2016) (citing *Conkle v. Potter*, 352 F.3d 1333, 1335 (10th Cir. 2003)). "To withstand a motion to dismiss under Rule 12(b)(6), 'a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Southern Utah Wilderness Alliance v. United States Dept. of the Interior*, 2015 WL 4389580, at * 1 (D. Utah July 17, 2015). *See also Ramos et al. v. Banner Health, et al.*, 2017 WL 4337598, at *1 (D. Col. Sep. 29, 2017) ("The 12(b)(6) standard requires the Court to 'assume the truth of the Plaintiffs' well-pleaded factual allegations and view them in the light most favorable to the Plaintiffs.'") (quoting *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

In cases alleging imprudent fiduciary process, the vast majority of courts agree with the Eighth Circuit's ruling in *Braden v. Wal-Mart Stores, Inc.*, that a claim may survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably "infer from what is alleged that the process

was flawed." *Braden*, 588 F.3d at 596. The reason is simple. Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598.

Thus, in cases alleging imprudent fiduciary process, "[r]equiring a Plaintiffs to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party." *Sweda*, 923 F.3d at 326 (citing *Braden v. Wal-Mart Stores, Inc*, 588 F.3d 585, 597 (8th Cir. 2009)); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by Defendants and the other advanced by Plaintiffs, both of which are plausible, Plaintiffs' complaint survives a motion to dismiss under Rule 12(b)(6).") In sum, at the motion to dismiss stage, a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594; *see also Sweda,* 923 F.3d at 331.

The Supreme Court's recent decision in *Hughes v. Northwestern Univ.*, reinforces the above pleading standard. *Hughes* vacated a decision that was at odds with the Third and Eighth Circuit's decisions in *Sweda* and *Davis, et al. v. Washington U. See* Br. for the United States as Amicus Curiae at 17, *Hughes v.*

*Northwestern Univ.*, No. 19-1401 (May 25, 2021)[5] ("the decision below conflicts with decisions of the Third and Eighth Circuits, both of which have held that very similar complaints—alleging that Defendants offered retail-class investment shares instead of available institutional-class shares, and paid excessive recordkeeping fees in universities' Section 403(b) plans — stated claims for relief under ERISA.").[6]

Additionally, *Hughes* implores lower courts to apply the teachings of *Tibble v. Edison Int'l*, 575 U.S. 523, 529-530 (2015) where the Supreme Court "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'" *Hughes*, 142 S.Ct. at 741 (quoting *Tibble*, 575 U.S. at 530). This duty includes controlling plan costs. *See Aplt. App. 097,* AC, ¶ 3; Aplt. App. 571, SAC ¶ 3 (citing Uniform Prudent Investor Act, § 7). Lastly, the dicta in *Hughes* that lower courts must give consideration of "reasonable judgments a fiduciary may make" at best suggests the scope of "judgments" ought to be taken up at summary judgment.

---

[5]https://www.supremecourt.gov/DocketPDF/19/19-1401/180105/20210525160954238_19-1401%20Hughes%20-%20US%20invitation%20brief%20final.pdf

[6] While decided after the filing of the above cited authority, it should be noted that prior to the Supreme Court's decision in *Hughes*, the Second Circuit joined the Third and Eighth Circuit's precedent in *Sacerdote v. New York Univ.*, 9 F.4th 95 (2d Cir. 2021).

# ARGUMENT

## I.   The District Court Failed to Consider Changes in the Law When It Dismissed Plaintiffs' Amended Complaint

### A. *Hughes v. Northwestern University* Represents A Change in the Controlling Law

The District Court's Order relies on arguments rejected by *Hughes*. *Hughes* implored lower courts to apply the teachings of *Tibble v. Edison Int'l*, 575 U.S. 523, 529-530 (2015) where the Supreme Court "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'" *Hughes*, 142 S.Ct. at 741 (quoting *Tibble*, 575 U.S. at 530). Under trust law, cost-conscious management is fundamental to prudence in the investment function. (Aplt. App. 097, AC, ¶ 4; Aplt. App. 571, SAC ¶ 4.)

Among other things, the Supreme Court rejected the arguments of the respondents and held "[t]he Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents." *Id.* at 742. Relying on its earlier decision in *Tibble*, the Court concluded "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* at 742 (citing *Tibble*, 575 U.S. at 529-530). In other words,

it was error for the Seventh Circuit to determine because "respondents had provided an adequate array of choices, including 'the types of funds Plaintiffs wanted (low-cost index funds)'…these offerings 'eliminat[ed] any claim that plan participants were forced to stomach an unappetizing menu.'" *Id.* at 742 (citing *Divane v. Northwestern Univ.*, 953 F.3d 980, at 991 (7th Cir. 2020)). The Court reasoned, "[i]f fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.* The Seventh Circuit's decision was vacated and the case was remanded for further proceedings. *Id.*

In the April 21, 2022 Order, the District Court stated "[a]s discussed in more detail below, Plaintiffs focus on a handful of funds and a small window of time in the Class Period." (Order at 9.) Additionally, the District Court relied on pre-*Hughes* Seventh Circuit authority, such as *Hecker v. Deere & Co.,* 556 F.3d 575 (7th Cir. 2009) and *Loomis v. Exelon Corp.*, 658 F.3d 670 (7th Cir. 2011), in accepting Defendants' argument that "the Plan's recent offerings include a wide variety of investment options with expense ratios ranging from 0.06% to 1.07%" warranted dismissal. *See* Order at 12. Both of those cases were decided long before the Supreme Court considered the Seventh Circuit's erroneous ruling in *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020). *See, e.g., Hughes*, 142 S.Ct. 737. Defendants' "wide variety of investment options" is precisely the "diverse menu of options" argument advanced by the *Hughes* Defendants and

27

rejected by the Supreme Court: "The Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents." *Hughes v. Northwestern Univ.*, 142 S.Ct. at 742. Moreover, because under trust law, a fiduciary must continually monitor the appropriateness of an investment, it is immaterial if a complaint focuses on a "small window of time." (Order at 9.)

### B. The District Court Relied on Outdated Authority From A District Court Within the Ninth Circuit Yet Failed to Consider Two Recent Ninth Circuit Opinions

In both *Davis v. Salesforce.com*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) and *Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. Apr. 15, 2022), both of which were issued after the Supreme Court's ruling in *Hughes v. Northwestern University* and submissions of the parties' positions on *Hughes* (ECF 59 and 60), the Ninth Circuit reversed the district courts' dismissal of the respective complaints and remanded the cases. In both cases the Ninth Circuit followed the Supreme Court's teachings in *Tibble* regarding the relevance of trust law in evaluating breach of fiduciary duty cases. The Ninth Circuit concluded the Plaintiffs adequately alleged Defendants breached their fiduciary duties under ERISA when the Defendants subjected the plans and their participants to excessively expensive investment options when there were lower cost options with identical underlying assets available to the plans. The Ninth Circuit found that it was improper at the

motion to dismiss stage to resolve the issue of whether revenue sharing was appropriately utilized by Defendants    *Salesforce.com,* 2022 WL 1055557, at *1 ("Plaintiffs have stated a plausible claim that Defendants imprudently failed to select lower-cost share classes or collective investment trusts with substantially identical underlying assets."); *Trader Joe's*, 2022 WL 1125667, at *1 ("Taking the allegations as true, as we must at this stage of the litigation, Defendants Trader Joe's Company, its board of directors, and its executive committee failed to monitor and control the offering of a number of mutual funds in the form of "retail" share classes that carried higher fees than those charged by otherwise identical "institutional" share classes of the same investments.").   The Ninth Circuit rejected the Defendants' efforts to rely on revenue sharing in an attempt to justify the use of the more expensive funds finding, "Defendants' explanation for the more expensive choice is unavailable at the pleading stage."  *Trader Joe's*, 2022 WL 1125667, at *1; *Salesforce.com,* 2022 WL 1055557, at *1 ("That explanation is plausible, and Defendants may well be able to substantiate it at the summary judgment stage.").

More specifically, in *Salesforce.com*, Defendants made the same argument Defendants make here that adjusting for revenue sharing credit, the investment option's expense ratio was lower than that of the lowest share class.  (Order at 14.) As stated by the Ninth Circuit, "Defendants further argue that the R6 class did not

include revenue sharing, which explains why that class of shares had a lower expense ratio than the R5 class, and thus provides an obvious alternative explanation for why Defendants offered beneficiaries the R5 class rather than the R6 class." *Salesforce.com,* 2022 WL 1055557, at *1. The Ninth Circuit, however, noted the impropriety of accepting Defendants' explanations at the motion to dismiss stage. *Id.* Quite simply, here because Plaintiffs allege revenue sharing was used to pay for over-priced recordkeeping costs, the issue of the true cost of the Plan's expense ratios is one best left for summary judgment. *Salesforce.com* also upholds Plaintiffs' collective trust allegations, which were similar to the allegations in this case. *Id.* at * 2.

Further, the Ninth Circuit in *Trader Joe's* also upheld Plaintiffs' claims that the Defendants subjected the plan and its participants to unreasonably high recordkeeping and administrative expenses. *Trader Joe's*, 2022 WL 1125667, at *1. The Ninth Circuit concluded, "[t]aking all the allegations as true, Defendants did not act with the purpose of defraying reasonable administrative expenses." *Id.*

Additionally, in its April 21, 2022 Order, the District Court relied on a decision that is no longer good law. The Order relied on the *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020) decision in finding "nothing in ERISA requires a fiduciary to obtain competitive bids." (Order at 24.) The *Marks* decision was decided by the same judge on the same basis as *Kong v.*

*Trader Joe's Co.*, 2020 WL 7062395 (C.D. Cali. Nov. 30, 2020), which was an analogous ERISA breach of fiduciary duty matter concerning the same Trader Joe's retirement plan.  As noted above, the Plaintiffs in *Kong* appealed the district court's decision to the Ninth Circuit, which reversed the district court's decision and remanded the matter for further proceedings.  *Kong*, 2022 WL 1125667, at \*2.

## II.    The District Court Erred In Prohibiting Plaintiffs From Filing A Second Amended Complaint

Because the District Court dismissed the Complaint with prejudice, it deprived itself of jurisdiction to entertain a "lenient" FED.R.CIV.P. 15(a) motion for leave to amend the Complaint.  Accordingly, FED.R.CIV.P. 59(e) is the only mechanism to utilize to seek leave to amend the Complaint.  The Tenth Circuit has "repeatedly and unequivocally held that, '[o]nce judgment is entered, the filing of an amended complaint is not permissible until the judgment is set aside or vacated pursuant to FED.R.CIV.P. 59(e) or 60(b).'"  *Sky Harbor Air Service, Inc. v. Cheynne Airport Board*, 2010 WL 11507677, at \*2 (D. Wyo. Oct. 26, 2010) (quoting *The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1087 (10th Cir. 2005)).

Defendants' motion to dismiss – filed August 3, 2020 – was pending for over 1.5 years before the District Court reached its decision.  In that time, numerous courts – including the Supreme Court – considered the adequacy of pleadings in analogous ERISA cases and issued orders clarifying the pleadings

31

requirements for breach of fiduciary duty claims brought pursuant to ERISA. In short, this has been a rapidly and currently developing area of the law. Thus, as demonstrated in Plaintiffs' Proposed SAC (Aplt. App. 571, ECF No. 63-01), the Amended Complaint Plaintiffs filed back in July of 2020 is not the same amended complaint Plaintiffs would file now.

Given recent case law interpreting the Supreme Court's *Hughes* decision, amendment of the Complaint would not be futile with particular regard to the recordkeeping claim. *See Aplt. App. 523,* ECF 59 (citing numerous decisions post-*Hughes* upholding allegations similar to those pled by Plaintiffs). For the District Court's consideration, Plaintiffs attached to their Motion for Reconsideration a proposed amendment in redline indicating the proposed changes Plaintiffs wish to make. (Aplt. App. 571, ECF No. 63-01.) Plaintiffs asked the District Court to modify its final judgment dismissing the case with prejudice to permit Plaintiffs to file an amended complaint. The amended complaint adds more allegations regarding Defendants' breaches related to lack of adequate monitoring of investment funds and recordkeeping benchmarks, among other things. Plaintiffs also drop the breach of the duty of loyalty claim in the amended complaint.

### III. Plaintiffs Plausibly Alleged Defendants Implemented A Flawed Process For Selecting The Plan's Investment Options and Thus Breached Their Fiduciary Duties Under ERISA

The District Court committed reversible error by holding Plaintiffs failed to plausibly allege Defendants breached ERISA's duty of prudence and should therefore be reversed to allow this litigation to proceed.  As an initial matter, courts recognize that direct evidence of an imprudent process "tend[s] systematically to be in the sole possession of Defendants," prior to discovery.  *Braden*, 588 F.3d at 598.  Moreover, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote*, 9 F.4th at 111 (emphasis in original).  Prior to filing suit, Plaintiffs requested from Defendants the bare minimum for determining a prudent process, *i.e.* meeting minutes, and were rejected.  (Aplt. App. 097, AC ¶¶ 22-25; Aplt. App. 63, SAC ¶¶ 62-65.)  *See Coviello et al. v. BHA Management, Inc. et al.,* No. 3:20-cv-30198 (ECF No. 77) (D. Mass. June 9, 2022) (finding it inappropriate on a motion to dismiss to criticize the complaint's purported lack of factual specificity where Plaintiffs allege they unsuccessfully sought from Defendants Plan-related documents under ERISA Section 104(b)(4) prior to filing suit.").

## A. Defendants Breached Their Duty By Maintaining Higher Cost Mutual Fund Shares When Identical Lower Cost Shares Were Available

Plaintiffs' primary claim is that throughout the putative Class Period, Defendants selected a slate of investment options for the Plan that were imprudent due to their high fees where *identical* alternative funds – differing only in price – were available in the marketplace.   Like the Plaintiffs here, the *Hughes v. Northwestern Univ.*, 2022 WL 199351 (Jan. 24, 2022) Plaintiffs alleged: "respondents allegedly offered a number of mutual funds and annuities in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments." *Hughes*, 2022 WL 199351, at *3.  As noted above, the Seventh Circuit's decision was vacated and the case was remanded for further proceedings.   Here, Plaintiffs' lowest cost share class allegations are analogous to the Plaintiffs' allegations in *Hughes.   See* Am. Cmplt. At Appt. App. 097, ¶¶71-108; Aplt. App. 571SAC ¶¶ 75-86.

In dismissing the Amended Complaint, the District Court improperly took Defendants at their word "that Plaintiffs' comparison of share classes relies on incorrect information about actual fees paid by the Plan participants" as "[t]aking into account the 15-basis-point revenue credit that Defendants negotiated for the JPMorgan funds' R5 share class, the Plan's expense ratio for each JPMorgan R5 fund was actually less than the R6 funds' expense ratios upon which Plaintiffs

rely." (Aplt. App. 535, ECF No. 61 at 14). Whether Defendants dispute how the fees and costs are calculated only stresses the fact there are disputes of fact in this action that cannot be resolved at this stage. *Sweda*, 923 F.3d at 329. "[T]he question is not 'whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make', but whether this revenue sharing arrangement was reasonable under all the circumstances." *Troudt v. Oracle Corp.*, 2017 WL 1100876, at * 2 (D. Col. Mar. 22, 2017). But that "determination must account for all the factors which informed the fiduciaries' decision-making, not all of which are presently known to Plaintiffs…." *Id.* at *2. Nonetheless, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Tibble*, 2017 WL 3523737, at * 11. In *Disselkamp v. Norton Healthcare, Inc.*, Defendants argued for dismissal of Plaintiffs' claim "because Defendants applied the higher fees collected from the retail class funds to pay administrative fees through revenue-sharing." *Disselkamp v. Norton Healthcare, Inc.*, 2019 WL 3536038, at * 5 (W.D. Ky. Aug. 2, 2019). The court rejected this argument because it was "not suited for a decision on a motion to dismiss." *Id.* It also noted that "while the revenue-sharing argument may eventually mitigate liability and damages, it still remains to be seen whether Defendants prudently investigated the higher share class investments before subjecting Plan participants to those higher fees." *Id.*; *see also Cassell*, 285 F.Supp.3d at 1067 ("the

appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss.")

The first courts to apply *Hughes* have similarly found in favor of the Plaintiffs.  In *Goodman et al. v. Columbus Regional Healthcare System, Inc.*, 2022 WL 228764 (M.D. Ga. Jan. 25, 2022), the plaintiffs alleged, defendants "offered mutual funds in the form of retail share classes even though it could have obtained otherwise identical institutional share classes of the same investments with significantly lower fees."  *Goodman*, 2022 WL 228764, at *2.  Applying *Hughes*, the court found "[t]he Supreme Court has suggested that a defined contribution plan participant may state a claim for breach of ERISA's duty of prudence by alleging that the plan fiduciary offered higher priced retail-class mutual funds instead of available identical lower priced institutional-class funds."  *Id.* at *2 (citing *Hughes*, 2022 WL 199351, at *3).  The court in *Shaw* similarly dismissed Defendants' motion to dismiss in light of the *Hughes* decision.  *Shaw v. Quad/Graphics, Inc.*, 2022 WL 227502, at *1 (E.D. Wis. Jan. 26, 2022) denying Defendants' motion to dismiss without prejudice in light of the *Hughes* decision); *see also Bangalore v. Froedtert Health, Inc.*, 2022 WL 227236, at *1 (E.D. Wis. Jan. 26, 2022) (same).

Like the plaintiffs in *Kruger, et al. v. Novant Health, Inc.*, "Plaintiffs are not arguing that Defendants had a duty to scour the market to find and offer any

36

cheaper investment. Instead, Plaintiffs allege that 'lower cost funds with the identical managers, investments styles, and stocks' should have been considered by the Plan." 131 F.Supp.3d 470, 476 (M.D.N.C. 2015); *see also Reetz v. Lowe's Companies, Inc.*, 2019 WL 4233616, at * 6 (W.D.N.C Sept. 6, 2019) ("While Lowe's is correct that "no authority requires the fiduciary to pick the best performing fund," *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018), that is not the allegation made here."). Indeed, when it comes to the Plan funds being in the wrong share class, there was no need to scour the market because the cheapest funds were right under the fiduciaries' noses.

In fact, during the Class Period, cheaper share classes were already available for the Plan's own mutual funds. (Aplt. App. 097, AC ¶ 83; Aplt. App. 571, SAC ¶ 80). All Defendants had to do was "immediately identif[y] the prudence of transferring the Plan's funds into these alternative investments." (Aplt. App. 097, AC ¶ 84; Aplt. App. 571, SAC ¶ 81). Most "[c]ourts examining this issue have concluded that investment in a retail class fund where an identical institutional class fund with lower fees is available can violate the duty of prudence." *Disselkamp,* 2019 WL 3536038, at *4. "Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16,

2017) ("*Tibble VI*"); *See also Fujitsu*, 250 F. Supp.3d at 466-67 (holding that plaintiffs' allegations regarding share classes supported a claim for breach of fiduciary duty).[7]

### B. ERISA Required Defendants to Offer Collective Investment Trusts (CITs) Under the Prevailing Circumstances

One of the alternative allegations alleged in the AC is that setting aside the lower-share class allegations, Defendants could have switched to JPMorgan CITs, or, alternatively, Fidelity CITs, during the Class Period.  As alleged, the JPMorgan (available beginning July 22, 2016) and Fidelity target date CITs were available during the Class Period, had a lower net expense ratio than the mutual funds. (Applt. App. 097, AC, ¶¶ 95-96; Applt. App. 571, SAC ¶¶ 92-93.)  The District Court rejected Plaintiffs' allegations with respect to Defendants' failure to investigate the JPMorgan and Fidelity CITs as lower cost alternatives to the JPMorgan SmartRetirement target date funds in the Plan and again improperly

---

[7] *See also Pinnell*, 2020 WL 1531870, at * 5 (noting Plaintiffs plead "a table listing at least twelve investment options for which the Plan fiduciaries could have switched to lower-fee share classes, in addition to numerous other comparisons."); *Nicolas v. Trustees of Princeton Univ.*, 2017 WL 4455897, *4 (D.N.J. Sept. 25, 2017) (court found analyzing similar allegations, including that Defendants failed "to use significant bargaining power to negotiate lower fees," that "[a]ccepting as true the facts alleged in the Complaint and giving Plaintiffs every favorable inference therefrom, Plaintiffs' Complaint states a claim for relief."); *Brotherston v. Putnam Investments LLC*, 2016 WL 1397427, at *1 (D. Mass. April 7, 2016) (same); *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) (same); *Moreno v. Deutsche Bank*, 2016 WL 5957307,  at * 2 (S.D.N.Y. Oct. 13, 2016) (same).  *See also* n. 3 and 4 *supra* listing decisions that have upheld similar allegations.

accepted Defendants' argument that the expense ratio between the JPMorgan mutual funds is actually lower than the JPMorgan and Fidelity CITs because the Plan received the 15-basis-point revenue credit. (Aplt. App. 535, ECF No. 61 at *14-15). But the District Court's findings as to the validity of Defendants' affirmative defenses effectively – and improperly – converted the motion to dismiss into a motion for summary judgment. Whether the 15-basis-point revenue credit did in fact "correct[] the expense ratios" (ECF No. 61 at 15) is a finding of fact more appropriately considered at summary judgment.

Further, the District Court's conclusion that "CITs are not comparable investments" is a factual issue improperly considered at the motion to dismiss. (ECF No. 61 at 15.) *See Salesforce*, 2022 WL 1055557, at *2 ("Whether the different regulatory regimes governing mutual funds and collective investment trusts justified Defendants' delay in making the switch earlier is itself a factual issue that cannot be resolved at the pleading stage."). As recognized by *Sweda*, "[u]nder § 1104(a), fiduciaries are held to the prudent man standard of care, which is drawn from trust law." *Sweda*, 923 F.3d 320 at 328 (citing *Tibble IV*, 135 S. Ct. at 1828-29). The Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp. v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states, however, that to determine whether a fiduciary has selected appropriate

funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds…"  Restatement (Third) of Trusts § 100 cmt. b(1).  The important concept to remember is that "[f]iduciaries must ... consider a plan's 'power ... to obtain favorable investment products, ***particularly when those products are substantially identical—other than their lower cost***—to products the trustee has already selected."  *Sweda*, 923 F.3d at 329 (citing *Tibble V*, 843 F.3d at 1198)).  Clearly, CITs are favorable investment products – as numerous courts have found - that should have been considered by Defendants during the Class Period when the JPMorgan CITs were available.  *See Tracey*, 2017 WL 4453541, at * 11 (upholding claim that Defendants failed to use "separate accounts, or collective trusts"); *In re M&T Bank Corp. ERISA Litig*., 2018 WL 4334807, at * 9 (WDNY Sept. 11, 2018) (upholding claim that fiduciaries failed to switch to a materially similar collective trust).  Defendants' failure to consider "favorable investment products" is egregious.  *See Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at * 10 (S.D.N.Y. July 9, 2020) (noting several courts have upheld similar claims at the motion to dismiss stage); *Pinnell,* 2020 WL 1531870, at * 6 (upholding claim that Defendants failed to consider CITs); *Tracey v. MIT*, 2017 WL 4453541, at * 11 (D. Mass. Aug. 31, 2017) (same); *In re M&T Bank Corp. ERISA Litig*., 2018 WL 4334807, at * 9 (WDNY Sept. 11, 2018) (same).

## C. ERISA Required Defendants to Investigate the Prudence of Offering Passively Managed Investments as an Alternative to Actively-Managed Counterparts

The District Court disregarded Plaintiffs' other alternative allegations that Defendants failed to adequately consider lower cost, better performing passively-managed and actively-managed funds. (Aplt. App. 097, AC, ¶¶ 100-108; Aplt. App. 571, SAC ¶¶ 97-104) finding, "Plaintiffs choose for comparison, some of the funds have different investment strategies […] This belies Plaintiffs' characterization of the funds as sufficiently similar." (Aplt. App. 535, ECF No. 61 at *18.)[8] This was in error.

The court in *Schapker v. Wadell & Reed Financial, Inc., et al*. 2018 WL 1033277 (D. Kan. Feb. 22, 2018) stated that "[a]lthough Defendants take issue with Plaintiffs' inclusion of some index funds in her list of comparable funds, the Court is not persuaded that this fact alone makes Plaintiffs' claim implausible." 2018 WL 1033277, at * 8. Further, the court held "the question whether the funds Plaintiffs presents are comparable is a question of fact that the Court will not resolve in the context of ruling on a motion to dismiss." *Id.*

Similarly, in *Nicolas*, the court remarked that "Defendants raises factual questions about whether the alternative funds Plaintiffs suggests ... are apt

---

[8] The District Court again notes that "[a]pplying the 15-basis-point revenue credit, the expense ratios are less than Plaintiffs represent, albeit higher than the funds Plaintiffs select for comparison." (ECF 61 at 18.) as addressed "supra Section III.B.", this constitutes a finding of fact improper at the motion to dismiss stage.

comparisons—and, therefore, whether the underperformance Plaintiffs depicts is an accurate portrait ... Such questions do not warrant dismissal—to the contrary, they suggest the need for further information from both parties." 2017 WL 4455897, at * 5; *Cryer v. Franklin Templeton Resources Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (same); *see also Main v. Am. Airlines, Inc.*, 248 F.Supp.3d 786, 794 (N.D. Tex. 2017) (upholding similar allegations); *Pinnell*, 2020 WL 1531870, at * 1 (upholding similar allegations); *Huang v. TriNet*, 2022 WL 93571 at * 8 (M.D. Fla. Jan. 10, 2022).

The comparator funds were not exclusively passively managed but a blend of passive and active funds. (Aplt. App. 097, AC, ¶ 104; Aplt. App. 571, SAC ¶ 101.) These comparator funds cost from 32% to 1,660% less than the Plan's funds. (Aplt. App. 097, AC, ¶ 104; Aplt. App. 571, SAC ¶ 101.) *See Feinberg v. T. Rowe Group, Inc.*, 2018 WL 3970470, at *5 (D. Md. Aug. 20, 2018) (upholding allegations "of comparable funds showing that the Plan's funds' expense ratios ranged from 16% to 2,500% higher than the comparable funds."). Plaintiffss also allege the alternative funds outperformed the Plan's funds in their 3- and 5-year average returns compared to the same benchmark. (Aplt. App. 097, AC, ¶¶ 103, 106; Aplt. App. 571, SAC ¶¶ 100, 102.)

Although the District Court relied on *Meiners*, 898 F.3d at 823 in making a blanket statement that "[t]he fact that 'cheaper alternative investments with *some*

similarities exist in the marketplace' does not provide a 'meaningful benchmark' upon which to determine whether the Committee breached its duty" (ECF No. 61 at 19) it fails to recognize that here Plaintiffs are comparing "materially similar but cheaper alternatives to the Plan's investment options."   (Aplt. App, 097, AC, ¶ 103; Aplt. App. 571, SAC ¶ 100.)   Several recent decisions have upheld similar allegations that offering an actively managed suite of target date funds over a suite of passively managed target date funds stated a claim for breach of fiduciary duty. *See In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6-7 (C.D. Cal. July 16, 2021)*; In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), at *28 (S.D.N.Y. Aug. 2, 2021); *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021)*; In re Quest Diagnostics, Inc. ERISA Litig.*, 2021 WL 1783274, at *3 (D.N.J. May 4, 2021)*; In re MedStar ERISA Litig.*, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021)*; Blackmon, et al v. Zachry Holdings, Inc.*, No. 5:20-cv-988-DAE (ECF No. 33), at *14 (W.D. Tex. April 22, 2021)*; Jones v. Coca-Cola. Consolidated, Inc.*, 2021 WL 1226551, at *4-5 (W.D.N.C. Mar. 31, 2021).   The point is that given the availability of other less costly passively-managed investments not selected by Defendants, they failed in their fiduciary duties to consider "a plan's 'power ... to obtain favorable investment products." *Sweda*, 923 F.3d at 329; *see also Pinnell,* 2020 WL 1531870, at * 6 (upholding materially similar allegations).

43

As noted *supra*, ERISA is derived from trust law, under which a fiduciary may compare a trust's investments to "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)" to determine whether the trust's investments are appropriate.  (Aplt. App. 097, AC, ¶ 91; Aplt. App. 571, SAC ¶ 88) (citing Restatement (Third) of Trusts § 100 cmt. b(1); *see also Brotherston et al. v. Putnam Investments,* LLC, 907 F.3d 17 (1st Cir. 2018), *writ of certiorari denied* 2020 WL 129535 (2020) (reasoning actively managed funds and passively managed funds are "**comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so**.") (citing the Restatement (Third) of Trusts, § 100 cmt) (emphasis added). *see also Marshall v. Northrop Grumman Corp.*, No. 16-6794, 2019 WL 4058583, at \*10 (C.D. Cal. Aug. 14, 2019) (the court determined the question of whether Defendants breached fiduciary duty by "fail[ing] to adequately weigh the costs and benefits of an active management strategy against a passive management strategy" was a question for the "trier of fact.").[9]

The District Court failed to consider the entirety of Plaintiffs' allegations with respect to the performance of actively managed funds in comparison to the

---

[9] In *Evonik*, an analogous ERISA matter, the court recognized the circuit split among whether allegations related to the maintenance of actively managed funds are sufficient to state a claim standing alone, but "decline[d] to parse the Complaint to assess whether each individual allegations plausibly suggests a breach of the Investment Committee's duty to prudently select investments." *Evonik,* No. 20-2202, slip op. at \*7-8 (citing *Sweda*, 923 F,3d at 331).

alternative lower cost passively and actively managed funds. (Aplt. App. 097, AC, ¶¶ 103, 106; Aplt. App. 571, SAC ¶¶ 100, 102.) In fact, the District Court brushed over Plaintiffs' performance comparisons suggesting, "Plaintiffs talk in generalities, comparing fund categories […] to corresponding market indexes." (Aplt. App. 535, ECF No. 61, at *17.) Yet, the District Court ignored the Supreme Court's finding that fiduciaries must continually monitor investments. *Tibble IV*, 135 S. Ct. at 1828. Industry experts and courts agree that five-year trailing performance comparisons should be used for benchmarking purposes because they encompass a period closer to a full market cycle. *See, e.g., Assembling a Robust Investment Policy Statement for Endowments and Foundations*, THE PNC FINANCIAL SERVICES GROUP INC., Jan. 8, 2020 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-five year period)"); *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (advisor satisfied fiduciary duty where it regularly presented "three and five-year benchmarks" of investment options). The thrust of these allegations is that Defendants failed to investigate whether the Plan's JPMorgan actively managed funds could be replaced with comparable passively and actively managed funds, given the lower fees of the latter funds and their better long-term prospects than

actively managed funds (Aplt. App. 097, AC, ¶¶ 100-108; Aplt. App. 571, SAC ¶¶ 97-104.)  *See Marshall*, 2019 WL 4058583, at * 10.  *See also Pinnell*, 2020 WL 1531870, at *6 (upholding materially similar allegations).

### D. The Fee and Performance Benchmarks for the Plan's Funds Are Plausibly Alleged

### i.    The ICI Chart is a Useful Measurement

The District Court questioned the usefulness of the Amended Complaint's utilization of median and average fee comparisons.  (Aplt. App. 535, ECF No. 61 at 11-12.)  Yet, the median and average cost comparisons charts highlight a glaring failure in the Plans' fiduciaries' investment selection and monitoring process.  The fact that some of the Plans' funds had expense ratios that exceeded comparable funds by as much as 167% in some instances, (Aplt. App. 097, AC ¶ 76; Aplt. App. 571, SAC ¶ 72), plausibly demonstrates imprudent conduct.  Had the Plan's fiduciaries faithfully executed their fiduciary duties, the expectation would be the expense ratios for the majority of the Plan's funds would be at or below the median and average prices similarly situated plans paid.  Instead, the opposite was true.  And the fact that the ICI uses composite fee data is insufficient to account for the significant discrepancy between the Plan's fund fees and the median and average fund fees.

Several courts have upheld claims based in part on the chart.  *See TriNet*, 2022 WL 93571, at *1, 5-8 (upholding prudence claim when plaintiffs alleged "the

expense ratios for many funds in the Plans greatly excessed the ICI Median"); *Silva v. Evonik Corp.,* 2020 U.S. Dist. LEXIS 250206, at *13 (D.N.J. Dec. 30, 2020) ("Plaintiffs allege that most of the investment options in the Plan charged higher-than-average fees, with reference to median fees published by the Investment Company Institute and the fees of alleged comparators."); *Pinnell v. Teva Pharmaceuticals USA, Inc.*, 2020 WL 1531870 at * 5 (E.D. Pa. Mar. 31, 2020) ("[Plaintiffs] included three tables comparing investment options offered by the Plan to similar or identical lower-fee alternatives and comparing expense ratios to median fees in the same category); *Bouvy v. Analog Devices, Inc.,* 2020 WL 3448385, at * 2 (S.D. Cal. June 24, 2020) ("the Plan's investment expenses were higher than industry averages: at least 18 of the 20 mutual funds offered in 2016 had above-average expenses."); *see generally McCool v. AHS Mgmt. Company, Inc.*, 2021 WL 826756 (M.D. Tenn. Mar. 4, 2020) (upholding allegations based on ICI median charts); *Davis v. Magna Int'l. of Am., Inc.*, 2021 WL 1212579, at *7 (E.D. Mich. Mar. 31, 2021) (court rejected defendants' challenges of the ICI study finding "[t]o the extent that Defendants argue the merits of Plaintiffs' comparisons, such arguments are premature in a motion to dismiss").

    In *Meiners*, relied on by the District Court, the investment management claim was the sole claim, whereas here it is a complementary claim. Moreover, the district court's observations in that case are supportive of Plaintiffs' claims here.

The district court in *Meiners v. Wells Fargo & Co.*, 2017 WL 2303968 (D. Minn. May 25, 2017) recognized the variety of benchmarks that could be satisfactory:

> Meiners must plead something more to make his excessive fees claim plausible. *See Wildman v. Am. Century Servs., LLC*, No. 4:16–737, 2017 WL 839795, at *4 (W.D. Mo. Feb. 27, 2017) (alleging that fees were excessive as compared to the average cost of similar sized plans); *Krueger*, 2012 WL 5873825, at *3 (alleging that fees were higher than the median fees for comparable funds as reported by two investment agencies).

*Id.* at * 3.  Plaintiffs have pled these same benchmarks identified by the district court (*e.g.* comparison to average and median costs of similar-sized plans).

## IV.    Defendants Breached Their Fiduciary Duties In Failing To Monitor the Plan's Recordkeeping Fees

### A. The Proposed Second Amended Complaint Demonstrates The Plan's Recordkeeping Fees Were Excessive Based On Market Comparisons of Similarly Sized Plans

The District Court rejected Plaintiffs' comparisons of the Plan's recordkeeping fees to the *401(k) Averages Book* as "[t]hose studies focus on fees charged to plans with less than $200 million in assets." (ECF No. 61 at 21).  But this misconstrues Plaintiffs' references to the *401(k) Averages Book*.  The Plan had over $600 million in assets, ***three times the size*** of the largest plans studied in the *401(k) Averages Book.*  (Aplt. App. 097, AC ¶ 122.)  In order to make an apples-to-apples comparison, Plaintiffs looked at what other plans pay in direct recordkeeping/administration compensation.  As alleged in the Complaint, for

plans with 2,000 participants and $200 million in assets, the **average** recordkeeping/administration fee (through direct compensation) was $5 per participant. *Id.* This is significant because recordkeeping costs drop as a plan increases in size. So for example, a plan with 200 participants and $20m in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. (*Id.*) The fact that the Plan had direct compensation recordkeeping costs of $68 per participant annually and $53 per participant annually, which was far higher than the $5 average for plans a third of the size of the Plan is egregious. *Intravaia, et al., v. National Rural Electric Cooperative Assoc.*, 2020 WL 58276, at * 3 (E.D.Va. Jan. 2, 2020) (upholding claim where Plaintiffss "also allege that a similarly situated comparator incurs approximately 25% the administrative expenses, per participant, of the Plan here. This comparative fact nudges the claim over the line from merely possible to plausible.").

Further, the Proposed SAC includes an even more robust comparisons of the Plan's per participant recordkeeping fees with the per participant recordkeeping fees of comparably sized Plans in the market – including two comparably sized Plans that had Fidelity as the recordkeeper. (Aplt. App. 571, SAC ¶ 128.) The Eighth Circuit has said there is "no one-size-fits-all approach" when it comes to picking benchmarks. *Davis, et al. v. Washington Univ.*, 960 F.3d 478, 484 (8th

49

Cir. 2020).

All of the comparator plans were about the same size as the Plan or smaller in terms of the number of participants. (Aplt. App. 571, SAC ¶¶ 127-128.) The significance is that "[t]he cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee." (Aplt. App. 571, SAC ¶ 115.) The fact that some of Plaintiffs' comparator plans utilized different recordkeepers than Fidelity is of no moment, as Plaintiffs allege "[a]ll national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans." (Aplt. App. 571, SAC ¶ 112.) *See Johnson et al. v. The PNC Financial Services Group, Inc. et al.*, No. 2:20-CV-01493, slip op. at 12 ("when applying the holistic review of the Amended Complaint and comparing the allegations to those made in *Sweda* and *Nicholas*, it is reasonable to infer that the alleged fiduciary process was flawed or that the fiduciaries acted imprudently.").

### B. Defendants Failed to Stay Informed About Overall Trends In the Marketplace Regarding Recordkeeping Fees

The District Court determined that a regular RFP process was not necessary as "there is no question that Defendants regularly re-negotiated their fee arrangement with Fidelity" and "Plaintiffs essentially speculate that an RFP process would result in even lower fees." (Aplt. App. 535, ECF 61 at 24.) But this

misunderstands the need for an RFP process. It was critically important for the Plan's fiduciaries to both conduct RFPs in this case and leverage the Plan's asset size and total number of participants to bargain for reasonable per participant recordkeeping and administrative costs beginning at the start of the Class Period. (Aplt. App. 097, AC ¶ 116; Aplt. App. 571, SAC ¶ 121.) **Specifically, this would have allowed the Plan's participants to determine whether they were obtaining the best rates from Fidelity**. Thus, Plaintiffs do not suggest there was any guarantee that an RFP process would have resulted in lower fees than those negotiated with Fidelity. Rather, Plaintiffs claim that a prudent fiduciary would have conducted an RFP at reasonable intervals "to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other services providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level of service." (Aplt. App. 571, SAC ¶ 122); *Bell v. Pension Comm. of ATH Holding Company, LLC*, 2017 WL 1091248 at * 5 (S.D. Ind. March 23, 2017) (finding "that Plaintiffs were not required to allege that the recordkeeping fees were the result of any type of self-dealing, but were required to assert only that Defendants failed to act with prudence under § 1104 when failing to solicit bids and to monitor and control recordkeeping fees."); *Short v. Brown U.*, 320 F.Supp.3d 363, 370 (D.R.I. July 11, 2018) ("Plaintiffs' claim that a prudent fiduciary in like circumstances would have

solicited competitive bids plausibly alleges a breach of the duty of prudence.");

*Ramos v. Banner Health*, 2017 WL 4337598, at * 3 (D. Colo. Sept. 29, 2017)

(upholding claims Defendants "failed to engage in a competitive bidding process in

retaining Fidelity as the Plan's recordkeeper."); *George v. Kraft Foods Glob., Inc*.,

641 F.3d 786, 799-800 (7th Cir. 2011) (finding plausible Plaintiffs' argument that

"Defendants' failure to solicit bids caused them to overpay Hewitt by at least $16

per participant per year."). Defendants' re-negotiations with Fidelity does not

excuse their imprudence in failing to conduct regular RFPs.

Defendants take issue with Plaintiffs' allegations but do not deny that the

Plan's fiduciaries failed to undertake an RFP for recordkeeping and administrative

services. (Defs. Mem. at 22.) Accordingly, under all circumstances Plaintiffs have

adequately alleged Defendants failed to undertake an RFP.

### C. The Reasonableness of Defendants' Purported Fee Negotiations With Fidelity Is A Finding of Fact Inappropriate for Consideration at the Pleading Stage

The District Court improperly considered a number of extraneous documents

submitted by Defendants, as well as Defendants' word at face value, in its

conclusions that "Plaintiffs have not created a reasonable inference that the

Committee violated the duty of prudence through its fee arrangement with

Fidelity" because "Defendants did manage, and reduce, Fidelity's fees over the

years." (Aplt. App. 535, ECF No. 61 at 23-24.) But this improperly presumes

prudence on the part of the Defendants because they obtained reductions in the recordkeeping fees over the years.  Just as Plaintiffs cannot claim Defendants acted imprudently solely because the recordkeeping fees were high, there is no presumption of prudence on the part of Defendants just because the recordkeeping fees were reduced over the years.   The question is whether Defendants implemented and followed a prudent process in monitoring the Plan's recordkeeping fees.  *See Garcia, et al. v. Alticor, Inc., et al.*, No. 1:20-cv-1078 (ECF No. 47), at *5-6 (W.D. Mich. Aug. 23, 2022) (emphasis in original) (distinguishing between inadequate claim based merely on the fact "that 'the plan's recordkeeping … fees were excessive'" from a viable claim alleging "that Defendants *failed to adequately monitor* the recordkeeping fees.").  Thus, the mere fact that Defendants may or may not have obtained lower fees does not mean that the fees were reasonable.

"Many allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance."  *Sweda*, 923 F.3d at 329; *see also Kendall*, 2021 WL 1231415, at *11 (upholding allegations plan fiduciaries overpaid for recordkeeping); *Magna*, 2021 WL 1212579, at *11 (same); *McCool*, 2021 WL 826756, at *5 (same); *Parmer v. Land O'Lakes, Inc.,* 518 F.Supp.3d 1293, 1307 (D. Minn. 2021)  (same); *Miller v. AutoZone, Inc.*, 2020 WL

6479564, at * 10 (W.D. Tenn. Sept. 18, 2020) ("the Court recognizes the need to conduct discovery on this [recordkeeping] issue…."). When considering Plaintiffs' allegations of excessive recordkeeping fees, the Court should apply "a fair reading of the entire Complaint." *Rohan v. Saint Luke's Health Sys., Inc.*, 2020 WL 8410451, at *6 (W.D. Mo. June 22, 2020).

### V. The Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor

The District Court did not address the merits of Plaintiffs' monitoring claim because it found it derivative of the underlying prudence and loyalty claims. (Order at 3.) Plaintiffs' Complaint contains similar factual allegations against the Monitoring Defendants that have been upheld in analogous cases. (Aplt. App. 097, AC ¶¶ 136-141; Aplt. App. 571, SAC ¶¶ 140-145.) *See also Fujitsu*, 250 F.Supp.3d at 465-66 (upholding failure to monitor claims).

## CONCLUSION

For the forgoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the District Court's decision granting Defendants-Appellees' motion to dismiss and remand this case to the District Court for further proceedings on the merits.

## ORAL ARGUMENT STATEMENT

Oral argument is requested given the importance of the issues as it relates to protecting retirement assets of millions of employees nationwide.

## CERTIFICATE OF COMPLIANCE WITH
## <u>FEDERAL RULE OF APPELLATE PROCEDURE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7), because this brief contains 12,894 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. Local Rule 32(b). I relied on my word processor to obtain the count and it is Microsoft Office Word 2013.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Times New Roman, 14 point font.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By: *<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that a copy of the foregoing **APPELLANTS' BRIEF**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with Microsoft Office 2013, and, according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

By: *<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of August, 2022, a copy of this APPELLANTS' APPENDIX, VOLUME I, was served via the ECF system which will send notification of such filing to all parties of record as follows:

Alexander W. Resar
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Kaitlin P. Sheehan
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Sanford Ian Weisburst
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Stephen Q. Wood
**QUINN EMANUEL URQUHART & SULLIVAN**
2755 East Cottonwood Parkway, Suite 430
Salt Lake City, UT 84121

I hereby certify that within five (5) days after notification of acceptance from the Court, one (1) copy of the foregoing **APPELLANTS' APPENDIX, VOLUME I**, will be delivered by Federal Express to the Clerk of the Court, U.S. Tenth Circuit Court of Appeals.

By:    */s/ Mark K. Gyandoh*
Mark K. Gyandoh

## ADDENDUM INDEX

1.      Judgment in a Civil Case, dated 4/22/22, Dkt. 62

2.      Order and Memorandum Decision, dated 4/21/22, Dkt. 61

ADDENDUM 1

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

## District of Utah

COLE MATNEY and PAUL WATTS,
individually and on behalf of all others
similarly situated,

             Plaintiffs,

       v.

BARRICK GOLD OF NORTH AMERICA,
INC.; BOARD OF DIRECTORS OF
BARRICK GOLD OF NORTH AMERICA,
INC.; and BARRICK U.S. SUBSIDIARIES
BENEFITS COMMITTEE,

           Defendants.

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:20-cv-275-TC-CMR

     IT IS ORDERED AND ADJUDGED that judgment is entered in favor of the Defendants and
the case is dismissed with prejudice.

April 21, 2022
_____
*Date*

BY THE COURT:

_____
Tena Campbell
United States District Court Judge

ADDENDUM 2

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br><br>Plaintiffs,<br><br>vs.<br><br><br>BARRICK GOLD OF NORTH AMERICA, INC.; BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC.; BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE; and JOHN DOES 1-30,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br><br>Case No. 2:20-cv-275-TC-CMR |

Plaintiffs Cole Matney and Paul Watts are participants in the retirement plan (the Plan) that Defendant Barrick Gold of North America, Inc. (Barrick) offers its employees.  They bring this putative class action under sections 409 and 502 of ERISA[1] (29 U.S.C. §§ 1109 and 1132), against the Plan's fiduciaries, which include Barrick, Barrick's Board of Directors and its members (the Board), and Barrick U.S. Subsidiaries Benefits Committee and its members (the Committee) (collectively, the Defendants).

In the Amended Complaint, Mr. Matney and Mr. Watts allege that Defendants breached

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

1

the duties that ERISA imposes on fiduciaries of employee retirement plans.[2]  Defendants move

to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim

upon which relief can be granted.  For the reasons set forth below, the court GRANTS the

motion.

**<u>Plaintiffs' Claims</u>**

Plaintiffs bring two causes of action.  First they assert breach of the dual fiduciary duties

of loyalty and prudence against the Committee.  In their second cause of action, Plaintiffs

contend that Barrick and the Board failed to monitor and correct the Committee's violation of its

fiduciary duties.  (By definition, this claim is derivative of the fiduciary duty claim.)

In the breach of fiduciary duty claim, Plaintiffs focus primarily on the costs of their

investment options and administrative recordkeeping fees.  They initially complain about the

amount of management fees charged by the investment funds the Committee chose for the Plan.

According to Plaintiffs, the Committee breached its duties by

> (1) failing to objectively and adequately review the Plan's investment portfolio
> with due care to ensure that each investment option was prudent, in terms of cost;
> and (2) maintaining certain funds in the Plan despite the availability of identical
> or similar investment options with lower costs and/or better performance
> histories.

(Am. Compl. ¶ 12, ECF No. 21.)

Plaintiffs also challenge recordkeeping expenses that Plan participants paid out of their

retirement accounts to Fidelity Management Trust Company (Fidelity), the investment trustee

providing recordkeeping services to the Plan.  Plaintiffs say the Committee failed to create "a

---

[2] After Plaintiffs filed their original complaint, Defendants moved to dismiss.  Plaintiffs then
amended their complaint to correct deficiencies Defendants identified in the first motion to
dismiss.

prudent payment arrangement" with Fidelity, which led to payment of fees higher than necessary given the Plan's sizable assets.  (Id. ¶ 69.)

Defendants challenge Plaintiffs' fiduciary duty claim, arguing that inaccurate and misleading allegations and unsupported inferences fail to state a plausible claim for relief. Defendants further maintain that because Plaintiffs have not alleged a breach of the duties of prudence and loyalty, their derivative monitoring claim necessarily fails.

In response, Plaintiffs say the Amended Complaint contains sufficient circumstantial factual allegations from which the court may reasonably infer that Defendants' decisionmaking processes wasted the Plan's and participants' assets because of unnecessary costs.  They also point out that much of the relevant information is solely in Defendants' possession[3] and that analysis of a fiduciary's decisionmaking process is a fact intensive endeavor better suited for summary judgment.

As explained below, the court finds that Plaintiffs' allegations, supplemented by materials appropriately cited by Defendants, do not state a plausible claim for breach of the duty of prudence or the duty of loyalty.  Consequently, Plaintiffs' monitoring claim fails as a matter of law because that claim's success relies on the viability of Plaintiffs' insufficiently pled fiduciary duty claim.

**Standing**

To begin, the court must address the threshold standing issue raised by Defendants, who

---

[3] Before Plaintiffs filed their suit, the Plan administrator denied a portion of Plaintiffs' ERISA § 104(b)(4) request for information, including the investment committee's meeting minutes. According to Plaintiffs, those documents "potentially contain the specifics of Defendants' *actual* practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments."  (Am. Compl. ¶ 23 (emphases in original).)

assert that Plaintiffs lack standing to challenge decisions related to fifteen of the twenty funds

Plaintiffs allege were imprudently retained in the Plan.  To establish Article III standing, a

plaintiff must show an injury in fact that is fairly traceable to the defendant's action and that

likely would be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555,

560–61 (1992).

According to Defendants, the fact that Plaintiffs personally invested in only five of the

twenty funds discussed in the Amended Complaint means Plaintiffs "have not suffered any

individualized harm as to [the remaining fifteen] funds."  (Mot. to Dismiss Pls.' Am. Compl. at

11 n.5, ECF No. 24.)  But Plaintiffs do not challenge decisions specific to the options in which

they invested.  They focus on an allegedly flawed process that resulted in investment offerings

Plaintiffs say were imprudent and unnecessarily cost them money.

That Plaintiffs did not invest in every option provided by the Plan is not relevant to the

issue of standing.  "[A] plaintiff's standing to sue a plan's fiduciaries, and that same plaintiff's

ability to seek relief that goes beyond his own injuries, are separate issues."  Krueger v.

Ameriprise Fin., Inc., 304 F.R.D. 559, 567 (D. Minn. 2014).  Plaintiffs allege infirmities in the

overall decisionmaking process, and that confers standing to challenge decisions that happened

to affect not only their accounts but other accounts in the Plan the fiduciaries managed.

Many courts have held that ERISA plaintiffs in putative class actions who allege breach

of a fiduciary duty through a claim of mismanagement of an ERISA plan's overall investments,

have standing even though the named plaintiffs did not invest in some of the plan's funds.  See

Kurtz v. Vail Corp., 511 F. Supp. 3d 1185, 1192–94 (D. Colo. 2021) (putative class action

collecting cases arising out of the First, Second, Third, Fourth, Eighth, and Ninth Circuits);

Larson v. Allina Health Sys., 350 F. Supp. 3d 780, 791–93 (D. Minn. 2018) (holding that ERISA

plaintiffs had standing in putative class action to bring breach of fiduciary duty claims

challenging, among other things, plan's investment fees and recordkeeping costs); Krueger, 304

F.R.D. at 567 (same).  The court agrees with those decisions and will not bar or otherwise limit

Plaintiffs' claims based on standing.

**Rule 12(b)(6) Motion to Dismiss Standard**

Federal Rule of Civil Procedure 12(b)(6) requires dismissal if the complaint fails to state

a claim upon which relief can be granted.  "[T]o withstand a motion to dismiss, a complaint must

have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its

face.'"  Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The court must accept all well-pled factual allegations as true and construe them in the

light most favorable to the nonmoving party.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009);

Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020).  But that rule does not apply

to legal conclusions.  Id. at 678–79.  "Mere 'labels and conclusions,' and 'a formulaic recitation

of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual

allegations to support each claim."  Kansas Penn, 656 F.3d at 1214 (quoting Twombly, 550 U.S.

at 555).

Moreover, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief

above the speculative level.'"  Id. at 1214 (citing Twombly, 550 U.S. at 555).

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility and plausibility
> of entitlement to relief.

Iqbal, 556 U.S. at 678 (internal citations and quotation marks omitted).  The Tenth Circuit, applying this standard, has stated that "plausibility" refers to "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (10th Cir.2008) (quoting Twombly, 550 U.S. at 570).  "Determining whether a complaint states a plausible claim for relief [is] … a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

In support of their motion, Defendants point to documents Plaintiffs cite in the Amended Complaint or that the court may judicially notice.  In large part, a court may not consider information outside the four corners of the complaint to assess whether the claims survive a Rule 12(b)(6) motion to dismiss.  Four exceptions exist: (1) documents attached to the complaint as exhibits, (2) documents the complaint incorporates by reference, (3) documents and information subject to judicial notice, and (4) documents referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.  Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010); Prager v. LaFaver, 180 F.3d 1185, 1188–89 (10th Cir. 1999).  Defendants contend their exhibits fall within the boundaries of those exceptions.  The court agrees in part.

The following sources satisfy the criteria described by Gee and Prager: the Master Trust Agreement between Barrick and Fidelity, the Plan's publicly available 5500 Forms submitted to the IRS for the years 2014 to 2018, Barrick's Investment Policy, 2019 Summary Prospectuses for JPMorgan Funds, the "ICI Study," a Fidelity FIAM Blend Target Date Fund fact sheet, the American Funds Target Date Retirement Fund prospectus, and the *401k Averages Book* (20th ed.

2020).  Plaintiffs refer to these materials in their Amended Complaint,[4] do not dispute the documents' authenticity, and rely on information in the documents to create an inference that Defendants breached their fiduciary duties.[5]  The court also judicially notices the publicly available documents, including the 5500 Forms, fund prospectuses, and information compiled in the Barrick Fund Descriptions.  See, e.g., Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (taking judicial notice of public filings with the SEC).

**Breach of the Fiduciary Duty of Prudence[6]**

The duty of prudence imposed by ERISA requires plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man" would have used in the same situation.  29 U.S.C. § 1104(a)(1)(B).  A plaintiff seeking to show a violation of the prudent man standard "must allege that a fiduciary's 'investment decisions—in the conditions prevailing at the time, and without the benefit of hindsight—are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, whole-portfolio, investment strategy that properly balances risk and reward, as well as short-term and long-term performance.'"  Kurtz, 511 F. Supp. 3d at 1196 (quoting Birse v. Century Link, Inc., No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *3 (D. Colo. Mar. 20, 2019)).

Under 29 U.S.C. § 1104, "a trustee has a continuing duty to monitor trust investments and remove imprudent ones," which includes a regular and systematic review of the trust's

---

[4] See Am. Compl. ¶¶ 26, 28, 31, 34–35, 49–50, 76–77, 83, 96, 104, 109, 111, 117, 119, 122–24.
[5] The court will not, however, consider Plaintiffs' retirement account statements offered by Defendants.
[6] ERISA imposes both a duty of prudence and a duty of loyalty on plan fiduciaries.  See 29 U.S.C. § 1104(a)(1)(A) (duty of loyalty), § 1104(a)(1)(B) (duty of prudence).  Plaintiffs assert in their first cause of action that the Committee breached both.  Because the statutorily imposed duties have different elements, the party seeking protection must plead each one separately.  Accordingly, the court addresses each one in turn.

investments to ensure they are appropriate.  Tibble v. Edison Int'l, 575 U.S. 523, 528–29 (2015);

Hughes v. Northwestern Univ., 142 S. Ct. 737, 741 (2022).  "Because the content of the duty of

prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts, the appropriate

inquiry will be necessarily be context specific."  Fifth Third Bancorp v. Dudenhoeffer, 573 U.S.

409, 425 (2014) (internal citation omitted), quoted in Hughes, 142 S. Ct. at 742.

Plaintiffs contend the Committee violated the duty of prudence when it failed to monitor,

investigate and ensure Plan participants paid reasonable investment management fees and

recordkeeping fees during the Class Period.[7]  But their lengthy Amended Complaint is filled with

generalities, legal standards, generic descriptions of investment options available to consumers,

industry-wide statistics and averages.  Specific factual allegations concerning the Plan make up a

small portion of the Amended Complaint.

The court recognizes that plaintiffs have limited access to information demonstrating the

process fiduciaries use to make their decisions.  But a plaintiff can survive a motion to dismiss if

the court can infer from the circumstantial allegations that the fiduciary's decisionmaking

process was flawed.  Pension Benefit Guar. Corp. ex. rel. St. Vincent Catholic Med. Ctr.'s Ret.

Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 719–20 (2d Cir. 2013); Braden v. Wal-

Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009).  Nevertheless, circumstantial factual

allegations "must give rise to a '*reasonable* inference' that the defendant committed the alleged

misconduct, thus 'permit[ting] the court to infer more than the *mere possibility* of misconduct."

St. Vincent, 712 F.3d at 718–19 (emphasis in original) (quoting Iqbal, 5556 U.S. at 678–79).

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

short of the line between possibility and plausibility of entitlement to relief."  Iqbal, 556 U.S. at

---

[7] Plaintiffs define the "Class Period" as April 24, 2014, through the date of judgment.

678.

Ultimately, Plaintiffs' allegations do not create a plausible inference that the Committee breached its fiduciary duty.  As discussed in more detail below, Plaintiffs focus on a handful of funds and a small window of time in the Class Period.  They rely on comparisons of dissimilar investment options.  And a number of their allegations contain incorrect information that, when corrected, show that many of the Plan's investment management fees are lower than the ones Plaintiffs cite as examples of prudent investment choices.  At most, Plaintiffs have plead circumstantial facts that are "merely consistent" with liability.

### 1.  The Plan

The Plan, which is a defined contribution plan governed by ERISA, offers Barrick employees a collection of retirement investment options.  Barrick is the Plan sponsor.  The Committee, which the Board appointed as the Plan's fiduciary, selects the investment options.

During the Class Period, the investment options included money market accounts, collective trusts (CITs), actively-managed mutual funds, and passively-managed mutual funds.  At the time, the Plan had approximately half a billion dollars in assets.  This gave the Plan substantial bargaining power regarding fees and expenses charged against Plan participants' investments.

### 2.  The Committee

The Committee performs a number of fiduciary duties, including selecting investment options; selecting investment trustees, recordkeepers, and managers; monitoring those entities; evaluating the Plan's investment performance; and recommending investment changes.  In turn, Barrick and the Board, as fiduciaries of the Plan, monitor the Committee's activities.

The Committee has a very detailed Investment Policy that creates a process for reviewing and selecting Plan investments, including (i) conducting a semi-annual review of the investment results of Plan funds; (ii) regularly reviewing each of the Plan's investments; (iii) placing funds on a "watch" or "probation" list for a specified period to determine if replacement of the investment option is necessary; and (iv) selecting new or alternative funds to include in the Plan. (Investment Policy at 4–6, ECF No. 24-10.)

### 3. Fees

A portion of each Plan participant's retirement assets covers expenses incurred by the Plan, including individual investment fund management fees and Fidelity's recordkeeping fees. Plaintiffs allege those fees were excessive and cost the proposed class millions of dollars in direct losses and lost investment opportunities.

### a. Investment Fund Management Fees

According to Plaintiffs, the Committee violated its fiduciary duty to ensure that Plan participants paid reasonable fees for management of funds in the Plan's investment portfolio. To support their allegation of imprudent decisionmaking, Plaintiffs provide examples of fees, measured as "expense ratios,"[8] charged by a select group of funds in the Plan for a slice of time during the Class Period. They compare those fees to fees charged by other funds in the marketplace. The comparisons are for illustrative purposes only, for the number, mix, and type of funds available to Plan participants changed throughout the Class Period. But Plaintiffs assert the examples give rise to an inference that the Committee breached its fiduciary duties

---

[8] An expense ratio is a "measure of what it costs to operate a fund expressed as a percentage of its assets." (BrightScope & Investment Co. Inst., *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* 71 (2016), ECF No. 24-13 (the "ICI Study").)

throughout the Class Period by failing to investigate and select lower cost funds.

To create the inference, Plaintiffs discuss expense ratios, costs of share classes, costs of collective trusts versus mutual funds, and costs of actively-managed versus passively-managed funds.

> i.   *Actual Expense Ratios versus Median Expense Ratios in the ICI Study*

As evidence of the Committee's alleged failure to prudently monitor and manage the Plan's costs, Plaintiffs point to "several [Plan] funds during the Class Period [that] were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets)." (Am. Compl. ¶ 75.) To illustrate, Plaintiffs evaluate eleven miscellaneous Plan funds with expense ratios higher than the median expense ratios of funds in the same investment categories (e.g., domestic equity and money market).

In their comparison, Plaintiffs rely on information in the investment funds' 2019 summary prospectuses and a 2016 publication they call the ICI Study.[9] (Id. n.7.) They present a chart listing the eleven Plan funds' 2019 actual expense ratios on the one hand, and the median expense ratios of the funds' generic investment categories on the other hand. (Id. ¶ 76.)

According to the chart, each of the eleven selected Plan funds' expense ratios exceeded the median of funds in the same investment categories. For instance, a domestic equity fund in the Plan in 2018 (the "Fidelity Growth Company K" fund) had an expense ratio of 76 basis points (0.76%) while the median expense ratio of domestic equity funds in the marketplace was 52 basis points (0.52%). In the chart, the expense ratios of the select Plan funds ranged from 0.42% to 1.12% while the median expense ratios ranged from 0.14% to 0.54%.

---

[9] See id.

Plaintiffs' selective examples are problematic.  To begin, expense ratios from the ICI

Study do not allow a meaningful analysis.  Plaintiff place a very specific Plan fund into a

particular investment category, such as "Domestic Equity," and compare it to the "ICI Median"

for investments falling into that category.  (See id.)  But the ICI Study itself clarifies that the

broad one-size-fits-all investment categories have limited utility, noting that "the expense ratios

applicable to funds vary within a given investment category."  (ICI Study at 53.)  As an example,

the study notes that "equity mutual funds have different expense ratios depending on the extent

to which they invest in small-cap, mid-cap, or emerging market stocks (which tend to be more

expensive to manage) instead of large-cap or developed market stocks (which tend to be less

expensive to manage)."  (Id.)

Also, Plaintiffs do not discuss Plan options that have lower expense ratios.  As

Defendants point out, the Plan's recent offerings include a wide variety of investment options

with expense ratios ranging from 0.06% to 1.07%.  (Mot. to Dismiss at 13–14 (citing Barrick

Fund Descriptions, ECF No. 24-12).)  Courts have found comparable ranges of expense ratios

reasonable.  See, e.g., Martin v. CareerBuilder, LLC, No. 19-cv-6463, 2020 WL 3578022, at *6

(N.D. Ill. July 1, 2020) (dismissing prudence claims concerning funds with expense ratios

between 0.04% and 1.06%); Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013) (expense

ratio range of ".03 to 2%" did not make selection of those funds imprudent), rev'd & remanded

on unrelated grounds, 575 U.S. 523 (2015); Loomis v. Exelon Corp., 658 F.3d 667, 669–72 (7th

Cir. 2011) (affirming dismissal where "expense ratios rang[ed] from 0.03% to 0.96%"); Renfro

v. Unisys Corp., 671 F.3d 314, 319 (3d Cir. 2011) (affirming dismissal where fees "ranged from

0.1% to 1.21%"); Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal

where "[a]t the low end, the expense ratio was .07%; at the high end, it was just over 1%");

White v. Chevron Corp., No. 16-cv-0793-PJH, 2016 WL 4502808, at *11 (N.D. Cal. Aug. 29, 2016) (White I) (rejecting a claim of excessive investment fees where complaint alleged fees ranging from .05% to 1.24%).

ii.   *Share Classes*

As another example of imprudence, Plaintiffs allege the Committee chose unnecessarily expensive mutual funds that contained higher fee "share classes."  Mutual funds offer share classes based on the types of investors and their bargaining power.

Plaintiffs focus on the Plan's retail-class ("Class R") mutual funds.  According to Plaintiffs, "[t]here is no difference between share classes other than cost—the funds hold identical investments and have the same manager."  (Am. Compl. ¶ 79.)  Plaintiffs assert the court must infer a breach of fiduciary duty because the Plan failed to use "lower fee" share classes even though it had the "asset size and negotiating power to invest in the cheapest share class available."  (Id. ¶ 80.)

Plaintiffs use the Plan's JPMorgan "R" share classes as an example.  Focusing on nine JPMorgan target date funds the Plan offered in 2015 that contained R5 share classes, Plaintiffs compare the R5 expense ratios with the R6 expense ratios of JPMorgan target date funds that Plaintiffs say were otherwise "identical counterparts."  (Id. ¶ 83.)  To illustrate, they list the expense ratios side by side in a chart purporting to show that the expense ratios for the Plan's R5 share class funds were about 20% more than the otherwise identical R6 share class funds.[10]

These comparisons are problematic.  To begin, courts have often held that "[a]lleging only the inclusion of more expensive share classes is not enough" to suggest imprudence.  Kurtz,

---

[10] See Am. Compl. ¶ 83.  For example, the Plan's JPMorgan SmartRetirement2025 R5 had an expense ratio of 0.55 %, while the corresponding JPMorgan R6 fund had an expense ratio of 0.45%.  According to the chart, the Plan paid 22% more than it needed to pay.

511 F. Supp. 3d at 1199.  But the bigger problem lies with Plaintiffs' numbers.  Defendants, using the same sources upon which Plaintiffs rely throughout the complaint, show that Plaintiffs' comparison of share classes relies on incorrect information about actual fees paid by the Plan's participants.  Taking into account the 15-basis-point revenue credit that Defendants negotiated for the JPMorgan funds' R5 share class,[11] the Plan's expense ratio for each JPMorgan R5 fund was actually less than the R6 funds' expense ratios upon which Plaintiffs rely.[12]

> iii.  *Collective Trusts*

Plaintiffs allege that the Committee breached its fiduciary duty because it failed to identify and select lower cost collective trusts (also referred to as CITs) in lieu of mutual funds.  They say a "prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity." (Am. Compl. ¶ 95.)

As Plaintiffs did for the JPMorgan share classes, they offer a chart[13] comparing the 2016 expense ratio of the JPMorgan mutual funds to the expense ratio of JPMorgan CITs.  For example, the chart shows that the JPMorgan SmartRetirement 2025 R5 fund had an expense ratio of 0.55%, while the collective trust version's was only 0.44%.  But, again, Defendants provide a corrected chart showing the expense ratio is actually lower because the Plan received the 15-basis-point revenue credit.  Once that is taken into account, the expense ratios are actually lower

---

[11] See Trust Agreement, ECF No. 24-4; 2018 Form 5500, ECF No. 24-9.

[12] For instance, the JPMorgan R5 0.55% expense ratio listed in the chart inaccurately reflects the actual 0.40% expense ratio Defendants negotiated with Fidelity.  (See Mot. to Dismiss at 15 (correcting chart in Am. Compl. ¶ 83).)

[13] See Am. Compl. ¶ 95.

than the CIT funds that Plaintiffs use for comparison.[14]

Plaintiffs also compare the 2019 JPMorgan funds' expense ratios to lower expense ratios of the Fidelity Freedom CITs, because, according to Plaintiffs, those CITs "had the same investment goals as the JPMorgan trust funds utilized by the Plan." (Id. ¶ 96.)  For example, the chart shows JPMorgan SmartRetirement 2025 R5 fund's expense ratio was 0.55% while the Freedom CIT's expense ratio was notably less, at 0.32%.  (Id.)  Plaintiffs list a "% Fee Excess" for the expense ratios, ranging from 69% to 78%.  But Plaintiffs' comparison to the Fidelity CITs has significant problems as well.

Again, Plaintiffs did not apply the 15-basis-point revenue credit.  Once one corrects the expense ratios, the R5 funds' improperly inflated "% Fee Excess" goes down.

Second, the 0.32% expense ratio Plaintiffs drew from the Fidelity CIT 2019 fact sheet[15] for comparison is not the CIT's actual expense ratio; it is an estimate.[16]  Plaintiffs do not allege facts suggesting the Plan would receive the 0.32% estimated expense ratio or otherwise explain why an average is a fair benchmark for comparison given all the factors at play.

Third, CITs are not comparable investments.  Plaintiffs acknowledge there are substantive differences between mutual funds and CITs, and the sources upon which they rely support that point.  (See id. ¶¶ 92–94, n.9.)  For example, the regulatory agencies overseeing each investment type are different, CITs are not required to file prospectuses or comply with

---

[14] For instance, the 0.55% ratio for the JPMorgan SmartRetirement 2025 R5 fund was 0.40%, lower than the CIT's 0.44% expense ratio.  (Compare Am. Compl. ¶ 96 to Mot. to Dismiss at 15 (showing actual expense ratios when the 15-basis-point revenue credit is applied).)

[15] See Am. Compl. n.12.

[16] According to the Fidelity fact sheet, the maximum expense ratio for the Fidelity blend target-date funds is 0.42%, an amount "subject to certain decreases" that "depends on a variety of factors." (Fidelity FIAM Blend Target Date Q Fund Fact Sheet at 4, ECF No. 24-18.)

reporting requirements, and CITs cannot be rolled over if the employee changes employment.[17]

"Separate accounts, collective trusts, and stable value funds are all common investment instruments with the potential to outperform mutual funds.  These non-mutual fund vehicles differ so much from mutual funds, however, in terms of their regulatory and transparency features that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two."  Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 212 (D. Mass. 2020) (internal citations omitted).  See also Renfro, 671 F.3d at 318 ("Mutual funds … are subject to a variety of reporting, governance, and transparency requirements that do not apply to other investment vehicles such as commingled pools."); Tobias v. NVIDIA Corp.,  No. 20-CV-06081-LHK, 2021 WL 4148706, at *12 (N.D. Cal. Sept. 13, 2021) ("[C]ourts have repeatedly recognized that collective trusts 'differ so much from mutual funds … in terms of their regulatory and transparency features that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two.") (quoting Moitoso, 451 F. Supp. 3d at 212); White I, 2016 WL 4502808, at *12 ("It is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly.").

Given these underlying problems with Plaintiffs' use of CITs, their suggestion that the Committee made imprudent investment choices is not plausible.

    iv.    *Actively-Managed and Passively-Managed Funds*

In another comparison, Plaintiffs contend the Committee's failure to select more passively-managed funds and cheaper actively-managed funds[18] supports a finding that it

---

[17] At any rate, the Plan offered CITs for multiple years during the Class Period.  (See, e.g., 2014 Form 5500 at 17, ECF No. 24-5; 2015 Form 5500 at 20, ECF No. 24-6; 2016 Form 5500 at 19, ECF No. 24-7; 2017 Form 5500 at 19, ECF No. 24-8; 2018 Form 5500 at 19, ECF No. 24-9.)
[18] The Seventh Circuit provides a helpful definition of actively-managed and passively-managed funds: "The low-expense funds tend to be passively managed (index funds, for example, which

breached its fiduciary duty:

> One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  Between 2014 and 2018 the Plan included only four passively managed funds.

(Am. Compl. ¶ 74.)

Plaintiffs first compare the past performance of actively-managed mutual funds to that of passively-managed funds.  But Plaintiffs talk in generalities, comparing fund categories (for example, large-cap, mid-cap, small-cap, domestic equity) to corresponding market indexes (for example, S&P 500, S&P MidCap 400, S&P SmallCap 600, S&P Composite 1500).  They list "percentage of funds that underperformed their benchmark" over five years.  Those percentages, according to a report they cite, ranged from 63 percent to 92 percent.  This, they say, suggests that selecting an actively-managed fund is imprudent because historically such funds cost more and have not performed as well.

Then, in support of their allegation that the Committee breached its fiduciary duties by failing to shift the weight of investment options to passively-managed funds, Plaintiffs offer a chart that "demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style."  (Id. ¶ 103.)  The chart uses 2019 expense ratios "as a

---

do not make any independent investment choices but simply track a designated portfolio such as the Standard & Poor's 500 Index) and have features that discourage turnover (an index fund typically disallows new investments for a month or more following any withdrawal). The high-expense funds tend to be actively managed (that is, the fund's investment advisers try to find and buy underpriced securities while selling ones that the advisers think are overvalued) and to allow rapid turnover both in the funds' holdings and the participants' investments. Higher turnover means higher brokerage fees and higher administrative expenses."  Loomis, 658 F.3d at 669–70.

methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts." (Id. ¶ 104.)

In the chart, Plaintiffs list the 2019 expense ratios of actively-managed JPMorgan funds in the Plan alongside the 2019 expense ratios of two alternative funds, one passively-managed and the other actively-managed. The chart indicates that the alternative funds' fees were significantly less expensive than the Plan's JPMorgan funds. Plaintiffs say they offer the chart for illustrative purposes only and allege that "the significant fee disparities … existed for all years of the Class Period." (Id. ¶ 105.)

But, as in previous comparisons, Plaintiffs use incorrect numbers. Applying the 15-basis-point revenue credit, the expense ratios are less than Plaintiffs represent, albeit higher than the funds Plaintiffs select for comparison. The fact that the numbers are higher does not suggest imprudent decisionmaking. See Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir. 2018) (selecting actively-managed funds as opposed to passively-managed funds is not per se imprudent); Kurtz, 511 F. Supp. 3d at 1200 ([P]laintiff's complaint reads as suggesting that choosing actively-managed funds can never be a prudent choice, which cannot be true.") (emphasis in original).

As for the types of investments Plaintiffs choose for comparison, some of the funds have different investment strategies. For example, the actively-managed American Funds Target Date Retirement funds that Plaintiffs select for comparison have materially different investment strategies than the JPMorgan target date funds. (See Mot. to Dismiss at 20 n.8 (citing fund prospectuses upon which Plaintiffs rely for their data).) This belies Plaintiffs' characterization of the funds as sufficiently similar.

### v.   Conclusion

Plaintiffs' assertion that the alleged circumstantial facts give rise to an inference of imprudence is flawed.

Importantly, Plaintiffs misstate expense ratios of Plan funds.  But they also make "apples to oranges" comparisons that do not plausibly infer a flawed monitoring and decisionmaking process.  "To show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark."  Meiners, 898 F.3d at 822 (affirming dismissal of ERISA fiduciary claim alleging that defendants breached their duty by keeping higher-fee mutual funds in the plan's investment portfolio).  The fact that "cheaper alternative investments with *some* similarities exist in the marketplace" does not provide a "meaningful benchmark" upon which to determine whether the Committee breached its duty.  Id. at 823 (emphasis in original).

ERISA does not require plan fiduciaries to offer a particular mix of investment options, whether that be, for example, favoring institutional over retail share classes, preferring CITs to mutual funds, or choosing passively-managed over actively-managed investments.  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  Hecker, 556 F.3d at 586 ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan.").  See also Loomis, 658 F.3d at 670 (same); Braden, 588 F.3d at 596 n.7 ("[W]e do not suggest that a claim is stated by a bare allegation that cheaper alternative investments exist in the marketplace."); Kurtz, 511 F. Supp. 3d at 1198 (the ERISA prudent man "mandate … naturally involve[s] selecting funds with a range of return and expense profiles");

White v. Chevron Corp., No. 16-cv-0793-PJH, 2017 WL 2352137, at *11 (N.D. Cal. May 31, 2017) ("White II") ("[F]iduciaries have latitude to value investment features other than price (and indeed are required to do so).").  Showing that purportedly "better" investment opportunities existed at the relevant times does not give rise to an inference that the Committee breached its fiduciary duties.  St. Vincent, 712 F.3d at 718; Kurtz, 511 F. Supp. 3d  at 1201 (collecting cases that "routinely rejected arguments … based on allegations of excessive fees"); Martin, 2020 WL 3578022 at * 6 ("[A]t the end of the day one cannot plausibly infer imprudence from the mere fact that fiduciaries failed to go with the cheapest possible option.") (citing Davis v. Washington Univ. in St. Louis, 960 F.3d 478, 485–86 (8th Cir. 2020) (dismissing ERISA complaint)).

   b.  Recordkeeping Fees

   Plaintiffs separately challenge the Committee's recordkeeping fee arrangement with Fidelity as yet another result of imprudent monitoring and decisionmaking.  Fidelity has been the recordkeeper for the Plan since Barrick and Fidelity entered into a Master Trust Agreement on April 1, 2002.  Barrick and Fidelity have amended the Trust Agreement seventeen times, most recently on April 1, 2020.

   Plaintiffs take issue with the long partnership between Barrick and Fidelity.  They assert the Committee breached its fiduciary duty to failing to conduct a Request for Proposal ("RFP") process to shop around for less expensive recordkeeping arrangements.  According to Plaintiffs, a fiduciary should obtain competitive bids "at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans."  (Am. Compl. ¶ 116.)

As another basis for their position that annual fees were unreasonable, Plaintiffs complain that Plan participants paid an unreasonable amount of fees.  They extrapolate from studies published in the *401k Averages Book*.  Those studies focus on fees charged to plans with less than $200 million in assets.  Acknowledging that Barrick's Plan is much larger (more than $500 million in assets), Plaintiffs still contend the *401k Averages Book* is "a useful resource" because "recordkeeping and administrative fees should decrease as a Plan increases in size."  (Id. ¶ 122.)

According to Plaintiffs, "a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant."  (Id. (citing *401k Averages Book* at 95).)  For a larger plan, the average fee goes down: a larger plan, one "with 2,000 participants and $200 million in assets," pays an average fee of $5 per participant.  (Id. (citing *401k Averages Book* at 108).)  Using that as a comparison point, Plaintiffs surmise that "the Plan, with half a billion dollars in assets and over 4,500–5,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average[.]"  (Id. ¶ 122.)  The Plan's "total amount of recordkeeping fees (both through direct and indirect payments)," which were "conservatively above $60 per participant per year," "exceeded that benchmark.  (Id. ¶ 124.)  Plaintiffs conclude that "[t]hese amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans."  (Id. ¶ 125.)  They further conclude, "Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost."  (Id. ¶ 126.)

Plaintiffs also take issue with the Plan's use of revenue sharing to cover recordkeeping costs. From April 24, 2014 (the start of the Class Period) to December 31, 2016, the Plan paid fees to Fidelity through revenue sharing. But the Trust Agreement required Fidelity to deposit a portion of its annual revenue sharing into a "Revenue Credit Account" to defray the costs for recordkeeping and administration costs. After applying that credit, the cost per participant was $101 in 2014. The cost went down to $85 in 2015.

On January 1, 2017, as shown in the Fourteenth Amendment to the Trust Agreement, the Plan transitioned to paying a contractual per-participant recordkeeper fee of $68. Then, in April 2020, the Plan's modified agreement with Fidelity reduced that fee to $53 per participant. And although Fidelity continued with its revenue sharing arrangement, the Trust Agreement's revenue credit program required Fidelity to credit the Plan the difference between what it collected and the amount of the per-participant recordkeeping fees. (See Fourteenth Amendment to Trust Agreement at 112, ECF No. 24-4.)

Despite that agreement, Plaintiffs allege that in 2018, Fidelity pocketed the difference in violation of its contractual obligation under the Trust Agreement's Fourteenth Amendment. Plaintiffs cite to the Plan's 2018 Form 5500 (which Defendants submitted to the IRS as part of their regulatory reporting obligations), and note that "for the years ended December 31, 2018 and 2017, $45,719 and $53,178 of the Revenue Credit Account were used to pay plan administrative expenses, respectively." (Am. Compl. ¶ 119 (quoting Note 1 to Barrick Retirement Plan's Audited Financial Statements, attached to 2018 Form 5500, ECF No. 24-9 p. 34).) They then allege that "[r]evenue sharing for 2018 was $664,000." (Id.) From that they conclude that "over $600,000 in collected revenue sharing never made [it] back to the pockets of the Plan participants in 2018." (Id.)

The contractual arrangement in the Fourteenth Amendment (to which the 2018 Form 5500 alluded) requires Fidelity to allocate amounts collected from revenue sharing, including that $600,000, "to Eligible Participant Accounts as soon as administratively feasible (generally within 15 business days)." (Fourteenth Amendment to Trust Agreement at 111–12.) Plaintiffs do not allege that Defendants knew, or should have known, about the alleged "pocketing" by Fidelity or that they failed to remedy any problem. Moreover, Plaintiffs' suggestion that Fidelity violated its contractual obligation, and that Defendants let it happen, is not plausible in light of the 2017 Fourteenth Amendment to the Trust Agreement.

Plaintiffs have not created a reasonable inference that the Committee violated the duty of prudence through its fee arrangement with Fidelity. To begin, revenue sharing is not per se imprudent. "Revenue sharing arrangements are not per se prohibited under ERISA." Terraza v. Safeway Inc., 241 F. Supp. 3d 1057, 1081 (N.D. Cal. 2017). "In fact, courts have noted that revenue sharing is a 'common and acceptable investment industry practice[ ] that frequently inure[s] to the benefit of ERISA plans.'" Id. at 1081 n.8 (quoting Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014)). See also Hecker, 556 F.3d at 585 (holding that maintaining a revenue sharing arrangement did not breach a fiduciary duty under ERISA); White I, 2016 WL 4502808 at *14 (same).

Second, the *401k Averages Book* does not provide a meaningful benchmark. Plaintiffs rely on averages. They then make a leap that is too far removed to create anything more than the "mere possibility" of misconduct, which does not nudge the claim "across the line from conceivable to the plausible." Twombly, 550 U.S. at 570.

Third, Defendants did manage, and reduce, Fidelity's fees over the years. Between 2002 and 2020, they re-negotiated the Trust Agreement seventeen times, which included amendments

modifying the revenue sharing arrangement and reducing fees participants paid for Fidelity's services.

Fourth, nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval. See, e.g., Marks v. Trader Joe's Co., No. 19-10942 PA (JEMx), 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020) (allegations that plan failed to engage in RFP process did not suggest imprudence); Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc., No. 17-cv-07243-BLF, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) ("T[he] absence of competitive bidding or RFP process, without more, does not support Plaintiffs' allegations that the [plan fiduciaries] acted imprudently"); White I, 2016 WL 4502808, at *14 (allegation that ERISA required fiduciary "to solicit competitive bids on a regular basis has no legal foundation."). Moreover, there is no question that Defendants regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants. Plaintiffs essentially speculate that an RFP process would result in even lower fees.

While compelling in the abstract, Plaintiffs' characterization of the reasonableness of the Plan's handling of its arrangement with Fidelity and payment of administrative costs through revenue sharing is based on generalizations, assumptions, and unsuitable comparisons. Their allegations about recordkeeping fees do not give rise to a reasonable inference that the Committee violated its fiduciary duty.

### 4. Conclusion

For the foregoing reasons, the court cannot infer that the process was flawed or that a prudent fiduciary in the same circumstances would have acted differently. Accordingly, the

court dismisses Plaintiffs' claim of breach of the duty of prudence.

**Breach of the Duty of Loyalty**

The duty of loyalty requires a fiduciary to act "solely in the interest of the participants

and beneficiaries … (A) for the exclusive purpose of (i) providing benefits to participants and

their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C.

§ 1104(a)(1)(A).  A fiduciary may not engage in "transactions that involve self-dealing or that

otherwise involve or create a conflict between the trustee's fiduciary duties and personal

interests."  Restatement (Third) of Trusts § 78(2) (Am. Law Inst. 2007).[19]

Here, Plaintiffs essentially conflate their duty of prudence claim with their duty of loyalty

claim.  They rely on the same set of allegations to support each theory of liability, yet the

allegations almost exclusively concern issues of prudence.

The duties of prudence and loyalty are distinct.  See, e.g., Turner v. Schneider Elec.

Holdings, Inc., 530 F. Supp. 3d 127, 1344 (D. Mass. 2021) (pleading a breach of loyalty claim

requires allegations that "'the fiduciary's subjective motivation' was improper") (quoting

Moitoso, 451 F. Supp. 3d at 204); Cassell v. Vanderbilt Univ., 285 F. Supp. 3d 1056, 1062

(M.D. Tenn. 2018) (to allege breach of duty of loyalty under ERISA, a plaintiff "must

sufficiently allege that Defendants acted for the purpose of benefitting … third parties or

---

[19] Courts look to the common law of trusts to analyze ERISA-imposed fiduciary duties.  See
Varity Corp. v. Howe, 516 U.S. 489, 497 (1996) ("[W]e believe that the law of trusts often will
inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's
fiduciary duties. In some instances, trust law will offer only a starting point, after which courts
must go on to ask whether, or to what extent, the language of the statute, its structure, or its
purposes require departing from common-law trust requirements."). See, also, e.g., Tibble v.
Edison Int'l, 575 U.S. 523, 528 (2015) ("[A]n ERISA fiduciary's duty is 'derived from the
common law of trusts.'") (quoting Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp.,
Inc., 472 U.S. 559, 570 (1985)); Petersen v. Comm'r of Internal Revenue, 924 F.3d 1111, 1117
(10th Cir. 2019) ("Although ERISA trusts are not governed by the common law of trusts …, the
federal statutory requirements mirror the law regarding a common-law trust.").

themselves. When claims do not support an inference that the defendants' actions were for the purpose of providing benefits to themselves or someone else and simply had that incidental effect, loyalty claims should be dismissed.").

Accordingly, even if Plaintiffs had sufficiently alleged a breach of the duty of prudence, breach of that duty does not equate to an act of disloyalty under ERISA.  See, e.g., Tobias, 2021 WL 4148706, at *16 ("[T]he duty of prudence and the duty of loyalty are two different requirements under ERISA § 404(a), and courts in this district dismiss claims for breach of the duty of loyalty when those claims hinge entirely on breach of the duty of prudence allegations."); Martin, 2020 WL 3578022, at *6 (dismissing duty of loyalty claim that repackaged duty of prudence claim and failed to provide additional allegations suggesting, for example, self-dealing); In re: SunEdison, Inc. ERISA Litig., 331 F. Supp. 3d 101, 115 (S.D.N.Y. 2018) (dismissing claim for breach of the duty of loyalty because the plaintiffs' allegations "merely repackage[d]" plaintiffs' inadequately pled claim for breach of the duty of prudence); In re: Pfizer Inc. ERISA Litig., No. 04 Civ. 10071(LTS)(HBP), 2013 WL 1285175, at *10 (S.D.N.Y. Mar. 29, 2013) (dismissing claim that defendants breached ERISA duty of loyalty because such claim was derivative of unsuccessful claim for breach of the ERISA duty of prudence).

The court, having reviewed the Amended Complaint's allegations independently in the context of ERISA's duty of loyalty, concludes that Plaintiffs do not allege any facts creating a reasonable inference that Defendants were disloyal to Plan participants.  Their only "allegations" of disloyalty are either conclusions of law or altogether conclusory and unsupported statements, all of which are insufficient to survive Defendants' Rule 12(b)(6) motion to dismiss.  Because Plaintiffs have not pled facts plausibly alleging breach of the duty of loyalty under 29 U.S.C. § 1104(a)(1)(A), the court dismisses that claim.

**Failure to Adequately Monitor Other Fiduciaries**

Plaintiffs' monitoring claim is fully dependent on the validity of their breach of fiduciary duty claims.  Because Plaintiffs have not adequately alleged a claim for breach of the duty of prudence or the duty of loyalty, the court dismisses their derivative monitoring claim.

## ORDER

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 24) is GRANTED.  Moreover, because Plaintiffs have already had one opportunity to amend their original complaint (following Defendants' first motion to dismiss), and because further amendment would not correct the problems the court has identified, the dismissal is with prejudice.

DATED this 21st day of April, 2022.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge