Appeal No. 22-4045

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

COLE MATNEY, individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF
BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S.
SUBSIDIARIES BENEFITS COMMITTEE, *Defendants-Appellees*

Appeal from the United States District Court
for the District of Utah, Central District
The Honorable Tena Campbell, Presiding
2:20-cv-275-TC-CMR

APPELLANTS' APPENDIX
VOLUME I

Mark K. Gyandoh
Donald R. Reavey
Gabrielle Kelerchian
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
Tel: (610) 890-0200
Fax: (717) 233-4103
Email:  Markg@capozziadler.com
        Donr@capozziadler.com
        Gabriellek@capozziadler.com
*Attorneys for Plaintiffs-Appellants*

David K. Isom (Utah 4773)
**ISOM LAW FIRM, PLLC**
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Tel: (801) 209-7400
Email:  david@isomlawfirm.com

August 31, 2022

# TABLE OF CONTENTS

**Document**                                                                    **Page**

## VOLUME I

Docket
(8/24/2022) ......................................................................................... 009

Class Action Complaint
(4/24/20) [Dkt. 2] ............................................................................... 022

Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick
Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Motion to Dismiss
(6/26/20) [Dkt. 19] ............................................................................. 065

Amended Complaint
(7/17/20) [Dkt. 21] ............................................................................. 097

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Motion to Dismiss Plaintiffs' Amended Complaint
(8/3/20) [Dkt. 24] ...............................................................................142

Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs'
Amended Complaint
(8/31/20) [Dkt. 25] .............................................................................174

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Reply in Support of Their Motion to Dismiss Plaintiffs'
Amended Complaint
(9/21/20) [Dkt. 28] .............................................................................208

Request to Submit for Decision Defendants Barrick Gold of North America, Inc.,
Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S.
Subsidiaries Benefits Committee's Motion to Dismiss Plaintiff's Amended
Complaint
(9/22/20) [Dkt. 29] ................................................................................224

Plaintiffs' Notice of Supplemental Authority
(1/4/21) [Dkt. 31] ................................................................................228

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Response to Plaintiffs' Notice of Supplemental Authority
(1/15/21) [Dkt. 33] ...............................................................................244

Plaintiffs' Notice of Supplemental Authority
(3/24/21) [Dkt. 34] ...............................................................................250

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Response to Plaintiffs' Notice of Supplemental Authority
(4/1/21) [Dkt. 35] ............................................................................... 269

Notice of Zoom Hearing on Motion
(4/5/21) [Dkt. 36] ............................................................................... 274

Plaintiffs' Notice of Supplemental Authorities
(4/9/21) [Dkt. 37] ............................................................................... 276

Amended Notice of Zoom Hearing on Motion
(4/22/21) [Dkt. 38] ............................................................................. 286

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Response to Plaintiffs' Notice of Supplemental Authority
(4/22/21) [Dkt. 39] ............................................................................. 288

# <u>VOLUME II</u>

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Notice of Supplemental Authority
(4/26/21) [Dkt. 40] ................................................................301

Plaintiffs' Response to Defendants' Notice of Supplemental Authority and
Plaintiffs' Notice of Supplemental Authorities
(5/5/21) [Dkt. 41] .................................................................313

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Objection to Plaintiffs' Notice of Supplemental Authority
(5/24/21 [Dkt. 42] .................................................................371

Minute Entry for Proceedings Held Before Judge Tena Campbell
(5/27/21) [Dkt. 43] ................................................................383

Notice of Filing of Official Transcript of Motion Hearing
(Transcript attached)
(6/2/21) [Dkt. 44] .................................................................385

Plaintiffs' Notice of Supplemental Authorities
(7/27/21) [Dkt. 46] ................................................................421

Plaintiffs' Notice of Supplemental Authorities
(8/20/21) [Dkt. 47] ................................................................465

Docket Text Order Referring Case to Magistrate Judge Cecilia M. Romero
(9/20/21) [Dkt. 49] ................................................................512

Stipulated Motion to Stay Pending Motion to Dismiss Decision and Unites
States Supreme Court Decision
(12/21/21) [Dkt. 56] ...............................................................514

Order Granting [56] Motion to Stay Pending Motion to Dismiss Decision and
United States Supreme Court Decision
(12/31/21) [Dkt. 57] ...............................................................519

Order for Supplemental Briefing
(1/26/22) [Dkt. 58] ................................................................................521

Plaintiffs' Brief Addressing the Impact of the *Hughes v. Northwestern University* Decision on the Pending Motion to Dismiss
(2/23/22) [Dkt. 59] ................................................................................523

Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee's Supplemental Memorandum in Support Their Motion to Dismiss Plaintiffs' Amended Complaint
(2/23/22) [Dkt. 60] ................................................................................529

Order and Memorandum Decision
(4/21/22) [Dkt. 61] ................................................................................535

Judgment in a Civil Case
(4/22/22) [Dkt. 62] ................................................................................562

## **<u>VOLUME III</u>**

Plaintiffs' Fed R. Civ. P. Rule (59e) Motion for Reconsideration of the
Court's April 21, 2022 Order and Opinion
(5/19/22) [Dkt. 63] ..................................................................................571

Notice of Appeal
(5/20/22) [Dkt. 64] ..................................................................................644

Defendants Barrick Gold of North America, Inc., Board of Directors of
Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits
Committee's Response in Opposition to Plaintiffs' Motion for
Reconsideration
(6/2/22) [Dkt. 68] .................................................................................. 675

Order
(6/21/22) [Dkt. 71] ................................................................................. 687

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that a copy of the foregoing **APPELLANTS' APPENDIX, VOLUME I**, as submitted in Digital Form via the courts ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with Microsoft Office 365, and, according to the program, is free of viruses.  In addition, I certify all required privacy redactions have been made.

By:    */s/ Mark K. Gyandoh*
      Mark K. Gyandoh

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of August, 2022, a copy of this **APPELLANTS' APPENDIX, VOLUME I**, was served via the ECF system which will send notification of such filing to all parties of record as follows:

Alexander W. Resar
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Kaitlin P. Sheehan
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Sanford Ian Weisburst
**QUINN EMANUEL URQUHART & SULLIVAN**
51 Madison Avenue, 22nd Floor
New York, NY 10010

Stephen Q. Wood
**QUINN EMANUEL URQUHART & SULLIVAN**
2755 East Cottonwood Parkway, Suite 430
Salt Lake City, UT 84121

I hereby certify that within five (5) days after notification of acceptance from the Court, one (1) copy of the foregoing **APPELLANTS' APPENDIX, VOLUME I**, will be delivered by Federal Express to the Clerk of the Court, U.S. Tenth Circuit Court of Appeals.

By:    */s/ Mark K. Gyandoh*
          Mark K. Gyandoh

APPEAL,CLOSED

## US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00275-TC

| | |
|---|---|
| Matney et al v. Barrick Gold of North America et al | Date Filed: 04/24/2020 |
| Assigned to: Judge Tena Campbell | Date Terminated: 04/22/2022 |
| Demand: $25,000,000 | Jury Demand: None |
| Case in other court: Tenth Circuit, 22-04045 | Nature of Suit: 791 Labor: E.R.I.S.A. |
| Cause: 28:1132 E.R.I.S.A. | Jurisdiction: Federal Question |

### Plaintiff

**Cole Matney**
*individually and on behalf of all others
similarly situated*

represented by **David K. Isom**
ISOM LAW FIRM
299 S MAIN ST STE 1300
SALT LAKE CITY, UT 84111
(801)209-7400
Email: david@isomlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark K. Gyandoh**
CAPOZZI ADLER PC
312 OLD LANCASTER RD
MERION STATION, PA 19066
717-233-4101
Fax: 717-233-4103
Email: markg@capozziadler.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald R. Reavey**
CAPOZZI ADLER PC
2933 N FRONT ST
HARRISBURG, PA 17110
717-233-4101
Fax: 717-233-4103
Email: Donr@capozziadler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Paul Watts**
*individually and on behalf of all others
similarly situated*

represented by **David K. Isom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APP 009

**Mark K. Gyandoh**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

__Defendant__

**Barrick Gold of North America**                    represented by   **John B. Quinn**
QUINN EMANUEL URQUHART &
SULLIVAN
865 S FIGUEROA ST 10TH FL
LOS ANGELES, CA 90017
213-443-3000
Email: johnquinn@quinnemanuel.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin P. Sheehan**
QUINN EMANUEL URQUHART &
SULLIVAN LLP
191 N WACKER DR STE 2700
CHICAGO, IL 60606
312-705-7400
Email: kaitlinsheehan@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Q. Wood**
QUINN EMANUEL URQUHART &
SULLIVAN LLP
2755 E COTTONWOOD PKWY STE 430
SALT LAKE CITY, UT 84121
801-515-7300
Fax: 801-515-7400
Email: stephenwood@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grace S. Pusavat**
QUINN EMANUEL URQUHART &
SULLIVAN LLP
2755 E COTTONWOOD PKWY STE 430
SALT LAKE CITY, UT 84121
801-515-7300
Fax: 801-515-7400
Email: gracepusavat@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

APP 010

**Lazar Pol Raynal**
QUINN EMANUEL URQUHART &
SULLIVAN LLP
191 N WACKER DR STE 2700
CHICAGO, IL 60606
312-705-7400
Email: lraynal@kslaw.com
*TERMINATED: 10/12/2021*

**Defendant**

**Board of Directors of Barrick Gold of North America**      represented by **John B. Quinn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin P. Sheehan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Q. Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grace S. Pusavat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lazar Pol Raynal**
(See above for address)
*TERMINATED: 10/12/2021*

**Defendant**

**Barrick US Subsidiaries Benefits Committee**      represented by **John B. Quinn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin P. Sheehan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Q. Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APP 011

**Grace S. Pusavat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lazar Pol Raynal**
(See above for address)
*TERMINATED: 10/12/2021*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/24/2020 | 1 | Case has been indexed and assigned to Judge Tena Campbell. Plaintiffs Cole Matney, Paul Watts is directed to E-File the <u>Complaint</u> and cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 400 by the end of the business day. <span style="color:red">NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system.</span> Civil Summons may be issued electronically. Prepare the summons using the courts <u>PDF version</u> and email it to utdecf_clerk@utd.uscourts.gov for issuance. (jl) (Entered: 04/24/2020) |
| 04/24/2020 | 2 | COMPLAINT against All Defendants (Filing fee $ 400, receipt number AUTDC-3556272) filed by Cole Matney. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) Assigned to Judge Tena Campbell (Isom, David) (Entered: 04/24/2020) |
| 04/24/2020 | 3 | NOTICE OF REQUIREMENTS for appearance PHV mailed to attorney Donald R. Reavey, Esq, for Plaintiffs Cole Matney and Paul Watts. (tlh) (Entered: 04/24/2020) |
| 04/24/2020 | 4 | NOTICE OF REQUIREMENTS for appearance PHV mailed to attorney Mark K. Gyandoh, Esq, for Plaintiffs Cole Matney, Paul Watts. (jl) (Entered: 04/24/2020) |
| 04/27/2020 | 5 | MOTION for Admission Pro Hac Vice of Mark Gyandoh , Registration fee $ 250, receipt number AUTDC-3558459, Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. filed by Plaintiff Cole Matney. (Attachments: # 1 Exhibit Application Pro Hac, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order) (Isom, David) (Entered: 04/27/2020) |
| 04/27/2020 | 6 | MOTION for Admission Pro Hac Vice of Donald Reavey , Registration fee $ 250, receipt number AUTDC-3558473, Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice |

|  |  | motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. |
|  |  | filed by Plaintiff Cole Matney. (Attachments: # 1 Exhibit Application Admission Pro Hac, # 2 Exhibit Certificate Good Standing, # 3 Exhibit Proposed Order)(Isom, David) (Entered: 04/27/2020) |
| 04/29/2020 | 7 | DOCKET TEXT ORDER granting 5 Motion for Admission Pro Hac Vice of Attorney Mark K. Gyandoh for Cole Matney. *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* So ordered by Judge Tena Campbell on 4/29/20 (docket text only - no attached document) (alt) (Entered: 04/29/2020) |
| 04/29/2020 | 8 | DOCKET TEXT ORDER granting 6 Motion for Admission Pro Hac Vice of Attorney Donald R. Reavey for Cole Matney. *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* So ordered by Judge Tena Campbell on 4/29/20 (docket text only - no attached document) (alt) (Entered: 04/29/2020) |
| 05/28/2020 | 9 | WAIVER OF SERVICE Returned Executed filed by Cole Matney, Paul Watts as to Barric US Subsidiaries Benefits Committee Waiver sent on 4/27/2020, answer due 6/26/2020. (Gyandoh, Mark) (Entered: 05/28/2020) |
| 06/03/2020 | 10 | NOTICE of Appearance by Stephen Q. Wood on behalf of Barric US Subsidiaries Benefits Committee, Barrick Gold of North America, Board of Directors of Barrick Gold of North America (Wood, Stephen) (Entered: 06/03/2020) |
| 06/03/2020 | 11 | MOTION for Admission Pro Hac Vice of John B. Quinn , Registration fee $ 250, receipt number AUTDC-3596011, Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. |

APP 013

| | | |
|---|---|---|
| | | filed by Defendants Barric US Subsidiaries Benefits Committee, Barrick Gold of North America, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order)(Wood, Stephen) (Entered: 06/03/2020) |
| 06/03/2020 | 12 | MOTION for Admission Pro Hac Vice of Lazar P. Raynal , Registration fee $ 250, receipt number AUTDC-3596017, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. <br> Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. <br><br> filed by Defendants Barric US Subsidiaries Benefits Committee, Barrick Gold of North America, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order)(Wood, Stephen) (Entered: 06/03/2020) |
| 06/03/2020 | 13 | MOTION for Admission Pro Hac Vice of Kaitlin P. Sheehan , Registration fee $ 250, receipt number AUTDC-3596033, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. <br> Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. <br><br> filed by Defendants Barric US Subsidiaries Benefits Committee, Barrick Gold of North America, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order)(Wood, Stephen) (Entered: 06/03/2020) |
| 06/05/2020 | 14 | WAIVER OF SERVICE Returned Executed filed by Cole Matney, Paul Watts as to Barrick Gold of North America Waiver sent on 4/27/2020, answer due 6/26/2020. (Gyandoh, Mark) (Entered: 06/05/2020) |
| 06/05/2020 | 15 | WAIVER OF SERVICE Returned Executed filed by Cole Matney, Paul Watts as to Board of Directors of Barrick Gold of North America Waiver sent on 4/27/2020, answer due 6/26/2020. (Gyandoh, Mark) (Entered: 06/05/2020) |
| 06/05/2020 | | Modification of Docket. Error: Dft party name was added incorrectly at case opening as "Barric US Subsidiaries Benefits Committee". Correction: Name spelling corrected to "Barrick US Subsidiaries Benefits Committee". (alt) (Entered: 06/05/2020) |
| 06/05/2020 | 16 | DOCKET TEXT ORDER granting 11 Motion for Admission Pro Hac Vice of Attorney John B. Quinn for Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, and Board of Directors of Barrick Gold of North America. <br><br> *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* |

APP 014

| | | |
|---|---|---|
| | | *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>So ordered by Judge Tena Campbell on 6/5/20 (docket text only - no attached document) (alt) (Entered: 06/05/2020) |
| 06/05/2020 | 17 | DOCKET TEXT ORDER granting 12 Motion for Admission Pro Hac Vice of Attorney Lazar P. Raynal for Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, and Board of Directors of Barrick Gold of North America.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.*<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>So ordered by Judge Tena Campbell on 6/5/20 (docket text only - no attached document) (alt) (Entered: 06/05/2020) |
| 06/05/2020 | 18 | DOCKET TEXT ORDER granting 13 Motion for Admission Pro Hac Vice of Attorney Kaitlin P. Sheehan for Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, and Board of Directors of Barrick Gold of North America.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.*<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>So ordered by Judge Tena Campbell on 6/5/20 (docket text only - no attached document) (alt) (Entered: 06/05/2020) |
| 06/26/2020 | 19 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Exhibit 1 - Complaint in Kendall v. Pharmaceutical Product Development, LLC, Case No. 20-CV-00071-D (E.D.N.C.), # 2 Exhibit 2 - Plaintiffs Counsels Request Letter to Barrick dated 1/14/2020, # 3 Exhibit 3 - Barricks Response Letter dated 2/11/2020, # 4 Exhibit 4 - Trust Agreement Between Barrick and Fidelity and Amendments 1-17, # 5 Exhibit 5 - 2014 Form 5500, # 6 Exhibit 6 - 2015 Form 5500, # 7 Exhibit 7 - 2016 Form 5500, # 8 Exhibit 8 - 2017 Form 5500, # 9 Exhibit 9 - 2018 Form 5500, # 10 Exhibit 10 - Barrick Investment Policy, # 11 Exhibit 11 - 2019 Summary Prospectuses for JPMorgan SmartRetirement Funds R5 Share Class, # 12 Exhibit 12 - Fund Descriptions for Current Plan, # 13 Exhibit 13 - BrightScope/ICI Report Defined Contribution Plan Profile, A Close Look at 401(k) Plans, 2015)(Wood, Stephen) (Entered: 06/26/2020) |

APP 015

| 06/26/2020 | 20 | CORPORATE DISCLOSURE STATEMENT under FRCP 7.1 filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America identifying Barrick Gold Corporation as Corporate Parent. (Wood, Stephen) (Entered: 06/26/2020) |
|---|---|---|
| 07/17/2020 | 21 | AMENDED COMPLAINT against Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. filed by Cole Matney, Paul Watts. (Gyandoh, Mark) (Entered: 07/17/2020) |
| 07/24/2020 | 22 | Stipulated MOTION for Extension of Time to File Answer re 21 Amended Complaint filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order)(Wood, Stephen) (Entered: 07/24/2020) |
| 07/27/2020 | 23 | ORDER granting 22 Motion for Extension of Time to Answer re 21 Amended Complaint. Answer deadlines updated for: Barrick Gold of North America answer due 8/3/2020; Barrick US Subsidiaries Benefits Committee answer due 8/3/2020; Board of Directors of Barrick Gold of North America answer due 8/3/2020. Signed by Judge Tena Campbell on 7/27/20 (alt) (Entered: 07/27/2020) |
| 08/03/2020 | 24 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Exhibit 1 - Complaint in Kendall v. Pharmaceutical Product Development, LLC, Case No. 20-CV-00071-D (E.D.N.C.), # 2 Exhibit 2 - Plaintiffs Counsels Request Letter to Barrick dated 1/14/2020, # 3 Exhibit 3 - Barricks Response Letter dated 2/11/2020, # 4 Exhibit 4 - Master Trust Agreement Between BGNA and Fidelity and amendments thereto, # 5 Exhibit 5 - 2014 Form 5500, # 6 Exhibit 6 - 2015 Form 5500, # 7 Exhibit 7 - 2016 Form 5500, # 8 Exhibit 8 - 2017 Form 5500, # 9 Exhibit 9 - 2018 Form 5500, # 10 Exhibit 10 - Barrick Investment Policy, # 11 Exhibit 11 - 2019 Summary Prospectuses for JPM Funds for years 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and Income, # 12 Exhibit 12 - Barrick Fund Descriptions, # 13 Exhibit 13 - BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016, # 14 Exhibit 14 - Covington et al. v. Biogen, Inc., et al., Case No. 20-CV-11325 (D. Mass.), # 15 Exhibit 15 - C. Matney 2018 Summary statement, # 16 Exhibit 16 - P. Watts 2018 Summary statement, # 17 Exhibit 17 - Paragraph 95 Corrected Chart, # 18 Exhibit 18 - Fidelity FIAM Blend Target Date Q Fund Fact Sheet, # 19 Exhibit 19 - American Funds Target Date Retirement prospectuses, # 20 Exhibit 20 - 401k Averages Book, Charts 24.5, 24.77)(Wood, Stephen) (Entered: 08/03/2020) |
| 08/31/2020 | 25 | RESPONSE to Motion re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Plaintiffs Cole Matney, Paul Watts. (Gyandoh, Mark) (Entered: 08/31/2020) |
| 09/09/2020 | 26 | Stipulated MOTION for Extension of Time to File Response/Reply as to 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order)(Wood, Stephen) (Entered: 09/09/2020) |

APP 016

| 09/10/2020 | 27 | ORDER granting 26 Motion for Extension of Time to File Response/Reply re 24 MOTION to Dismiss for Failure to State a Claim: Reply memo due by 9/21/2020. Signed by Judge Tena Campbell on 9/9/20 (alt) (Entered: 09/10/2020) |
|---|---|---|
| 09/21/2020 | 28 | REPLY to Response to Motion re 24 MOTION to Dismiss for Failure to State a Claim filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 09/21/2020) |
| 09/22/2020 | 29 | REQUEST to Submit for Decision re 24 MOTION to Dismiss for Failure to State a Claim filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 09/22/2020) |
| 09/28/2020 | 30 | ORDER TO PROPOSE SCHEDULE - Plaintiff must propose a schedule to defendant in the form of a draft Attorney Planning Meeting Report within the earlier of fourteen (14) days after any defendant has appeared or twenty-eight (28) days after any defendant has been served with the complaint. See order for additional instructions. Signed by Judge Tena Campbell on 9/28/20 (alt) (Entered: 09/28/2020) |
| 01/04/2021 | 31 | NOTICE of SUPPLEMENTAL AUTHORITY by Cole Matney, Paul Watts (Attachments: # 1 Exhibit A - Letter Order in Silva v. Evonik) (Gyandoh, Mark) Modified on 4/30/2021: removed repetitive text (alt) (Entered: 01/04/2021) |
| 01/15/2021 | 32 | NOTICE of Change of Address by Stephen Q. Wood (Wood, Stephen) (Entered: 01/15/2021) |
| 01/15/2021 | 33 | RESPONSE re 31 Notice of Supplemental Authority, filed by Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 01/15/2021) |
| 03/24/2021 | 34 | NOTICE of Supplemental Authority by Cole Matney, Paul Watts re 25 Response to Motion (Gyandoh, Mark) Modified on 4/30/2021: removed repetitive text (alt) (Entered: 03/24/2021) |
| 04/01/2021 | 35 | RESPONSE re 34 Notice (Other), filed by Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 04/01/2021) |
| 04/05/2021 | 36 | **NOTICE OF ZOOM HEARING ON MOTION** re: 24 MOTION to Dismiss for Failure to State a Claim : (Notice generated by Chris Ford) Zoom Motion Hearing set for 5/21/2021 at 10:30 AM in Judges Chambers before Judge Tena Campbell. (cff) (Entered: 04/05/2021) |
| 04/09/2021 | 37 | NOTICE of SUPPLEMENTAL AUTHORITY by Cole Matney, Paul Watts re 25 Response to Motion (Attachments: # 1 Exhibit A - Jones v Coca-Cola - Motion to Dismiss Denied, # 2 Exhibit B - Davis v Magna - Motion to Dismiss Denied) (Gyandoh, Mark) Modified on 4/30/2021: removed incorrectly added text (alt) (Entered: 04/09/2021) |
| 04/22/2021 | 38 | **AMENDED NOTICE OF ZOOM HEARING ON MOTION** re: 24 MOTION to Dismiss for Failure to State a Claim : (Notice generated by Chris Ford) Motion Hearing RESET for 5/27/2021 at 10:30 AM in Judges Chambers before Judge Tena Campbell. (cff) (Entered: 04/22/2021) |

APP 017

| 04/22/2021 | 39 | RESPONSE re 37 Notice of Supplemental Authority,, filed by Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 04/22/2021) |
| --- | --- | --- |
| 04/26/2021 | 40 | NOTICE of SUPPLEMENTAL AUTHORITY by Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America (Attachments: # 1 Exhibit A - Davis v. Salesforce.com, Inc., et al.) (Wood, Stephen) (Entered: 04/26/2021) |
| 05/05/2021 | 41 | NOTICE of SUPPLEMENTAL AUTHORITY by Cole Matney, Paul Watts re 40 Notice of Supplemental Authority, (Attachments: # 1 Exhibit A - McGowan v. Barnabas, # 2 Exhibit B - Blackmon v. Zachry Holdings, # 3 Exhibit C - Peterson v. Insurance Serv. Office, # 4 Exhibit D - In re Quest Diagnostics) (Gyandoh, Mark) (Entered: 05/05/2021) |
| 05/24/2021 | 42 | OBJECTIONS to 41 Notice of Supplemental Authority, filed by Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Exhibit A - Response to Plaintiffs' Notice of Supplemental Authority)(Wood, Stephen) (Entered: 05/24/2021) |
| 05/27/2021 | 43 | Minute Entry for proceedings held before Judge Tena Campbell: Motion Hearing held on 5/27/2021 re 24 MOTION to Dismiss for Failure to State a Claim filed by Barrick US Subsidiaries Benefits Committee, Barrick Gold of North America and Board of Directors of Barrick Gold of North America.<br><br>All parties appear via ZOOM due to continued concerns with COVID-19.<br><br>Court advises counsel that it does not need to hear from them as to standing.<br><br>The court hears argument from counsel as to defendant's Motion to Dismiss.<br><br>The court orders a transcript of this hearing and advises counsel that the cost of the same is to be divided between the parties.<br><br>The court takes the matter under advisement.<br><br>Attorneys for Plaintiff: Mark K. Gyandoh and David K. Isom.<br><br>Attorneys for Defendants: Lazar Pol Raynal, Kaitlin P. Sheehan and Stephen Q. Wood.<br><br>Court Reporter: Teena Green.<br><br>(cff) (Entered: 05/27/2021) |
| 06/02/2021 | 44 | **~~RESTRICTED DOCUMENT~~** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on May 27, 2021, before Judge Tena Campbell. Court Reporter/Transcriber Teena Green, Telephone number 801-910-4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to** |

APP 018

**Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/23/2021. Redacted Transcript Deadline set for 7/6/2021. Release of Transcript Restriction set for 8/31/2021 (alt) Modified to remove restricted text on 8/31/2021 (jl). (Entered: 06/04/2021)

| | | |
|---|---|---|
| 07/27/2021 | 46 | NOTICE of SUPPLEMENTAL AUTHORITY by Cole Matney, Paul Watts (Attachments: # 1 Exhibit A - PrimeHealthcare ERISA Litigation, # 2 Exhibit B - McNeilly v. Spectrum Order, # 3 Exhibit C - Biogen Inc ERISA Litigation) (Gyandoh, Mark) (Entered: 07/27/2021) |
| 08/20/2021 | 47 | NOTICE of SUPPLEMENTAL AUTHORITY by Cole Matney, Paul Watts (Attachments: # 1 Exhibit A - Sacerdote v. NYU, # 2 Exhibit B - Garcia v Alticor) (Gyandoh, Mark) (Entered: 08/20/2021) |
| 09/14/2021 | 48 | REPORT OF ATTORNEY PLANNING MEETING. (Gyandoh, Mark) (Entered: 09/14/2021) |
| 09/20/2021 | 49 | DOCKET TEXT ORDER REFERRING CASE to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A), Magistrate to hear and determine all nondispositive pretrial matters. So ordered by Judge Tena Campbell on 9/20/21 (docket text only - no attached document) (alt) (Entered: 09/20/2021) |
| 09/22/2021 | 50 | DOCKET TEXT ORDER TO SUBMIT PROPOSED SCHEDULING ORDER. The court is in receipt of the 48 Attorney Planning Meeting Report. As previously directed in paragraph 2(a) of the 30 Order to Propose Schedule, the parties are ordered to submit a proposed scheduling order in Microsoft Word format directly to chambers email at utdecf_romero@utd.uscourts.gov within three days from the date of this order. No attached document. Signed by Magistrate Judge Cecilia M. Romero on 09/22/2021. (jfm) (Entered: 09/22/2021) |
| 09/24/2021 | 51 | SCHEDULING ORDER: Expert Discovery due by 11/23/2022. Motions due by 12/23/2022. Final Pretrial Conference set for 5/1/2023 at 03:00 PM in Rm 3.400 before Judge Tena Campbell. 10-Day Bench Trial set for 5/22/2023 at 08:30 AM in Rm 3.400 before Judge Tena Campbell. Signed by Magistrate Judge Cecilia M. Romero on 9/23/21 (alt) (Entered: 09/24/2021) |
| 09/29/2021 | 52 | NOTICE of Appearance by Grace S. Pusavat on behalf of Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America (Pusavat, Grace) (Entered: 09/29/2021) |
| 10/12/2021 | 53 | NOTICE OF WITHDRAWAL OF COUNSEL of Lazar P. Raynal filed by Lazar Pol Raynal on behalf of Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America (Raynal, Lazar) (Entered: 10/12/2021) |
| 10/12/2021 | 54 | NOTICE of REMOVING COUNSEL FROM SERVICE LIST filed by Lazar Pol Raynal.Attorney Lazar Pol Raynal will no longer receive notice from the court in this case including final judgment. (Raynal, Lazar) (Entered: 10/12/2021) |

APP 019

| | | |
|---|---|---|
| 10/14/2021 | 55 | NOTICE: The court received a bounce-back notification that a secondary email address of anthonyquinn@quinnemanuel.com, for attorney Stephen Q. Wood as invalid. As a result, the court has removed the invalid secondary email address from CM/ECF. Going forward, the court will not send email notifications to anthonyquinn@quinnemanuel.com. To learn how to update your secondary email address, please visit https://www.utd.uscourts.gov/update-your-address-court. (nl) (Entered: 10/14/2021) |
| 12/21/2021 | 56 | Stipulated MOTION to Stay *Pending Motion to Dismiss Decision and United States Supreme Court Decision* filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Wood, Stephen) (Entered: 12/21/2021) |
| 12/23/2021 | 57 | ORDER granting 56 Motion to Stay pending a decision from this court on 24 Motion to Dismiss and SCOTUS decision in *Hughes* case. Signed by Magistrate Judge Cecilia M. Romero on 12/23/21 (alt) (Entered: 12/23/2021) |
| 01/26/2022 | 58 | ORDER for Supplemental Briefing re 24 MOTION to Dismiss for Failure to State a Claim. Proposed amended scheduling order due two weeks after decision on the Motion to Dismiss. Signed by Judge Tena Campbell on 1/26/22 (alt) (Entered: 01/26/2022) |
| 02/23/2022 | 59 | Plaintiffs' Brief Addressing the Impact of Hughes v. Northwestern BRIEF re 58 Order, filed by Plaintiffs Cole Matney, Paul Watts. (Gyandoh, Mark) (Entered: 02/23/2022) |
| 02/23/2022 | 60 | Defendants' Supplemental BRIEF re 58 Order, 24 MOTION to Dismiss for Failure to State a Claim filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 02/23/2022) |
| 04/21/2022 | 61 | ORDER AND MEMORANDUM DECISION granting 24 Motion to Dismiss for Failure to State a Claim, with prejudice. Signed by Judge Tena Campbell on 4/21/22 (alt) (Entered: 04/21/2022) |
| 04/22/2022 | 62 | JUDGMENT is entered in favor of the Defendants and the case is dismissed with prejudice - CASE CLOSED. Magistrate Judge Cecilia M. Romero no longer assigned to case. Signed by Judge Tena Campbell on 4/21/22 (alt) (Entered: 04/22/2022) |
| 05/19/2022 | 63 | MOTION to Alter Judgment and Memorandum in Support filed by Plaintiffs Cole Matney, Paul Watts. (Attachments: # 1 Exhibit Comparison of Amended Complaint and Second Amended Complaint)(Gyandoh, Mark) (Entered: 05/19/2022) |
| 05/20/2022 | 64 | NOTICE OF APPEAL as to 61 Order on Motion to Dismiss for Failure to State a Claim, Memorandum Decision, 62 Judgment filed by Cole Matney, Paul Watts. Appeals to the USCA for the 10th Circuit. Filing fee $ 505, receipt number AUTDC-4338409. (Attachments: # 1 Exhibit A - Order and Memorandum Granting Motion to Dismiss, # 2 Exhibit B - Judgment in a Civil Case - Case Dismissed with Prejudice and Closed)(Gyandoh, Mark) (Entered: 05/20/2022) |
| 05/20/2022 | 65 | Transmission of Preliminary Record to USCA re 64 Notice of Appeal (Attachments: # 1 Appendix) (alt) (Entered: 05/20/2022) |

APP 020

| | | |
|---|---|---|
| 05/20/2022 | 66 | USCA Case Number Case Appealed to Tenth Circuit Case Number 22-4045 for 64 Notice of Appeal, filed by Cole Matney, Paul Watts. A transcript order form or notice that no transcript is necessary per 10th Cir. R. 10.2. This form must be filed in both the district court and this court. See letter for additional information. (jrj) (Entered: 05/20/2022) |
| 05/20/2022 | 67 | ORDER of USCA 10th Circuit as to 64 Notice of Appeal: appeal is abated. (alt) (Entered: 05/23/2022) |
| 06/02/2022 | 68 | MEMORANDUM in Opposition re 63 MOTION to Alter Judgment filed by Defendants Barrick Gold of North America, Barrick US Subsidiaries Benefits Committee, Board of Directors of Barrick Gold of North America. (Wood, Stephen) (Entered: 06/02/2022) |
| 06/03/2022 | 69 | TRANSCRIPT REQUEST FORM filed by Cole Matney, Paul Watts re 64 Notice of Appeal, (Gyandoh, Mark) (Entered: 06/03/2022) |
| 06/07/2022 | 70 | Please be advised the Record is complete for purposes of appeal for USCA case number 22-4045 re 64 Notice of Appeal (alt) (Entered: 06/07/2022) |
| 06/21/2022 | 71 | ORDER denying 63 Motion to Alter Judgment/for Reconsideration. Signed by Judge Tena Campbell on 6/21/22 (alt) (Entered: 06/21/2022) |
| 06/22/2022 | 72 | ORDER of USCA 10th Circuit as to 64 Notice of Appeal, filed by Cole Matney, Paul Watts (alt) (Entered: 06/23/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/31/2022 11:13:36 | | | |
| PACER Login: | mgyandoh | Client Code: | 125-20 |
| Description: | Docket Report | Search Criteria: | 2:20-cv-00275-TC |
| Billable Pages: | 11 | Cost: | 1.10 |

APP 021

**ISOM LAW FIRM PLLC**
David K. Isom, Esquire (Utah 4773)
299 South Main Street
Suite 1300
Salt Lake City, Utah 84111
(801) 209-7400

**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103
(Pro Hac Vice Pending)

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103
(Pro Hac Vice Pending)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>Defendants. ) | **CIVIL ACTION NO.:  2:20-cv-00275**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JUDGE TINA CAMPBELL** |

<u>**COMPLAINT**</u>

Plaintiffs, Cole Matney and Paul Watts ("Plaintiffs"), by and through their attorneys, on behalf of the Barrick Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Barrick Gold of North America, Inc. ("Barrick" or "Company"), the Board of Directors of Barrick ("Board") and its members during the Class Period and the Barrick U.S. Subsidiaries Benefits Committee and its members ("Committee") during the Class Period for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus,

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      The Tenth Circuit has recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.)

6.      At all times during the Class Period (April 24, 2014 through the date of judgment) the Plan had at least half a billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $619 million and $560 million, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

7.      Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

8.      To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

9.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

10.      Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.      JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

12.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

14.     Plaintiff, Cole Matney ("Matney"), resides in Katy, Texas.  During his employment, Plaintiff Matney participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

15.     Plaintiff, Paul Watts ("Watts"), resides in New Market, Tennessee.  During his employment, Plaintiff Watts participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans,

information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.[2] Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

18.     Barrick is the Plan sponsor with a principal place of business being 460 West 50 north, Suite 500, Salt Lake City, Utah 84101.  *See,* 2018 Form 5500 at 1.

19.     As described on Barrick's website "Barrick has gold and copper mining operations and projects in 13 countries in North and South America, Africa, Papua New Guinea and Saudi Arabia. Our diversified portfolio spans many of the world's prolific gold districts and is focused on high-margin, long-life assets."[3]

---

[2] Several weeks prior to filing the instant lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  Their request for meeting minutes was denied for, among other reasons, that the request went beyond the scope of Section 104(b)(4). *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

[3] https://www.barrick.com/English/about/default.aspx

20.     The Company appointed the Barrick U.S. Subsidiaries Benefits Committee as the Plan Administrator, and accordingly, had a concomitant fiduciary duty to monitor and supervise those appointees. *See*, Investment Policy at Page 1.

21.     The Company also acted through its officers, including the Board and Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

22.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

23.     The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including monitoring the activities of the Committee. In fact, the Board, together with the Company, appointed the Committee. *See*, Investment Policy at Page 1.

24.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

25.     The unnamed members of the Board of Directors for Barrick during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

26.     The Committee, a Named Fiduciary, had discretionary authority to select, and accordingly, the fiduciary duty to prudently select and monitor Plan investments. *See* Appendix A to Investment Policy.  "The Committee is responsible for selecting and monitoring the performance of the trustees, record keepers and/or investment managers and advisors; establishing

and maintaining the Investment Policy; selecting investment options with respect to the Plans that permit participants to direct their own investments; periodically evaluating the Plan's investment performance and recommending investment and investment option changes." *See,* Investment Policy at page 2.

27.     The Committee was appointed by the Company and Board of Directors. *See*, Investment Policy at Page 1.

28.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

29.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

30.     To the extent that there are additional officers, employees and/are contractors of Barrick who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Barrick officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.     THE PLAN

31.     The Summary Plan Description describes the purpose of the Plan as follows: "[t]he purpose of the plan is to enable eligible Employees to save for retirement." SPD at 1.

32.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

*Eligibility*

33.     In general, regular full-time employees are eligible to participate in the Plan.  SPD at 4. Participants are automatically enrolled with a deferral of 5% of compensation as soon as administratively possible after the expiration of a 30-day notification period, unless the participant affirmatively elects otherwise. Once a participant is automatically enrolled, this deferral percentage increases by 1% each plan year. *See*, SPD at 5.

*Contributions*

34.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  SPD at 6.

35.     With regard to employee contributions, "[p]articipants may contribute up to 75% of pretax annual compensation, as defined in the Plan." Notes to Financial Statements, December 31, 2018 ("Financial Statement") at 5.

36.     Barrick "contributes 100% of the first 5% of base compensation that a participant contributes to the Plan. The Company also contributes a nonmatch contribution of 4% of base compensation for the plan year."  *Id*.

37.     Like other companies that sponsor 401(k) plans for their employees, Barrick enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

38.     Barrick also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."   *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

39.     Given the size of the Plan, Barrick likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

40.     Participants who began participating in the Plan prior to July 1, 2015 are fully vested in their accounts at all times. Participants who began participating in the Plan on or after July 1, 2015 are fully vested at all times for all contributions but non-match contributions, which are subject to a four-year vesting schedule. *See,* SPD at 8 and 9.

### *The Plan's Investments*

41.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.  *See,* Investment Policy at page 2.  As noted above, the Committee, selects the investment funds that the Plan participants invest in.  *Id.*

42.     The Plan's assets under management for all funds as of December 31, 2018 was over $560,000,000.  *See,* 2018 Form 5500.

*Payment of Plan Expenses*

43.     During the Class Period Plan assets were used to pay for expenses incurred by the Plan, including recordkeeping fees. *See,* Summary Plan Description at page 18.

## V.     CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 24, 2014 through the date of judgment (the "Class Period").

45.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 4,858 Plan "participants with account balances as of the end of the plan year."  *See*, the Barrick 2018 Form 5500 at p. 2.

46.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

47.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are fiduciaries of the Plan;

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B.  Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.  Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.  The proper form of equitable and injunctive relief; and

E.  The proper measure of monetary relief.

48.  Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

49.  This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50.  In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

51.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

52.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

54.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest

of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law."  *In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341 (N.D. Okla. 2003) (citation omitted).

55.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).   "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

56.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

57.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  "[A] fiduciary cannot free

himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio."  *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

58.      In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

59.      During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

60.      Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period and (2) lower recordkeeping and administrative fees.

61.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.     Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

62.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

63.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

64.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

65.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See "A Look at 401(k) Plan Fees," supra.*

66.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id.* at 5.

67.     Prudent and impartial plan fiduciaries thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.      Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

68.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participant's assets because of unnecessary costs.

69.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

70.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

71.    When large plans, particularly those with over half a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

72.    The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  Between 2014 and 2018 the Plan included only four passively managed funds.

73.     During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

74.     The funds in the Plan have stayed relatively unchanged since 2014.  Taking 2018 as an example year, the majority of funds in the Plan (**63% of the 27 funds**) were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets).  The expense ratios for funds in the Plan were in some cases up to ***102%*** (in the case of the Lazard Emerging Markets Equity Inst.) above the median expense ratios in the same category: [5]

| Current Fund | ER[6] | Category | ICI Median |
|---|---|---|---|
| JPMorgan SmartRetirement 2025 I | 0.69 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2030 I | 0.70 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2035 I | 0.70 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2020 I | 0.66 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2045 I | 0.71 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2050 I | 0.71 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2040 I | 0.71 % | Target-date Fund | 0.65% |
| JPMorgan SmartRetirement 2055 I | 0.71 % | Target-date Fund | 0.65% |
| Fidelity Growth Company K | 0.76 % | Domestic Equity | 0.52% |

---

[5] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study") available at *https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf*

[6]  The listed expense figures are taken from summary prospectuses published in 2019.

| Current Fund | ER[6] | Category | ICI Median |
|---|---|---|---|
| FRESX<br>Fidelity Real Estate Investment Port | 0.74 % | Domestic Equity | 0.52% |
| HIASX<br>Hartford Small Co. HLS IA | 0.71 % | Domestic Equity | 0.52% |
| MGOSX<br>Victory Munder Mid-Cap Core Growth R6 | 0.88 % | Domestic Equity | 0.52% |
| ROFIX<br>Royce Opportunity Instl | 1.08 % | Domestic Equity | 0.52% |
| DODBX<br>Dodge & Cox Balanced | 0.53 % | Non-target date balanced | 0.34% |
| FDIKX<br>Fidelity Diversified International K | 0.63 % | Int'l Equity | 0.53% |
| LZEMX<br>Lazard Emerging Markets Equity Instl | 1.07 % | Int'l Equity | 0.53% |
| FGMXX<br>Fidelity Money Market Trust Retirement Government Money Market Portfolio | 0.42 % | Money Market | 0.10% |

75.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years. Accordingly, the median expense ratios in 2019 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

76.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

77.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

78.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

79.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

80.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the

lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2019 expense

ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| JNSSX JPMorgan SmartRetirement 2025 I | 0.69 % | JNSYX JPMorgan SmartRetirement 2025 R6 | 0.45 % | 53.33% |
| JSMSX JPMorgan SmartRetirement 2030 I | 0.70 % | JSMYX JPMorgan SmartRetirement 2030 R6 | 0.46 % | 52.17% |
| SRJSX JPMorgan SmartRetirement 2035 I | 0.70 % | SRJYX JPMorgan SmartRetirement 2035 R6 | 0.46 % | 52.17% |
| JTTSX JPMorgan SmartRetirement 2020 I | 0.66 % | JTTYX JPMorgan SmartRetirement 2020 R6 | 0.44 % | 50.00% |
| JSASX JPMorgan SmartRetirement 2045 I | 0.71 % | JSAYX JPMorgan SmartRetirement 2045 R6 | 0.47 % | 51.06% |
| JTSSX JPMorgan SmartRetirement 2050 I | 0.71 % | JTSYX JPMorgan SmartRetirement 2050 R6 | 0.47 % | 51.06% |
| SMTSX JPMorgan SmartRetirement 2040 I | 0.71 % | SMTYX JPMorgan SmartRetirement 2040 R6 | 0.47 % | 51.06% |
| JFFSX JPMorgan SmartRetirement 2055 I | 0.71 % | JFFYX JPMorgan SmartRetirement 2055 R6 | 0.47 % | 51.06% |
| JSRSX JPMorgan SmartRetirement Income I | 0.61 % | JSIIX JPMorgan SmartRetirement Income R5 | 0.52 % | 17.31% |

81.     The above is for illustrative purposes only.  During the Class Period, Defendants

knew or should have known of the existence of cheaper share classes and therefore also should

have immediately identified the prudence of transferring the Plan's funds into these alternative

investments.

82.     As noted above, qualifying for lower share classes usually requires only a minimum

of a million dollars for individual funds.  And it is common knowledge that investment minimums

are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329

(3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).  The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| JPMorgan SmartRetirement 2020 I | $32.6m |
| JPMorgan SmartRetirement 2030 I | $41.9m |
| JPMorgan SmartRetirement 2035 I | $36.4m |
| JPMorgan SmartRetirement 2045 I | $30.7m |
| JPMorgan SmartRetirement 2050 I | $30.4m |
| JPMorgan SmartRetirement 2040 I | $26.9m |

83.    All of the lower share alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

84.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

85.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble*, 2017 WL 3523737, at * 8.  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11.  This basic tenet of good fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

86.     By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

***Failure to Investigate Availability of Lower Cost Collective Trusts and Separate Accounts***

87.     Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds, which are pooled investment products.

88.     As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts § 100 cmt. b(1).  To determine whether

a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.* (emphasis added).

89.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

90.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

91.    Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[7] It appears the Plan included no more than one collective trust during the Class Period.

---

[7] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, Employee Benefit News (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in*

92.    Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

93.    Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees.  Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund.   By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

94.    Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

95.    Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.  Here, the Plan's recordkeeper, Fidelity Investments Institutional ("Fidelity"),

---

*DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

offered collective trust formats for its "Freedom" index and blend target-date funds during the Class Period.  Accordingly, collective trusts were readily available to the Plan.

96.     The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts and/or separate accounts in the same investment style of mutual funds in the Plan.  Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts, but Defendants again failed to investigate this option adequately.

97.     In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts or separate accounts,  Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### ***Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds***

98.     As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

99.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available   at   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:   Study*,   available   at   http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-

managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

100.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

101.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.  The alternative funds also had better performances than the Plan's funds in their 3 and 5 year average returns as of 2019.  Indeed, the 5 year average return for Lazard Emerging Markets Equity Instl was worse than 78% of peer funds.  And the 5 year average return for the Victory Munder Mid-Cap Core Growth R6 was worse than 95% of peer funds.  A reasonable investigation would have revealed the existence of lower-cost and better performing alternatives to the Plan's funds.

102.    The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[8] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 I | 0.69 % | Fidelity Freedom Index 2025 Investor | 0.12 % | Target-date Fund | 475.00% |
| | | American Funds Trgt Date Retirement 2025 R6 | 0.36 % | | 91.67% |
| | | | | | |
| JPMorgan SmartRetirement 2030 I | 0.70 % | Fidelity Freedom Index 2030 Investor | 0.12 % | Target-date Fund | 483.33% |
| | | American Funds Trgt Date Retirement 2030 R6 | 0.38 % | | 84.21% |
| | | | | | |
| JPMorgan SmartRetirement 2035 I | 0.70 % | Fidelity Freedom Index 2035 Investor | 0.12 % | Target-date Fund | 483.33% |
| | | American Funds Trgt Date Retirement 2035 R6 | 0.39 % | | 79.49% |
| | | | | | |
| JPMorgan SmartRetirement 2020 I | 0.66 % | Fidelity Freedom Index 2020 Investor | 0.12 % | Target-date Fund | 450.00% |
| | | American Funds Trgt Date Retirement 2020 R6 | 0.34 % | | 94.12% |
| | | | | | |
| JPMorgan SmartRetirement 2045 I | 0.71 % | Fidelity Freedom Index 2045 Investor | 0.12 % | Target-date Fund | 491.67% |
| | | American Funds Trgt Date Retirement 2045 R6 | 0.40 % | | 77.50% |
| | | | | | |

---

[8] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  With regard to the two rows where only one is fund listed, the Fidelity Advisor Series Growth Opps is a passively-managed fund and the Vanguard International Growth Adm is an actively managed fund.  The listed expense figures for the funds are taken from prospectuses published in 2019.

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[8] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2050 I | 0.71 % | Fidelity Freedom Index 2050 Investor | 0.12 % | Target-date Fund | 491.67% |
| | | American Funds Trgt Date Retirement 2050 R6 | 0.41 % | | 73.17% |
| JPMorgan SmartRetirement 2040 I | 0.71 % | Fidelity Freedom Index 2040 Investor | 0.12 % | Target-date Fund | 491.67% |
| | | American Funds Trgt Date Retirement 2040 R6 | 0.40 % | | 77.50% |
| JPMorgan SmartRetirement 2055 I | 0.71 % | Fidelity Freedom Index 2055 Investor | 0.12 % | Target-date Fund | 491.67% |
| | | American Funds Trgt Date Retirement 2055 R6 | 0.42 % | | 69.05% |
| Fidelity Growth Company K | 0.76 % | Fidelity Advisor Series Growth Opps | 0.01 % | Domestic Equity | 7500.00% |
| HIASX Hartford Small Co. HLS IA | 0.71 % | Vanguard Small Cap Growth Index I | 0.07 % | Domestic Equity | 914.29% |
| | | Lord Abbett Developing Growth R6 | 0.60 % | | 18.33% |
| DODBX Dodge & Cox Balanced | 0.53 % | Vanguard Balanced Index I | 0.06 % | Non-target date balanced | 783.33% |
| | | State Farm Balanced | 0.13 % | | 307.69% |
| FDIKX Fidelity Diversified International K | 0.63 % | Vanguard International Growth Adm | 0.32 % | Int'l Equity | 96.88% |
| FRESX Fidelity Real Estate Investment Port | 0.74 % | Vanguard Real Estate Index Adm | 0.10 % | Domestic Equity | 640.00% |

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[8] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | 0.74 % | DFA Real Estate Securities I | 0.18 % | | 311.11% |
| | | | | | |
| JSRSX JPMorgan SmartRetirement Income I | 0.61 % | Fidelity Freedom Index Income Investor | 0.12 % | Target-date Fund | 408.33% |
| | | American Funds Retire Inc Port-Cnsrv R6 | 0.31 % | | 96.77% |
| | | | | | |
| MGOSX Victory Munder Mid-Cap Core Growth R6 | 0.88 % | Vanguard Mid-Cap Growth Index Adm | 0.07% | Domestic Equity | 1157.14% |
| | | Vanguard Mid-Cap Growth Fund | 0.36 % | | 144.44% |
| | | | | | |
| LZEMX Lazard Emerging Markets Equity Instl | 1.07 % | FPADX Fidelity Emerging Markets Idx | 0.08 % | Int'l Equity | 1237.50% |
| | | DFA Emerging Markets Core Equity I | 0.52 % | | 105.77% |
| | | | | | |
| ROFIX Royce Opportunity Instl | 1.08 % | Vanguard S&P Small-Cap 600 Value Index I | 0.08% | Domestic Equity | 1250.00% |
| | | Vanguard Explorer Value | 0.56% | | 92.86% |
| | | | | | |

103.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

104.    Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.   As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term.  With regard to this action in particular, there is objective evidence that

selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.  Comparing the five-year returns of some of the Plan's actively managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in performance.  The chart below indicates the efficiency of the active funds or lack thereof (*i.e.*, the return needed by the actively managed fund to match the returns of the passively managed fund):

| Fund Name/Comparator | Expense Ratio | Return (5 Year) | INDEX/Return Deficiency |
|---|---|---|---|
| Fidelity Growth Company Fund K | 0.75 | 14.71 | Fails Efficiency Requires 3.32% more return to be efficient |
| Fidelity Advisor Series Growth Opps | 0.01 | 17.15 | |
| | | | |
| JPMorgan SmartRetirement 2025 I | 0.69 | 3.49 | Fails Efficiency Requires 1.97% more return to be efficient |
| Fidelity Freedom Index 2025 Investor | 0.12 | 4.82 | |
| | | | |
| JPMorgan SmartRetirement 2020 I | 0.66 | 3.4 | Fails Efficiency Requires 1.82% more return to be efficient |
| Fidelity Freedom Index 2020 Investor | 0.12 | 4.71 | |
| | | | |
| JPMorgan SmartRetirement 2030 I | 0.70 | 3.55 | Fails Efficiency Requires 2.32% more return to be efficient |
| Fidelity Freedom Index 2030 Investor | 0.12 | 5.25 | |
| | | | |
| JPMorgan SmartRetirement 2035 I | 0.70 | 3.37 | Fails Efficiency Requires 2.41% more return to be efficient |
| Fidelity Freedom Index 2035 Investor | 0.12 | 5.28 | |
| | | | |
| JPMorgan SmartRetirement 2045 I | 0.71 | 3.24 | Fails Efficiency Requires 2.53% more return to be efficient |
| Fidelity Freedom Index 2045 Investor | 0.12 | 5.04 | |
| | | | |
| JPMorgan SmartRetirement 2050 I | 0.71 | 3.25 | Fails Efficiency Requires 2.51% more return to be efficient |
| Fidelity Freedom Index 2050 Investor | 0.12 | 5.03 | |

| Fund Name/Comparator | Expense Ratio | Return (5 Year) | INDEX/Return Deficiency |
|---|---|---|---|
| | | | |
| JPMorgan SmartRetirement 2040 I | 0.71 | 3.4 | Fails Efficiency |
| Fidelity Freedom Index 2040 Investor | 0.12 | 5.04 | Requires 2.26% more return to be efficient |

105. The comparator funds above belong to the same peer group as the Plan fund. Comparing funds in the same peer group is an industry-standard that allows comparisons to be "apples to apples." Here, the following data points were used to calculate the Plan fund's efficiency: r-squared, standard deviation, and 5-year return. The same data points were used on both the active and passive funds to calculate the incremental cost and incremental return and then to determine if the active fund is efficient, less than efficient, or fails efficiency.

106. Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

## C.    Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses

107. As noted above, the Plan's recordkeeper during the Class Period was Fidelity. SPD at 2. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[9] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have

---

[9] Qualified Domestic Relations Order.

the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

108.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

109.    On overage, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf

110.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

111.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

112.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-

based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

113.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").  First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

114.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

115.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at

reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

116. Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to undertake any of the aforementioned steps because, among other things, there is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was astronomical.

117. As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan. However, the amount of indirect compensation received by Fidelity for recordkeeping services is impossible to pinpoint using publicly available information[10] given that "revenue sharing' is divvied among all the plan's service providers which "***could include but are not limited*** to recordkeepers, advisors and platform providers." *401k Averages* Book, (20th ed. 2020)[11] at p. 7, Answer to FAQ No. 14 (emphasis added).

118. If all the indirect revenue sharing reported on the Plan's form 5500 (or even a fraction of it)[12] were paid to the recordkeeper, then prior to any rebates, the per participant

---

[10] *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

[11] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at 2.

[12] The Plan reported the following revenue sharing payments during the Class Period:

recordkeeping fee would have ranged from approximately $74 to $164 during the Class Period. These amounts are clearly unreasonable as they are well above recognized reasonable rates.[13] During the Class Period, the Plan reported a revenue sharing credit which was intended to offset the high recordkeeping and administration costs of the Plan.  However, even applying the claimed credit, the fees still range from approximately $64 to $160 during the Class Period.

119.    A 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grow, a plan can negotiate lower recordkeeping fees:[14]

| Number of Participants | Avg. Cost Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

| | | |
| --- | --- | --- |
| 2018 | $ | 715,063.00 |
| 2017 | $ | 846,904.00 |
| 2016 | $ | 739,485.00 |
| 2015 | $ | 773,341.00 |
| 2014 | $ | 907,307.00 |

[13] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

[14]    *See*   https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.  Given the general trend of decreasing recordkeeping fees, the average costs per participants from ***nearly 20 years ago*** cited in the DOL study would be much lower today.

120.    Additionally, as plan asset size increases, so should the costs per participant decrease.  *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")

121.    Given the size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services at a lower cost that were comparable to or superior to the typical services provided by the Plan's recordkeeper.

122.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

123.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

124.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

125.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

126.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

127.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

128.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

129.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Barrick and the Board Defendants)

130.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

131.    Barrick and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

132.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

133.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

134.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)      failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)      failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

135.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

136.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

145.   **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

        common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  April 24, 2020

**ISOM LAW FIRM PLLC**

*/s/ David K. Isom*

_____
David K. Isom (Utah 4773)
299 South Main Street
Suite 1300
Salt Lake City, Utah 84111
david@isomlawfirm.com
(801) 209-7400

**CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey                    .*
Donald R. Reavey, Esquire
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

*/s/ Mark K. Gyandoh                    .*
Mark K. Gyandoh, Esquire
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class

Stephen Q. Wood (12403)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
60 East South Temple, Suite 500
Salt Lake City, UT 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,*
*Board of Directors of Barrick Gold of North America,*
*Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>     Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S MOTION TO DISMISS**<br><br><br>Case Number:  2:20-cv-00275-TC<br><br>Judge Tena Campbell |

# TABLE OF CONTENTS

**Page**

DUCIV 7-1 MOTION STATEMENT..................................................................................1

INTRODUCTION ..............................................................................................................1

RELEVANT FACTS ..........................................................................................................4

      A.    The Plan Offered Numerous Investment Options.....................................................5

      B.    Defendants Consistently Negotiated Lower Recordkeeper Fees.............................5

LEGAL STANDARD..........................................................................................................6

ARGUMENT ......................................................................................................................7

I.      PLAINTIFFS' CLAIMS FOR BREACH OF THE FIDUCIARY DUTY OF LOYALTY MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE A SINGLE FACT FROM WHICH A BREACH CAN BE INFERRED...........7

II.    NONE OF PLAINTIFFS' ALLEGATIONS SUPPORT A CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF PRUDENCE. ...........................................8

      A.    Plaintiffs Fail to State a Claim for Excessive Fund Expense Ratios. ...................10

             1.    There Is No Breach of Fiduciary Duty Simply Because Some Funds In The Plan Have Purportedly Higher Expense Ratios.................10

             2.    Plaintiffs Misstate Plan Fund Expense Ratios. .........................................13

             3.    Plaintiffs' Share-Class Allegations Are Meritless. ...................................15

             4.    Plaintiffs' Other Allegations Regarding The Plan's Investment Options Also Are Legally And Factually Erroneous.................................18

      B.    Plaintiffs Fail To Allege A Plausible Claim For Excessive Recordkeeping Fees. .......................................................................................................................21

III.   PLAINTIFFS' MONITORING CLAIM FAILS. ..........................................................24

CONCLUSION..................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................. 7, 9, 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 6

*Birse v. CenturyLink, Inc.*,
    No. 17-cv-02872, 2019 WL 1292861 (D. Co. Mar. 20, 2019) ............... 15

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*,
    920 F. 2d 457 (7th Cir. 1990) ............................................................. 9

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
    No. 17-cv-07243-BLF, 2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) ................... 24

*Dorman v. Charles Schwab Corp.*,
    No. 17-cv-00285, 2018 WL 6803738 (N.D. Cal. Sept. 20, 2019) .......................... 25

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ............................................................................ 6

*Gearren v. The McGraw-Hill Cos.*,
    660 F.3d 605 (2d Cir. 2011) ............................................................... 20

*Hecker v. Deere & Co.*,
    556 F.3d 586 (7th Cir. 2009) ............................................... 10, 12, 15, 16

*In re Calpine Corp.*,
    No. C-03-1685 SBA, 2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ................... 25

*In re McKesson HBOC Inc. ERISA Litig.*,
    391 F. Supp. 2d 812 (N.D. Cal. 2005) .................................................. 7

*In re Pfizer Inc. ERISA Litig.*,
    No. 04CIV10071, 2013 WL 1285175 (S.D.N.Y. Mar. 29, 2013) ........................... 8

*In re SunEdison, Inc. ERISA Litig.*,
    331 F. Supp. 3d 101 (S.D.N.Y. 2018) .............................................. 7, 8

*Johnson v. Providence Health & Services*,
    No. C17-1779-JCC, 2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ................... 3

*Khalik v. United Air Lines*,
    671 F.3d 1188 (10th Cir. 2012) ......................................................... 7

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ........................................ 2, 8, 10, 12, 15, 16

*Marks v. Trader Joe's Co.*,
    No. CV 19-10942 PA, 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ........................ 22, 23, 24

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F. 3d 705 (2nd Cir. 2013) ............................................................................ 9, 20

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ................................................................ 10, 11, 12, 15

*Romero v. Nokia, Inc.*,
    No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ..................... 7, 8

*Sacerdote v. New York University*,
    No. 16-cv-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ............................... 11

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................ 7, 22

*Tibble v. Edison Int'l, ("Tibble I")*,
    729 F.3d 1110 (9th Cir. 2013) ........................................................ 11, 12, 15, 16, 19

*Tibble v. Edison Int'l.*,
    135 S. Ct. 1823 (2015) ............................................................................................. 11

*White v. Chevron Corp. ("Chevron I")*,
    No. 16-cv-00793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .................... passim

*White v. Chevron Corp. ("Chevron II")*,
    No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017) ........... 15, 16, 21

## DUCiv 7-1 MOTION STATEMENT

Pursuant to Fed. R. Civ. P. 12(b)(6) and DUCiv 7-1, Defendants Barrick Gold of North America, Inc. ("BGNA"), the Board of Directors of Barrick Gold of North America, Inc. (the "Board"), and Barrick U.S. Subsidiaries Benefits Committee (the "Committee") (BGNA, the Board, and the Committee are collectively, the "Defendants" or "Barrick") hereby move to dismiss Plaintiffs Cole Matney and Paul Watts' (collectively, the "Plaintiffs") Complaint with prejudice for the following independent reasons: (1) Plaintiffs fail to state a claim for breach of the fiduciary duties of loyalty and prudence by the Committee (Count I); and (2) since Plaintiffs have failed to state a claim against the Committee for breach of its fiduciary duties under Count I, Plaintiffs' derivative monitoring claim (Count II) also fails.

## INTRODUCTION

Plaintiffs, former Barrick employees, were participants in the Barrick Retirement Plan (the "Plan"), a defined-contribution plan governed by ERISA.  Plaintiffs claim that during the alleged relevant six-year time period (beginning April 24, 2014, hereinafter the "Alleged Relevant Time Period") Defendants, as well as John Does 1-30, breached the fiduciary duties of loyalty and prudence in violation of ERISA by purportedly failing to: (i) "investigate and select lower cost alternative funds" for the Plan; and (ii) "monitor or control the Plan's recordkeeping expenses." (Compl. ¶¶ 68-136.)

Plaintiffs' claims, however, do not state a viable breach of fiduciary duty claim under the applicable legal standards for two principal reasons.  First, none of the alleged breaches amount to an actionable breach of fiduciary duty.  Numerous courts have ruled that a plan fiduciary is under no duty to scour the market to find the least expensive option, that there is no duty to choose passive over active investments, that there is no duty to choose institutional over retail funds, and

that there is no duty to choose any particular type of investment.  *See e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 669-72 (7th Cir. 2011).  Similarly, numerous courts have ruled that a plaintiff cannot base a breach of a fiduciary duty claim on excessive fees when the plan offers a variety of funds, including funds with cheaper fees.  *Id*. at 672-73.

Second, Plaintiffs fail to plead any facts supporting a plausible claim for breach of fiduciary duty in this case.  In fact, Plaintiffs' Complaint is a nearly identical cut-and-paste copy of a complaint Plaintiffs' counsel filed against a pharmaceutical company a week earlier in the Eastern District of North Carolina.[1]  To give the illusion of substance, the majority of the Complaint is comprised of the same lengthy recitation of ERISA fiduciary duties, case law, opinions regarding the "best" types of investments, and alleged failures pled in the PPD Complaint.   (*Compare* Compl. and Ex. 1, PPD Complaint.)  But noticeably absent are any specific allegations suggesting that the Defendants *in this case* actually breached any fiduciary duties.  Instead, Plaintiffs plead that they have no knowledge regarding the material facts, including Plan investment alternatives, actual Plan fees and costs, reasonable fees for a plan of Barrick's size, or any of Defendants' decision-making processes for selecting, monitoring, or removing Plan investments. (Compl. ¶ 17; Ex. 1, PPD Compl. ¶ 17.)  Plaintiffs nonetheless ask the Court to accept as "reasonable inferences" their allegations regarding the very facts for which they disclaim any knowledge, such as concluding that "Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options."  (Compl. ¶ 60; Ex. 1, PPD Compl. ¶ 63.)  Plaintiffs suggest that they are entitled to rely on unsupported "inferences" as opposed to actual facts because Barrick purportedly

---

[1]   *See Kendall v. Pharmaceutical Product Development, LLC*, Case No. 20-CV-00071-D (E.D.N.C.) Complaint ("PPD Complaint"), attached as Exhibit 1.

"denied" their pre-litigation ERISA §104(b)(4) demand for documents and therefore the material facts are "systematically . . . in the sole possession of defendants." (Compl. at fn. 2; Ex. 1, PPD Compl. at fn. 2.) Plaintiffs' cut-and-paste allegations regarding lack of access to material facts simply are false.

Notably, the ERISA §104(b)(4) correspondence referenced in the Complaint, is not attached for the Court's review. This omission is telling because the actual correspondence reveals that Barrick produced over 1,000 pages of relevant Plan documents in direct response to Plaintiffs' §104(b)(4) demand.[2] In addition, as former Plan participants, Plaintiffs regularly received statements providing them with the very information they admit is material to their Complaint.

These documents, which Plaintiffs withheld from the Court in lieu of unsupported "inferences" copied from a complaint in another case, demonstrate that there is no substance to

---

[2]   A copy of Plaintiffs' counsel letter to Barrick dated 1/14/2020 is attached as Exhibit 2. A copy of Barrick's 2/11/2020 response letter is attached as Exhibit 3. Enclosed with Barrick's response letter was a flash drive that contained eight (8) categories of documents, including copies of the Trust Agreement between Barrick and Fidelity and amendments thereto, Barrick's Investment Policy, and Plan prospectuses for the current investment options under the Plan. Many of the documents that were provided to Plaintiffs' counsel on the flash drive are referenced and cited in the Complaint but are not attached. (See e.g., Compl. ¶ 20 (citing Investment Policy), ¶ 31 (citing Summary Plan Description), ¶ 35 (citing 12/31/2018 Form 5500), and fn. 6 (citing 2019 summary prospectuses). Accordingly, Barrick attaches the following: Exhibit 4 (Trust Agreement and Amendments 1-17); Exhibit 5 (2014 Form 5500); Exhibit 6 (2015 Form 5500); Exhibit 7 (2016 Form 5500); Exhibit 8 (2017 Form 5500); Exhibit 9 (2018 Form 5500); Exhibit 10 (Investment Policy and addendum); Exhibit 11 (2019 Summary Prospectuses for JPMorgan SmartRetirement Funds R5 Share Class for years 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and Income); Exhibit 12 (descriptions of funds in the Plan); and Exhibit 13 (The BrightScope/ICI Report Defined Contribution Plan Profile, A Close Look at 401(k) Plans, 2015). The Court can consider these documents on a Rule 12(b)(6) motion because they are either referred to and/or cited in the Complaint, but not attached, and are central to the Plaintiffs' claims or are documents that are publicly available and subject to judicial notice because there is no dispute about their authenticity. Johnson v. Providence Health & Services, No. C17-1779-JCC, 2018 WL 1427421, at * 3 (W.D. Wash. Mar. 22, 2018) (unpublished) (granting, in part, motion to dismiss, and considering Form 5500s, fee disclosure summaries, amendments to recordkeeper agreement with Fidelity, fund prospectuses, and BrightScope/ICI Report). "The Court can consider information from these documents insofar as they contradict allegations from the complaint." Id.

Plaintiffs' Complaint.  These documents show that the Plaintiffs have grossly misstated fund expense ratios and recordkeeping fees.  The documents also demonstrate that the Committee regularly reviewed the investment funds offered in the Plan and routinely removed and added new investment options to provide Plan participants with meaningful investment options.  The Plan documents also reveal that the Committee routinely reviewed the recordkeeper fees and amended Barrick's agreement with the recordkeeper seventeen times, resulting in a reduction in recordkeeper fees charged.  Thus, the records available to Plaintiffs demonstrate that Defendants have engaged in the very fiduciary actions Plaintiffs ask this Court to assume never occurred.

ERISA breach of fiduciary duty claims are not one size fits all.  Plaintiffs cannot state a plausible claim by ignoring information in their possession and asserting allegations from another complaint against Barrick.

## **RELEVANT FACTS**

BGNA is an industry leading mining company that owns and operates gold and copper mines.  (Compl. ¶ 19.)  During the Alleged Relevant Time Period, one of the retirement benefits BGNA offered its employees was the Plan—an employer-sponsored, individual-account, defined contribution plan.  (Compl. ¶¶ 31-32.)  Employees who worked for BGNA were eligible to participate in the Plan and make contributions from their pretax annual compensation, up to certain limits.  (Compl. ¶¶ 33, 35.)  In addition, Barrick matches 100% of the first 5% of base compensation that an employee contributed and contributes an additional non-match contribution of 4% of the base compensation for the Plan year.  (Compl. ¶ 36.)  Thus, BGNA makes significant contributions to its employees' retirement savings.  For example, in 2018, BGNA contributed a total of $1,352,364 in 100% employer-funded discretionary contributions.  ([2018 Form 5500, Ex. 9, at 46](#).)

**A.      The Plan Offered Numerous Investment Options.**

During the Alleged Relevant Time Period, the Plan offered a wide range of investment options.  The Committee, in accordance with its Investment Policy, employed robust review and approval procedures for selecting, monitoring, and removing investment options.  (Investment Policy, Ex. 10, at 4-5.)  Plan participants could allocate their accounts to approximately thirty core funds.  (2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42; 2016 Form 5500, Ex. 7, at 44; 2017 Form 5500, Ex. 8, at 42; and 2018 Form 5500, Ex. 9, at 73.)  The Plan investment options included: major asset classes (domestic equity, domestic fixed income, and international equities); a stable value fund; a money market cash equivalent; a real estate fund; target-date funds; and both actively and passively managed funds.  (Investment Policy, Ex. 10, at 2-3; 2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42; 2016 Form 5500, Ex. 7, at 44; 2017 Form 5500, Ex. 8, at 42; and 2018 Form 5500, Ex. 9, at 73.)

Over the Alleged Relevant Time Period, the Committee actively supervised and managed the available investment options, removing certain options and adding others.  (Investment Policy, Ex. 10, at 4-5.)  For example, in 2015, the Plan transitioned from offering the Fidelity Freedom target date funds to the JPMorgan SmartRetirement Funds.  (2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42.)

**B.      Defendants Consistently Negotiated Lower Recordkeeper Fees.**

Fidelity Management Trust Company ("Fidelity) has served as the Plan's recordkeeper during the entirety of the Alleged Relevant Time Period.  (Master Trust Agreement Between BGNA and Fidelity (the "Trust Agreement") and the amendments thereto, Ex. 4.)  During that time, Barrick has consistently evaluated its recordingkeeping fees and negotiated reductions. Indeed, since engaging Fidelity, Barrick has amended the Trust Agreement with Fidelity seventeen times.  (Amendments 1-17 to Trust Agreement, Ex. 4 at 62-119.)  These amendments resulted in

a consistent decline in the amount of fees paid to Fidelity for its administrative services.  For example, during the period April 24, 2014 to December 31, 2016, there was no contractual recordkeeper fee per participant.  Rather, Fidelity's recordkeeper fee was comprised of variable percentages of the total amount of Plan assets for each of the various investment options in the Plan.  (Trust Agreement, Exhibit 4, at 40-41.)  During this period, Barrick and Fidelity agreed to a revenue credit program, under which Fidelity's recordkeeper fee was further reduced by an agreed-upon dollar amount (ranging from $325,000 to $375,000) that Fidelity annually credited back the Plan.  (12th Amendment to Trust Agreement, Ex. 4, at 100-101; 13th Amendment to Trust Agreement, Ex. 4 at 102-103.)

On January 1, 2017, Barrick and Fidelity again amended (for the fourteenth time) the Trust Agreement and transitioned Fidelity's recordkeeper fee from a percentage of Plan assets model to a contractual per participant recordkeeper fee of $68.  (14th Amendment to Trust Agreement, Ex. 4, at 104-114.)  Barrick and Fidelity continued the revenue credit program, under which Fidelity annually credited back Plan participants variable percentages of average daily balances held in the Plan funds.  (14th Amendment to Trust Agreement, Ex. 4, at 111-114.)  In April 2020, the Trust Agreement was amended yet again to further reduce the recordkeeper fee to $53 per participant.  (17th Amendment to Trust Agreement, Ex. 4, at 118-119.)  Thus, a review of the history of the relationship between Barrick and Fidelity reveals a consistent effort by Barrick to drive fees lower.

## LEGAL STANDARD

Motions to dismiss are an "important mechanism for weeding out meritless claims," and district courts are charged with carefully reviewing complaints in ERISA cases to separate the "plausible sheep from the meritless goats."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "[W]here

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Legal conclusions, whether presented as such or masquerading as factual allegations, are not afforded such deference. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191–93 (10th Cir. 2012) (finding conclusory allegations are not entitled to an assumption of truth).

## ARGUMENT

I.  **PLAINTIFFS' CLAIMS FOR BREACH OF THE FIDUCIARY DUTY OF LOYALTY MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE A SINGLE FACT FROM WHICH A BREACH CAN BE INFERRED.**

The Complaint is devoid of any facts supporting a claim for a breach of the duty of loyalty. Simply attaching a "disloyalty" label to Count I of the Complaint is not enough. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions . . . will not do." (internal quotations omitted)). The duties of loyalty and prudence are separate and distinct and must be pled separately. Courts have not hesitated to dismiss disloyalty claims that merely attempt to piggyback on other theories of fiduciary breach. *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018); *Romero v. Nokia, Inc.*, No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (unpublished) (dismissing claim for breach of the duty of loyalty that did not "present any separate allegations regarding any loyalty breach"); *In re McKesson HBOC Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005).

Here, Plaintiffs have not pled a single fact that permits an inference that the Committee ever discharged its duties with anything other than "an eye single to the interests of the participants and beneficiaries." *In re SunEdison,* 331 F. Supp. 3d at 114. Plaintiffs did not allege any facts

suggesting that the Committee acted for anyone's interest other than the Plan participants and beneficiaries, much less any benefit to BGNA, the Board, or the Committee.  The only references in the Complaint to the word "loyalty" or a breach of the duty of loyalty are either: (i) quotes from ERISA and case law *(see e.g.*, Compl. ¶¶ 4, 5, 54, 55, 56); or (ii) conclusory statements that the Committee breached its duty of loyalty (and prudence) *(see e.g.*, Compl. ¶¶ 9, 10, 122).  Thus, despite having over 1,000 pages of documents relating to Defendants' management of the Plan, Plaintiffs were unable to identify any specific acts of disloyalty.

Instead, Plaintiffs' disloyalty claims improperly hinge "on the prudence-based allegations" in the Complaint, and "do[] [not] present any separate allegations regarding any loyalty breach [.]" *Romero*, 2013 WL 5692324, at \*5; *In re SunEdison, Inc.*, 331 F. Supp. 3d at 115; *In re Pfizer Inc. ERISA Litig.*, No. 04CIV10071, 2013 WL 1285175, at \*10 (S.D.N.Y. Mar. 29, 2013) (unpublished) (dismissing duty of loyalty claims that were derivative of plaintiffs' unsuccessful duty of prudence claims).  Accordingly, Plaintiffs' disloyalty claims should be dismissed where, as here, there is "no reason to think" that the Committee chose particular investment options "to enrich itself at participants' expense."  *Loomis*, 658 F.3d at 671.

## II.    NONE OF PLAINTIFFS' ALLEGATIONS SUPPORT A CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF PRUDENCE.

In Count I, Plaintiffs claim that the Committee breached the fiduciary duty of prudence by: (i) failing to select lower cost alternative funds by not utilizing lower fee share classes, collective trusts, separate accounts, and passively managed funds; and (ii) the failing to negotiate lower recordkeeping fees paid to Fidelity.

Under ERISA, the duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character

and with like aims." 29 U.S.C. § 1104(a)(1)(B).  In pleading claims for breach of the duty of prudence, it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F. 3d 705, 718 (2nd Cir. 2013).  "[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a '*reasonable inference*' that the defendant committed the alleged misconduct, thus permitting the court to infer more than the '*mere possibility* of misconduct.'" *Id.* (citing *Iqbal*, 556 U.S. at 678) (emphasis in original).  Courts "judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."  *Id.* at 716.  "In short, ERISA's 'fiduciary duty of care . . . requires prudence, not prescience.'"  *Id.* (citing *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F. 2d 457, 465 (7th Cir. 1990)).

Plaintiffs' prudence allegations rest on legally baseless conclusions—*i.e.* that merely because there were allegedly cheaper and better performing alternatives to a cherry-picked subset of Plan funds with which Plaintiffs take issue, Defendants must have failed to investigate and monitor the Plan's investments.  (Compl. ¶¶ 84-85, 101, 106, 126).  As set forth below, this exact type of analysis has been repeatedly rejected by courts.  Moreover, and fatally, Plaintiffs' allegations regarding the Plan's fund expense ratios and recordkeeping fees are wrong.  The very premise of Plaintiffs' Complaint—that the Plan contained options more expensive than Plaintiffs' hypothetical alternatives is incorrect—***the Plan was less expensive***.

A. **Plaintiffs Fail to State a Claim for Excessive Fund Expense Ratios.**

1. *There Is No Breach of Fiduciary Duty Simply Because Some Funds in The Plan Have Purportedly Higher Expense Ratios.*

Plaintiffs claim that the Committee breached its fiduciary duty of prudence by offering certain funds that Plaintiffs allege "charged grossly excessive fees compared with comparable or superior alternatives." (Compl. ¶ 72.) Plaintiffs argue that seventeen of the twenty-seven funds available in the Plan had higher expense ratios than purportedly identical funds. (Compl. ¶¶ 74, 80.) This is insufficient, as numerous Courts have made clear:

> [t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).

*Loomis*, 658 F.3d at 670 (*quoting Hecker v. Deere & Co.*, 556 F.3d 586 (7th Cir. 2009). In *Hecker*, the plan at issue offered twenty mutual funds with expense ratios ranging from .07% to just over 1%. 556 F.3d at 581. The Seventh Circuit affirmed dismissal of the plaintiffs' claim that the defendant violated its fiduciary duty by not offering cheaper investment options, noting that there was nothing in ERISA that required plan fiduciaries to offer a particular mix of investment vehicles in a plan. *Id.* Similarly, in *Loomis*, the Seventh Circuit again affirmed dismissal where the plan offered 24 mutual funds with expense ratios ranging from 0.03% to 0.96%. 658 F.3d at 669. In affirming dismissal, the court reiterated that a fiduciary need not offer the lowest-cost, highest-performing investment options and that providing participants choices between high risk/high expense funds along with low expense index funds is what is important. *Id*. at 673. Likewise, courts have dismissed claims for breach of the duty of prudence based on the existence of funds with a cheaper expense ratio. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011) (affirming dismissal and finding that plan offering 73 investment options with expense ratios ranging from 0.10% to 1.21% offered meaningful alternatives and therefore the court was unable

"to infer from what is alleged that the process was flawed."); *Sacerdote v. New York University*, No. 16-cv-6284, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017) (unpublished) (dismissing breach of duty of prudence claim holding that courts look "first to the characteristics of the mix and range of options and then evaluate[] the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options" (quoting *Renfro*, 671 F.3d at 326)).

Furthermore, courts have consistently recognized that "[i]t is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly." *White v. Chevron Corp.*, No. 16-cv-00793, 2016 WL 4502808 at *12 (N.D. Cal. Aug. 29, 2016) ("*Chevron I*") (unpublished). "There are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable." *Chevron I*, 2015 WL 4502808 at 10, *quoting Tibble v. Edison Int'l*, ("*Tibble I*") 729 F.3d 1110, 1135 (9th Cir. 2013), *judgment vacated on other ground*s, *Tibble v. Edison Int'l.*, 135 S. Ct. 1823 (2015) (noting that a fiduciary might choose funds with higher fees for a number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility).

Here, Plaintiffs take issue with seventeen of the twenty-seven funds offered in the Plan in 2018 and allege that the expense ratios for this group of funds ranged from 42 to 108 basis points (0.42% to 1.08%). (Compl. ¶ 74.) Even accepting this allegation as true—which as explained below it is not—this allegation cannot legally establish a claim for breach of the fiduciary duty of prudence. Indeed, as the allegation itself acknowledges, there are other investment alternatives available to Plan participants outside of these seventeen funds. Thus, Plan participants had choice. Further, despite Plaintiffs' use of emphasis in the Complaint (Compl. ¶ 74), there is no

requirement—under ERISA or the relevant case law—that plan administrators include investments within certain expense ratios.  Rather, providing options is the key.  Such is the case here.

Using 2018 (the same year Plaintiffs use in the Complaint), other Plan investment options included: (i) an income fund (Dodge & Cox Income); (ii) a stock fund (Dodge & Cox Stock); (iii) an index fund (FID 500 Index); and (iv) bonds (Vanguard Total Bond Mkt Adm).  (2018 Form 5000, Ex. 9, at 73.)  Moreover, the same documents provided to Plaintiffs' counsel, demonstrate that the current Plan (*i.e.*, 2020) includes a variety of investment options with expense ratios as low as 0.06%.  (Barrick Fund Descriptions, Ex. 12, at 6.)  Even the seventeen funds that Plaintiffs target—with a purported range of expense ratios (between 42 to 108 basis points) and a range of asset types (target-date funds to money-market government funds to real estate)—are broadly diversified and provide Plan participants the ability to elect cheaper (*e.g.*, 42 basis points) or more expensive (*e.g.*, 108 basis points) investments.

Further, not only are the Plan's investment options sufficiently diverse on the face of the Complaint, the range of expense ratios that Plaintiffs take issue with are well within the range that other courts have repeatedly determined are reasonable as a matter of law.  *Tibble I*, 729 F. 3d at 1135 (affirming reasonableness of fees that "varied from .03[%] to 2%"); *Loomis*, 658 F.3d at 669-72 (affirming dismissal where "expense ratios rang[ed] from 0.03% to 0.96%"); *Renfro*, 671 F. 3d at 319 (affirming dismissal where fees "ranged from 0.1% to 1.21%"); *Hecker*, 556 F. 3d at 586 (affirming dismissal where "[a]t the low end, the expense ratio was .07%; at the high end, it was just over 1%"); *Chevron I*, 2016 WL 4502808 at *11 (N.D. Cal. Aug. 29, 2016) (rejecting a claim of excessive investment fees where the complaint alleged fees ranging from .05% to 1.24%).  Here, the alleged expense ratios for the funds in the Plan range from .06% to 1.07%, well within the ranges found to be reasonable.  *See Renfro*, 671 F. 3d at, 326-28 and *Hecker*, 556 F. 3d at 586.

## 2.    *Plaintiffs Misstate Plan Fund Expense Ratios.*

In Paragraphs 68-106 of the Complaint, Plaintiffs make various allegations and comparisons purportedly showing how some of the Plan's funds were more expensive than cheaper alternatives.  These allegations are premised on misstating the Plan's actual investment options.

For example, in 2018, eight of the seventeen funds that Plaintiffs take issue with and allege are more expensive than comparable funds are the JPMorgan SmartRetirement Funds, which Plaintiffs claim were offered in share class "I".  (Compl. ¶¶ 74, 80.)  Plaintiffs' comparative expense ratio analysis, however, is completely inaccurate because the Plan offered JPMorgan SmartRetirement Funds in the "R5" share class, not the "I" share class.  This was clearly identified in the 2018 Form 5500 provided to Plaintiffs' counsel in February (also publicly available), as excerpted below:

| (d) Enter name and EIN (address) of source of indirect compensation | | | (e) Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|---|---|
| JPM SMRTRET 2020 R5 | DST ASSET MA | PO BOX 219432 KANSAS CITY, MO 64121 | 0.15% |

([2018 Form 5500, Ex. 9 at 9-12](#) (indicating R5 share class for each of the JPMorgan SmartRetirement Funds).)

This mistake removes the purported basis for the entirety of the Complaint.  For example, in Paragraph 74, Plaintiffs allege that the expense ratio for the "JPMorgan SmartRetirement 2025 I" is 0.69% and that this expense ratio is higher than the "ICI Median" of 0.65%.  However, the very 2019 summary prospectus Plaintiffs rely on, shows that the correct share class, JPMorgan SmartRetirement 2025 R5, has an expense ratio of only 0.55%—which is 10 basis points less than the alleged "ICI Median."  ([2019 Summary Prospectus for JPMorgan SmartRetirement Funds R5 Share Class, Ex. 11 at 16](#).)  Thus, Plaintiffs' allegation is demonstrably incorrect on its face.  The same faulty "I" share class expense ratio is repeated throughout the chart in Paragraph 74 leading

to an overstatement of the actual expense ratios for funds available under the Plan.  (2019 Summary Prospectuses for JPMorgan SmartRetirement Funds R5 Share Class, Ex. 11, at 8 (2020 expense ratio of 0.54); 24 (2030 expense ratio of 0.56); 32 (2035 expense ratio of 0.56); 40 (2040 expense ratio of 0.57); 48 (2045 expense ratio of 0.57); 56 (2050 expense ratio of 0.57); 64 (2055 expense ratio of 0.57); 1 (income expense ratio of 0.52).)  This same fatal error is repeated in each of the charts in Paragraphs 80, 82, 102, and 104.  Plaintiffs repeatedly misstate the median expense ratios in an effort to illustrate that these funds are more expensive.

To create the illusion of inflated expense ratios, Plaintiffs assign a one-size fits all investment "category" (*e.g.*, Domestic Equity, Money Market, Int'l Equity) to each of the remaining funds, which then corresponds to an alleged "median" expense ratio.  (Compl. ¶ 74.) However, the very study upon which Plaintiffs rely for this "median" cautions that using such broad, one-size fits all investment "categories" to compare expense ratios is not meaningful.  The study clarifies that "the expense ratios applicable to funds *vary within a given investment category*" and notes that for any given investment category, "expense ratios can vary wildly depending on the extent to which the fund was invested in small-cap, mid-cap, or emerging market stocks (which tend to be more expensive to manage) instead of large-cap or developed market stocks (which tend to be less expensive to manage)."  (BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015, Ex. 13, at 59) (emphasis added.)  Therefore, as the ICI Study itself acknowledges, use of the "category" that Plaintiffs assigned to the remaining funds is not a meaningful tool to compare fund expense ratios.[3]

---

[3]   Although not applicable to the Court's analysis here, Barrick notes that when the correct median expense ratios for the like kind subcategories applicable to the remaining funds are applied, nearly all of the funds offered here are less expensive than the median expense ratio.

The Court is not required to accept Plaintiffs' erroneous expense ratio analysis as true when it is contradicted both by the documents referenced in the Complaint and by documents which the Court can take judicial notice.  *Birse v. CenturyLink, Inc.*, No. 17-cv-02872, 2019 WL 1292861, at * 2 (D. Co. Mar. 20, 2019) (granting motion to dismiss noting that allegations regarding purported breach of fiduciary duty were both "unsupported and conclusory" and therefore "not entitled to a presumption of truth.")  As the documents provided to Plaintiffs and those that are publicly available demonstrate, the Plan fund expense ratios were actually *lower* than Plaintiffs' alternative options.  There simply is no merit to Plaintiffs' claims otherwise.

### 3.      *Plaintiffs' Share-Class Allegations Are Meritless.*

Similarly, ignoring the Plan documents provided to them, Plaintiffs ask this Court to infer that the Committee failed to investigate the use of lower-cost share classes simply because Plaintiffs purportedly identified a lower-cost share class available for certain funds in the Plan. (Compl. ¶¶ 80, 83-86.)  These allegations fail to state a claim for several reasons.

*First*, "ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach."  *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) ("*Chevron II*") (unpublished), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).  That is because "fiduciaries have latitude to value investment features other than price, and indeed are required to do so, and ERISA does not require fiduciaries to 'scour the market to find and offer the cheapest possible funds.'"  *Id*. (citation omitted).  *See also*, *Tibble I*, 729 F.3d at 1135 (rejecting the argument that "a fiduciary should have offered only wholesale or institutional funds.") (quotation marks and citation omitted); *see also Loomis*, 658 F.3d at 669–70 (dismissing claim that fiduciaries should have offered institutional funds); *Hecker*, 556 F.3d at 586 (same); *Renfro*, 671 F.3d at 326–28 (dismissing claims that fiduciaries should have selected cheaper funds).  As the Seventh Circuit noted in

*Hecker*, "the cheapest possible fund" also "might, of course, be plagued by other problems." 556

F.3d at 586; *see also Loomis*, 658 F.3d at 670 (same); *Tibble I*, 729 F.3d at 1135 (same).

The lynchpin conclusion undergirding Plaintiffs' entire claim that is that "there is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available . . .." (Compl. ¶ 84.)  However, as the court in *Chevron II* noted, it is legally insufficient if the sole support for this conclusory allegation is a comparison between funds in the Plan and funds that Plaintiffs have identified as less expensive.  2017 WL 2352137, at *14 ("what is still missing from the FAC are factual allegations sufficient to create a plausible inference that defendants' process of selecting funds and their monitoring of the funds was imprudent.")  Moreover, courts have repeatedly found that retail funds do have advantages over their institutional-class counterparts. For example, they are more transparent and offer more opportunities to benchmark. *Loomis*, 658 F.3d at 672.  And they are highly liquid, unlike "institutional investment vehicles [which have] a drawback [of] lower liquidity." *Id*.  "There are simply too many relevant considerations for a fiduciary, for [any] type of bright-line approach [judging the] prudence [of offering retail-class investments] to be tenable." *Tibble I*, 729 F.3d at 1135.  Thus, judging Plan decisions on price alone fails as a matter of law.

**Second**, the documents in Plaintiffs' counsel's possession refute Plaintiffs' unsupported statements regarding the Committee's alleged failure to investigate a set of lower share classes. The Investment Policy states that the Committee will "periodically review" the funds including the "structure of the option…its cost to the participants" and "its annual operating expenses." (Investment Policy, Ex. 10 at 5.)  The Investment Policy states further that the Committee "with the advice of the Investment Consultant, will periodically evaluate expense ratios. . .." (*Id.* at 6.) Thus, Plaintiffs' allegations fail when confronted with actual Plan documents.

***Finally***, Plaintiffs' allegations regarding the Committee's purported failure to move from the "I" share class of the JPMorgan SmartRetirement Funds to the "R6" share class is fundamentally erroneous as discussed *supra* at 13-14.  Even if Plaintiffs alleged the correct share class (they have not), moving to the "R6" share class would have actually increased costs for Plan participants, not lowered them.

Publicly available documents as well as those provided to Plaintiffs in February, which Plaintiffs acknowledge they relied upon in compiling their "comparison" chart in Paragraph 80, show that the Plan participants received a 15 basis point revenue credit for the "R5" share class of the JPMorgan SmartRetirement Funds.  (14th Amendment to Trust Agreement, Ex. 4 at 111-114; 2018 Form 5500, Ex. 9 at 9-12 (noting "0.015%" for JPMorgan SmartRetirement Funds.) Accordingly, when this 15 basis point revenue share is actually applied and the correct expense ratio for the "R5" share class is used, it is clear that the "R5" share class is actually cheaper than the "R6" share class.  Indeed, the following chart corrects Plaintiffs' inaccurate chart in Paragraph 80.

| Fund | 2019 Prospectus Expense Ratio[4] | Actual Plan Expense Ratio When 15 bps Applied | Plaintiffs' Alleged Lower Share Class | Plaintiffs' Alleged Expense Ratio[5] | R5 Cheaper Than R6? |
|---|---|---|---|---|---|
| JP Morgan SmartRetirement 2025 R5 | 0.55% | 0.40% | JP Morgan SmartRetirement 2025 R6 | 0.45% | YES |
| JP Morgan SmartRetirement 2030 R5 | 0.56% | 0.41% | JP Morgan SmartRetirement 2030 R6 | 0.46% | YES |

---

[4]   *See* 2019 Summary Prospectuses for JPMorgan SmartRetirement Funds R5 Share Class, Ex. 11, at 8 (2020 expense ratio of 0.54); 24 (2030 expense ratio of 0.56); 32 (2035 expense ratio of 0.56); 40 (2040 expense ratio of 0.57); 48 (2045 expense ratio of 0.57); 56 (2050 expense ratio of 0.57); 64 (2055 expense ratio of 0.57); 1 (income expense ratio of 0.52).

[5]   Compl. ¶ 80.

| JP Morgan SmartRetirement 2035 R5 | 0.56% | 0.41% | JP Morgan SmartRetirement 2035 R6 | 0.46% | YES |
|---|---|---|---|---|---|
| JP Morgan SmartRetirement 2020 R5 | 0.54% | 0.39% | JP Morgan SmartRetirement 2020 R6 | 0.44% | YES |
| JP Morgan SmartRetirement 2045 R5 | 0.57% | 0.42% | JP Morgan SmartRetirement 2045 R6 | 0.47% | YES |
| JP Morgan SmartRetirement 2050 R5 | 0.57% | 0.42% | JP Morgan SmartRetirement 2050 R6 | 0.47% | YES |
| JP Morgan SmartRetirement 2040 R5 | 0.57% | 0.42% | JP Morgan SmartRetirement 2040 R6 | 0.47% | YES |
| JP Morgan SmartRetirement 2055 R5 | 0.57% | 0.42% | JP Morgan SmartRetirement 2055 R6 | 0.47% | YES |
| JP Morgan SmartRetirement Income R5 | 0.52% | 0.37% | JP Morgan SmartRetirement Income R6 | 0.42% | YES |

Thus, Plaintiffs' assertion that the "R6" share class is cheaper than the share class offered by the Plan is demonstrably false.

> ### 4.   *Plaintiffs' Other Allegations Regarding the Plan's Investment Options Also Are Legally And Factually Erroneous.*

Lastly, Plaintiffs allege a variety of other purported failures by the Committee including: (i) failure to utilize collective trusts and separate accounts; (ii) failure to include passively managed funds; and (iii) the existence of other funds that purportedly outperformed the seventeen funds Plaintiffs identify in the Complaint.   (Compl. ¶¶ 87-106.)   These allegations are similarly undermined by Plaintiffs' repeated erroneous reliance on "I" share class for the JPMorgan SmartRetirement Funds.   Nonetheless, setting that fundamental issue aside, all of these allegations fail to state a claim as a matter of law.

As the court in *Chevron I* cogently explained in dismissing the plaintiff's claims:

> While plaintiffs appear to be challenging the entire lineup of funds, the challenge is primarily based on *speculation* that the Plan fiduciaries "could have" provided lower-cost versions of the funds, or "could have" had the same advisors manage the same funds in a separate account, or "could have" structured the investments differently. It is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly. In particular, mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an "apples-to-oranges comparison."

*Chevron I*, 2016 WL 4502808 at *12 (*citing Tibble I*, 729 F.3d at 1134) (emphasis added).  This is exactly what Plaintiffs have done here.  For example, in Paragraph 102, Plaintiffs include a chart that purportedly compares seventeen lower cost funds.  However, as Plaintiffs acknowledge, some of the "fund counterparts" in Paragraph 102 include passively-managed funds.  (Compl. at fn. 8.)  Thus, even if Plaintiffs had cited to the correct funds, and even if the expense ratios associated with these funds were higher than the passively-managed funds in Paragraph 102, Plaintiffs still would not have stated a proper claim.  Allegations that are nothing more than an "apples-to-oranges comparison" must fail.  *Chevron I*, 2016 WL 4502808 at *12 (*citing Tibble I*, 729 F.3d at 1134).

Similarly, Plaintiffs attempt to establish a breach of the duty of prudence by comparing actively managed JPMorgan SmartRetirement Funds to Plaintiffs' selected passively managed Fidelity Freedom Index Funds, is yet another invalid comparison.  (Compl. ¶¶ 104-105.)  The purported purpose of Plaintiffs' chart (on page 32) is to illustrate that other funds outperformed the erroneously identified "I" class JPMorgan SmartRetirement Funds.  Once again, this "apples-to-oranges comparison" is insufficient to state a claim given the differences between the funds (*i.e.*, passively managed index vs. target date).

Moreover, even if comparing the performance of an active to a passive management fund were a valid comparison—it is not—Plaintiffs' use of hindsight to draw the comparison is expressly prohibited as a basis for establishing a breach of fiduciary duty.  ERISA's "fiduciary

duty of care . . . requires prudence, not prescience." *St. Vincent*, 712 F. 3d at 716. "[T]he decline in the price of a security does not, by itself, give rise to a plausible inference that the security is no longer a good investment." *Id.* at 721; *see also Gearren v. The McGraw-Hill Cos.*, 660 F.3d 605, 610 (2d Cir. 2011) (noting that an investment is not imprudent merely because the price "trend[s] downward significantly."). Consequently, Plaintiffs' hindsight allegations do not give rise to a plausible claim of breach of fiduciary duty.

Furthermore, Plaintiffs do not plead any plausible facts suggesting that Defendants failed to investigate lower cost options. Plaintiffs' failure to plead any such fact is noteworthy because Plan documents provided to Plaintiffs demonstrate that the Committee had a robust process in place for reviewing and selecting Plan investments. This included: (i) a semi-annual review of the investment results of funds in the Plan; (ii) regular quantitative and qualitative review of each of the Plan's investments; (iii) giving funds a status of "watch" or "probation" for a specified period in order to determine if replacement of the investment option was necessary; and (iv) a process for selecting new, alternative, or additional funds to include in the Plan. (Investment Policy, Ex. 10 at 4-6.) And it is evident that the Committee regularly removed, replaced, and added investment options to the Plan as the materials provided to Plaintiffs' counsel make that clear. For example, as noted in a comparison of the Plan lineup from 2014 to 2015, the Committee identified and replaced the Fidelity Freedom target date retirement funds with the JPMorgan SmartRetirement Funds. (2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42.) Likewise, comparison of the funds in the Plan during the Alleged Relevant Time Period show numerous changes to the Plan line up and consistent analysis and movement of funds by the Committee. (2015 Form 5500, Ex. 6, at 42 (removing funds "Munder MDCPCR Gth R6" and "Fidelity Retire MMKT" and adding "FID RETIRE GOV II" and "VM MID-CO Core GR R6"); 2016 Form 5500, Ex. 7, at 44

(removing funds "Spartan Intl Index" and "GEIF US LGCP COR INV" and adding funds "SSI US LG-CP COR INV" and "FID Intl Index Pr"); 2017 Form 5500, Ex. 8, at 42 (removing funds "SSI US LG-CP COR INV" and "FID RETIRE GOV II" and adding "FID MMKT Government Portfolio"). Thus, Plaintiffs' claims regarding any purported failure to investigate on the part of the Committee and claims that "[t]he funds in the Plan have stayed relatively unchanged since 2014" are belied by the documents in Plaintiffs' possession.

In sum, Plaintiffs' unsupported allegations regarding the Plan's investment options are not actionable as a matter of law and are rebutted by documents in Plaintiffs' possession.

**B.     Plaintiffs Fail to Allege A Plausible Claim for Excessive Recordkeeping Fees.**

Plaintiffs also contend that the Committee allowed Fidelity to receive excessive compensation for its administrative services. (Compl. ¶¶ 107-122, 126.) Plaintiffs' claim fails as a matter of law for three reasons.

***First***, courts have dismissed excessive recordkeeping fee claims when the plaintiff fails to identify the complained of recordkeeping fees. For example, in *Chevron I,* the district court emphasized the plaintiffs' failure to allege "what recordkeeping fees Vanguard charged" when addressing a motion to dismiss the initial complaint. *Chevron I*, 2016 WL 4502808, at *15. Because of that failure, the district court dismissed the duty of prudence claim, noting "it [wa]s not clear on what basis plaintiffs [we]re asserting that the fees were excessive." *Id*. Attempting to overcome this deficiency in their first amended complaint, the plaintiffs in *Chevron II* alleged an "estimate" for recordkeeping fees, providing a $167-$181 figure. *Chevron II*, 2017 WL 2352137, at *17–18 (unpublished), *aff'd*, 752 F. App'x 453 (9th Cir. 2018). The court concluded this was just "guesswork," *id*. at *18, and again granted defendants' motion to dismiss. *Id*. at *23. On appeal, the Ninth Circuit affirmed the district court's opinion and the Supreme Court denied certiorari. *Chevron II*, 752 F. App'x 453, 454 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2646 (2019).

Likewise here, Plaintiffs' pure guesses that the recordkeeping fees were "approximately $74-$164" or further reduced to a different "range" of "approximately $64 to $160" over the Alleged Relevant Time Period are not sufficient.  Plaintiffs assert that "the amount of indirect compensation received by Fidelity for recordkeeping services is impossible to pinpoint using publicly available information."  (Compl. ¶ 117.)  Even if this assertion were true—it is not— Plaintiffs' speculation about what the recordkeeping fees were cannot support an imprudence claim.  *Marks v. Trader Joe's Co.*, No. CV 19-10942 PA, 2020 WL 2504333, at * 6 (C.D. Cal. Apr. 24, 2020) (unpublished) (dismissing complaint where plaintiff "guessed" recordkeeper fees were $140 in finding that claims "had no factual basis.").  This is particularly true where documents provided to Plaintiffs' counsel and subject to judicial notice make clear that the Plan's recordkeeping fees were nowhere close to the purely speculated amounts.  (*Id.*)

Indeed, as specified in the fourteenth amendment to the Trust Agreement, beginning on January 1, 2017, Fidelity's compensation for its recordkeeping services was paid by a flat fee of $68 per participant annually.  (14th Amendment to Trust Agreement, Ex. 4, at 104-114.)  This amount has been further reduced to $53 per participant annually.  (17th Amendment to Trust Agreement, Ex. 4, at 118-119.)

Accordingly, Plaintiffs' guesses that the Plan's recordkeeping fees were "approximately $74 to $164" or a reduced range of approximately "$64 to $160" over the relevant period (Compl. ¶ 118) are simply wrong and entitled to no credit.  *See Sprewell*, 266 F. 3d at 988 ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").  Without these speculative allegations, Plaintiffs have no allegations, much less facts, to support their claim that the fees paid to Fidelity were a violation of the duty of prudence.  *Marks,* 2020 WL 2504333, at *6.

22

**Second**, Plaintiffs state that their speculative recordkeeping fees "are clearly unreasonable and well above recognized reasonable rates." (Compl. ¶ 118.)  The Complaint, however, fails to allege what a "recognized reasonable rate" would be for a plan of Barrick's size.  Instead, the best Plaintiffs can muster is a footnote citation to a series of cases identifying expert testimony and settlement agreements regarding recordkeeper fees for multibillion-dollar plans with hundreds of thousands of participants administered by Boeing, Kraft Foods, and Mass Mutual.  (Compl. fn. 13.)  But, what an expert testified may be a reasonable recordkeeper fee or what parties agreed to was reasonable in a settlement agreement for multibillion-dollar plans does not plead a plausible comparison to the fees in a much smaller plan such as Barrick's.  As Plaintiffs themselves claim, the larger the plan, the lower the recordkeeping fees.  (Compl. ¶¶ 119-120.)  Thus, Plaintiffs are admittedly offering an irrelevant apples-to-oranges comparison.  Plaintiffs' failure to plead a reasonable recordkeeping fee combined with their rank speculation regarding the fees actually paid does not state a plausible claim that the fees paid to Fidelity were unreasonable.

**Third**, Plaintiffs rightfully acknowledge that "utilizing a revenue sharing approach is not *per se* imprudent,"[6] but allege that when "unchecked it would be devastating for Plan participants." (Compl. ¶ 112.)  Plaintiffs plead no facts suggesting that fees went "unchecked" and any suggestion that Barrick's relationship with Fidelity went "unchecked" is belied by the very documents Plaintiffs' counsel received back in February.  As noted above, Barrick and Fidelity have amended the Trust Agreement seventeen times.  (Trust Agreement and Amendments, Ex. 4.) This includes a transition from a revenue-sharing recordkeeping fee to a flat per participant

---

[6]   *See, e.g. Marks*, 2020 WL 2504333, at *6 (granting motion to dismiss where all excessive fee claims were based upon were conclusory allegations regarding a revenue-sharing agreement which are insufficient to state a claim); *Chevron I*, 2016 WL 4502808, at *14 (stating that revenue sharing is a "common and acceptable investment industry practice that frequently inure[s] to the benefit of ERISA plans.") (citation and internal quotation marks omitted).

recordkeeping fee in January 2017, and then a further amendment to reduce the flat per participant amount.  (Ex. 4 at 104-114, 118-119.)  The "reasonable inference" from these documented facts—not rank speculation—is that the Committee is focused on keeping fees low and negotiating fee structures to achieve reductions.

Similarly, Plaintiffs' assertion that the Committee needed to issue a request for proposal ("RFP") "every three to five years as a matter of course" is baseless.  (Compl. ¶ 115.)  ERISA does not require a fiduciary to obtain competitive bids from recordkeeping service providers on any kind of timetable—much less the three to five-year schedule Plaintiffs claim is required.  "[N]othing in ERISA compels periodic competitive bidding."  *Marks*, 2020 WL 2504333, at *6 (granting motion to dismiss where complaint "simply recites legal conclusions, and does not allege any facts suggesting that the Plan fiduciaries failed to consider putting the fee structure out for competitive bidding, or failed to negotiate a reasonable fee structure."); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, No. 17-cv-07243-BLF, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) (unpublished) (the "absence of competitive bidding or RFP process, without more, does not support Plaintiffs' allegations that . . . Defendant[] acted imprudently in violation of § 404(a)(1)(B)."").  Alleging that the Committee was "required to solicit competitive bids on a regular basis has no legal foundation."  *Chevron I*, 2016 WL 4502808, at *14.

## III.    PLAINTIFFS' MONITORING CLAIM FAILS.

Plaintiffs' derivative monitoring claim (Count II) fails with their inadequately pled duty of loyalty and prudence claim (Count I).  Even if the claim were not derivative, Plaintiffs fail to plead any facts plausibly alleging BGNA and/or the Board failed to adequately monitor expenses.

"[B]ecause Plaintiffs have failed to plead sufficient facts as to their other allegations, they cannot maintain a claim that [the Board and BGNA] failed to monitor the fiduciaries."  *Marks*, 2020 WL 2504333, at *8 (dismissing monitoring claims and stating that "Trader Joes is correct in

referring to [the monitoring] claim as derivative, as the claim is pled wholly dependent on the breaches of duty previously alleged."); *Dorman v. Charles Schwab Corp.*, No. 17-cv-00285, 2018 WL 6803738, at \*7 (N.D. Cal. Sept. 20, 2019) (unpublished) ("Because the breach of fiduciary duty cause of action fails to state a claim, this [duty to monitor] cause of action does as well.").

Independently, Count II also fails because Plaintiffs have not pled the facts necessary for a monitoring claim to survive. To state a claim, Plaintiffs must make a "threshold showing that the monitoring fiduciary failed to 'review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards.'" *Chevron I*, 2016 WL 4502808, at \*18 (unpublished) (*quoting In re Calpine Corp.*, No. C-03-1685 SBA, 2005 WL 1431506 at \*6 (N.D. Cal. Mar. 31, 2005) (unpublished)). The Complaint is bare of any allegations that plausibly demonstrate a failure to review the performance of Committee appointees. Conclusory allegations reciting the elements of such a claim are not enough. For these reasons, Count II should likewise be dismissed. *Iqbal*, 556 U.S. at 678.

## **CONCLUSION**

For the reasons stated above, the Court should dismiss Plaintiffs' Complaint in its entirety and with prejudice.

DATED:  June 26, 2020

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By _____*/s/ Stephen Q. Wood*_____
Stephen Q. Wood
60 East South Temple, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Barrick Gold of North America,
Inc., Board of Directors of Barrick Gold of North
America, Inc., and Barrick U.S. Subsidiaries
Benefits Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of June, 2020, I filed with the Clerk of Court a true and correct copy of the foregoing **Motion to Dismiss** via the CM/ECF System which sent notification to:

> ISOM LAW FIRM PLLC
> David K. Isom, Esq.
> 299 South Main Street, Suite 1300
> Salt Lake City, Utah 84111
> david@isomlawfirm.com
>
> CAPOZZI ADLER, P.C.
> Donald R. Reavey, Esquire
> 2933 North Front Street
> Harrisburg, PA 17110
> donr@capozziadler.com
>
> CAPOZZI ADLER, P.C.
> Mark K. Gyandoh, Esq.
> 312 Old Lancaster Road
> Merion Station, PA 19066
> markg@capozziadler.com

/s/ *Stephen Q. Wood*

| INDEX OF EXHIBITS | |
|---|---|
| Exhibit 1 | Complaint in *Kendall v. Pharmaceutical Product Development, LLC*, Case No. 20-CV-00071-D (E.D.N.C.) |
| Exhibit 2 | Plaintiffs' Counsel's Request Letter to Barrick dated 1/14/2020 |
| Exhibit 3 | Barrick's Response Letter dated 2/11/2020 |
| Exhibit 4 | Trust Agreement Between Barrick and Fidelity and Amendments 1-17 |
| Exhibit 5 | 2014 Form 5500 |
| Exhibit 6 | 2015 Form 5500 |
| Exhibit 7 | 2016 Form 5500 |
| Exhibit 8 | 2017 Form 5500 |
| Exhibit 9 | 2018 Form 5500 |
| Exhibit 10 | Barrick Investment Policy |
| Exhibit 11 | 2019 Summary Prospectuses for JPMorgan SmartRetirement Funds R5 Share Class |
| Exhibit 12 | Fund Descriptions for Current Plan |
| Exhibit 13 | BrightScope/ICI Report Defined Contribution Plan Profile, A Close Look at 401(k) Plans, 2015 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |  |
|---|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No.: 2:20-cv-00275-TC** |
| BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30. | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT[1]

Plaintiffs, Cole Matney and Paul Watts ("Plaintiffs"), by and through their attorneys, on behalf of the Barrick Retirement Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Barrick Gold of North America, Inc. ("Barrick" or "Company"), the Board of Directors of Barrick ("Board") and its members during the Class Period and the

---

[1]  Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Barrick U.S. Subsidiaries Benefits Committee and its members ("Committee") during the Class Period for breaches of their fiduciary duties.

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

3.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

4.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

5.     As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.    The Tenth Circuit has also recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig*., 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.)

9.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id*., at 5.

10.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

11.     At all times during the Class Period (April 24, 2014 through the date of judgment) the Plan had at least half a billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $619 million and $560 million, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

13.     In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider certain collective trusts available during the Class Period as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives.

14.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

15.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

### Plaintiffs

19.     Plaintiff, Cole Matney ("Matney"), resides in Katy, Texas.  During his employment, Plaintiff Matney participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Paul Watts ("Watts"), resides in New Market, Tennessee.  During his employment, Plaintiff Watts participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit (specifically, the initial complaint) was filed.

23.     Several weeks prior to filing this lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s), which potentially contain the specifics of Defendants' *actual* practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments.  Plaintiffs' request for meeting minutes was denied because the Plan Administrator determined that this document, among certain others requested, was "either not applicable to the Plan or [did] not constitute instruments under which the Plan is established or operated."  Feb. 11, 2020 response to Plaintiffs' request.

24.     Accordingly, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

25.     Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

26.     Barrick is the Plan sponsor with a principal place of business being 460 West 50 north, Suite 500, Salt Lake City, Utah 84101. *See,* 2018 Form 5500 at 1.

27.     As described on Barrick's website "Barrick has gold and copper mining operations and projects in 13 countries in North and South America, Africa, Papua New Guinea and Saudi Arabia. Our diversified portfolio spans many of the world's prolific gold districts and is focused on high-margin, long-life assets."[4]

28.     The Company appointed the Barrick U.S. Subsidiaries Benefits Committee as the Plan Administrator, and accordingly, had a concomitant fiduciary duty to monitor and supervise those appointees. *See,* Investment Policy at Page 1.

---

[4] https://www.barrick.com/English/about/default.aspx

29.     The Company also acted through its officers, including the Board and Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

31.     The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including monitoring the activities of the Committee. In fact, the Board, together with the Company, appointed the Committee. *See*, Investment Policy at Page 1.

32.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

33.     The unnamed members of the Board of Directors for Barrick during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

34.     The Committee, a Named Fiduciary, had discretionary authority to select, and accordingly, the fiduciary duty to prudently select and monitor Plan investments. *See* Appendix A to Investment Policy.   "The Committee is responsible for selecting and monitoring the performance of the trustees, record keepers and/or investment managers and advisors; establishing and maintaining the Investment Policy; selecting investment options with respect to the Plans that permit participants to direct their own investments; periodically evaluating the Plan's investment

performance and recommending investment and investment option changes." *See,* Investment Policy at page 2.

35.     The Committee was appointed by the Company and Board of Directors. *See*, Investment Policy at Page 1.

36.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

37.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

38.     To the extent that there are additional officers, employees and/are contractors of Barrick who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Barrick officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.     THE PLAN

39.     The Summary Plan Description describes the purpose of the Plan as follows: "[t]he purpose of the plan is to enable eligible Employees to save for retirement." SPD at 1.

40.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts,

and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

*Eligibility*

41.    In general, regular full-time employees are eligible to participate in the Plan. SPD at 4. Participants are automatically enrolled with a deferral of 5% of compensation as soon as administratively possible after the expiration of a 30-day notification period, unless the participant affirmatively elects otherwise. Once a participant is automatically enrolled, this deferral percentage increases by 1% each plan year. *See*, SPD at 5.

*Contributions*

42.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. SPD at 6.

43.    With regard to employee contributions, "[p]articipants may contribute up to 75% of pretax annual compensation, as defined in the Plan." Notes to Financial Statements, December 31, 2018 ("Financial Statement") at 5.

44.    Barrick "contributes 100% of the first 5% of base compensation that a participant contributes to the Plan. The Company also contributes a nonmatch contribution of 4% of base compensation for the plan year." *Id.*

45.    Like other companies that sponsor 401(k) plans for their employees, Barrick enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46. Barrick also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

47. Given the size of the Plan, Barrick likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

48. Participants who began participating in the Plan prior to July 1, 2015 are fully vested in their accounts at all times. Participants who began participating in the Plan on or after July 1, 2015 are fully vested at all times for all contributions but non-match contributions, which are subject to a four-year vesting schedule. *See,* SPD at 8 and 9.

### *The Plan's Investments*

49. In theory, the Plan's "investments and investment options will be selected to maximize return within reasonable and prudent levels of risk; provide returns comparable to returns for similar investment options; provide exposure to a wide range of investment opportunities in various asset classes for the Plan[]; and control administrative and management costs." Investment Policy at 2. But in practice, as alleged below, that is not what happened.

50. Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. *See,* Investment Policy at page 2. As noted above, the Committee, selects the investment funds that the Plan participants invest in. *Id.*

51.     The Plan's assets under management for all funds as of December 31, 2018 was over $560,000,000.  *See,* 2018 Form 5500.

***Payment of Plan Expenses***

52.     During the Class Period Plan assets were used to pay for expenses incurred by the Plan, including recordkeeping fees. *See,* Summary Plan Description at page 18.

## V.     CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 24, 2014 through the date of judgment (the "Class Period").

54.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 4,858 Plan "participants with account balances as of the end of the plan year."  *See*, the Barrick 2018 Form 5500 at p. 2.

55.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

56.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

57.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

58.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.     DEFENDANTS' FIDUCIARY STATUS <br> AND OVERVIEW OF FIDUCIARY DUTIES

60.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

61.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

62.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

63.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341 (N.D. Okla. 2003) (citation omitted).

64.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

65.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

66.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

67.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

68.    During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

69.    Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan

during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

70.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

71.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participant's assets because of unnecessary costs.

72.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

73.     When large plans, particularly those with over half a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment,

a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

74.     One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  Between 2014 and 2018 the Plan included only four passively managed funds.

75.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets).

76.     In 2018, for example, excluding the target date offerings which are discussed below, the expense ratios for a majority of the remaining eighteen funds in the Plan (61%) were in some cases up to *167%* (in the case of the Royce Opportunity Instl) above the median expense ratios in the same category: [6]

| Current Fund | ER[7] | Category | ICI Median |
|---|---|---|---|
| Fidelity Growth Company K | 0.76 % | Domestic Equity | 0.52% |
| FRESX<br>Fidelity Real Estate Investment Port | 0.74 % | Domestic Equity | 0.42% |
| HIASX<br>Hartford Small Co. HLS IA | 0.79 % | Domestic Equity | 0.52% |
| MGOSX<br>Victory Munder Mid-Cap Core Growth R6 | 0.88 % | Domestic Equity | 0.42% |

[6] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[7]  The listed expense figures are taken from summary prospectuses published in 2019.

| Current Fund | ER[7] | Category | ICI Median |
|---|---|---|---|
| ROFIX<br>Royce Opportunity Instl | 1.12 % | Domestic Equity | 0.42% |
| DODBX<br>Dodge & Cox Balanced | 0.53 % | Non-target date balanced | 0.40% |
| DODGX<br>Dodge & Cox Stock | 0.52% | Domestic Equity | 0.42% |
| FDIKX<br>Fidelity Diversified International K | 0.63 % | Int'l Equity | 0.54% |
| LZEMX<br>Lazard Emerging Markets Equity Instl | 1.08 % | Int'l Equity | 0.54% |
| FGMXX<br>Fidelity Money Market Trust Retirement Government Money Market Portfolio | 0.42 % | Money Market | 0.14% |
| HWMIX<br>Hotchkis & Wiley Mid-Cap Value I | 1.03% | Domestic Equity | 0.42% |

77.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than 2019 or even today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with between 500 million and 1 billion dollars in assets was 0.52% using 2015 data compared with 0.42% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

78.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

79.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

80.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

81.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

82.     The Plan transitioned to JPMorgan target date funds in 2015 utilizing the I share versions of the fund which had expense ratios ranging from .61% to .70% as of 2019 (the expense ratios would have been higher in 2015).  In 2017, the Plan's fiduciaries converted from I share to

R5 shares which had lower expense ratios but were still more expensive than the R6 share class. Importantly, both the I share and R5 share classes were more expensive than the R6 shares and all three share classes – identical in all respects other than price - had been available during the Class Period.  The I share and R5 share classes were available since July 2007 and the R6 share class since November 2014.

83.     As demonstrated by the chart below, Defendants' failure to select the R6 share class was an indication of their failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.[8]  The chart below uses 2019 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| JNSSX JPMorgan SmartRetirement 2025 R5 | 0.55 % | JNSYX JPMorgan SmartRetirement 2025 R6 | 0.45 % | 22% |
| JSMSX JPMorgan SmartRetirement 2030 R5 | 0.55 % | JSMYX JPMorgan SmartRetirement 2030 R6 | 0.46 % | 20% |
| SRJSX JPMorgan SmartRetirement 2035 R5 | 0.56 % | SRJYX JPMorgan SmartRetirement 2035 R6 | 0.46 % | 22% |
| JTTSX JPMorgan SmartRetirement 2020 R5 | 0.54 % | JTTYX JPMorgan SmartRetirement 2020 R6 | 0.44 % | 23% |
| JSASX JPMorgan SmartRetirement 2045 R5 | 0.57 % | JSAYX JPMorgan SmartRetirement 2045 R6 | 0.47 % | 21% |
| JTSSX JPMorgan SmartRetirement 2050 R5 | 0.57 % | JTSYX JPMorgan | 0.47 % | 21% |

---

[8] This same fiduciary breach applies to the failure to select the R5 share class prior to November 2014.

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| | | SmartRetirement 2050 R6 | | |
| SMTSX JPMorgan SmartRetirement 2040 R5 | 0.57 % | SMTYX JPMorgan SmartRetirement 2040 R6 | 0.47 % | 21% |
| JFFSX JPMorgan SmartRetirement 2055 R5 | 0.57 % | JFFYX JPMorgan SmartRetirement 2055 R6 | 0.47 % | 21% |
| JSRSX JPMorgan SmartRetirement Income R5 | 0.52 % | JSIIX JPMorgan SmartRetirement Income R6 | 0.42 % | 24% |

84.     The above is for illustrative purposes only.  During the Class Period, Defendants know or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

85.     As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, No. 18-3345, slip op. at 5 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).  The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| JPMorgan SmartRetirement 2020 R5 | $33m |

| Fund in Plan | 2018<br>Assets Under Management |
|---|---|
| JPMorgan SmartRetirement<br>2025 R5 | $47m |
| JPMorgan SmartRetirement<br>2030 R5 | $42m |
| JPMorgan SmartRetirement<br>2035 R5 | $36m |
| JPMorgan SmartRetirement<br>2040 R5 | $27m |
| JPMorgan SmartRetirement<br>2045 R5 | $31m |
| JPMorgan SmartRetirement<br>2050 R5 | $30m |

86.     All of the lower share alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

87.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only

consequence was higher costs for Plan participants.  Indeed, given that the lower-priced share classes were the same fund as the higher-priced classes, they had greater returns.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

88.    It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017) ("*Tibble III*").  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11.  This lack of basic fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

89.    By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Investigate Availability of Lower Cost Collective Trusts*

90.    Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

91.    ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate

funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

92.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

93.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much less, with lower or no administrative costs, and lower or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

94.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[9]

---

[9] The criticisms that have been launched against collective trust vehicles in the past no longer apply.  Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k)*

95.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, JPMorgan offered collective trust versions of its target date funds, which had *no minimum* investment requirement, beginning on July 22, 2016 as follows:

| Current Fund | ER | Collective Trust Version | ER | Excess Expense |
|---|---|---|---|---|
| JNSSX JPMorgan SmartRetirement 2025 R5 | 0.55 % | JNSYX JPMorgan SmartRetirement 2025 CF | 0.44 % | 25% |
| JSMSX JPMorgan SmartRetirement 2030 R5 | 0.55 % | JSMYX JPMorgan SmartRetirement 2030 CF | 0.44 % | 25% |
| SRJSX JPMorgan SmartRetirement 2035 R5 | 0.56 % | SRJYX JPMorgan SmartRetirement 2035 CF | 0.44 % | 27% |
| JTTSX JPMorgan SmartRetirement 2020 R5 | 0.54 % | JTTYX JPMorgan SmartRetirement 2020 CF | 0.44 % | 23% |
| JSASX JPMorgan SmartRetirement 2045 R5 | 0.57 % | JSAYX JPMorgan SmartRetirement 2045 CF | 0.44 % | 30% |
| JTSSX JPMorgan SmartRetirement 2050 R5 | 0.57 % | JTSYX JPMorgan SmartRetirement 2050 CF | 0.44 % | 30% |
| SMTSX JPMorgan SmartRetirement 2040 R5 | 0.57 % | SMTYX JPMorgan SmartRetirement 2040 CF | 0.44 % | 30% |
| JFFSX JPMorgan SmartRetirement 2055 R5 | 0.57 % | JFFYX JPMorgan SmartRetirement 2055 CF | 0.44 % | 30% |

*Plans*, Employee Benefit News (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground.*  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

96.     Additionally, here, the Plan's recordkeeper, Fidelity Investments Institutional ("Fidelity"), offered collective trust formats for its "Freedom" index and blend target-date funds during the Class Period which had the same investment goals as the JPMorgan trust funds utilized by the Plan.  Had the Plan utilized these Fidelity collective trust funds, the Plan's participants could have realized savings as follows:[10]

| Fund in Plan | Exp. Ratio[11] | Comparable Collective Trust | Incep Date | Exp. Ratio[12] | % Fee Excess |
|---|---|---|---|---|---|
| JTTSX JPMorgan SmartRetirement 2020 R5 | 0.54% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 69% |
| JNSSX JPMorgan SmartRetirement 2025 R5 | 0.55% | FIAM Blend Target Date 2025 Q Fund | Oct. 31 2007 | 0.32% | 72% |
| JSMSX JPMorgan SmartRetirement 2030 R5 | 0.55% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 72% |
| SRJSX JPMorgan SmartRetirement 2035 R5 | 0.56% | FIAM Blend Target Date 2035 Q Fund | Oct. 31 2007 | 0.32% | 75% |
| SMTSX JPMorgan SmartRetirement 2040 R5 | 0.57% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 78% |

---

[10]  The Plan transitioned from Fidelity Freedom Target date funds to JPMorgan target date funds in 2015 so could have easily transitioned to the less expensive Fidelity collective trust versions of the Freedom funds.

[11] The listed expense figures are as of 2019.

[12] The listed expense figures are as of 2019.

| Fund in Plan | Exp. Ratio[11] | Comparable Collective Trust | Incep Date | Exp. Ratio[12] | % Fee Excess |
|---|---|---|---|---|---|
| JSASX JPMorgan SmartRetirement 2045 R5 | 0.57% | FIAM Blend Target Date 2045 Q Fund | Oct. 31 2007 | 0.32% | 78% |
| JTSSX JPMorgan SmartRetirement 2050 R5 | 0.57% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 78% |
| JFFSX JPMorgan SmartRetirement 2055 R5 | 0.57% | FIAM Blend Target Date 2055 Q Fund | July 12 2011 | 0.32% | 78% |

97.     Accordingly, collective trusts were readily available to the Plan during the Class Period, which Defendants knew or should have known of their existence, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

98.     The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts, but Defendants again failed to investigate this option adequately.

99.     In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

100.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828.

Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds

or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts

§ 100 cmt. b(1).

101.    While higher-cost mutual funds may outperform a less-expensive option, such as a

passively-managed index fund, over the short term, they rarely do so over a longer term.  *See*

Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post,

available   at   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-

funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at

2,862 actively managed mutual funds, focused on the top quartile in performance and found most

did not replicate performance from year to year); *see also Index funds trounce actively managed

funds:  Study*,   available   at   http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-

managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their

passive counterparts across nearly all asset classes, especially over the 10-year period from 2004

to 2014.")

102.    Indeed, funds with high fees on average perform worse than less expensive funds,

even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee

Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009)

(hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of

Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous

studies showing that "the most consistent predictor of a fund's return to investors is the fund's

expense ratio").

103.    During the Class Period, Defendants failed to consider materially similar but

cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the

expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style. These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial. The alternative funds also had better performances than the Plan's funds in their 3 and 5 year average returns as of June 2020. Indeed, as of 2019, the 5 year average return for Lazard Emerging Markets Equity Instl was worse than 78% of peer funds. And the 5 year average return for the Victory Munder Mid-Cap Core Growth R6 was worse than 95% of peer funds. A reasonable investigation would have revealed the existence of lower-cost and better performing alternatives to the Plan's funds.

104.    The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 R5 | 0.55 % | Fidelity Freedom Index 2025 Investor | 0.12 % | Target-date Fund | 358% |
| | | American Funds Trgt Date Retirement 2025 R6 | 0.36 % | | 67% |
| | | | | | |
| JPMorgan SmartRetirement 2030 R5 | 0.56 % | Fidelity Freedom Index 2030 Investor | 0.12 % | Target-date Fund | 367% |
| | | American Funds Trgt Date Retirement 2030 R6 | 0.35 % | | 60% |
| | | | | | |

[13] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). Where only one fund is listed, index funds are identified by the word "index" following the fund name. Actively managed funds don't have this designation. The listed expense figures are taken from summary prospectuses published in 2020. The listed expense figures for the funds are taken from prospectuses published in 2019.

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2035 R5 | 0.56 % | Fidelity Freedom Index 2035 Investor | 0.12 % | Target-date Fund | 367% |
| | | American Funds Trgt Date Retirement 2035 R6 | 0.37 % | | 51% |
| JPMorgan SmartRetirement 2020 R5 | 0.54 % | Fidelity Freedom Index 2020 Investor | 0.12 % | Target-date Fund | 350% |
| | | American Funds Trgt Date Retirement 2020 R6 | 0.31 % | | 74% |
| JPMorgan SmartRetirement 2045 R5 | 0.57 % | American Funds Trgt Date Retirement 2045 R6 | 0.38 % | Target-date Fund | 50% |
| JPMorgan SmartRetirement 2050 R5 | 0.57 % | American Funds Trgt Date Retirement 2050 R6 | 0.39 % | Target-date Fund | 46% |
| JPMorgan SmartRetirement 2040 R5 | 0.57 % | Fidelity Freedom Index 2040 Investor | 0.12 % | Target-date Fund | 375% |
| | | American Funds Trgt Date Retirement 2040 R6 | 0.38 % | | 50% |
| JPMorgan SmartRetirement 2055 R5 | 0.57 % | Fidelity Freedom Index 2055 Investor | 0.12 % | Target-date Fund | 375% |
| | | American Funds Trgt Date Retirement 2055 R6 | 0.40 % | | 43% |
| | 0.79 % | Vanguard Small Cap Growth Index I | 0.06 % | Domestic Equity | 783% |

| Current Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| HIASX Hartford Small Co. HLS IA | | Lord Abbett Developing Growth R6 | 0.60 % | | 32% |
| DODBX Dodge & Cox Balanced | 0.53 % | Vanguard Balanced Index I | 0.06 % | Non-target date balanced | 783.33% |
| | | VWENX Vanguard Wellington Fund Admiral Shares | 0.17% | | 212% |
| FDIKX Fidelity Diversified International K | 0.63 % | Vanguard International Growth Adm | 0.32 % | Int'l Equity | 96.88% |
| FRESX Fidelity Real Estate Investment Port | 0.74 % | Vanguard Real Estate Index Adm | 0.12 % | Domestic Equity | 517% |
| | | TIREX TIAA-CREF Real Estate Sec Instl | 0.51 % | | 45% |
| JSRSX JPMorgan SmartRetirement Income R5 | 0.52 % | Fidelity Freedom Index Income Investor | 0.12 % | Target-date Fund | 333% |
| MGOSX Victory Munder Mid-Cap Core Growth R6 | 0.88 % | Vanguard Mid-Cap Growth Index Adm | 0.05% | Domestic Equity | 1660% |
| | | DBMYX BNY Mellon Sm/Md Cp Gr Y | 0.64% | | 38% |
| LZEMX Lazard Emerging Markets Equity Instl | 1.08 % | FPADX Fidelity Emerging Markets Idx | 0.08 % | Int'l Equity | 1250% |
| | | DFA Emerging Markets Core Equity I | 0.43 % | | 151% |
| ROFIX Royce Opportunity Instl | 1.12 % | FRCSX Franklin Small Cap Value R6 | 0.63% | Domestic Equity | 78% |

105.     The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been, given the bargaining power available to the Plan fiduciaries.

106.     With regard to the comparison of the actively managed funds to passively managed funds, these results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[14]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
| --- | --- | --- |
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

107.     A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

108.     Defendants' failure to investigate lower cost alternative investments (both actively

---

[14] Source: https://us.spindices.com/spiva/#/reports

and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**B.**    **Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

109.    As noted above, the Plan's recordkeeper during the Class Period was Fidelity. SPD at 2. The initial trust agreement with Fidelity was executed on April 1, 2002. *See* Master Trust Agreement between Barrick and Fidelity ("Trust Agreement").

110.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[15] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

111.    Here, Fidelity was "willing to perform recordkeeping and administrative services for the Plan if the services are ministerial in nature…" Trust Agreement at 2.

112.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven

---

[15] Qualified Domestic Relations Order.

by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

113.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

114.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

115.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

116.    Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that

are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

117.    In this matter, between April 24, 2014 and December 31, 2016 there was no contractual recordkeeper fee per participant.  Rather, recordkeeping and administrative costs were paid using revenue sharing.  The Plan reported the following revenue sharing payments during the Class Period on the form 5500:

| Year | Number of Participants | Revenue Sharing | Per Participant Cost prior to credits |
|------|------------------------|-----------------|----------------------------------------|
| 2016 | 4,669 | $739,485 | $158 |
| 2015 | 5,270 | $773,341 | $147 |
| 2014 | 5,259 | $907,307 | $173 |

118.    In 2014 and 2015, Fidelity deposited $375,000 and $325,000, respectively in a revenue sharing account ("Revenue Credit Account") to be purportedly used to defray costs for recordkeeping and administration costs.  Even accounting for the Revenue Credit Account, the cost per participant was $101 in 2014 and $85 in 2015.

119.    Beginning on January 1, 2017, Fidelity purportedly charged a flat $68 per participant annually and $53 per participant as of April 2020.   But Fidelity **still continued to collect** revenue sharing which was deposited into a revenue sharing account.  Based on the Plan's 2018 Form 5500, for the years ended December 31, 2018 and 2017, $45,719 and $53,178 of the Revenue Credit Account were used to pay plan administrative expenses, respectively.  Revenue

sharing for 2018 was $664,000.  That means over $600,000 in collected revenue sharing never made back to the pockets of the Plan participants in 2018.

120.    The manner in which recordkeeping costs were paid for by the Plan's fiduciaries was clearly imprudent and disloyal to the Plan participants.  The excess amount of money taken from revenue sharing that was never used to pay for recordkeeping and administrative costs cannot justify Defendants' selection of high-priced investment options to take advantage of revenue sharing.  A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration costs with no strings attached.

121.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to, among other things, send out RFPs to try to obtain lower recordkeeping costs than Fidelity was charging.  Fidelity has been the Plan's recordkeeper for 18 years and counting.

122.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.  One data source, the *401k Averages Book* (20th ed. 2020)[16] studies Plan fees for smaller plans, those under $200 million in assets.  Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at

---

[16] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the Plan, with half a billion dollars in assets and over 4,500 - 5,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

123.    Looking at the Plan's total compensation for recordkeeping and administrative costs also reveals fiduciary breaches.  As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan.  The maximum  indirect compensation received by Fidelity for recordkeeping services can be estimated to a reasonable degree of certainty using publicly available information[17] because "revenue sharing' is divvied among all the plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers."  *401k Averages Book*, at p. 7, Answer to FAQ No. 14.

124.    The total amount of recordkeeping fees (both through direct and indirect payments) per the Plan's form 5500 throughout the Class Period on a per participant annual basis was conservatively above $60 per participant per year, after credits.

125.    These amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans.[18]

---

[17] *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

[18] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

126.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

127.     A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

128.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

129.     At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

130.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

131.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan

participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Prudence Defendants failed to investigate collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost. Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

132. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

133. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

134. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Barrick and the Board Defendants)**

135.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

136.    Barrick and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

137.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

138.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

139.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

    (b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

140.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

141.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

142.    **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties,

including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.       An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.       Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.       An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.       Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

K.       An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.       Such other and further relief as the Court deems equitable and just.

Dated:  July 17, 2020    **CAPOZZI ADLER, P.C.**

          *s/ Mark K. Gyandoh   .*
          Mark K. Gyandoh, Esquire
          312 Old Lancaster Road
          Merion Station, PA 19066
          markg@capozziadler.com
          (610) 890-0200
          Fax (717) 233-4103

          Donald R. Reavey, Esquire
          2933 North Front Street
          Harrisburg, PA 17110
          donr@capozziadler.com
          (717) 233-4101
          Fax (717) 233-4103

          **ISOM LAW FIRM PLLC**
          David K. Isom (Utah 4773)
          299 South Main Street
          Suite 1300
          Salt Lake City, Utah 84111
          david@isomlawfirm.com
          (801) 209-7400

          Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2020, a true and correct copy of Plaintiffs' Amended Complaint was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

Stephen Q. Wood
Quinn Emanuel Urquhart & Sullivan, LLP
60 East South Temple, Suite 500
Salt Lake City, UT  84111
stephenwood@quinnemanuel.com

Lazar P. Raynal *(admitted pro hac vice)*
Kaitlin P. Sheehan *(admitted pro hac vice)*
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 606063
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

John B. Quinn *(admitted pro hac vice)*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
johnquinn@quinnemanuel.com


By:   /s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esq.

Stephen Q. Wood
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
60 East South Temple, Suite 500
Salt Lake City, UT 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,*
*Board of Directors of Barrick Gold of North America,*
*Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>    Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br><br>Case Number:  2:20-cv-00275<br><br>Judge Tena Campbell |

**TABLE OF CONTENTS**

**Page**

DUCIV 7-1 MOTION STATEMENT ................................................................................1

RELEVANT FACTS ..........................................................................................................5

    A.    The Plan Offered Numerous Investment Options.................................................6

    B.    Defendants Consistently Negotiated Lower Recordkeeper Fees..........................6

LEGAL STANDARD.........................................................................................................8

ARGUMENT ......................................................................................................................8

I.    PLAINTIFFS' CLAIMS FOR BREACH OF THE FIDUCIARY DUTY OF
LOYALTY MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT
ALLEGE A SINGLE FACT FROM WHICH A BREACH CAN BE INFERRED...........8

II.    NONE OF PLAINTIFFS' ALLEGATIONS ESTABLISH A CLAIM FOR
BREACH OF THE FIDUCIARY DUTY OF PRUDENCE. ...........................................10

    A.    Plaintiffs Fail to State a Claim for Excessive Fund Expense Ratios. ...................11

        1.    There Is No Breach of Fiduciary Duty Simply Because Some
Funds in the Plan Have Purportedly Higher Expense Ratios. ..................11

        2.    Plaintiffs Continue to Misstate the Applicable Expense Ratios. ..............14

        3.    Plaintiffs' Allegations That Barrick Failed to Investigate and Select
Certain Types of Investments Fail as a Matter of Law..............................18

    B.    Plaintiffs Fail to Allege a Plausible Claim for Excessive Recordkeeping
Fees. .......................................................................................................................22

III.    PLAINTIFFS' MONITORING CLAIM FAILS. ............................................................25

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 8, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................... 8

*Birse v. CenturyLink, Inc.*,
   *No, 17-cv-02872*, 2018 WL 6603961 (D. Co. Nov. 19, 2018) ................................ 8

*Birse v. CenturyLink, Inc.*,
   No. 17-cv-02872, 2019 WL 1292861 (D. Co. Mar. 20, 2019) ........................... 8, 17

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
   No. 17-cv-07243-BLF, 2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) .................. 22

*Dezelan v. Voya Ret. Ins. & Annuity Co.*,
   No. 3:16-CV-1251, 2017 WL 2909714 (D. Conn. July 6, 2017) .......................... 11

*Divane v. Northwestern University*,
   953 F.3d 980 (7th Cir. 2020) ...................................................................... 12, 14

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .......................................................................................... 8

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ............................................................... 12, 14, 18

*In re Pfizer Inc. ERISA Litig.*,
   No. 04CIV10071, 2013 WL 1285175 (S.D.N.Y. Mar. 29, 2013) ........................... 9

*In re SunEdison, Inc. ERISA Litig.*,
   331 F. Supp. 3d 101 (S.D.N.Y. 2018) .................................................................. 9

*Johnson v. Providence Health & Services*,
   No. C17-1779-JCC, 2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) .................... 2

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ......................................................................... 8

*Larson v. Allina Health Sys.*,
   350 F. Supp. 3d 780 (D. Minn. 2018) ................................................................ 19

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) .................................................................... *passim*

*Main v. American Airlines, Inc.*,
   248 F. Supp. 3d 786 (N.D. Tex. 2017) ............................................................... 19

*Marks v. Trader Joe's Co.*,
   No. CV 19-10942 PA, 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ......... 23, 24, 25

*Marshall v. Northrop Grumman Corp.*,
    No. CV 16-06794 AB(JCX), 2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) .......................... 11

*Martin v. CareerBuilder, LLC*,
    No. 19-cv-6463, 2020 WL 3578022 (N.D. Ill. Jul. 1, 2020) ........................................... *passim*

*Moitoso v. FMR LLC*,
    No. 18-12122-WGY, 2020 WL 1495938 (D. Mass. Mar. 37, 2020)...................................... 19

*Patterson v. Morgan Stanley*,
    No. 16-CV-6568(RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)..................................... 11

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers*
    *Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F. 3d 705 (2nd Cir. 2013).......................................................................................... 10

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011).................................................................................... 12, 14, 18

*Romero v. Nokia, Inc.*,
    No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ......................................... 9

*Sacerdote v. New York University*,
    No. 16-cv-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)............................................. 12

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................................. 8

*Tibble v. Edison Int'l., ("Tibble I")*,
    729 F.3d 1110 (9th Cir. 2013) ....................................................................... 13, 14, 20, 21

*Tibble v. Edison Int'l.*,
    135 S. Ct. 1823 (2015)..................................................................................................... 13

*White v. Chevron Corp.*, *("Chevron I")*
    No. 16-cv-00793, 2016 WL 4502808 at *12 (N.D. Cal. Aug. 29, 2016) ................... 13, 20, 21

*White v. Chevron Corp.*, *("Chevron II")*
    No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017)...................................... 18

*Wilcox v. Georgetown Univ.*,
    No. 18-422, 2019 WL 132281 (D.D.C. Jan 8, 2019)............................................................ 11

## <u>Statutory Authorities</u>

29 U.S.C. § 1104(a)(1)(B) ......................................................................................................... 10

## DUCiv 7-1 MOTION STATEMENT

Pursuant to Fed. R. Civ. P. 12(b)(6) and DUCiv 7-1, Defendants Barrick Gold of North America, Inc. ("BGNA"), the Board of Directors of Barrick Gold of North America, Inc. (the "Board"), and Barrick U.S. Subsidiaries Benefits Committee (the "Committee") (BGNA, the Board, and the Committee are collectively, "Defendants" or "Barrick") hereby move to dismiss Plaintiffs Cole Matney and Paul Watts' (collectively, the "Plaintiffs") Amended Complaint (Dkt. No. 21, "Amended Complaint" or "AC") with prejudice for the following reasons: (1) Plaintiffs fail to state a claim for breach of the fiduciary duties of loyalty and prudence by the Committee (Count I); and (2) since Plaintiffs have failed to state a claim against the Committee for breach of its fiduciary duties under Count I, Plaintiffs' derivative monitoring claim (Count II) also fails.

## INTRODUCTION

Plaintiffs' Amended Complaint is a vain attempt to plead around the numerous legal and factual deficiencies identified in Barrick's June 26, 2020 Motion to Dismiss Plaintiffs' Complaint (Dkt. No. 19, the "First MTD"). In the First MTD, Barrick demonstrated that Plaintiffs' claims were a cut and paste copy of a complaint Plaintiffs' counsel filed a week earlier in another court against a different company.[1] Although Plaintiffs' Complaint was full of the same lengthy recitations of ERISA fiduciary duties, case law, and opinions regarding the "best" types of investments, noticeably absent were any specific allegations suggesting that the Defendants *in this case* actually breached any fiduciary duties. Instead, mirroring the PPD Complaint, Plaintiffs alleged that their pre-litigation ERISA §104(b)(4) demand for documents was purportedly "denied" and therefore the specific material facts at issue were "systematically . . . in the sole

---

[1]    *See Kendall v. Pharmaceutical Product Development, LLC,* Case No. 20-CV-00071-D (E.D.N.C.) Complaint ("PPD Complaint"), Ex. 1.

possession of defendants." (Dkt. No. 2, Compl. fn. 2; Ex. 1, PPD Compl. fn. 2.) As a result, Plaintiffs erroneously claimed they lacked knowledge of the material facts and were therefore entitled to make "reasonable inferences" regarding the very facts of which they disclaimed any knowledge. (Dkt. No. 2, Compl., ¶ 17; Ex. 1, PPD Compl. ¶ 17.)

The First MTD illustrated that Plaintiffs' cut and paste allegations were simply untrue— Barrick had produced over 1,000 pages of relevant Plan documents in direct response to Plaintiffs' §104(b)(4) demand.[2] These Plan documents showed that there was no substance to the unsupported "inferences" Plaintiffs were attempting to pass off as "facts" to the Court.[3] In fact, Plaintiffs' Complaint grossly misstated even the most basic facts, including, the actual funds offered under the Plan, fund expense ratios, and recordkeeping fees. Furthermore, these same Plan documents dispelled Plaintiffs' unsupported "inferences" that the Committee was "asleep at the

---

[2]    A copy of Plaintiffs' counsel letter to Barrick dated 1/14/2020 is attached as Ex. 2. A copy of Barrick's 2/11/2020 response letter is attached as Ex. 3. Enclosed with Barrick's response letter was a flash drive that contained eight (8) categories of documents, including copies of the Trust Agreement between Barrick and Fidelity and amendments thereto, Barrick's Investment Policy, and Plan prospectuses for the current investment options under the Plan. Many of the documents that were provided to Plaintiffs' counsel on the flash drive are referenced and cited in the Complaint and Amended Complaint but are not attached. (See e.g., AC ¶ 28 (citing Investment Policy), ¶ 39 (citing Summary Plan Description), ¶ 43 (citing 12/31/2018 Form 5500), fn. 6 (citing BrightScope/ICI 2016 Report), and fn. 7 (citing 2019 summary prospectuses). Accordingly, Barrick attaches the following: Ex. 4 (Trust Agreement and Amendments 1-17); Ex. 5 (2014 Form 5500); Ex. 6 (2015 Form 5500); Ex. 7 (2016 Form 5500); Ex. 8 (2017 Form 5500); Ex. 9 (2018 Form 5500); Ex. 10 (Investment Policy and addendum); Ex. 11 (2019 Summary Prospectuses for JPM Funds for years 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and Income); Ex. 12 (descriptions of funds in the Plan); and Ex. 13 (The BrightScope/ICI Report Defined Contribution Plan Profile, A Close Look at 401(k) Plans, 2016).

[3]    The Court can consider Exs. 1-20 attached to this Rule 12(b)(6) motion, because they are either referred to and/or cited in the Amended Complaint, but not attached, and are central to the Plaintiffs' claims or are documents that are publicly available and subject to judicial notice. Johnson v. Providence Health & Services, No. C17-1779-JCC, 2018 WL 1427421, at * 3 (W.D. Wash. Mar. 22, 2018) (unpublished) (granting, in part, motion to dismiss, and considering Form 5500s, fee disclosure summaries, amendments to recordkeeper agreement with Fidelity, fund prospectuses, and BrightScope/ICI Report). "The Court can consider information from these documents insofar as they contradict allegations from the complaint." Id.

wheel" by demonstrating that the Committee regularly reviewed the investment funds and recordkeeper fees, routinely made changes to the funds in the Plan, and amended the agreement with the recordkeeper seventeen times, resulting in less expensive and more diversified investment options. Simply put, the unsupported premise underlying Plaintiffs' Complaint was untrue. Barrick engaged in the very fiduciary oversight Plaintiffs asked the Court to "infer" had not occurred. And fund expense ratios and recordkeeper fees *were less expensive* than the cherry-picked alternative investments Plaintiffs claimed a "prudent" fiduciary would have selected.

Having been caught trying to pass off a copied complaint, Plaintiffs now attempt to concoct a new basis for a breach of fiduciary duty by moving the goal posts and abandoning the cherry-picked investments they claimed were "prudent" in the Complaint for a new set of cherry-picked investment alternatives.

For example, Plaintiffs now claim that Barrick should have substituted all of the JPMorgan SmartRetirement Target Date Funds ("JPM Funds") for purportedly less expensive Fidelity "Freedom" target date funds. (AC ¶ 96.) But this allegation loses credibility in light of the fact that Plaintiffs' counsel recently filed another ERISA class action against Biogen, specifically claiming that Biogen breached its fiduciary duty of loyalty by investing in certain Fidelity funds when Fidelity also served as Biogen's recordkeeper.[4]

---

[4]   *See Covington et al. v. Biogen, Inc., et al.*, Case No. 20-CV-11325 (D. Mass.) Complaint ("Biogen Complaint"), Ex. 14, ¶¶ 136-139 (alleging defendants breached their fiduciary duty of loyalty "because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan" and that the conflict of interest is laid bare "where lower-cost Fidelity mutual funds—materially similar or identical to the Plan's other Fidelity funds (other than in price)—were available but not selected because the higher-cost funds returned more value to Fidelity.") It is clear that for Plaintiffs' counsel "prudence" is a changeable concept, inconsistently applied in whatever way best serves the purpose of advancing a breach of fiduciary duty claim.

Plaintiffs' Amended Complaint also continues to allege that Barrick breached its fiduciary duty of prudence by failing to select the R6 share class for the JPM Funds, which Plaintiffs assert was "the lowest-cost share class available for the Plan's mutual funds." (AC ¶¶ 83-84.) But as noted in the First MTD, the Plan documents provided to Plaintiffs in February illustrate that Plan participants received a 15 basis point revenue credit for the R5 share class, making the R5 share class actually cheaper than the R6 share class. (Dkt. No. 19, pp. 17-18.)

Alternatively, Plaintiffs claim that Barrick should have moved all of its R5 share class JPM Funds to purportedly less expensive collective trusts ("CITs"). (AC ¶ 95.) Once again, this claim is based on a misstatement of the fund expense ratios. When the correct expense ratio (*i.e.*, including the 15 basis point revenue credit) is applied, the R5 share class JPM Funds are less expensive than Plaintiffs' proposed CITs. But even if this was not the case, no court has ever held that a plan administrator has a fiduciary duty to invest in collective trusts simply because they are purportedly less expensive. This is because CITs are fundamentally different investment vehicles than mutual funds, a fact Plaintiffs acknowledge, but ask the Court to offhandedly dismiss.

Finally, Plaintiffs attempt to salvage their excess recordkeeping fees claim by moving the goal posts and inventing a new standard for reasonable fees that is entirely inconsistent with their prior claims and belied by the Plan documents within their possession. In the Complaint, Plaintiffs alleged that the Plan had grossly excessive fees within a range of "approximately $74 to $164 during the Class Period." (Dkt. No. 2, Compl. ¶ 118.) When confronted with the fact that the Plan documents provided to Plaintiffs clearly state that participants only pay $53 annually (Dkt. No. 19, at 21-24), Plaintiffs pivot and claim, without any support, that certain monies were collected via revenue sharing, but that "over $600,000 in collected revenue sharing never made [it] back to the pockets of the Plan participants," which is "clearly imprudent." (AC ¶¶ 119-120.) This allegation

is belied by the documents provided to Plaintiffs in February and attached to the First MTD, which clearly state that the Plan had a "Participant Revenue Credit" under which amounts collected via revenue sharing (*e.g.*, the $600,000 alleged in the Amended Complaint) were "allocated to Eligible Participants accounts as soon as administratively feasible (generally within 15 business days)." (14th Am. to Trust Agreement, Ex. 4, at 111-112.)

Plaintiffs' shifting standards of prudence, their changing cherry-picked examples of less expensive "comparative" investments, and their wildly fluctuating claims about the "reasonable" amount of recordkeeping fees, perfectly illustrates why numerous courts have dismissed similar claims, ruling that a plan fiduciary is under no duty to scour the market to find the least expensive option to meet some subjective and ever-changing fiduciary duty definition, why there is no duty to choose passive investments or CITs, and why there is no duty to choose any particular type of investment. *See e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 669-72 (7th Cir. 2011). At bottom, Plaintiffs' Amended Complaint fails to state an actionable or plausible claim for breach of fiduciary duty. *Martin v. CareerBuilder, LLC*, No. 19-cv-6463, 2020 WL 3578022, at * 5 (N.D. Ill. Jul. 1, 2020) (unpublished) (dismissing complaint filed by Plaintiffs' counsel asserting similar claims because "[t]he Court must dismiss speculative suits lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." (internal citations omitted).)

## **RELEVANT FACTS**

During the Alleged Relevant Time Period (April 24, 2014-present), one of the retirement benefits BGNA offered its employees was the Plan—an employer-sponsored, individual-account, defined contribution plan. (AC ¶¶ 39-40.) Employees who worked for BGNA were eligible to participate in the Plan and make contributions from their pretax annual compensation, up to certain limits. (AC ¶¶ 41, 43.) In addition, Barrick matches 100% of the first 5% of base compensation

that an employee contributed and contributes an additional non-match contribution of 4% of the base compensation for the Plan year.  (AC ¶ 44.)  This results in BGNA making significant contributions to its employees' retirement savings.  (*See e.g.*, 2018 Form 5500, Ex. 9, at 20 (noting BGNA contributed a total of $28,323,175).)

## A.    The Plan Offered Numerous Investment Options.

During the Alleged Relevant Time Period, the Plan offered a wide range of investment options.  The Committee, in accordance with its Investment Policy, employed robust review and approval procedures for selecting, monitoring, and removing investment options.  (Investment Policy, Ex. 10, at 4-5.)  Plan participants could allocate their accounts to approximately thirty core funds.  (2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42; 2016 Form 5500, Ex. 7, at 44; 2017 Form 5500, Ex. 8, at 42; and 2018 Form 5500, Ex. 9, at 73.)  The Plan investment options included: major asset classes (domestic equity, domestic fixed income, and international equities); a stable value fund; a money market cash equivalent; a real estate fund; target-date funds; and both actively and passively managed funds.  (Investment Policy, Ex. 10, at 2-3; 2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42; 2016 Form 5500, Ex. 7, at 44; 2017 Form 5500, Ex. 8, at 42; and 2018 Form 5500, Ex. 9, at 73.)

The Committee actively supervised and managed Plan investment options, removing certain options and adding others.  (Investment Policy, Ex. 10, at 4-5.)  For example, in 2015, the Plan transitioned from the Fidelity Freedom target date funds to the JPM Funds.  (AC fn. 10; 2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42.)

## B.    Defendants Consistently Negotiated Lower Recordkeeper Fees.

Fidelity Management Trust Company ("Fidelity) has served as the Plan's recordkeeper during the entirety of the Alleged Relevant Time Period.  (Master Trust Agreement Between BGNA and Fidelity (the "Trust Agreement") and the amendments thereto, Ex. 4.)  During that

time, Barrick has consistently evaluated its recordingkeeping fees and negotiated reductions. Indeed, since engaging Fidelity as its recordkeeper, Barrick has amended the Trust Agreement with Fidelity seventeen times.  (Amendments 1-17 to Trust Agreement, Ex. 4 at 62-119.)  These amendments resulted in a consistent decline in the amount of fees paid to Fidelity for its administrative services in accord with industry best practices.  For example, for a portion of the Alleged Relevant Time Period (April 24, 2014 to December 31, 2016), there was no contractual recordkeeper fee per participant; rather Fidelity's recordkeeper fee was paid via revenue sharing (*i.e.*, comprised of variable percentages of the total amount of Plan assets for each of the various investment options in the Plan).  (AC ¶ 117; Trust Agreement, Ex. 4, at 40-41.)  During this period (April 24, 2014-December 31, 2016), Barrick and Fidelity agreed to a revenue credit program, under which Fidelity's recordkeeper fee was further reduced by an agreed-upon dollar amount (ranging from $325,000 to $375,000) that Fidelity annually credited back the Plan.  (AC ¶ 118; 12th Amendment to Trust Agreement, Ex. 4, at 100-101; 13th Amendment to Trust Agreement, Ex. 4 at 102-103.)

On January 1, 2017, Barrick and Fidelity again amended (for the fourteenth time) the Trust Agreement and transitioned Fidelity's recordkeeper fee from a percentage of Plan assets model to a contractual per participant recordkeeper fee of $68.  (AC ¶ 119; 14th Amendment to Trust Agreement, Ex. 4, at 104-114.)  Barrick and Fidelity continued the revenue credit program, under which Fidelity annually credited back Plan participants variable percentages of average daily balances held in the Plan funds.  (14th Amendment to Trust Agreement, Ex. 4, at 111-114.)  In April 2020, the Trust Agreement was amended yet again to further reduce the recordkeeper fee to $53 per participant.  (AC ¶ 119; 17th Amendment to Trust Agreement, Ex. 4, at 118-119.)

## LEGAL STANDARD

Motions to dismiss are an "important mechanism for weeding out meritless claims," and district courts are charged with carefully reviewing complaints in ERISA cases to separate the "plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal citations omitted). A court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Legal conclusions, whether presented as such or masquerading as factual allegations, are not afforded such deference. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191–93 (10th Cir. 2012) (finding conclusory allegations are not entitled to an assumption of truth); *see also*, *Birse v. CenturyLink, Inc.*, No, 17-cv-02872, 2018 WL 6603961, at *3 (D. Co. Nov. 19, 2018) *adopted in part Birse v. CenturyLink, Inc.*, No. 17-cv-02872, 2019 WL 1292861, at * 2 (D. Co. Mar. 20, 2019) (unpublished).

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS FOR BREACH OF THE FIDUCIARY DUTY OF LOYALTY MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE A SINGLE FACT FROM WHICH A BREACH CAN BE INFERRED.

The Amended Complaint is devoid of any facts supporting a claim for a breach of the duty of loyalty. The duties of loyalty and prudence are separate and distinct and must be pled separately. Simply attaching a "disloyalty" label to Count I of the Amended Complaint is not enough. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions . . . will not do." (internal

quotations omitted)).  Courts have not hesitated to dismiss disloyalty claims that merely attempt to piggyback on other theories of fiduciary breach.  *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018); *Romero v. Nokia, Inc.*, No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (unpublished) (dismissing claim for breach of the duty of loyalty that did not "present any separate allegations regarding any loyalty breach").

Here, even in the face of the First MTD, Plaintiffs' Amended Complaint does not plead a single fact that permits an inference that the Committee ever discharged its duties with anything other than "an eye single to the interests of the participants and beneficiaries."  *In re SunEdison*, 331 F. Supp. 3d at 114.  Plaintiffs do not allege any facts suggesting that the Committee acted for anyone's interest other than the Plan participants and beneficiaries, much less allege any benefit to BGNA, the Board, or the Committee.  The only references to the word "loyalty" or a breach of the duty of loyalty are either: (i) quotes from ERISA and case law (AC ¶¶ 2, 10, 63-65); or (ii) conclusory statements that the Committee breached its duty of loyalty (and prudence) (AC ¶¶ 14, 15, 56, 120, 127).  Thus, despite having over 1,000 pages of documents relating to Defendants' management of the Plan, and the opportunity to amend their pleading, Plaintiffs remain unable to identify a single act of disloyalty.

Instead, Plaintiffs' disloyalty claims improperly hinge "on the prudence-based allegations" in the Amended Complaint, and "do[] [not] present any separate allegations regarding any loyalty breach[.]"  *Martin,* 2020 WL 3578022, at * 6 (dismissing duty of loyalty claim filed by Plaintiffs' counsel because the loyalty claim was "based on the same facts as the duty of prudence claim"); *Romero*, 2013 WL 5692324, at *5; *In re SunEdison*, 331 F. Supp. 3d at 115; *In re Pfizer Inc. ERISA Litig.*, No. 04CIV10071, 2013 WL 1285175, at *10 (S.D.N.Y. Mar. 29, 2013) (unpublished opinion) (dismissing duty of loyalty claims that were derivative of plaintiffs' unsuccessful duty of

prudence claims).  Accordingly, Plaintiffs' disloyalty claims should be dismissed where, as here, there is "no reason to think" that the Committee chose particular investment options "to enrich itself at participants' expense."  *Loomis*, 658 F.3d at 671; *Martin,* 2020 WL 3578022, at * 6.

## II.   NONE OF PLAINTIFFS' ALLEGATIONS ESTABLISH A CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF PRUDENCE.

In Count I, Plaintiffs claim that the Committee breached the fiduciary duty of prudence by failing to: (i) select certain lower cost alternative funds by not utilizing lower fee share classes, collective trusts and passively managed funds; and (ii) negotiate lower recordkeeping fees.

Under ERISA, the duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  In pleading a breach of the duty of prudence, it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F. 3d 705, 718 (2nd Cir. 2013).  A complaint relying on circumstantial factual allegations must "give rise to a '*reasonable inference*' that the defendant committed the alleged misconduct, thus permitting the court to infer more than the '*mere possibility* of misconduct.'"  *St. Vincent*, 712 F. 3d at 718 (citing *Iqbal*, 556 U.S. at 678) (emphasis in original).  Courts "judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight" and therefore ERISA's fiduciary duty of care "requires prudence, not prescience."  *St. Vincent*, 712 F. 3d at 716.

Plaintiffs' prudence allegations rest on legally baseless conclusions—*i.e.* that merely because there were allegedly cheaper alternatives to a cherry-picked subset of Plan funds with which Plaintiffs take issue, Defendants must have failed to investigate and monitor the Plan's

investments.  (AC ¶¶ 76, 83, 95, 96, 104.)  As set forth below, this type of *ipse dixit* analysis has been repeatedly rejected by courts.  Moreover, and fatally, Plaintiffs' allegations regarding the Plan's fund expense ratios and recordkeeping fees are wrong.  The very premise of Plaintiffs' Amended Complaint—that the Plan contained options more expensive than Plaintiffs' new set of hypothetical alternatives is incorrect—***the Plan was still less expensive***.

### A.    Plaintiffs Fail to State a Claim for Excessive Fund Expense Ratios.

#### 1.    *There Is No Breach of Fiduciary Duty Simply Because Some Funds in The Plan Have Purportedly Higher Expense Ratios.*

Plaintiffs claim that the Committee breached its fiduciary duty of prudence by offering certain funds that Plaintiffs allege "charged grossly excessive fees compared with comparable or superior alternatives."  (AC ¶ 74.)  Plaintiffs argue that the majority of funds available in the Plan had higher expense ratios than purportedly identical funds.[5]  (AC ¶¶ 76, 83.)  This type of allegation fails to state a plausible claim, as numerous Courts have made clear:

> [t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour

---

[5]    Plaintiffs allege that Barrick imprudently retained twenty funds in the Plan (AC ¶¶ 76, 83), yet invested in only five of them.  (*See* C. Matney Summary Fidelity Statements 2014-2019 (invested in FID Growth Co K, FID Real Estate Inv., JPM Funds 2025, and JPM Funds 2050), Ex. 15; P. Watts Summary Fidelity Statements 2014-2018 (invested in JPM Funds 2020 R5), Ex. 16.)  Plaintiffs lack standing to challenge the fifteen Plan funds in which they did not personally invest because they have not suffered any individualized harm as to these funds.  *See e.g.*, *Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019) (dismissing claims as to investments in which no plaintiff personally invested because "[l]osses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts" and thus they were not injured as to those funds); *Wilcox v. Georgetown Univ.*, No. 18-422, 2019 WL 132281, at *9-10 (D.D.C. Jan 8, 2019); *Dezelan v. Voya Ret. Ins. & Annuity Co.*, No. 3:16-CV-1251, 2017 WL 2909714, at *6 (D. Conn. July 6, 2017); *Marshall v. Northrop Grumman Corp.*, No. CV 16-06794 AB (JCX), 2017 WL 2930839, at *8 (C.D. Cal. Jan. 30, 2017).  All confidential and personal information contained in Plaintiffs' summary statements have been redacted, except for the relevant information illustrating the funds in which they were invested and the revenue credit paid to Plaintiffs in 2018.  To the extent necessary for purposes of this motion, Barrick can provide the Court with an unredacted version of Exs. 15-16, for *in camera* review and consideration.

the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).

*Loomis*, 658 F.3d at 670 (*quoting Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).); *see also*, *Divane v. Northwestern University*, 953 F.3d 980, 988 (7th Cir. 2020), *petition for cert. filed* (U.S. June 23, 2020) (No. 19-1401); *Martin*, 2020 WL 3578022, at * 6.  In *Hecker*, the plan at issue offered twenty mutual funds with expense ratios ranging from .07% to just over 1%.  556 F.3d at 581.  The Seventh Circuit affirmed dismissal of the plaintiffs' claim that the defendant violated its fiduciary duty by not offering cheaper investment options, noting that there was nothing in ERISA that required plan fiduciaries to offer a particular mix of investment vehicles in a plan.  *Id*.  Similarly, in *Loomis*, the Seventh Circuit again affirmed dismissal where the plan offered 24 mutual funds with expense ratios ranging from 0.03% to 0.96%.  658 F.3d at 669.  In affirming dismissal, the court reiterated that a fiduciary need not offer the lowest-cost, highest-performing investment options and that providing participants choices between high risk/high expense funds along with low expense index funds is what is important.  *Id*. at 673.  Likewise, courts have dismissed claims for breach of duty of prudence based on the existence of funds with a cheaper expense ratio.  *Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011) (affirming dismissal and finding that plan offering 73 investment options with expense ratios ranging from .10% to 1.21% offered meaningful alternatives and investment options and therefore the court was unable "to infer from what is alleged that the process was flawed."); *Sacerdote v. New York University*, No. 16-cv-6284, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017) (unpublished) (dismissing breach of duty of prudence claim holding that courts look "first to the characteristics of the mix and range of options and then evaluate[] the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options" (quoting *Renfro*, 671 F.3d at 326)).

Furthermore, courts have consistently recognized that "[i]t is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly." *White v. Chevron Corp.*, No. 16-cv-00793, 2016 WL 4502808 at *12 (N.D. Cal. Aug. 29, 2016) ("*Chevron I*") (unpublished). "There are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable." *Chevron I*, 2015 WL 4502808 at 10, *quoting Tibble v. Edison Int'l*, ("*Tibble I*") 729 F.3d 1110, 1135 (9th Cir. 2013), *judgment vacated on other grounds*, *Tibble v. Edison Int'l.*, 135 S. Ct. 1823 (2015) (noting that a fiduciary might choose funds with higher fees for a number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility).

Here, Plaintiffs take issue with certain funds offered in the Plan and allege that the expense ratios for this group of funds ranged from 42 to 112 basis points (0.42% to 1.12%). (AC ¶¶ 76, 83). Even accepting this allegation as true—which as explained below it is not—this allegation does not state a claim for breach of the duty of prudence. As the allegation itself acknowledges, there are other investment alternatives available to Plan participants outside of the twenty funds and thus, Plan participants had choice. Further, there is no requirement—under ERISA or the relevant case law—that plan administrators include investments within certain expense ratios. Rather, providing a range of options is the key. Such is the case here.

Using 2018 as an example (the same year Plaintiffs use in the Amended Complaint), examples of other Plan investment options included: (i) an income fund (Dodge & Cox Income); (ii) an international index fund (FID Intl Index PR); (iii) an index fund (FID 500 Index); and (iv) bonds (Vanguard Total Bond Mkt Adm). (2018 Form 5000, Ex. 9, at 73.) Indeed, the documents provided to Plaintiffs' counsel demonstrate that the current Plan (*i.e.*, 2020) includes a variety of investment options with expense ratios as low as 0.06%. (Barrick Fund Descriptions, Ex. 12, at

6.)  Even the twenty funds that Plaintiffs target are broadly diversified (*i.e.*, offer a range of asset types and associated risks) and provide Plan participants the ability to elect cheaper or more expensive investments.

Further, not only are the Plan's investment options sufficiently diverse on the face of the Amended Complaint, the range of expense ratios are well within the range that other courts have repeatedly determined are reasonable as a matter of law.  *See Divane*, 953 F.3d at 989 (affirming dismissal with expense ratios between .05% to 1.89%); *Martin*, 2020 WL 3578022, at * 6 (dismissing prudence claims filed by Plaintiffs' counsel with expense ratios between .04% to 1.06%); *Tibble I*, 729 F. 3d at 1135 (affirming reasonableness of fees that "varied from .03[%] to 2%"); *Loomis*, 658 F.3d at 669-72 (affirming dismissal where "expense ratios rang[ed] from 0.03% to 0.96%"); *Renfro*, 671 F. 3d at 319 (affirming dismissal where fees "ranged from 0.1% to 1.21%"); *Hecker*, 556 F. 3d at 586 (affirming dismissal where "[a]t the low end, the expense ratio was .07%; at the high end, it was just over 1%"); *Chevron I*, 2016 WL 4502808 at *11 (rejecting a claim of excessive investment fees where the complaint alleged fees ranging from .05% to 1.24%).  Here, the expense ratios for the funds in the Plan range from .06% to 1.12%, well within the ranges found to be reasonable.

### 2.     *Plaintiffs Continue to Misstate the Applicable Expense Ratios.*

Barrick's First MTD demonstrated that Plaintiffs' Complaint pervasively misrepresented the share class of Barrick's JPM Funds.  (Dkt. No. 19 at 13-15.)  When this mistake was corrected, any basis for Plaintiffs' claims evaporated because applying the correct share class shows that the Plan was less expensive than Plaintiffs' alleged comparison investment choices.  (*Id*. at 17-18.)  In response, Plaintiffs come up with a whole new standard of "prudent" investments based on a new set of cherry-picked comparisons purportedly showing the Plan's funds were "excessively" more

expensive than cheaper alternatives.  But once again, Plaintiffs' allegations are premised on misstating the Plan's actual investment options.

Specifically, Plaintiffs continue to ignore that Plan participants received a 15 basis point revenue credit for the R5 share class of the JPM Funds.  (14th Amendment to Trust Agreement, Ex. 4 at 112; 2018 Form 5500, Ex. 9 at 9-12 (noting "0.15%" for JPM Funds).)  When the 15 basis point revenue credit is applied, the R5 share class is cheaper than the R6 share class.  The chart below, again corrects Plaintiffs' inaccurate chart in Paragraph 83.

| Fund | 2019 Prospectus Expense Ratio[6] | Actual Plan Expense Ratio When 15 bps Applied | Plaintiffs' Alleged R6 Lower Share Class | Plaintiffs' Alleged R6 Expense Ratio[7] | R5 Cheaper Than R6? |
|---|---|---|---|---|---|
| JPM Fund 2025 R5 | 0.55% | **0.40%** | JPM Fund 2025 R6 | 0.45% | YES |
| JPM Fund 2030 R5 | 0.56% | **0.41%** | JPM Fund 2030 R6 | 0.46% | YES |
| JPM Fund 2035 R5 | 0.56% | **0.41%** | JPM Fund 2035 R6 | 0.46% | YES |
| JPM Fund 2020 R5 | 0.54% | **0.39%** | JPM Fund 2020 R6 | 0.44% | YES |
| JPM Fund 2045 R5 | 0.57% | **0.42%** | JPM Fund 2045 R6 | 0.47% | YES |
| JPM Fund 2050 R5 | 0.57% | **0.42%** | JPM Fund 2050 R6 | 0.47% | YES |
| JPM Fund 2040 R5 | 0.57% | **0.42%** | JPM Fund 2040 R6 | 0.47% | YES |
| JPM Fund 2055 R5 | 0.57% | **0.42%** | JPM Fund 2055 R6 | 0.47% | YES |
| JPM Fund Income R5 | 0.52% | **0.37%** | JPM Fund Income R6 | 0.42% | YES |

---

[6]   *See* 2019 Summary Prospectuses for JPM Funds R5 Share Class, Ex. 11, at 8 (2020 expense ratio of 0.54); 24 (2030 expense ratio of 0.56); 32 (2035 expense ratio of 0.56); 40 (2040 expense ratio of 0.57); 48 (2045 expense ratio of 0.57); 56 (2050 expense ratio of 0.57); 64 (2055 expense ratio of 0.57); 1 (income expense ratio of 0.52).

[7]   AC ¶ 83.

Similarly, in Paragraph 95, Plaintiffs allege that "[a] clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts." The sole basis for this allegation is an inaccurate chart where the "Excess Expense" column is improperly inflated based upon Plaintiffs' use of the wrong expense ratio for the R5 share class. When the correct expense ratio is applied (*i.e.*, including the 15 basis point revenue credit), the R5 share class is again cheaper than the collective trusts alternatives Plaintiffs suggest. (Paragraph 95 Corrected Chart, Ex. 17.)

Likewise, Plaintiffs' chart in Paragraph 96 suffers from a similar deficiency (*i.e.*, it fails to include the 15 basis point revenue credit for the R5 JPM Funds), as well as other issues. The chart purports to show that the collective trust format for the Fidelity blend target-date funds is cheaper than the JPM Funds and "[h]ad the Plan utilized [the FIAM Blend Target Date Funds], the Plan's participants could have realized savings." (AC ¶ 96.) In the chart, Plaintiffs list the "expense ratio" for the purportedly cheaper Fidelity funds at 0.32%. *Id.* However, a review of Fidelity's fact sheet (a document relied upon by Plaintiffs but not attached (AC at fn. 12)) states that the 0.32% expense ratio listed is not the actual expense ratio; ***it is only an estimate***. (Fidelity FIAM Blend Target Date Q Fund Fact Sheet, Ex. 18, at 1, 4.) The Fidelity fact sheet clearly states that the 0.32% expense ratio is an estimated indication of pricing and that the actual expense ratio for the Fidelity blend target-date funds (*i.e.*, what the Plan would actual be charged if it switched to the funds) is 42 basis points (0.42%), but that amount can be "subject to certain decreases" that "depend[] on a variety of factors." (*Id.* at 4.) The Amended Complaint is devoid of any facts to support the conclusory assertion that the Plan would receive the 0.32% estimated expense ratio Plaintiffs assigned *sua sponte*. Accordingly, the chart in Paragraph 96 alleges nothing of factual or legal significance, is riddled with errors, and is based upon pure speculation.

In addition to misstating the actual expense ratios for the JPM Funds R5 share class, to create the illusion of inflated expense ratios Plaintiffs continue to assign a broad, one-size fits all investment "category" (*e.g.*, Domestic Equity, Money Market, Int'l Equity) to each of the remaining funds, which then corresponds to an alleged "median" expense ratio. (AC ¶ 76.) However, as set forth in the First MTD, the very study upon which Plaintiffs rely for the purported "median" cautions that using the broad one-size fits all investment "categories" to compare expense ratios is not meaningful. The study clarifies that "***the expense ratios applicable to funds vary within a given investment category***" and notes that for any given investment category, expense ratios can vary wildly depending on the extent to which the fund was invested in small-cap, mid-cap, or emerging market stocks (which tend to be more expensive to manage) instead of large-cap or developed market stocks (which tend to be less expensive to manage). ([BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016, Ex. 13, at 53](#) (emphasis added).) Therefore, as the ICI Study itself acknowledges, use of the "category" that Plaintiffs assigned to the funds in Paragraph 76 is not a meaningful tool to compare fund expenses. Plaintiffs continue to ignore this fact and misstate the applicability of the ICI study.

The Court is not required to accept Plaintiffs' erroneous expense ratio analysis as true when it is contradicted by the documents referenced in the Amended Complaint and First MTD, within Plaintiffs' possession, and by which the Court can take judicial notice. *Birse*, 2019 WL 1292861, at * 2 (granting motion to dismiss noting that allegations regarding purported breach of fiduciary duty were both "unsupported and conclusory" and therefore "not entitled to a presumption of truth.") As the Plan documents provided to Plaintiffs demonstrate, the Plan fund expense ratios were actually ***lower*** than Plaintiffs' alternative options.

### 3. Plaintiffs' Allegations That Barrick Failed to Investigate and Select Certain Types of Investments Fail as a Matter of Law.

At the heart of Plaintiffs' excessive fee claim is the allegation that the Committee breached its fiduciary duty by failing to consider **certain** investment vehicles including: (i) collective trusts; and (ii) passively managed funds that are allegedly less expensive. (AC ¶¶ 90-108.) This allegation fails to state a claim for breach of fiduciary duty as a matter of law.

**First**, ample authority holds that merely alleging that a plan offered one investment class over another is insufficient to carry a claim for fiduciary breach. *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) ("*Chevron II*") (unpublished), *aff'd*, 752 F. App'x 453 (9th Cir. 2018). That is because "fiduciaries have latitude to value investment features other than price, and indeed are required to do so, and ERISA does not require fiduciaries to "scour the market to find and offer the cheapest possible funds." *Id*. (citation omitted); *see also Loomis*, 658 F.3d at 669–70 (dismissing claim that fiduciaries should have offered institutional funds); *Hecker*, 556 F.3d at 586 (same); *Renfro*, 671 F.3d at 326–28 (dismissing claims that fiduciaries should have selected cheaper funds). As the Seventh Circuit noted in *Hecker*, "the cheapest possible fund" also "might, of course, be plagued by other problems." 556 F.3d at 586; *see also Loomis*, 658 F.3d at 670; *Martin*, 2020 WL 3578022, at * 3.

The lynchpin conclusion undergirding Plaintiffs' entire claim is that lower-cost alternatives (*e.g.*, collective trusts and passively-managed accounts) were available and the mere fact that the Plan's funds were not transferred to Plaintiffs' identified alternative investment vehicles illustrates a lack of prudence. (AC ¶¶ 97-99, 107-108.) However, this is not the law. As the court in *Chevron II* noted, it is legally insufficient if the sole support for this conclusory allegation is a comparison between funds in the Plan and funds that Plaintiffs have identified as less expensive. 2017 WL 2352137, at *14 ("what is still missing from the FAC are factual allegations sufficient to create a

plausible inference that defendants' process of selecting funds or their monitoring of the funds was imprudent.")  And as Plaintiffs acknowledge in the Amended Complaint, CITs are fundamentally different from mutual funds, namely, that they are not regulated by the SEC, are not required to file prospectus or comply with reporting requirements, and cannot be rolled over if the employee changes employment.  (AC fn. 9 (acknowledging differences of CITs).)  Thus the reason why numerous courts examining allegations identical to the ones alleged in the Amended Complaint (*i.e.*, failure to investigate and select CITs over mutual funds) have found that such allegations fail to state a claim for breach of the fiduciary duty of prudence.  *See Moitoso v. FMR LLC*, No. 18-12122-WGY, 2020 WL 1495938, at *14 (D. Mass. Mar. 37, 2020) (unpublished) ("This Court agrees there is no fiduciary duty to investigate alternatives to mutual funds."); *see also Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 796 (D. Minn. 2018) (holding plaintiffs failed to state a claim for breach of fiduciary duty by failing to "explore collective trusts . . . in lieu of mutual funds[.]"); *Main v. American Airlines, Inc.*, 248 F. Supp. 3d 786, 794 (N.D. Tex. 2017) (holding fiduciary defendant had not breached duty by failing either to offer or investigate alternatives to mutual funds).

But even if a plan fiduciary had a duty to select CITs (they do not), the Plan documents provided to Plaintiffs in February and attached to the First MTD make clear that Plaintiffs' claim that Barrick "fail[ed] to identify and select available collective trusts" is simply false ***as the Plan offers the Vanguard Target Retirement funds in the collective trust format***.  (Plan Fund Descriptions, Ex. 12 at 9-16.)  Additionally, the CIT alternatives identified by Plaintiffs in the Amended Complaint ***are more expensive*** than the funds previously offered in the Plan, as noted above.  (*See supra*, p. 16 (discussing AC Paragraph 95).)

***Second***, as the court in *Chevron I* explained in dismissing the plaintiff's claims:

> While plaintiffs appear to be challenging the entire lineup of funds, the challenge is primarily based on ***speculation*** that the Plan fiduciaries "could have" provided lower-cost versions of the funds, or "could have" had the same advisors manage the same funds in a separate account, or "could have" structured the investments differently. It is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly. In particular, mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an "apples-to-oranges comparison."

*Chevron I*, 2016 WL 4502808 at *12 (*citing Tibble I*, 729 F.3d at 1134) (emphasis added).  This

deficiency was identified in the First MTD, but nonetheless, Plaintiffs include the same apples to

oranges allegations in the Amended Complaint.  For example, in Paragraph 104, Plaintiffs include

a chart that purportedly compares fourteen lower cost alternative investment funds.  However,

Plaintiffs once again misstate the JPM Funds R5 expense ratios (*i.e.*, failing to include the 15 basis

point revenue credit), but do acknowledge that some of the "fund counterparts" in Paragraph 104

include passively-managed funds and funds from completely different investment categories.[8]

---

[8]   Even Plaintiffs' comparison of the actively managed alternatives is plagued with issues.  For example, Plaintiffs allege that the American Funds Target Date Retirement are an actively managed target date fund that are comparable and cheaper than the JPM Funds.  A review of the American Funds Target Date Retirement prospectuses to the JPM Funds' prospectuses illustrates that these two funds have fundamentally different investment strategies.  The American Funds Target Date Retirement prospectuses state that the funds are a "through" retirement fund, meaning that the funds include more high-risk asset allocations at and through retirement (*i.e.*, for approximately 30-years past 65).  (*See* American Funds Target Date Retirement prospectuses, attached as Ex. 19, at 7, 13, 20, 26, 32, 38, 44, 50, 57.)  The American Funds Target Date Retirement prospectuses make clear that the funds are not "designed for a lump sum redemption at the retirement date." (*Id*.)  Conversely, the prospectuses for the JPM Funds make clear that they are "to" retirement funds, meaning the fund "intends to reach its most conservative strategic target allocations around the end of the year of the target retirement date."  (Ex. 11 at 10, 18, 26, 34, 42, 50, 58, 66.)  Accordingly, despite Plaintiffs' conclusory allegation that such funds constitute "alternative fund counterparts," publicly available documents (and those which Plaintiffs rely upon in the Amended Complaint (AC fn. 20 noting that expense figures are "taken from summary prospectuses")) make clear that allegation is false as the entire investment strategy and timing of modification of asset allocations are materially different and achieve different outcomes.

(AC at fn. 13.)  Allegations that are nothing more than an "apples-to-oranges comparison" fail.[9]

*Chevron I*, 2016 WL 4502808 at *12 (*citing Tibble I*, 729 F.3d at 1134).

**Finally**, Plaintiffs do not plead any plausible facts suggesting that Defendants failed to investigate lower cost options and the Plan documents provided to Plaintiffs refute the unsupported "inferences" Plaintiffs attempt to pass off as "facts."  The Plan documents provided to Plaintiffs and discussed in the First MTD, demonstrate that the Committee had a robust process in place for reviewing and selecting Plan investments.  This included: (i) a semi-annual review of the investment results of funds in the Plan; (ii) regular quantitative and qualitative review of each of the Plan's investments; (iii) giving funds a status of "watch" or "probation" for a specified period in order to determine if replacement of the investment option was necessary; and (iv) a process for selecting new, alternative, or additional funds to include in the Plan.  (Investment Policy, Ex. 10, at 4-6.)  And Plaintiffs know that the Committee regularly removed, replaced, and added investment options to the Plan as the materials provided to them make that clear.  For example, between 2014 to 2015, the Committee identified and replaced the Fidelity Freedom target date funds with the JPM Funds.  (2014 Form 5500, Ex. 5, at 40; 2015 Form 5500, Ex. 6, at 42.)  Likewise, the Committee later identified and replaced the JPM Funds with the Vanguard Target Date Funds.[10]  (Plan Fund Descriptions, Ex. 12 at 9-16.)

---

[9]   Moreover, even if comparing the performance of an actively managed fund to a passively managed fund were a valid comparison—it is not—Plaintiffs' use of hindsight to draw the comparison (AC ¶ 103 (alleging certain funds in the Plan were outperformed by others)) is prohibited as a basis for establishing a breach of fiduciary duty.  ERISA's "fiduciary duty of care . . . requires prudence, not prescience."  *St. Vincent*, 712 F. 3d at 716.  "[T]he decline in the price of a security does not, by itself, give rise to a plausible inference that the security is no longer a good investment."  *Id.* at 721.  Plaintiffs' hindsight claims do not give rise to a plausible claim of breach of fiduciary duty.

[10]   In addition to the target date funds, comparison of other funds in the Plan since April 24, 2014 show numerous changes to the Plan line up.  (2015 Form 5500, Ex. 6, at 42 (removing funds "Munder MDCPCR Gth R6" and "Fidelity Retire MMKT" and adding "FID RETIRE GOV II"

Plaintiffs' unsupported allegations regarding the Committee's purported failure to investigate alternative investment options fail as a matter of law and are rebutted by publicly available documents, documents provided to Plaintiffs in February, documents attached to the First MTD, and documents upon which Plaintiffs rely in their Amended Complaint.

**B.      Plaintiffs Fail to Allege A Plausible Claim for Excessive Recordkeeping Fees.**

Plaintiffs contend that the Committee allowed Fidelity to receive excessive recordkeeping fees by purportedly failing to: (i) select a "more prudent" payment arrangement for how the Plan's recordkeeper fees were paid (AC ¶ 120); and (ii) obtain lower recordkeeping fees.  (AC ¶¶ 121-122, 125-127.)  Plaintiffs fail to state a plausible claim for several reasons.

***First***, contrary to Plaintiffs' suggestions (AC ¶ 121), ERISA does not impose a fiduciary duty to obtain competitive bids for recordkeeping services.  *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, No. 17-cv-07243-BLF, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) (unpublished) (the "absence of competitive bidding or RFP process, without more, does not support Plaintiffs' allegations that . . . Defendant[] acted imprudently in violation of § 404(a)(1)(B).").  Alleging that the Committee was "required to solicit competitive bids on a regular basis has no legal foundation."  *Chevron I*, 2016 WL 4502808, at *14.

***Second***, Plaintiffs take issue with the "manner in which recordkeeping costs were paid" and allege that this unidentified "manner" was "clearly imprudent."  (AC ¶ 120.)  But the Amended Complaint is devoid of any facts supporting these vague allegations.

---

and "VM MID-CO Core GR R6"); 2016 Form 5500, Ex. 7, at 44 (removing funds "Spartan Intl Index" and "GEIF US LGCP COR INV" and adding "SSI US LG-CP COR INV" and "FID Intl Index Pr"); 2017 Form 5500, Ex. 8, at 42 (removing funds "SSI US LG-CP COR INV" and "FID RETIRE GOV II" and adding "FID MMKT Government Portfolio").

*Third*, without any support, Plaintiffs claim that in 2018, Fidelity continued to collect revenue sharing and that "$600,000 in collected revenue sharing never made [it] back to the pockets of the Plan participants." (AC ¶¶ 119-120.) Even a cursory review of the documents provided to Plaintiffs in February and attached to the First MTD demonstrate that this allegation is meritless. The relevant provision of the Trust Agreement clearly states that in 2018, the Plan had a "Participant Revenue Credit" under which amounts collected via revenue sharing (*e.g.*, the $600,000) were "allocated to Eligible Participants accounts as soon as administratively feasible (generally within 15 business days)." (14th Am. to Trust Agreement, Ex. 4, at 111-112.)

These amounts were in fact credited back to Plan participants as indicated in Fidelity summary statements to which Plaintiffs had access, as clearly accounted for with the line item "Revenue Credit." (C. Matney 2018 Summary statement, Ex. 15 at 14; P. Watts 2018 Summary statement, Ex. 16 at 12.) Accordingly, since revenue sharing amounts did make it back to the pockets of Plan participants, there are no facts to support Plaintiffs' allegations otherwise.

*Fourth*, Plaintiffs claim that "the total amount of recordkeeping fees (both through direct and indirect payments) . . . was conservatively above $60 per participant per year" and that these recordkeeping fees "are clearly unreasonable and well above recognized reasonable rates." (AC ¶¶ 124-125.) Even if this assertion were true—it is not—Plaintiffs again fail to allege what a "recognized reasonable rate" would be for a Plan of Barrick's size and their pure speculation about what the recordkeeping fees were cannot support an imprudence claim. *Martin*, 2020 WL 3578022, at * 4 (dismissing claims filed by plaintiffs' counsel with allegations that fees ranged between "$131.55 and $222.43 per person[.]"); *Marks v. Trader Joe's Co.*, No. CV 19-10942 PA, 2020 WL 2504333, at * 6 (C.D. Cal. Apr. 24, 2020) (unpublished) (dismissing complaint where plaintiff "guessed" recordkeeper fees were $140 in finding that claims "had no factual basis.").

Instead of alleging what a reasonable recordkeeper fee would be for the Plan, Plaintiffs opt to make apples to oranges comparisons in an effort to give an air of substance to their baseless allegations.  For example, Plaintiffs suggest that the Plan should have had a ***direct recordkeeper fee*** below $5 per participant based on a purported analysis of small plans with "under $200 million in assets."  (AC ¶ 122.)  But the *401k Averages Book*, the very book upon which Plaintiffs rely, actually makes clear that the purported $5 per participant direct recordkeeper fee is, in fact, only a fraction of the total recordkeeper fee paid by plan participants, and that for small plans with under $200 million in assets, ***the average total recordkeeper fee paid is actually $666*** (and it can be as high as $931).  ([401k Averages Book, Charts 24.5, 24.77, Ex. 20](#).)  Plaintiffs' erroneous attempt to pass off one component of a recordkeeper fee (in an inapplicable context—*i.e.*, small plan with under $200 million in assets) as an example and comparison for what would be "reasonable" for the Plan's total recordkeeper fee here is misleading at best.

Perhaps recognizing the fatal flaw in their allegations, Plaintiffs fall back on the suggestion that the larger the plan the lower the recordkeeping fees and cite to a series of cases identifying expert testimony and settlement agreements regarding recordkeeper fees (ranging from $18-$42 per participant) for multibillion-dollar plans with hundreds of thousands of participants administered by Boeing, Kraft Foods, and Mass Mutual.  (AC at fn. 18.)  As stated in the First MTD, what an expert testified may be a reasonable recordkeeper fee or what parties agreed to was reasonable in a settlement agreement for multibillion-dollar plans does not plead a plausible comparison to the fees in a plan the size of Barrick's.  Plaintiffs' excess recordkeeping fee allegations fail as a matter of law because Plaintiffs fail to allege what a reasonable fee in this case would be.  *Marks*, 2020 WL 2504333, at *6.

### III.   PLAINTIFFS' MONITORING CLAIM FAILS.

Plaintiffs' derivative monitoring claim (Count II) fails with their inadequately pled duty of loyalty and prudence claim (Count I).  Even if the claim were not derivative, Plaintiffs fail to plead any facts plausibly alleging BGNA and/or the Board failed to adequately monitor expenses.

"[B]ecause Plaintiffs have failed to plead sufficient facts as to their other allegations, they cannot maintain a claim that [the Board and BGNA] failed to monitor the fiduciaries."  *Marks*, 2020 WL 2504333, at *8 (dismissing monitoring claims and stating that "Trader Joes is correct in referring to [the monitoring] claim as derivative, as the claim is pled wholly depending on the breaches of duty previously alleged."); *see also, Martin*, 2020 WL 3578022, at * 6 (same).

Independently, Count II also fails because Plaintiffs have not pled the facts necessary for a monitoring claim to survive.  To state a claim, Plaintiffs must make a "threshold showing that the monitoring fiduciary failed to review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards."  *Chevron I*, 2016 WL 4502808, at *18 (internal citations omitted.)  The Amended Complaint is bare of any allegations that plausibly demonstrate a failure to review the performance of Committee appointees and conclusory allegations reciting the elements of such a claim are not enough.  For these reasons, Count II should likewise be dismissed.

### <u>CONCLUSION</u>

For the reasons stated above, the Court should dismiss Plaintiffs' Amended Complaint in its entirety and with prejudice.

DATED:  August 3, 2020

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By      */s/ Stephen Q. Wood*
     Stephen Q. Wood
     60 East South Temple, Suite 500
     Salt Lake City, Utah 84111
     Telephone: (801) 515-7300
     stephenwood@quinnemanuel.com

     John B. Quinn (*admitted pro hac vice*)
     865 S. Figueroa Street, 10th Floor
     Los Angeles, CA 90017
     Telephone: (213) 443-3000
     johnquinn@quinnemanuel.com

     Lazar P. Raynal (*admitted pro hac vice*)
     Kaitlin P. Sheehan (*admitted pro hac vice*)
     191 N. Wacker Drive, Suite 2700
     Chicago, IL 60606
     Telephone: (312) 705-7400
     lazarraynal@quinnemanuel.com
     kaitlinsheehan@quinnemanuel.com

     *Attorneys for Barrick Gold of North America,*
     *Inc., Board of Directors of Barrick Gold of North*
     *America, Inc., and Barrick U.S. Subsidiaries*
     *Benefits Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August, 2020, I filed with the Clerk of Court a true and correct copy of the foregoing **Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee's Motion to Dismiss Plaintiffs' Amended Complaint** via the CM/ECF System which sent notification to:

> ISOM LAW FIRM PLLC
> David K. Isom, Esq.
> 299 South Main Street, Suite 1300
> Salt Lake City, Utah 84111
> david@isomlawfirm.com
>
> CAPOZZI ADLER, P.C.
> Donald R. Reavey, Esq.
> 2933 North Front Street
> Harrisburg, PA 17110
> donr@capozziadler.com
>
> CAPOZZI ADLER, P.C.
> Mark K. Gyandoh, Esq.
> 312 Old Lancaster Road
> Merion Station, PA 19066
> markg@capozziadler.com

/s/ *Stephen Q. Wood*

| INDEX OF EXHIBITS | |
|---|---|
| Exhibit 1 | Complaint in *Kendall v. Pharmaceutical Product Development, LLC*, Case No. 20-CV-00071-D (E.D.N.C.) |
| Exhibit 2 | Plaintiffs' Counsel's Request Letter to Barrick dated 1/14/2020 |
| Exhibit 3 | Barrick's Response Letter dated 2/11/2020 |
| Exhibit 4 | Master Trust Agreement Between BGNA and Fidelity and amendments thereto |
| Exhibit 5 | 2014 Form 5500 |
| Exhibit 6 | 2015 Form 5500 |
| Exhibit 7 | 2016 Form 5500 |
| Exhibit 8 | 2017 Form 5500 |
| Exhibit 9 | 2018 Form 5500 |
| Exhibit 10 | Barrick Investment Policy |
| Exhibit 11 | 2019 Summary Prospectuses for JPM Funds for years 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and Income |
| Exhibit 12 | Barrick Fund Descriptions |
| Exhibit 13 | BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 |
| Exhibit 14 | Covington et al. v. Biogen, Inc., et al., Case No. 20-CV-11325 (D. Mass.) |
| Exhibit 15 | C. Matney 2018 Summary statement |
| Exhibit 16 | P. Watts 2018 Summary statement |
| Exhibit 17 | Paragraph 95 Corrected Chart |
| Exhibit 18 | Fidelity FIAM Blend Target Date Q Fund Fact Sheet |
| Exhibit 19 | American Funds Target Date Retirement prospectuses |
| Exhibit 20 | 401k Averages Book, Charts 24.5, 24.77 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |  |
|---|---|---|
| COLE MATNEY and PAUL WATTS,<br>individually and on behalf of all others<br>similarly situated, | ) ) ) ) ) | |
|  Plaintiffs, | ) ) | |
|  v. | ) ) | **Case No.: 2:20-cv-00275-TC** |
| BARRICK GOLD OF NORTH AMERICA,<br>INC., BOARD OF DIRECTORS OF<br>BARRICK GOLD OF NORTH AMERICA,<br>INC., BARRICK U.S. SUBSIDIARIES<br>BENEFITS COMMITTEE, and JOHN<br>DOES 1-30. | ) ) ) ) ) ) | |
|  Defendants. | ) ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................1

II.     STANDARD OF REVIEW ................................................................................2

III.    STATEMENT OF FACTS .................................................................................3

        A.  Defendants Cost the Plan Millions of Dollars in Excessive Fees ............................3

            1.  Imprudent Selection of High Cost Funds Led to Excessive Fees .....................4

            2.  Fidelity Received Excessive and Unreasonable Fees at the Expense of Plan
                Participants.................................................................................................5

IV.     ARGUMENT.......................................................................................................6

        A. Plaintiffs Have Standing to Challenge Funds in Which They Did Not Personally
           Invest .........................................................................................................................6

        B. Plaintiffs Have Pled Facts Sufficient to Support a Plausible Claim that Defendants
           Implemented A Flawed Process for Selecting the Plan's Investment Options .........7

            1. The Circuits are Split on the Requirements to Plead a violation of ERISA's
               Duty of Prudence in Excessive Fee Suits With the Seventh Circuit Taking the
               Minority View...............................................................................................7

            2. Plaintiffs Have Pled Facts That Fit Within the Prevailing Legal Guideposts.....8

        C.  Count I States a Plausible Claim for Breach of Fiduciary Duties........................10

            1.  ERISA Requires Selection of Lower-Cost Alternatives When They are
                Identical To Higher-Cost Alternatives..........................................................10

            2.  Plaintiffs Have Accurately Pled the Applicable Expense Ratios for the Plan's
                Funds...........................................................................................................14

            3.  ERISA Required Defendants to Offer CITs Under the Prevailing
                Circumstances ..............................................................................................17

            4.  The Complaint Plausibly Pleads that the Plan Fiduciaries Failed to Consider
                Materially Similar Funds ..............................................................................18

            5.  ERISA Requires Defendants to Offer Passively-Managed Investment Options
                When Prudent Under the Prevailing Circumstances.......................................19

        D.  Count I Plausibly Alleges that Defendants Breached Their Fiduciary Duties in
            Failing to Monitor the Plan's Recordkeeping Fees...........................................20

        E. The Complaint States a Plausible Claim for Breach of the Duty of Loyalty ..........24

        F. The Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor .25

V.      CONCLUSION.................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Statutes**

Employee Retirement Income Security Act of 1974 .................................................................. 1

**Cases**

*Bell v. Pension Committee of ATH Holding Company, LLC*,
2019 WL 387214, at * 5 (S.D. Ind. Jan. 30, 2019) .................................................................. 17

*Bell v. Pension Committee of ATH Holding Company, LLC*,
2017 WL 1091248, at * 4 (S.D. Ind. Mar. 23, 2017) ................................................................ 2

*Bouvy v. Analog Devices, Inc.*,
2020 WL 3448385 (S.D. Cal. June 24, 2020) ........................................................................... 2

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 598 ....................................................................................................................... Passim

*Brotherston v. Putnam Investments LLC*,
2016 WL 1397427, at *1 (D. Mass. April 7, 2016) ................................................................ 16

*Brotherston et al. v. Putnam Investments,* LLC,
907 F.3d 17 (1st Cir. 2018), *writ of certiorari denied* 2020 WL 129535 (2020) .................... 19

*Cassell v. Vanderbilt*,
285 F.Supp.3d 1056, 1061 (M.D. Tenn. 2018) ................................................................. Passim

*Clark v. Duke University*,
2018 WL 1801946 (M.D.N.C. April 13, 2018) ......................................................................... 6

*Creamer v. Starwood Hotels & Resorts Worldwide, Inc.*,
2017 WL 2909408, at *3 (C.D. Cal. May 1, 2017) ................................................................ 21

*Cryer v. Franklin Templeton Resources Inc.*,
2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) ................................................................. 19

*Cunningham v. Cornell Univ.*,
2018 WL 4279466 at * 4 (S.D.N.Y. Sept. 6, 2018) ................................................................ 25

*Davis et al. v. Washington U.*,
960 F.3d 478, 483 (8th Cir. 2020) ...................................................................................... 2, 16

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty. Inc.*,
2019 WL 6841222, at * 1 (N.D. Cal. Dec. 16, 2019) ............................................ 21

*Dezelan v. Voya Ret. Ins. & Annuity Co.*,
2017 WL 2909714, at * 1 (D. Conn. July 6, 2017) ................................................ 6

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410, 418 n.3 (4th Cir. 2007) ................................................................. 12

*Disselkamp, et al. v. Norton Healthcare, Inc. et al.*,
2019 WL 3536038, at * 5 (W.D. Ky. Aug. 2, 2019) ......................................... 3, 15

*Divane v. Northwestern Univ.*,
953 F.3d 980 (7th Cir. 2020) ............................................................................ 7, 9

*Falberg v. Goldman Sachs Group, Inc.*,
2020 WL 3893285, at * 11 (S.D.N.Y. July 9, 2020)… ...................................Passim

*Feinberg v. T.Rowe Price Group, Inc., et al.*,
2018 WL 3970470, at * 7 (D. Md. Aug. 20, 2018) ......................................... 2, 19

*Glass Dimensions, Inc. v. State Street Bank & Trust Co.*,
285 F.R.D. 169, 175 (D. Mass. 2012) (same) ....................................................... 6

*Hay v. Gucci America, Inc., et al.*,
2018 WL 4815558, at * 6 (D.N.J. Oct. 3, 2018) .................................................... 2

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ("*Hecker I*") ........................................................ 12

*Hecker v. Deere & Co.*,
569 F.3d 708 (7th Cir. 2009) ("*Hecker II*") ...................................................... 12

*Henderson v. Emory Univ.*,
252 F.Supp.3d 1344, 1349 (N.D. Ga. May 10, 2017)................................. 2, 14, 25

*Hughes v. Northwestern University*,
(No. 19-1401), docketed June 23, 2020 ................................................................ 7

*Intravaia, et al., v. National Rural Electric Cooperative Assoc.*,
2020 WL 58276, at * 3 (E.D.Va. Jan. 2, 2020) .................................................. 23

*Johnson v. Providence Health & Services, et al.*,
2018 WL 1427421, at * 4 (W.D. Wash. Mar. 22, 2018) ................................... 6, 25

*Johnson et al. v. Fujitsu Tech. and Bus. of Am., Inc.*,
250 F.Supp. 3d 460, 465  (N.D. Cal. Apr. 11, 2017) ............................................ 6

*Krueger v. Ameriprise Fin., Inc.*,
2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) ...................................... 16

*Kruger v. Novant Health, Inc.*,
131 F.Supp.3d 470, 479 (M.D.N.C. 2015) ............................................... 11, 15, 24

*Larson v. Allina Health Sys.*,
350 F.Supp. 3d 780, 792 (D. Minn. 2018) .......................................................... 6, 18

*Leber v. Citigroup*,
No. 07-cv-9329, 2017 WL 5664850, at * 6  (S.D.N.Y. Nov. 27, 2017) ................... 6

*Loomis v. Exelon Corp.*,
58 F.3d 667 (7th Cir. 2011) ............................................................................ 12, 13, 18

*In re M&T Bank Corp. ERISA Litig.*,
2018 WL 4334807, at * 9 (WDNY Sept. 11, 2018) ............................................. 18

*Main v. Amr. Airlines*,
248 F.Supp.3d 786, 794 (N.D. Tex. Mar. 31, 2017)............................................ 2, 18, 19

*Massachusetts v EPA*,
549 U.S. 497, 517 (2007).................................................................................. 7

*Marshall v. Northrop Grumman Corp.*,
2017 WL 2930839, at * 8 (C.D. Cal. Jan. 30, 2017)........................................... 6

*Marshall v. Northrop Grumman Corp.*,
2019 WL 4058583 at * 10 (C.D. Cal. Aug. 14, 2019)........................................... 19

*Martin v. Careerbuilder, LLC, et al*,
2020 WL 3578022 (N.D. Ill. July 1, 2020)........................................................ 9

*McDonald v. Jones*,
2017 WL 372101, at * 3 (E.D. Mo. Jan. 26, 2017) .......................................... 6

*Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)...................... 10

*Moitoso v. FMR LLC*, 2020 WL 1495938, at * 14 (D. Mass. Mar. 27, 2020) ...... 18

*Moreno v. Deutsche Bank*,
2016 WL 5957307,  at * 2 (S.D.N.Y. Oct. 13, 2016) .......................................... 16

*Morin v. Essentia Health*,
2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) ............................................. 24

*Nicolas v. Trustees of Princeton Univ.*,
2017 WL 4455897, *4 (D.N.J. Sept. 25, 2017) ........................................................... 16

*Patterson v. Morgan Stanley*,
2019 WL 4934834, at * 2  (S.D.N.Y. Oct. 7, 2019) ...................................................... 6

*Pfizer Inc. ERISA Litig.*,
2013 WL 1285175 (S.D.N.Y. Mar. 29, 2013) ............................................................ 24

*Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*,
2020 WL 1531870, at * 1 (E.D.Pa. Mar. 31, 2020) ............................................Passim

*Reetz v. Lowe's Companies, Inc.*,
2019 WL 4233616, at * 6 (W.D.N.C Sept. 6, 2019) ................................................. 11

*Ramos et al. v. Banner Health*,
2017 WL 4337598, at * 1 (D. Col. Sept. 29, 2017) ............................................. 2, 10

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) ............................................................................... 12, 13

*Ridge at Red Hawk, LLC v. Schneider*,
493 F.3d 1174, 1177 (10th Cir. 2007) ...................................................................... 3

*Romero v. Nokia, Inc.*, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ..................................... 24

*Sacerdote v. New York Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) .......................................................... 13

*Schapker v. Wadell & Reed Financial, Inc., et al.*,
2018 WL 1033277 (D. Kan. Feb. 22, 2018) .......................................................Passim

*Schultz et al. v. Edward Jones*,
2018 WL 1508906, a * 3 (E.D.Mo. Mar. 27, 2018) .................................................. 2

*Short v. Brown U.*,
320 F.Supp.3d 363, 370 (D.R.I. July 11, 2018) ...................................................... 21

*Southern Utah Wilderness Alliance v. United States Dept. of the Interior*,
2015 WL 4389580, at * 1 (D. Utah July 17, 2015) .................................................. 3

*Starr v. Baca*,
652 F.3d 1202, 1216 (9th Cir. 2011) ...................................................................... 17

*In re SunEdison, Inc. ERISA Litig.*,
331 F.Supp. 3d 101, (S.D.N.Y. 2018) ...................................................................... 24

*Sweda v. Univ. of Pennsylvania,*
923 F.3d 320, 331 (3d Cir. 2019) .................................................................. Passim

*Terraza v. Safeway,*
No. 16-cv-03994, 2017 WL 952896 (N.D. Cal. Mar. 13, 2017) ............................ 13

*Tibble v. Edison Int'l,*
135 S. Ct. 1823 (2015) ............................................................................................. 2

*Tibble v. Edison Int'l,*
729 F.3d 1110, 1137-39 (9th Cir. 2013) ................................................................ 16

*Tibble v. Edison Int'l,*
843 F.3d 1187 (9th Cir. 2016) .......................................................................... 8, 12

*Tibble v. Edison Int'l,*
2017 WL 3523737, at * 11 (C.D. Cal. Aug. 16, 2017) .......................................... 17

*Tracey et al. v. MIT,*
2017 WL 4478239, * 2 (D.Mass. Oct. 4, 2017) ........................................... 2, 18, 25

*Troudt v. Oracle Corp.,*
2017 WL 1100876, at * 3 (D. Col. Mar. 22, 2017) ........................................ Passim

*Tussey v. ABB, Inc.,*
No. 06-cv-4305, 2007 WL 4289694, *2 (W.D. Mo. Dec. 3, 2007) .......................... 6

*Tussey v. ABB, Inc.,*
746 F.3d 327(8th Cir. 2014) .................................................................................. 24

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.,*
2016 WL 4507117, at *4-5 (C.D. Cal. Aug. 5, 2016) ............................................. 6

*White v. Chevron Corp., et al,*
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ("White* I") ............................... 1, 181

*White v. Chevron Corp.,*
2017 WL 2352137 (N.D. Cal. May 31, 2017) ("White II") ................................... 11

*Wilcox v. Georgetown Univ.,*
2019 WL 132281, at * 10 (D.D.C. Jan. 8, 2019) .................................................... 6

*Wildman v. Amr. Cent. Servs. et al.,*
237 F.Supp.3d 902 (W.D. Mo. 2017) ..................................................................... 24

Plaintiffs Cole Matney and Paul Watts, (together, "Plaintiffs"), by and through their attorneys, respectfully submit this opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.[1]

## I.  INTRODUCTION

Defendants continue to dwell on the same arguments from their initial motion to dismiss even though those arguments are now moot in light of Plaintiffs' amended complaint.  Regardless, Defendants wrongly assert that the initial complaint, only amended to correct certain inconsequential facts (to clean up the record), was a copy and paste job of Plaintiffs' counsel's prior complaint against Pharmaceutical Product Development ("PPD").  To be sure, there is one common thread in the PPD complaint and Complaint here.  That is, that the defendant-fiduciaries in both cases selected a slate of investment options for their retirement plan participants that were imprudent due to their high fees where identical or nearly identical alternative funds – differing only in price – were available in the marketplace.  The allegations related to ERISA[2] law and prudent fiduciary conduct in both complaints are of course the same.  But the facts are different.

For instance, in the case against PPD, the defendant-fiduciaries there failed to select the lower-cost version of Fidelity Freedom target date funds.  Here, Defendants failed to select lower-cost versions of JPMorgan target date funds.  Defendants' insistence that they did not select higher cost funds is based on a sleight of hand, namely that the Plan received "revenue credits" that purportedly "reduced" the overall expenses for the Plan.  But that does not change the fact that Defendants selected more expensive funds to begin with.  When companies commit such blatant breaches of fiduciary duty, the question isn't why they are sued but why they utterly failed in their

---

[1] Defendants' memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint is referred to herein as "Defs. Mem."  All references to "¶" or "Complaint" are to the Amended Class Action Complaint (ECF 21).

[2]  Employee Retirement Income Security Act of 1974.

fiduciary duties.  Is it because they "did not negotiate aggressively enough with" their service provider or because they were "asleep at the wheel?;" either reason is inexcusable.  *Davis et al. v. Washington U.* 960 F.3d 478, 482 (8th Cir. 2020).

Plaintiffs have pled facts to plausibly show Defendants failed to select the lower-cost versions of JPMorgan target date funds, among other breaches.  These facts are analogous to facts pled in other actions decided by courts within the Tenth Circuit that have denied motions to dismiss.[3]  For example, in *Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 2020 WL 1531870 (E.D.Pa. Mar. 31, 2020), the court, while analyzing a factually similar complaint to the instant one filed by Capozzi Adler, upheld plaintiffs' claims in full.  *Id.* at * 1.[4]  For these and the reasons explained below, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

## II.    STANDARD OF REVIEW

ERISA's duty of prudence applies to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones.  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015).  "To withstand a motion to dismiss under Rule 12(b)(6), 'a complaint

---

[3] *See, e.g.*, *Schapker v. Wadell & Reed Financial, Inc., et al*. 2018 WL 1033277 (D. Kan. Feb. 22, 2018); *Troudt v. Oracle Corp*., 2017 WL 1100876, at * 3 (D. Col. Mar. 22, 2017); *Ramos et al. v. Banner Health, et al.*, 2017 WL 4337598 (D. Col. Sep. 29, 2017); *But see Birse v. CenturyLink*, 2019 WL 1292861, at * 1 (D. Col. Mar. 20, 2019) (dismissing inapposite action without prejudice where plaintiffs alleged that **one** fund out of twenty-two – an actively managed Large Cap Fund – was inadequately designed, selected, and monitored by defendant).

[4] *See also Tracey et al. v. MIT*, 2017 WL 4478239, * 2 (D.Mass. Oct. 4, 2017) (upholding excessive fee claim); *Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at * 11 (S.D.N.Y. July 9, 2020) (same); *Hay v. Gucci America, Inc.*, *et al.*, 2018 WL 4815558, at * 6 (D.N.J. Oct. 3, 2018) (same); *Feinberg  v. T. Rowe Price, Inc. et al.*, 2018 WL 3970470 (D.Md. Aug. 20, 2018); *Main v. Amr. Airlines*, 248 F.Supp.3d 786, 794 (N.D. Tex. Mar. 31, 2017) (same); *Cassell v. Vanderbilt*, 285 F.Supp.3d 1056, 1061 (M.D. Tenn. 2018) (same); *Bell v. Pension Committee of ATH Holding Company, LLC*, 2017 WL 1091248, at * 4 (S.D. Ind. Mar. 23, 2017) (same); *Schultz et al. v. Edward Jones*, 2018 WL 1508906, a * 3 (E.D.Mo. Mar. 27, 2018) (same); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385 (S.D. Cal. June 24, 2020) (same); *Henderson v. Emory Univ.*, 252 F.Supp.3d 1344, 1349 (N.D. Ga. May 10, 2017) (same).

must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Southern Utah Wilderness Alliance v. United States Dept. of the Interior*, 2015 WL 4389580, at * 1 (D. Utah July 17, 2015). *See also Ramos*, 2017 WL 4337598, at * 1 ("The 12(b)(6) standard requires the Court to 'assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff.'") (quoting *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).[5]

In cases alleging imprudent fiduciary process, the vast majority of courts agree with the Eighth Circuit's ruling in *Braden v. Wal-Mart Stores, Inc.*, that a claim may survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably "infer from what is alleged that the process was flawed." *Braden*, 588 F.3d at 596. The reason is simple. Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. In sum, at the motion to dismiss stage, a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Id.* at 594; *see also Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019). Moreover, "the determination of the reasonableness of fees is a 'fact intensive' approach that 'must account for all the factors which informed the fiduciaries' decisionmaking,' and this determination will rarely "'be appropriate on a motion for summary judgment,' let alone a motion to dismiss." *Schapker*, 2018 WL 1033277, at * 9 (citations omitted).

## III.    STATEMENT OF FACTS

### A.    Defendants Cost the Plan Millions of Dollars in Excessive Fees

---

[5] *Disselkamp, et al. v. Norton Healthcare, Inc. et al.*, 2019 WL 3536038, at * 5 (W.D. Ky. Aug. 2, 2019) (analogous ERISA excessive fee action finding "Plaintiffs' claim that Defendants failed to investigate lower cost options…is a statement of fact that the Court will accept as true for purposes of this 12(b)(6) motion.").

### 1. Imprudent Selection of High Cost Funds Led to Excessive Fees

Measured by several different benchmarks, it is obvious that during the Class Period Defendants breached the duties they owed to the Plan. In 2018, excluding the Plan's target date offerings, the expense ratios for a majority of the remaining eighteen funds in the Plan (61%) were above the median expense ratios for comparable funds found in similarly-sized plans (plans having $500m to $1b in assets). *Id.* at ¶ 76. The expense ratios for funds in the Plan were in some cases up to *167%* (in the case of the Royce Opportunity Instl) above the median expense ratios of other funds in the same category. *Id.*

During the Class Period, several funds in the Plan (all the JPMorgan target date funds) had identical lower share counterparts that were never selected by the Plan's fiduciaries. ¶ 83 (listing nine funds). The amount Plan participants were overcharged ranged from 20% to 24% above what they should have been paying. *Id.* Additionally, Defendants also failed to select target date collective trusts offered by JPMorgan and Fidelity, the Plan's recordkeeper, that were materially identical to the target date mutual funds offered in the Plan, except they were cheaper. ¶¶ 95-96. At all times during the Class Period, each of the Plan funds had assets under management that satisfied the minimum needed to qualify for investment in the lower-priced share classes or collective trusts. *Id.* at ¶ 85.

Finally, the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style. *Id.* at ¶ 104 (showing that the Plan's fees were in some instances up to 1,660% more expensive than other comparable funds). These alternative funds had better performances than the Plan's funds in their 3 and 5 year average returns as of June 2020. ¶ 103. Indeed, as of 2019, the 5 year average return for Lazard Emerging Markets Equity Instl was worse than 78% of peer funds. *Id.* And the 5 year average return for the Victory Munder Mid-Cap Core Growth

4

R6 was worse than 95% of peer funds.  *Id.*

## 2. Fidelity Received Excessive and Unreasonable Fees at the Expense of Plan Participants

Fidelity was the Plan's recordkeeper during the Class Period.  ¶ 110.  The services it provided to the Plan were nothing out of the ordinary.  ¶ 111 (Fidelity agrees to perform work "ministerial in nature.") (citing Trust Agreement at 2).  But what they charged and Defendants accepted was out of the ordinary.  Between April 24, 2014 and December 31, 2016 there was no contractual recordkeeper fee per participant.  Rather, recordkeeping and administrative costs were paid using revenue sharing.  ¶ 117.  The Plan reported the following revenue sharing payments during the Class Period on the form 5500:

| Year | Number of Participants | Revenue Sharing | Per Participant Cost prior to credits |
|------|------------------------|-----------------|---------------------------------------|
| 2016 | 4,669 | $739,485 | $158 |
| 2015 | 5,270 | $773,341 | $147 |
| 2014 | 5,259 | $907,307 | $173 |

*Id.*  In 2014 and 2015, after accounting for revenue credits, the cost per participant was $101 and $85, respectively.  ¶ 118.

Beginning on January 1, 2017, Fidelity purportedly charged a flat $68 per participant annually and $53 per participant annually as of April 2020.  ¶ 119.  But Fidelity **still continued to collect** revenue sharing which was deposited into a revenue sharing account.  *Id.*  The total amount of recordkeeping fees (both through direct and indirect payments) per the Plan's form 5500 throughout the Class Period on a per participant annual basis was conservatively above $60 per participant per year, after credits.  ¶ 124.  This amount is clearly well above recognized reasonable rates for total recordkeeping compensation which range from $18 to $45 per participant.  ¶ 125, n. 18 (referencing case law); *see also* ¶ 122 (extrapolating reasonable costs by comparing the Plan's recordkeeping fees to smaller plans).

## IV.   ARGUMENT

### A. Plaintiffs Have Standing to Challenge Funds In Which They Did Not Personally Invest

Buried in footnote 5, Defendants argue that Plaintiffs lack standing to challenge fifteen Plan funds in which they did not invest.  Defendants are wrong.  Plaintiffs in an ERISA case like this one may seek recovery on behalf of the ***entire plan***, even if they did not personally invest in every one of the funds that caused injury.[6]  The cases Defendants cite do not counsel otherwise because unlike here, they involve challenges to specific funds as opposed to the process utilized by defendants that resulted in selection of several imprudent funds, including ones invested in by plaintiffs.[7]  *See, e.g., Patterson v. Morgan Stanley*, 2019 WL 4934834, at * 2  (S.D.N.Y. Oct. 7, 2019) ("Plaintiffs focus on thirteen investment options."); *Dezelan v. Voya Ret. Ins. & Annuity Co.*, 2017 WL 2909714, at * 1 (D. Conn. July 6, 2017) (challenging one product; Voya's stable value funds).[8]  The court in *Clark v. Duke University*, 2018 WL 1801946 (M.D.N.C. April 13, 2018), an analogous ERISA action, explained it this way:

---

[6] *See, e.g.*, *Hay*, 2018 WL 4815558, at * 4 (finding plaintiffs had standing to bring claims regarding funds in which they did not personally invest); *Larson v. Allina Health Sys.*, 350 F.Supp. 3d 780, 792 (D. Minn. 2018) (same); *Johnson v. Providence Health & Services, et al.*, 2018 WL 1427421, at * 4 (W.D. Wash. Mar. 22, 2018) (same); *Johnson et al. v. Fujitsu Tech. and Bus. of Am., Inc.*, , 250 F.Supp. 3d 460, 465  (N.D. Cal. Apr. 11, 2017) (same); *Leber v. Citigroup*, No. 07-cv-9329, 2017 WL 5664850, at * 6  (S.D.N.Y. Nov. 27, 2017) (same); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 285 F.R.D. 169, 175 (D. Mass. 2012) (same); *Tussey v. ABB, Inc.*, No. 06-cv-4305, 2007 WL 4289694, *2 (W.D. Mo. Dec. 3, 2007) (same); *McDonald v. Jones*, 2017 WL 372101, at * 3 (E.D. Mo. Jan. 26, 2017) (same); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *4-5 (C.D. Cal. Aug. 5, 2016) (same).

[7] *See* ¶ 71 ("Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participant's assets because of unnecessary costs.")

[8] To the extent *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at * 10 (D.D.C. Jan. 8, 2019) supports Defendants' position, it is an outlier.  And in *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at * 8 (C.D. Cal. Jan. 30, 2017) plaintiff failed to allege investment in a fund to establish injury-in-fact, but here Defendants concede that Plaintiffs have established Article III standing for certain funds.

> The cases cited by the defendants do not require a different conclusion. Those cases involve allegations that the ERISA fiduciaries breached their duties in buying or keeping specific funds in which the named plaintiff did not invest.
>
> ****
>
> That is not the case here, where the plaintiffs are invested in some of the challenged funds and where they allege that the breach of fiduciary duty arose from the overall decision-making processes, or lack thereof.

*Id.* at * 4-5 (quoting *Massachusetts v EPA,* 549 U.S. 497, 517 (2007)).  Accordingly, Plaintiffs have standing with respect to all funds at issue in this case.

### B.  Plaintiffs Have Pled Facts Sufficient to Support a Plausible Claim that Defendants Implemented A Flawed Process for Selecting the Plan's Investment Options

#### 1.  The Circuits are Split on the Requirements to Plead a Violation of ERISA's Duty of Prudence in Excessive Fee Suits With the Seventh Circuit Taking the Minority View

While the Tenth Circuit has not had occasion to address the issues presented by this case, other circuits have.  The Seventh Circuit's recent decision in *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020) put it at odds with the Third, Eighth and Ninth Circuits regarding allegations a plaintiff needs to plead in order to survive a motion to dismiss claims of excessive fees.  The Third, Eighth and Ninth Circuits have held that allegations that fiduciaries breached their duty of prudence by allowing excessive administrative and investment management fees to diminish participants' retirement accounts in 401(k) plans state a claim for violation of ERISA.  In *Divane*, the Seventh Circuit upheld a decision dismissing such claims, seemingly creating a circuit-split. *See generally* Petition for Writ of Certiorari, *Hughes v. Northwestern University*, (No. 19-1401), docketed June 23, 2020,

Notably, Defendants rely heavily on Seventh Circuit case law whereas the majority of courts, including those within the Tenth Circuit have followed the lead of the Eight Circuit in

*Braden* and its progeny.  The takeaway from the majority view is expressed best by *Braden*'s admonition that "[i]f Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer." 588 F.3d at 598.

### 2.  Plaintiffs Have Pled Facts That Fit Within the Prevailing Legal Guideposts

To meet their fiduciary duties, fiduciaries are "obligated to minimize costs." *Tibble*, 843 F.3d at 1198 (citing Unif. Prudent Investor Act § 7).  Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Id.* at 1197-98 (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)).  "Beneficiaries subject to higher fees… lose not only the money spent on higher fees, but also 'lost investment opportunity;' that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.  Accordingly, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected." *Id*.

Here, Plaintiffs' Complaint alleges circumstantial facts from which the Court can reasonably infer that Defendants' investment selection and monitoring processes were imprudent. Among other facts alleged in the Complaint are (1) the Plan's bargaining power as a large plan (¶ 99),[9] (2) the Plan's failure to switch to identical lower-fee share class mutual funds (¶¶ 82-83) which by definition had better performance than their higher-fee counterparts because the only difference in the funds are the fees they charge; (3)  the further breach in failing to consider available collective trusts (¶¶ 95-96); (4) the maintenance of expensive actively-managed mutual funds compared to comparable passively and actively managed funds (¶ 104); and (5) the

---

[9] *See Schapker*, 2018 WL 1033277, at * 9 ("Plaintiff's allegation that Defendants could have pooled the Plan's assets to obtain lower-cost institutional shares supports her fiduciary breach claim.")

maintenance of several funds during the Class Period that were more expensive that comparable funds found in similarly sized plans (¶ 75).  The fact that the 61% of the funds, excluding the target date funds which were in the wrong share class, had expense ratios more expensive than those of funds in similar-sized plans is circumstantial evidence of a serious breach because it plausibly shows lack of continuous monitoring as is required under ERISA.  ¶ 76.  *See, e.g. Bouvey*, 2020 WL 3448385, at * 2 (upholding allegations that "the Plan's investment expenses were higher than industry averages: at least 18 of the 20 mutual funds offered in 2016 had above-average expenses.").

Throughout their memorandum, Defendants cite to *Martin v. Careerbuilder, LLC, et al*, 2020 WL 3578022 (N.D. Ill. July 1, 2020) as an example of a lawsuit filed by Capozzi Adler that was dismissed.  This comparison is inapt.  To begin, *Martin* was filed in the Northern District of Illinois where the judge was constrained to follow the Seventh Circuit's *Divane* decision.  *Martin*, 2020 WL 3578022, at *  4 ("Defendants are correct that under binding Seventh Circuit precedent Plaintiff has not adequately pled a breach of the duty of prudence.").  Importantly, *Martin* relied on different facts than this case and did not rely on the same metrics and comparators.  It was a much smaller plan in terms of assets under management ($190m in assets), used a different recordkeeper, and had a different menu of investments with different expense ratios.

The instant case is in fact more similar to *Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., supra*, also filed by Capozzi Adler, where the court denied Defendants' motion to dismiss *in toto* while finding plaintiffs "plead charts, comparative studies, and specific facts necessary to proceed into discovery."  *Id*. at * 1.  Indeed, the *Pinnell* plaintiffs supported their allegations of imprudent plan management with "comparative" tables and citation to comparative studies identical to those pled in this case.  *See Pinnell et al. v. Teva Pharmaceuticals USA, Inc. et al.*, No. 2:19cv05738-MAK, ECF 10 (amended complaint), at ¶¶ 96, 99, 111, and 113.  The court in *Schapker*, 2018 WL

10333277, at * 7 also noted that unlike how Plaintiffs have pled their case here, in *Meiners v. Wells Fargo*, "[w]ithout pleading 'something more,' such as allegations that the fees were excessive as compared to the average cost of similar sized plans or that the fees were higher than the median fees for comparable funds, the court explained that the plaintiff's claim was not plausible."[10]

Defendants' contention that the "Plan documents provided to Plaintiffs…demonstrate that the Committee had a robust process in place for reviewing and selecting Plan investments," is misguided. Defs. Mem. at 21.  Plaintiffs allege that Defendants denied their request for the Committee's meeting minutes, which potentially contain the specifics of Defendants' ***actual*** practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments.  ¶ 23.  *See Troudt*, 2017  WL 1100876, at * 2 (noting "plaintiffs allege they were not privy to the process by which defendants selected investment options, which both explains their inability to plead with more factual specificity and underscores the necessity for discovery.")  Thus, simply citing to provisions in an investment policy statement is not an adequate substitute for knowledge regarding the Committee's actual deliberations.[11]

### C.  Count I States a Plausible Claim for Breach of Fiduciary Duties

#### 1.  ERISA Requires Selection of Lower-Cost Alternatives When They Are Identical To Higher-Cost Alternatives

---

[10] *See also Ramos*, 2017 WL 4337598, at * 6 (Plaintiffs successfully alleged the plan included funds with "expense ratios far in excess of other options available to the Plan."); *Troudt*, 2017 WL 1100876, at * 2 (upholding allegation that a fund was imprudent because it "greatly underperformed its benchmark in four out of five years….")

[11]  To the extent Defendants contend the Committee's later removal and replacement of the JPM Funds, Defs. Mem. at 21, demonstrates prudent conduct, it is insufficient to defeat a motion to dismiss. *Troudt*, 2017 WL 1100876, at * 2 (plaintiffs allege one fund "to have greatly underperformed its benchmark in four out of five years before it was removed from the plan…. These allegations are sufficient to suggest a lack of prudence in the … retention of the [fund].")

Plaintiffs' primary claim is that Defendants failed to offer available identical lower-cost alternatives to the Plan's investments. Like the plaintiffs in *Kruger et al. v. Novant Health, Inc.*, "Plaintiffs are not arguing that Defendants had a duty to scour the market to find and offer any cheaper investment. Instead, Plaintiffs allege that 'lower cost funds with the identical managers, investments styles, and stocks" should have been considered by the Plan.'" 131 F.Supp.3d 470, 476 (M.D.N.C. 2015); *see also Reetz v. Lowe's Companies, Inc.*, 2019 WL 4233616, at * 6 (W.D.N.C Sept. 6, 2019) ("While Lowe's is correct that "no authority requires the fiduciary to pick the best performing fund," *Meiners*, 898 F.3d at 823, that is not the allegation made here."). Indeed, when it comes to the Plan funds being in the wrong share class, there was no need to scour the market because the cheapest funds were right under the fiduciaries' noses.[12] The same goes for the collective trusts which were offered by JPMorgan and Fidelity, the Plan's recordkeeper.

Plaintiffs provide specific examples of at least nine Plan investment options for which Defendants could have switched to the lowest-fee share class. *See* ¶ 83 (charting funds). Fee discrepancies in some instances were as much as 24 percent. *Id.* (comparing the differences between the JPMorgan SmartRetirement Income R5 and JPMorgan SmartRetirement Income R6 fund share classes). Plaintiffs allege that selecting cheaper identical share classes would have saved Plan participants millions of dollars over the course of the Class Period. ¶ 89. As the Ninth

---

[12] Because Defendants chose the wrong share class of an identical investment, their argument that it is inappropriate to compare distinct investment vehicles solely by cost misses the point. Defs. Mem. at 13. *White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017) ("*White II*") which dismisses plaintiffs' amended complaint for the same reasons the court dismissed the initial complaint in *White v. Chevron Corp., et al*, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ("*White I*"), the case Defendants cite, is out of step with the majority of other courts, including those within the Ninth Circuit as demonstrated by citations herein to district courts within the Ninth Circuit. Nonetheless, one purported reason for dismissing the plaintiffs' claim was that the complaint lacked "factual allegations sufficient to create a plausible inference that defendants' process of selecting funds and their monitoring of the funds was imprudent." *White II*, at *14. But as argued herein, Plaintiffs have done just that.

Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198. Further, Plaintiffs allege all of the lower share alternatives were available during the Class Period. ¶ 86. Defendants cannot dispute this. Nor do Defendants deny they failed to obtain cheaper versions of identical funds or that they could have qualified for lower share classes. Instead, they rely on a sleight of hand to argue that after revenue credits the net cost to Plan participants was lower than the cost of the initially overpriced funds. Plaintiffs address this meritless argument in the next section.

Citing to several circuit court decisions, Defendants argue that because the Plan provided a range of options they are absolved from any liability.[13] Defendants misstate the law.[14] In *Sweda*, the Third Circuit addressed how defendants, like Defendants here, have misinterpreted its *Renfro* decision. It stated:

> Penn's solution is to interpret *Renfro* to mean that if a plan fiduciary provides a 'mix and range of investment options,' plaintiffs cannot plausibly allege breach of fiduciary duty.
>
> *****
>
> Despite our appreciation of Penn and amici's fear of frivolous litigation, if we were to interpret *Renfro* to bar a complaint as

---

[13] *See* Defs. Mem. at 12-13 (citing *Loomis v. Exelon Corp*., 658 F.3d 667 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ("*Hecker I*"); *Divane v. Northwestern*, *supra*; and *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011)).

[14] Defendants' attempt to shift the fiduciary responsibility to the Plan's participants conflicts with black letter law. It is the Defendants' obligation to select prudent investment options under the Plan, not the participants.' *See, e.g., Hecker v. Deere & Co.*, 569 F.3d 708 (7th Cir. 2009) ("*Hecker II*") ("a "Plan fiduciary can[not] insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them…."); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007) (finding ERISA § 404(c) does not insulate a fiduciary from liability for assembling an imprudent menu of investment options for participant-driven 401(k) plans).

> detailed and specific as the complaint here, we would insulate from
> liability every fiduciary who, although imprudent, initially selected
> a 'mix and range' of investment options. Neither the statute nor our
> precedent justifies such a rule.

*Sweda*, 923 F.3d 333-34.[15]  Defendants' reliance on *Hecker* and *Loomis* on this point is also

misplaced because "[i]n both *Hecker* and *Loomis*, plaintiffs generally asserted that defendants

violated their fiduciary duty by not offering certain investment options and selecting investment

options with excessive fees…. Neither court addressed whether a defendant violates their fiduciary

duty in selecting high-cost investment options where identical investment options are available at

a lower-cost." *Bell*, 2017 WL 1091248, at * 4.

Defendants' additional argument that the Plan's expense ratios fell within a reasonable

range, Defs. Mem. at  14, has been rejected by courts time and again for good reason.  It is

nonsensical.  In *Terraza v. Safeway*, No. 16-cv-03994, 2017 WL 952896 (N.D. Cal. Mar. 13,

2017), the court noted that "this approach would effectively carve out a presumption of prudence

for expense ratios that fell within a certain range." *Id.* at *13.  Because the reasonableness of a fee

is a fact intensive inquiry, the *Terraza* "[c]ourt therefore refuse[d] to adopt an approach that would

immunize an investment from scrutiny simply because its expense ratio fell within a certain range."

*Id.* at *13.  Other courts are in accord. *See Troudt*, 2017 WL 1100876, at *1 ("[h]eeding []

admonitions of [pertinent case law], the court cannot adopt defendants' proposal to dismiss Count

I of the complaint on the theory that the plan's fee structure fell within a presumptively reasonable

range of expense ratios."); *Schapker*, 2018 WL 1033277, at * 9 ("Courts have consistently rejected

the argument Defendants make that there is a 'presumptive reasonableness' range for fees, as 'this

---

[15] *Sacerdote v. New York Univ.*, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017), which Defendants
cite in support of their argument, was decided prior to the ruling in *Sweda* and relied on *Renfro*.

approach would effectively carve out a presumption of prudence for expense ratios that fell within a certain range.'")[16]

### 2. Plaintiffs Have Accurately Pled the Applicable Expense Ratios for the Plan's Funds

Defendants present a distorted view of the "correct" Plan fund share class. Defs. Mem. at 14-15.  Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  The "correct" expense ratio is thus precisely what the prospectus states the expense ratio is.  It is not a figure that can be manipulated as Defendants seek to do here by arguing one must deduct the "revenue credit" in order to know the expense ratio. Defs. Mem. at 15.  The reason is simple.  The expense ratio reduces the participant's return and the compounding effect of that return.  Receiving a revenue credit "later" is of little value because of the lost opportunity cost.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so. And that is why it is Defendants that misstate the actual expense ratios of the Plan's funds, not Plaintiffs.

In this case, Defendants purposely selected funds with expense ratios that were higher than were available for identical funds.  Their own chart shows that before a "revenue credit" the R5 JPMorgan target date funds in the fund were more expensive than the identical R6 target date funds.  Defs. Mem. at 15.  Defendants do not explicitly explain why they would willingly allow

---

[16] *See also Falberg,* 2020 WL 3893285, at * 9 ("courts have rejected any presumption of reasonableness from expense ratios falling within a given range."); *Henderson*, 252 F.Supp.3d at 1349-1350 (rejecting argument that "the Plans' investment options offer a range of expense ratios from .07% to 1.41%, and that many courts have found this range to be reasonable.").

the Plan to pay more for investment funds than necessary but they suggest the higher share classes provided revenue sharing to cover Plan expenses.  Defs. Mem. at 7, 23.  This argument raises issues of fact incapable of resolution at the motion to dismiss stage.  *Braden*, 588 F.3d at 597 (not every potential lawful explanation defeat's a plaintiff's claim).

"[T]he question is not 'whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make', but whether this revenue sharing arrangement was reasonable under all the circumstances."  *Troudt*. 2017 WL 1100876, at * 2.  But that "determination must account for all the factors which informed the fiduciaries' decision-making, not all of which are presently known to plaintiffs…." Nonetheless, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Tibble*, 2017 WL 3523737, at * 11.  In *Disselkamp*, defendants argued for dismissal of plaintiffs' claim "because Defendants applied the higher fees collected from the retail class funds to pay administrative fees through revenue-sharing." 2019 WL 3536038, at * 5.  The court rejected this argument because it was "not suited for a decision on a motion to dismiss."  *Id.*  It also noted that "while the revenue-sharing argument may eventually mitigate liability and damages, ***it still remains to be seen whether Defendants prudently investigated the higher share class investments before subjecting Plan participants to those higher fees***."  *Id.* (emphasis added); *see also Cassell*, 285 F.Supp.3d at 1067 ("the appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss.")[17]

---

[17] *See also Kruger*, 131 F.Supp.3d 470  at 478, n.8 ("Defendants also argue that … revenue sharing is not accounted for in Plaintiffs' allegations. These are all strong arguments proffered by Defendants. However, it does appear to this court, under the prudent man standard, that these arguments are better resolved at a later stage of the proceedings in light of the fact this court finds the allegations sufficient to allow the excessive fees claim to move forward.")

Indeed, most courts examining the exact claims pled by Plaintiffs have upheld them.[18] Just a few weeks ago, the Eighth Circuit issued the latest decision supporting Plaintiff's claims. It found that failure to gain access to cheaper identical funds is a "failure of effort [or] competence" and "is enough to state a claim for breach of the duty of prudence." *Davis et al. v. Washington U.* 960 F.3d 478, 483 (8th Cir. 2020).

Defendants also attempt to undermine Plaintiffs' well-pled allegations by citation to extraneous material for the truth of what they state and by imposing their interpretation of documents cited by Plaintiffs, including with respect to the ICI study cited in the Complaint. Defs. Mem. at 16-17. This is improper. At bottom, these issues are questions of fact inappropriate to resolve at the motion to dismiss stage. *See Ramos*, 2017 WL 4337598, at * 6 (defendants "seek to disprove Plaintiffs' allegations on their merits or to put into evidence facts beyond what Plaintiffs have pled. This again demonstrates that Plaintiffs' allegations may be contested, but not that they are implausible or insufficiently pled as a matter of law under Rule 12(b)(6)."); *Main*, 248 F. Supp. 3d at 794 ("Defendants rely on a number of materials outside the pleadings to argue why the inclusion of these three funds was not imprudent. And while the Court may take judicial notice of

---

[18] *See Pinnell*, 2020 WL 1531870, at * 5 (noting plaintiffs plead "a table listing at least twelve investment options for which the Plan fiduciaries could have switched to lower-fee share classes, in addition to numerous other comparisons."); *Nicolas v. Trustees of Princeton Univ.*, 2017 WL 4455897, *4 (D.N.J. Sept. 25, 2017) (court found analyzing similar allegations, including that defendants failed "to use significant bargaining power to negotiate lower fees," that "[a]ccepting as true the facts alleged in the Complaint and giving Plaintiff every favorable inference therefrom, Plaintiff's Complaint states a claim for relief."); *Fujitsu*, 250 F. Supp. 3d at 466-67 (holding that plaintiffs' allegations regarding share classes supported a claim for breach of fiduciary duty); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137-39 (9th Cir. 2013) (finding "little difficulty" in holding that fiduciaries breached their duty of prudence by failing to use the least expensive share class available); *Brotherston v. Putnam Investments LLC*, 2016 WL 1397427, at *1 (D. Mass. April 7, 2016) (same); *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) (same); *Moreno v. Deutsche Bank*, 2016 WL 5957307,  at * 2 (S.D.N.Y. Oct. 13, 2016) (same). *See also* n. 3 and 4 *supra* listing decisions that have upheld similar allegations.

16

those materials, it may not rely on the parties' opinions about what proper inferences should be drawn from them… Accordingly, the Court finds that dismissal is not warranted at this time.").

For example, Defendants claim the Complaint is devoid of facts to support the allegation the Plan could have obtained the Fidelity collective trusts at a .32% expense ratio. But the Complaint alleges the fact that Fidelity was the Plan's recordkeeper. If Defendants' argument is that they could not obtain the best rates from their own recordkeeper then they clearly have failed to negotiate aggressively enough with their service provider to obtain better pricing or they simply don't care about the participants. *See Davis*, 960 F.3d at 483. Regardless, "at this stage of the proceedings, it is not Plaintiffs' burden to rule out every possible lawful explanation for the allegedly high fees charged in administering the Plan." *Cassell*, 285 F.Supp.3d at 1066. Defendants' attempt to insert their own view of facts, where the Court must view the facts in Plaintiffs' favor, must be rejected. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### 3. ERISA Required Defendants to Offer CITs Under the Prevailing Circumstances

Clearly, Collective Trusts ("CITs") are favorable investment products, *see ¶* 90, that should have been considered by Defendants by the start of the Class Period. *Sweda*, 923 F.3d at 329 (fiduciaries must consider "favorable investment products, ***particularly when those products are substantially identical—other than their lower cost***—to products the trustee has already selected) (emphasis added). Defendants' argument that the Plan included **one** collective trust option out of nearly thirty options when an additional **sixteen** (¶¶ 95-96) were available to replace the target date funds, only highlights Defendants' fiduciary breaches. *Tibble* "reminded the Ninth Circuit that one debate on the pros and cons of alternate funds is insufficient to fulfill a fiduciary duty under ERISA." *Bell v. Pension Comm. Of ATH Holding Co et al.*, 2019 WL 387214, at * 5 (S.D. Ind. Jan. 30, 2019).

It is true, as Defendants point out, that some courts have found fiduciaries need not offer CITs, [19] but the essence of Plaintiffs' claim is that Defendants were aware – or should have been aware - of the advantages of CITs at the beginning of the Class Period, confirmed by Defendants' admission that the Plan included one collective trust.  Defendants' failure to consider "favorable investment products" is egregious.  *See Falberg,* 2020 WL 3893285, at * 10 (noting several courts have upheld similar claims at the motion to dismiss stage); *Pinnell,* 2020 WL 1531870, at * 6 (upholding claim that defendants failed to consider CITs); *Tracey v. MIT*, 2017 WL 4453541, at * 11 (D. Mass. Aug. 31, 2017) (same); *In re M&T Bank Corp. ERISA Litig*., 2018 WL 4334807, at * 9 (WDNY Sept. 11, 2018) (same).

### 4. The Complaint Plausibly Pleads that the Plan Fiduciaries Failed to Consider Materially Similar Alternative Funds

Another benchmark alleged in the Complaint in ¶ 104, compares the Plan's investments with other investments, both passively and actively managed, within the same investment style, thereby "provid[ing] a sound basis for comparison—a meaningful benchmark" as the Eighth Circuit stated in *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (noting the plaintiff in *Braden* alleged, *inter alia*, the market index).  Through this comparison of 16 funds,

---

[19] The cases Defendants cite had varying reasons behind their rulings.  On a case stated hearing (after class certification), *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 14 (D. Mass. Mar. 27, 2020) held there is no particular duty to "investigate alternatives to mutual funds."  But the decision hinged on the court's finding that plaintiffs "failed to show that a prudent fiduciary would have considered these alternatives to mutual funds."  That is different than here where, among other things, Plaintiffs demonstrate that the companies that offered mutual funds to the Plan also had available collective trusts such that it would take little effort for the Defendants to obtain the better priced investments.  *Larson*, 350 F.Supp. 3d at 796 based its ultimate decision  on the fact that the 403(b) plan was prohibited by law from offering collective trusts.  The Plan here is of course not a 403(b) plan.  Finally, *White I* improperly characterizes collective trusts as differing "significantly" from their mutual fund counterparts when in fact these investment vehicles have more in common than not.  *See* Complaint, ¶¶ 93-94.  *Main* relied on *Loomis* without further explanation as to why fiduciaries have no duty to consider alternatives to mutual funds.  *Id.*  248 F.Supp. 3d at 794.

Plaintiffs plausibly allege that comparable actively managed funds would have yielded better results for Plan participants because of their lower fees.  *See Pinnell*, 2020 WL 1531870, at * 6 (upholding materially similar allegations).  Plaintiffs list comparable actively managed funds to the Plan's actively managed funds that cost from 38% to 212% less than the Plan's funds.  ¶ 104. *See Feinberg*,  2018 WL 3970470, at * 5 (upholding allegations "of comparable funds showing that the Plan's funds' expense ratios ranged from 16% to 2,500% higher than the comparable funds.").  Defendants challenge these comparisons on the basis that the comparator funds are not really comparable.  Defs. Mem. at 20, n. 8.  "Such questions do not warrant dismissal – to the contrary, they suggest the need for further information from both parties."  *Nicolas*, 2017 WL 4455897, at * 5; *Cryer v. Franklin Templeton Resources Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (same); *see also Main*, 248 F. Supp. 3d at 794 (same).

### 5. ERISA Requires Defendants to Offer Passively-Managed Investment Options When Prudent Under the Prevailing Circumstances

The thrust of the Complaint's alternative allegations regarding passively-managed funds is that Defendants also failed to investigate whether all the actively managed funds – not some – could be replaced with comparable index funds given the lower fees of index funds and their better long-term prospects than actively managed funds (Complaint, ¶¶ 100-104).  *See Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583 at * 10 (C.D. Cal. Aug. 14, 2019) (a fiduciary breach may exist where "the Investment Committee failed to adequately weigh the costs and benefits of an active management strategy against a passive management strategy.") (emphasis added).  ERISA is derived from trust law, under which a fiduciary may compare a trust's investments to "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)" to determine whether the trust's investments are appropriate.  ¶ 105 (citing Restatement (Third) of Trusts § 100 cmt. b(1); *see also Brotherston et al. v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018), *writ of certiorari denied* 2020 WL 129535 (2020) (reasoning

actively managed funds and passively managed funds are "**comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so**.") (citing the Restatement (Third) of Trusts, § 100 cmt) (emphasis added).

Defendants complain that this is an apples to oranges comparison. The court in *Schapker* rejected a similar argument. It stated that "[a]lthough Defendants take issue with Plaintiff's inclusion of some index funds in her list of comparable funds, the Court is not persuaded that this fact alone makes Plaintiff's claim implausible." 2018 WL 1033277, at * 8. Further, the court held "the question whether the funds Plaintiff presents are comparable is a question of fact that the Court will not resolve in the context of ruling on a motion to dismiss." *Id.*

Neither are Plaintiffs' comparisons based on hindsight. Investment returns may not be known in advance but fees are known. If a fiduciary has the knowledge that in the long term index funds out-perform actively managed funds, and there are index funds that cost 375% less than a comparable fund (¶ 104 comparing the JPMorgan SmartRetirement 2040 R5 with the Fidelity Freedom Index 2040 Investor fund), prudence dictates that the index fund in such a scenario is the better option. The point is that given the availability of other less costly passively-managed investments not selected by Defendants, they failed in their fiduciary duties to consider "a plan's 'power ... to obtain favorable investment products." *Sweda*, 923 F.3d at 329; *see also Pinnell*, 2020 WL 1531870, at * 6 (upholding materially similar allegations).

### D. Count I Plausibly Alleges that Defendants Breached Their Fiduciary Duties in Failing to Monitor the Plan's Recordkeeping Fees

*First,* contrary to Defendants' argument, Defs. Mem. at 22, plenty of authority supports Plaintiffs' allegations that the Plan's fiduciaries should have conducted competitive bids for recordkeeping services. ¶ 116 (competitive bidding is necessary to "remain informed about overall

trends in the marketplace regarding the fees being paid by other plans.").[20]   Importantly, courts

have found that plaintiffs "[are] required to assert only that Defendants failed to act with prudence

under § 1104 when failing to solicit bids and to monitor and control recordkeeping fees." *Bell*,

2017 WL 1091248 at * 5; *see also Ramos*, 2017 WL 4337598, at * 3 (upholding claims that

defendant "failed to engage in a competitive bidding process in retaining Fidelity as the Plan's

recordkeeper."); *Short v. Brown U.*, 320 F.Supp.3d 363, 370 (D.R.I. July 11, 2018) ("Plaintiffs'

claim that a prudent fiduciary in like circumstances would have solicited competitive bids

plausibly alleges a breach of the duty of prudence.").  Cerulli Associates stated in early 2012 that

more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a]

recordkeeper within the next two years."  These RFPs were conducted even though many of the

plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[21]

*Second*, the Complaint alleges several facts that plausibly plead that Defendants utilized an

imprudent payment arrangement to pay for recordkeeping costs.  For example, Fidelity deposited

$375,000 and $325,000, respectively in a revenue sharing account to be purportedly used to defray

costs for recordkeeping and administration costs.   ¶ 118.  The manner of placing revenue sharing

into an account before disbursement to pay for Plan expenses was completely unnecessary ***for this***

***plan*** given that the Plan's fiduciaries could bargain for a per participant/capita fee with Fidelity as

they eventually did beginning on January 1, 2017.[22]   ¶ 119.  In other words, there was no need to

---

[20] *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty. Inc.*, 2019 WL 6841222, at * 1
(N.D. Cal. Dec. 16, 2019) is not on point because the alleged failure to send out requests for
proposals was related to "life annuity contracts" and "consulting services to" plan participants, and
not recordkeeping contracts.  The difference is that recordkeeping is a highly competitive business
because nearly all recordkeepers in the marketplace offer the same range of services.  ¶ 110.

[21] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*,
January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

[22] Switching to a per participant/capita fee agreement with Fidelity does not absolve Defendants of
liability.  *Creamer v. Starwood Hotels & Resorts Worldwide, Inc.*, 2017 WL 2909408, at *3 (C.D.
Cal. May 1, 2017) (Because Starwood failed to exercise bargaining power to obtain lower fees for

take extra funds only to give it back.  This manner of paying for recordkeeping fees deprived Plan participants use of their money and millions of dollars in lost opportunity costs.  *See Troudt*, 2017 WL 1100876, at * 2 ("[T]he question is not 'whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make' (Obj. at 10), but whether *this* revenue sharing arrangement was reasonable under all the circumstances.") (emphasis in original).  "To the extent plaintiffs are required to plead some 'plus' factor in connection with their revenue sharing allegations, the allegations of the complaint permit a reasonable inference that this method of compensating the plan administrator drove up the costs in a way that was completely untethered from the value of the services provided." *Troudt*, 2017 WL 1100876, at * 2, n. 5.

*Third*, beginning on January 1, 2017, Fidelity purportedly charged a flat $68 per participant annually and $53 per participant annually as of April 2020.   ¶ 119.  But Fidelity ***still continued to collect*** revenue sharing which was deposited into a revenue sharing account.  *Id.*  Based on the Plan's 2018 Form 5500, for the years ended December 31, 2018 and 2017, $45,719 and $53,178 of the Revenue Credit Account were used to pay plan administrative expenses, respectively.  *Id.*  Revenue sharing for 2018 was $664,000.  *Id.*  That means over $600,000 in collected revenue sharing never made back to the pockets of the Plan participants in 2018 according to the Form 5500.  Defendants dispute this allegation but do not explain the discrepancy between what the Form 5500 says and their contention that the entire $600,000 was credited back to Plan participants.  Defs. Mem. at 23.  Specifically, they do not provide an aggregate amount for the revenue credits provided to all the Plan participants.

---

many years… "viewed in the light most favorable to Plaintiffs, the Court can infer from these facts that Starwood's recordkeeping and administrative fees were excessive prior to 2015 and are still excessive" ).  Additionally, as explained *infra*, even the per participant/capita fee agreement was above market prices.

22

*Fourth,* Defendants are wrong that Plaintiffs fail to allege what a reasonable recordkeeping fee for the Plan should be. As an initial matter, Plaintiffs have stated exactly what the Plan paid for recordkeeping. *See supra* Section III.A.2. Thus, Plaintiffs' Complaint is unlike other cases where plaintiffs speculated as to the amount paid for recordkeeping. Defs. Mem. at 23.

Defendants misconstrue Plaintiffs' reference to the *401k Averages Book*. The Plan had over $600 million in assets, ***three times the size*** of the largest plans studied in the *401(k) Averages Book.* ¶ 122. In order to make an apples to apples comparison, Plaintiffs looked at what other plans pay in direct recordkeeping/administration compensation. As alleged in the Complaint, for plans with 2,000 participants and $200 million in assets, the **average** recordkeeping/administration fee (through direct compensation) was $5 per participant. *Id.* This is significant because recordkeeping costs drop as a plan increases in size. So for example, a plan with 200 participants and $20m in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. *Id*. The fact that the Plan had direct compensation recordkeeping costs of $68 per participant annually and $53 per participant annually (*see supra* Section III.A.2), which was far higher than the $5 average for plans a third of the size of the Plan is egregious. *Intravaia, et al.*, *v. National Rural Electric Cooperative Assoc.*, 2020 WL 58276, at * 3 (E.D.Va. Jan. 2, 2020) (upholding claim where plaintiffs "also allege that a similarly situated comparator incurs approximately 25% the administrative expenses, per participant, of the Plan here. This comparative fact nudges the claim over the line from merely possible to plausible.")

Defendants also cite the *401k Averages Book* for the proposition that the average total recordkeeper fee paid for plans under $200 million in assets is $666 to $931. Defs. Mem. at 24. The *401k Averages Book* says no such thing. The charts Defendants cite to show that the $666 to $931 figures Defendants point to refer to investment costs which are different than recordkeeping administration which the chart clearly shows averages $5 per participant. *See* Defs. Ex. 20. At

this stage of the litigation, Plaintiffs have alleged enough facts to plead a plausible claim. *See, e.g.*, *Kruger*, 131 F. Supp. 3d at 479 ("While Defendants claim that Plaintiff have not alleged facts regarding … the services provided, or how the fees charged to the Plan were excessive in light of those services, this court finds that those are the types of facts warranting discovery, and, therefore, dismissal at this stage is not appropriate")[23]

### E.   The Complaint States a Plausible Claim for Breach of the Duty of Loyalty

Often, like here, where Plaintiffs have pled a breach of the intertwined fiduciary duties of loyalty and prudence as a single count, courts reject a motion to dismiss the loyalty claims independently when the plaintiff has plausibly pled a breach of the duty of prudence. *See, e.g. Schapker*, 2018 WL 1033277, at * 9 ("Taken together, these circumstantial facts give rise to a plausible claim that Defendants' process in selecting the Plan's funds was flawed, and that Defendants breached their duties of prudence and loyalty to the Plan participants."); *Ramos*, 2017 WL 4337598,  at * 7 (finding "Plaintiffs have sufficiently pled a claim for breach of duties of loyalty and prudence by plausibly alleging that [defendant] had at least co-fiduciary responsibility for insufficient monitoring or selection of the Fund's mutual fund offerings").[24]

Fiduciaries need not set out to enrich themselves in order to violate ERISA's duty of loyalty; benefiting a third party over the Plan participants is also a violation.  The Complaint

---

[23]  *See also Sweda*, 923 F.3d at 329 ("[m]any allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance."); *Cassell*, 285 F.Supp.3d at 1064 ("[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss.").

[24] *See also Falberg*, 2020 WL 3893285, at * 11; *Pinnell*, 2020 WL 1531870, at * 6; *Kruger*, 131 F.Supp.3d at 479; *Morin v. Essentia Health*, 2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) (citing *Tussey*, 746 F.3d at 335 and *Braden.*, 588 F.3d at 595).  Indeed, the cases cited by Defendants are all inapposite because in each of the cases, the court dismissed both the prudence and loyalty claims.  *See, e.g, In re SunEdison, Inc. ERISA Litig.*, 331 F.Supp. 3d 101, (S.D.N.Y. 2018); *Romero v. Nokia, Inc.*, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013); *In re Pfizer Inc. ERISA Litig.*, 2013 WL 1285175 (S.D.N.Y. Mar. 29, 2013).

24

alleges that Defendants caused the Plan and participants to pay high recordkeeping fees by selecting high-cost investments with revenue sharing in order use a portion of the fees to pay Fidelity its inflated fees.  ¶¶ 117 – 125.  These actions support a strong inference that Defendants' actions, were taken (1) to save itself costs at the expense of Plan participants, and/or (2) to favor its recordkeepers over the Plan participants.  Either reason is inconsistent with the duty of loyalty.[25]

At any rate, these determinations are best suited for a decision on a more developed record.  *See, e.g.*, *Henderson*, 2017 WL 2558565, at *8 ("Whether the [p]lans' fiduciaries intended to benefit TIAA, Fidelity, and Vanguard is an issue than can be better determined at the motion for summary judgment stage.").

### F. The Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor

In *Cunningham v. Cornell Univ.*, 2018 WL 4279466 at * 4 (S.D.N.Y. Sept. 6, 2018), the court held that plaintiffs' allegations that defendants "breached their fiduciary duties by, among other things, failing to monitor their appointees, including the Committee and its members, failing to have a system in place to monitor the appointees' performance, and failing to remove appointees whose performance was inadequate" were adequate to defeat defendants' motion to dismiss.  *Id.*  Plaintiffs' Complaint contains similar factual allegations. ¶¶ 135-141.[26]

### V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.

Dated:  August 31, 2020                              Respectfully submitted,

---

[25] *See, e.g.*, *Johnson*, 2018 WL 1427421, at * 9 ("While the complaint provides no direct evidence of self-dealing or preferential treatment for Fidelity, the inclusion and retention of various Fidelity investment products is circumstantial evidence that Defendants did not act "with an eye single toward beneficiaries, interests.").

[26] *See also Tracey v. Massachusetts Inst. of Tech.*, 2017 WL 4478239, at *4 (in analogous action relying on the same facts to uphold Plaintiffs' failure to monitor claim against the incorporated entity).

**CAPOZZI ADLER, P.C.**


 _/s/ Mark K. Gyandoh_____
Mark K. Gyandoh, Esquire
(admitted *pro hac vice*)
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax (717) 233-4103
Email: markg@capozziadler.com

**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
(admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103
Email: donr@capozziadler.com


Counsel for Plaintiffs and
the Putative Class

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2020 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:   <u>/s/ *Mark K. Gyandoh*</u>
      Mark K. Gyandoh, Esq.

Stephen Q. Wood
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
60 East South Temple, Suite 500
Salt Lake City, UT 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,
    Board of Directors of Barrick Gold of North America,
    Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>        Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br><br>Case Number:  2:20-cv-00275<br><br>Judge Tena Campbell |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.     Plaintiffs Misstate The Legal Standard And Applicable Case Law. ...................................2

II.    Plaintiffs Effectively Concede That Their "Disloyalty" Claims Must Be Dismissed...........................................................................................................3

III.   Plaintiffs Have Not Plausibly Pled That Barrick Acted Imprudently. ...............................5

IV.   Plaintiffs' Claim That The Committee Failed to Monitor the Plan's Recordkeeping Fees Is Without Merit. ..................................................................8

V.    Plaintiffs Admit Their Failure To Monitor Claim Lacks Substance................................10

CONCLUSION....................................................................................................10

i

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................... 2, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................. 2

*Birse v. CenturyLink, Inc.*,
   No. 17-cv-02872, 2019 WL 1292861 (D. Co. Mar. 20, 2019) ........................... 6, 8

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ........................................................... 1, 2, 4

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
   No. 17-cv-07243-BLF, 2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) .................. 9

*Divane v. Northwestern Univ.*,
   953 F.3d 980 (7th Cir. 2020) .................................................................. 3

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) ................................................................... 4

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ........................................................................... 1, 2

*Hecker v. Deere*,
   556 F.3d 575 (7th Cir. 2009) ................................................................ 1, 5

*In re McKesson HBOC, Inc. ERISA Litig.*,
   391 F. Supp. 2d 812 (N.D. Cal. 2005) ..................................................... 4

*In re SunEdison, Inc. ERISA Litig.*,
   331 F. Supp. 3d 101 (S.D.N.Y. 2018) ...................................................... 4

*Johnson v. Providence Health & Services*,
   No. C17-1779-JCC, 2018 WL 1427421 (W. D. Wash. Mar. 22, 2018) .................. 3

*Larson v. Allina Health Sys.*,
   350 F. Supp. 3d 780 (D. Minn. 2018) ...................................................... 6

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) ................................................................ 1, 8

*Main v. American Airlines, Inc.*,
    248 F. Supp. 3d 786 (N.D. Tex. 2017) ...................................................................... 6

*Martin v. CareerBuilder, LLC*,
    No. 19-cv-6463, 2020 WL 3578022 (N.D. Ill. Jul. 1, 2020) ................................... 3, 8

*Moitoso v. FMR LLC*,
    No. 18-12122-WGY, 2020 WL 1495938 (D. Mass. Mar. 37, 2020)......................... 6

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F. 3d 705 (2nd Cir. 2013) .................................................................. 1, 3, 7, 10

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ................................................................................ 4, 5, 8

*Romero v. Nokia, Inc.*,
    No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ..................... 4, 5

*Tibble v. Edison Int'l.*,
    729 F. 3d 1110 (9th Cir. 2013) ................................................................................ 5, 7

*White v. Chevron Corp. ("Chevron I")*,
No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016),……………….…...7, 8

*White v. Chevron Corp.("Chevron II")*,
No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017),………………………3, 7

## Statutory Authorities

29 U.S.C. § 1104(a)(1)(A) ................................................................................................ 4

## Rules and Regulations

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 2

## <u>INTRODUCTION</u>

The fundamental question presented in Defendants' Motion to Dismiss (the "Motion" or "Mot.") is: Do Plaintiffs allege facts sufficient to support a plausible claim that Defendants breached their fiduciary duties in the administration of the Plan simply because Plaintiffs allege that less expensive investment choices were available?  The clear answer to that question is no. As a matter of law, it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F. 3d 705, 718 (2nd Cir. 2013) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 fn. 7 (8th Cir. 2009)).  A fiduciary has no duty to scour the market to find the least expensive option or to choose any particular type of investment simply because it is less expensive.  *See e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011); *Hecker v. Deere*, 556 F.3d 575, 586 (7th Cir. 2009).

Even if this were not the case, Plaintiffs fail to allege any plausible facts upon which a "reasonable inference" could be drawn that Defendants were derelict in their fiduciary duties.  To the contrary, the documents provided to Plaintiffs and their counsel months in advance of their filing suit, depict an attentively managed 401(k) plan that provided a broad array of retirement investment options to Barrick employees, and that the Committee regularly reviewed and adjusted the investment options, as appropriate.

Faced with this reality, Plaintiffs' Opposition (Dkt. No. 25) asks the Court to apply a new pleading standard in which they are permitted to simply posit "circumstantial facts," which are entirely unsupported—in fact contradicted—by the Plan documents.  (Opp. at 8.)  Plaintiffs argue that these "facts" are sufficient to support "inferences" of wrongdoing.  (Opp. at 8, 25.)  But as the United States Supreme Court has made clear, district courts are charged with carefully reviewing ERISA complaints to separate the "plausible sheep from the meritless goats." *Fifth Third Bancorp*

*v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  Here, Plaintiffs' "inferences" of wrongdoing, which are contradicted by the Plan documents upon which their Amended Complaint relies, are meritless goats.  The Amended Complaint should be dismissed with prejudice.

**ARGUMENT**

**I.      Plaintiffs Misstate The Legal Standard And Applicable Case Law.**

The Opposition is premised on a misstatement of the applicable pleading standard.  In order to survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the Amended Complaint must set forth allegations that raise a plausible inference of wrongdoing.  (Mot. at 8 (discussing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).)  This well-established pleading standard requires more than "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).  Thus, a complaint cannot survive if it alleges facts that create only a "sheer possibility that [the defendant] has acted unlawfully," because "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (quotation omitted).

Plaintiffs ignore both *Iqbal* and *Twombly* and argue instead that "the vast majority of courts agree with the Eighth Circuit's ruling in *Braden v. Wal-Mart Stores, Inc.*" that if Plaintiffs "lack the inside information necessary to make out their claims in detail," their claims should survive.  (Opp. at 3.)  Notwithstanding Plaintiffs' conclusory assertion about "the vast majority of courts," the Opposition is silent as to any other decision supporting this lower pleading standard.  Moreover, Plaintiffs cannot claim they "lack the inside information" necessary to state a claim.  They admittedly already have the relevant Plan documents.  As *Braden* recognized, ERISA has "extensive disclosure requirements" that give plan beneficiaries information on which they can base a claim.  *Braden*, 588 F.3d at 598.  Plaintiffs here have even more:  Barrick produced over

2

1,000 pages of relevant Plan documents in advance of litigation.  These documents show that there is no substance to the "inferences" Plaintiffs attempt to pass off as "facts."  (Mot. at 2-3.)  Plaintiffs cannot change the applicable pleading standard by simply ignoring the materials in their possession and alleging ignorance in an effort to proceed to discovery.[1]

## II.    Plaintiffs Effectively Concede That Their "Disloyalty" Claims Must Be Dismissed.

The moving papers showed that Plaintiffs' duty of loyalty claim must be dismissed because they do not allege a single fact remotely suggesting that the Plan fiduciaries failed to act "solely in the interest" of the Plan's participants.  (Mot. at 9.)  The Opposition essentially concedes the point. Plaintiffs cannot identify any factual allegation establishing conflicted conduct.  Instead, Plaintiffs argue that they have pled a "breach of the intertwined fiduciary duties of loyalty and prudence." (Opp. at 24.)  The supposed "intertwined duty" allegations consist of a claim that Defendants breached their duty of prudence by causing "the Plan and participants to pay high recordkeeping

---

[1]    Plaintiffs attempt to side-step dismissal by arguing that there is a purported "circuit split" between the Seventh Circuit and the Third, Eighth, and Ninth Circuit.  (Opp. at 7.)  Plaintiffs argue that the Seventh Circuit's "recent decision" in *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020) is at odds with other circuits.  (Opp. at 7.)  Again, this assertion is unsupported by any citation to any case from the Third, Eighth, or Ninth Circuit illustrating any such circuit split.  This is because there is none.  In the Motion, Barrick cited to numerous cases from courts in the Third and Ninth Circuit and beyond, all of which support dismissal of Plaintiffs' claims here.  *See e.g.*, *White v. Chevron Corp.*, ("*Chevron II*") No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd.* 752 Fed. Appx. 453 (9th Cir. 2018), *cert. denied* 139 S. Ct. 2646 (2019); *St. Vincent*, 712 F. 3d 705 (2nd Cir. 2013); *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011); *Johnson v. Providence Health & Services*, No. C17-1779-JCC, 2018 WL 1427421 (W. D. Wash. Mar. 22, 2018).  And the Seventh Circuit's holding in *Divane*, although recent in terms of the date decided, did not establish new precedent or untested legal principles.  Rather, the holding in *Divane* is consistent with a long history of cases in which pleadings identical to Plaintiffs' here, including one filed by their own counsel, were held insufficient to withstand a motion to dismiss and therefore properly dismissed with prejudice.  *See e.g.*, *Hecker*, 556 F. 3d 575 (7th Cir. 2009); *Loomis*, 658 F.3d 667 (7th Cir. 2011); *Martin v. CareerBuilder, LLC*, No. 19-cv-6463, 2020 WL 3578022 (N.D. Ill. Jul. 1, 2020).

fees by selecting high-cost investments with revenue sharing" and that this "support[s] a strong inference" of a breach of the duty of loyalty.  (Opp. at 25.)

This "intertwined fiduciary duty" theory is contrary to established case law holding that the duties of loyalty and prudence are separate and distinct.  *See, e.g.*, *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114-15 (S.D.N.Y. 2018); *Romero v. Nokia, Inc.*, No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (unpublished) (dismissing claim for breach of the duty of loyalty that did not "present any separate allegations regarding any loyalty breach"). The claim that a fiduciary caused a plan to incur excessive fees is an imprudence claim, not a breach of loyalty claim.  (Mot. at 9-10.)  A disloyalty claim, in contrast, requires an allegation that a fiduciary's purpose in its decision was to benefit itself, or another party other than the plan, rather than to cover plan benefits and expenses.  *See* 29 U.S.C. § 1104(a)(1)(A); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (duty of loyalty requires fiduciaries to discharge their duties with "an eye single to the interests of the participants and beneficiaries"); *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 834–35 (N.D. Cal. 2005) (duty of loyalty requires that fiduciaries refrain from "actual disloyal conduct").

Accordingly, excessive fee allegations relate to a disloyalty claim only where the alleged facts support the inference that the fees were incurred as a result of a fiduciary's divided loyalty. *See Renfro*, 671 F.3d 314, 327-28 (3d Cir. 2011) (*distinguishing Braden*, 588 F.3d 585, which involved a concealed kickback scheme, and affirming dismissal of disloyalty claim where the "allegations concerning fees are directed exclusively to the fee structure and are limited to contentions that [the plan sponsor] should have paid per-participant fees rather than fees based on a percentage of assets in the plan").  Plaintiffs allege nothing of the kind here, and accordingly, the

4

duty of loyalty claim must be dismissed.  *See Renfro*, 671 F.3d at 327; *Romero*, 2013 WL 5692324, at *5 (dismissing breach of loyalty claims with prejudice).

## III.   Plaintiffs Have Not Plausibly Pled That Barrick Acted Imprudently.

Plaintiffs similarly fail to plead a plausible claim for breach of the duty of prudence. Plaintiffs argue that the Amended Complaint alleges "circumstantial facts from which the Court can reasonably infer that Defendants' investment selection and monitoring processes were imprudent." (Opp. at 8.)  The "facts" in the Amended Complaint that allegedly support this are the Committee's: (i) failure to switch to "identical" lower-fee share class mutual funds; (ii) failure to consider collective trusts; and (iii) maintenance of expensive actively managed mutual funds as compared to passively managed funds.  (Opp. at 8-9.)  None of these alleged "facts" establish that the Committee breached its fiduciary duty of prudence.

First, Plaintiffs' claim that Defendants failed to switch to "identical" lower-fee share class mutual funds does not state a claim as a matter of law.  ERISA does not require plan fiduciaries to focus on cost to the exclusion of all other factors.  (Mot. at 12.)  As courts have repeatedly recognized—and as Plaintiffs admit (Opp. at 11)—"nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  *Hecker*, 556 F.3d at 586; *accord Tibble v. Edison Int'l.*, ("*Tibble I*"), 729 F. 3d 1110, 1135 (9th Cir. 2013).

Plaintiffs suggest that this uncontroverted case law does not apply here because their "primary claim" is that "Defendants failed to offer available identical lower-cost alternatives." (Opp. at 11.)  But this is a distinction without a difference.  Moreover, the "fact" cited by Plaintiffs in support of this argument is a chart in Paragraph 83 of the Amended Complaint.  (Opp. at 11.) Plaintiffs rely on this chart to support an "inference" that the Committee failed to consider identical lower-cost alternatives.  However, this chart is plagued with problems, most apparent that it

misstates the applicable expense ratio.  (Mot. at 14-17.)  The Court is not required to accept

Plaintiffs' erroneous expense ratio analysis as true when it is contradicted by the Plan documents

referenced in the Amended Complaint and First MTD.  *Birse v. CenturyLink, Inc.*, No. 17-cv-

02872, 2019 WL 1292861, at * 2 (D. Co. Mar. 20, 2019).

Second, Plaintiffs' assertion that ERISA "required Defendants to offer CITs" (Opp. at 17)

is similarly contrary to law.  *See e.g.*, *Moitoso v. FMR LLC*, No. 18-12122-WGY, 2020 WL

1495938, at *14 (D. Mass. Mar. 37, 2020) (unpublished) ("This Court agrees there is no fiduciary

duty to investigate alternatives to mutual funds."); *see also Larson v. Allina Health Sys.*, 350 F.

Supp. 3d 780, 796 (D. Minn. 2018) (holding plaintiffs failed to state a claim for breach of fiduciary

duty by failing to "explore collective trusts . . . in lieu of mutual funds[.]"); *Main v. American

Airlines, Inc.*, 248 F. Supp. 3d 786, 794 (N.D. Tex. 2017) (holding fiduciary defendant had not

breached duty by failing either to offer or investigate alternatives to mutual funds).  As Plaintiffs

concede on the very next page of their Opposition "[it] is true, as Defendants point out, that some

courts have found fiduciaries need not offer CITs."  (Opp. at 18.)  Yet, even though Plaintiffs

concede that fiduciaries are not required to invest in CITs, Plaintiffs allege that "Defendants'

failure to consider [these] 'favorable investment products' is egregious" because the Plan included

purportedly ***only one*** collective trust.  (Opp. at 18.)  Plaintiffs cannot plausibly infer that

Defendants ***failed to consider CITs***, in a plan that in fact ***offers*** CITs.  Moreover, Plaintiffs'

assertion that the Plan only offers one CIT is incorrect.  In fact, the Plan offers twelve investment

options in the collective trust format, as the Plan documents demonstrate.  (Mot. at 19; Dkt. No.

24-12, Plan Fund Descriptions, Ex. 12, CM/ECF Filing No. 24-12, at 9-16.)

Third, Plaintiffs claim that the Committee "fail[ed] to consider materially similar funds"

that "would have yielded better results for Plan participants."  (Opp. at 18-19.)  The entire premise

of Plaintiffs' assertion (*i.e.*, that certain funds outperformed some of the Plan's investment options), contradicts the well-established ERISA principle that the fiduciary duty owed under ERISA "requires prudence, not prescience." *St. Vincent*, 712 F. 3d at 716. A fiduciary's investment is "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *Id*. Plaintiffs attempt to argue that they are not making a comparison based upon hindsight because allegedly "long term index funds outperform actively managed funds," and thus "prudence dictates that the index fund . . . . is the better option." (Opp. at 20.) But no court has ever upheld this as the standard for prudence or suggested that a fiduciary must select index funds on this basis.

Furthermore, the sole support for this claim is Plaintiffs' chart in Paragraph 104 of the Amended Complaint. (Opp. at 18-19.) That chart purportedly compares fourteen lower cost alternative investment funds. However, Plaintiffs' chart contains numerous demonstrable errors including misstatements of the JPM Funds R5 expense ratios (*i.e.*, failing to include the 15 basis point revenue credit) and comparing "fund counterparts" that are in fact passively-managed funds and funds from completely different investment categories. (Mot. at 20-21, fn. 8.) These "apples-to-oranges" comparisons fail as a matter of law. *White v. Chevron Corp.*, ("*Chevron I*"), No. 16-CV-0793-PJH, 2016 WL 4502808, at *12 (N.D. Cal. Aug. 29, 2016) (citing *Tibble I*, 729 F.3d at 1134).

Lastly, Plaintiffs assert that ERISA "requires Defendants to offer passively-managed investment options." (Opp. at 19-20.) There is no authority, however, that requires fiduciaries to offer any specific type of investment, let alone compelling fiduciaries to offer passively-managed investments. *Chevron II*, 2017 WL 2352137, at *14 ("fiduciaries have latitude to value investment features other than price"); *Loomis*, 658 F.3d at 669–70 (dismissing claim that fiduciaries should

7

have offered institutional funds); *Hecker*, 556 F.3d at 586 (same); *Renfro*, 671 F.3d at 326–28 (dismissing claims that fiduciaries should have selected cheaper funds); *Martin*, 2020 WL 3578022, at * 3.  As shown in the moving papers, the Plan documents demonstrate that the Committee had a robust process in place for reviewing and selecting Plan investments and in fact followed this robust process, as made clear by the modifications to the Plan's investment options. (Mot. at 21 and fn. 10.)  Plaintiffs' conclusory "inferences" regarding the Committee's purported "failure to investigate" cannot stand where there is no support for this assertion in the Plan documents or any other source.  *Birse*, 2019 WL 1292861, at * 2.

## IV.    Plaintiffs' Claim That The Committee Failed to Monitor the Plan's Recordkeeping Fees Is Without Merit.

Plaintiffs' conclusory allegation that the Committee failed to monitor the Plan's recordkeeper fees is similarly unsupported by the law and the Plan documents upon which Plaintiffs' Amended Complaint relies.  (Opp. at 20.)

First, Plaintiffs claim that by engaging in revenue sharing "Defendants utilized an imprudent payment arrangement to pay for recordkeeping costs."  (Opp. at 21.)  This claim is rebutted by Plaintiffs' own allegations that acknowledge that utilizing revenue sharing is not imprudent.  (Am. Compl. ¶ 114.)  Moreover, as *Loomis* made clear, there is nothing wrong with having participants bear certain costs of running a 401(k) plan "rather than having the Plan cover those costs" and "ERISA does not create any fiduciary duty requiring employers to make pension plans more valuable to participants."  658 F.3d at 670-71.

Second, Plaintiffs argue that the Committee "should have conducted competitive bids for recordkeeping services.  (Opp. at 20-21.)  As a matter law, "nothing in ERISA compels periodic competitive bidding."  *Chevron I*, 2016 WL 4502808, at *14-15 (finding "no legal foundation" for allegations that plan fiduciaries were "required to solicit competitive bids on a regular basis"); *see*

*also Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, No. 17-cv-07243-BLF, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) (same); *Marks*, 2020 WL 2504333, at *6 ("[N]othing in ERISA compels periodic competitive bidding."). The Amended Complaint acknowledges there is no such request for proposal requirement under ERISA. (Am. Compl. ¶ 116.) Moreover, the Plan documents make clear that Barrick and Fidelity have amended the Trust Agreement seventeen times. (Dkt. No. 24-4, Trust Agreement and Amendments, Ex. 4, CM/ECF Filing No. 24-4.) This includes a transition from a revenue-sharing recordkeeping fee to a flat per participant recordkeeping fee in January 2017, and then a further amendment to reduce the flat per participant amount. (Dkt. No. 24-4, Trust Agreement, Ex. 4, CM/ECF Filing No. 24-4, at 104-114, 118-119.) Given these facts, Plaintiffs cannot reasonably infer that the Committee failed to monitor recordkeeping fees.

Finally, Plaintiffs fall back on their claim that the Committee breached the fiduciary duty of prudence with regard to the Plan's recordkeeper fees because allegedly "over $600,000 in collected revenue sharing never made [it] back to the pockets of Plan participants in 2018." (Opp. at 22.) This claim is wholly without merit; the Plan documents show Plan participants received the applicable credits. Even a cursory review of the documents provided to Plaintiffs in February and attached to the First MTD shows that in 2018, the Plan had a "Participant Revenue Credit" under which amounts collected via revenue sharing (*e.g.*, the $600,000) were "allocated to Eligible Participants accounts as soon as administratively feasible (generally within 15 business days)." (Mot. at 23; Dkt. No. 24-4, 14th Am. to Trust Agreement, Ex. 4, CM/ECF Filing No. 24-4, at 111-112.) In addition, Plaintiffs' individual Fidelity summary statements accounted for this credit with the line item "Revenue Credit." (Mot. at 23; Dkt. No. 24-15, C. Matney 2018 Summary statement,

Ex. 15, CM/ECF Filing No. 25-15, at 14; Dkt. No. 24-16, P. Watts 2018 Summary statement, Ex. 16, CM/ECF Filing No. 25-16, at 12.)

Plaintiffs argue that Barrick did not provide an aggregate amount for the revenue credits provided to all the Plan participants. (Opp. at 22.) But Barrick did—by pointing to the terms of the Trust Agreement indicating that all amounts in the account (*i.e.*, all $600,000) were credited back to all Plan participants. (Dkt. No. 24-4, 14th Am. to Trust Agreement, Ex. 4, CM/ECF Filing No. 24-4, at 111-112.) Plaintiffs' Opposition does nothing to meaningfully respond to the Motion and therefore, Plaintiffs' claims regarding the Plan's recordkeeper fees should be dismissed.

## V. Plaintiffs Admit Their Failure To Monitor Claim Lacks Substance.

Plaintiffs have no substantive response to Defendants' showing that Plaintiffs' derivative failure to monitor claim must be dismissed. (Mot. at 25.) Instead, Plaintiffs restate the elements of a failure to monitor claim and summarily state "Plaintiffs' Complaint contains similar factual allegations." (Opp. at 25.) As already shown, the federal pleading standard requires more. An ERISA plaintiff may lack direct evidence of the fiduciaries' process, but must nevertheless at least make factual allegations that give rise to a "reasonable inference" that the defendant committed the alleged violation. *St. Vincent*, 712 F.3d at 718 (quoting *Iqbal*, 556 U.S. at 678). Plaintiffs do not even try to meet this standard. Plaintiffs' monitoring claim should therefore be dismissed.

## <u>CONCLUSION</u>

For the reasons stated herein and in Defendants' Motion, Plaintiffs' Amended Complaint should be dismissed in its entirety, with prejudice.

10

DATED:  September 21, 2020

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By      */s/ Stephen Q. Wood*
Stephen Q. Wood
60 East South Temple, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee*

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of September, 2020, I filed with the Clerk of Court a

true and correct copy of the foregoing **Defendants Barrick Gold of North America, Inc., Board**

**of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits**

**Committee's Reply in Support of their Motion to Dismiss Plaintiffs' Amended Complaint** via

the CM/ECF System which sent notification to:

> ISOM LAW FIRM PLLC
> David K. Isom, Esq.
> 299 South Main Street, Suite 1300
> Salt Lake City, Utah 84111
> david@isomlawfirm.com
>
> CAPOZZI ADLER, P.C.
> Donald R. Reavey, Esq.
> 2933 North Front Street
> Harrisburg, PA 17110
> donr@capozziadler.com
>
> CAPOZZI ADLER, P.C.
> Mark K. Gyandoh, Esq.
> 312 Old Lancaster Road
> Merion Station, PA 19066
> markg@capozziadler.com

/s/ *Stephen Q. Wood*

12

Stephen Q. Wood
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
60 East South Temple, Suite 500
Salt Lake City, UT 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,
Board of Directors of Barrick Gold of North America,
Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>        Defendants. | **REQUEST TO SUBMIT FOR DECISION DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br><br>Case Number:  2:20-cv-00275<br><br>Judge Tena Campbell |

Pursuant to DUCivR 7-3, Defendants Barrick Gold of North America, Inc., the Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee (collectively, "Defendants"), by and through their undersigned counsel, hereby request that their Motion to Dismiss Plaintiffs' Amended Complaint [Docket No. 24] ("Motion") be submitted for decision.

1.      The Motion was served on August 3, 2020.

2.      On August 31, 2020, Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [Docket No. 25] was filed.

3.      On September 21, 2020, Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint [Docket No. 28] was filed.

Defendants' Motion has been fully briefed and is therefore ripe for decision.  Oral argument is requested.

1

DATED:  September 22, 2020

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By     */s/ Stephen Q. Wood*

Stephen Q. Wood
60 East South Temple, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Barrick Gold of North America,*
*Inc., Board of Directors of Barrick Gold of North*
*America, Inc., and Barrick U.S. Subsidiaries*
*Benefits Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2020, I filed with the Clerk of Court a true and correct copy of the foregoing **Request to Submit for Decision Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee's Motion to Dismiss Plaintiffs' Amended Complaint** via the CM/ECF System which sent notification to:

ISOM LAW FIRM PLLC
David K. Isom, Esq.
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
david@isomlawfirm.com

CAPOZZI ADLER, P.C.
Donald R. Reavey, Esq.
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com

CAPOZZI ADLER, P.C.
Mark K. Gyandoh, Esq.
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com

/s/ *Stephen Q. Wood*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |  |
|---|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **Case No.: 2:20-cv-00275-TC** |
| BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30. | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs Cole Matney and Paul Watts (together, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Notice of Supplemental Authority of a recent decision in an analogous ERISA matter, *Silva, et al. v. Evonik Corp., et al.*, No. 2:20-cv-02202-MCA-MAH (D.N.J. Dec. 30. 2020). *Silva*, like this matter, alleges breaches of fiduciary duty in violation of ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2). A copy of this decision is attached hereto as Exhibit A.

In *Evonik*, the Court reasoned that based on plaintiffs' citations to "news articles, academic scholarship and specific examples of cheaper investment funds," plaintiffs adequately claimed defendants breached their duty of prudence:

> Plaintiffs allege that (1) the Plan offered mutual funds in a higher cost share class, despite the availability of lower cost share mutual funds that were identical in every way except for their lower cost, id. ¶¶ 103-08; (2) Defendant's [sic] failed to investigate the availability of collective trusts or separate accounts, which are "materially similar but cheaper alternatives" to the mutual funds in

> the Plan, id. ¶¶ 109-13; and (3) the Plan maintained three actively
> managed funds, despite the comparable returns and lower costs
> offered by passively managed funds, id. ¶¶ 114-15. Citing news
> articles, academic scholarship and specific examples of cheaper
> investment alternatives, Plaintiffs contend that a prudent fiduciary
> would have fully investigated each of the above options and selected
> investments with cheaper costs. See, e.g., Compl. ¶¶ 82-87, 90-94.
> More generally, Plaintiffs allege that most of the investment options
> in the Plan charged higher-than-average fees, with reference to
> median fees published by the Investment Company Institute and the
> fees of alleged comparators. Id. ¶¶ 100-02, 112-13.

*Evonik*, No. 2:20-cv-02202-MCA-MAH at p. 6.  As in *Evonik*, Plaintiffs' Complaint here alleges

near analogous – if not identical – facts, comparisons to specific examples of lower cost funds and

alternatives, and citations to various articles, academic scholarship, and the median fees published

by the Investment Company Institute and the fees of alleged competitors.  *See* Complt. (ECF No.

1) at ¶¶ 76-80, 83-87, 93-98, 101-105.

The court in *Evonik* also noted that, like here, "Plaintiffs' cost-share allegations are well-

supported by authority demanding that a plan fiduciary specifically consider a plan's bargaining

power to obtain 'substantially identical' investment products with lower costs." *Evonik*, No. 2:20-

cv-02202-MCA-MAH at p. 7.  The court also found "[t]o the extent Defendants argue that

Plaintiffs must allege additional facts, such as whether the higher cost share class offered any

additional benefit, the Court disagrees. Plaintiffs need not 'rule out every possible lawful

explanation' for the challenged conduct in the Complaint." *Id.*  at p. 7, fn 15.

Dated:  January 4, 2021                     Respectfully submitted,

                                            **CAPOZZI ADLER, P.C.**

                                            */s/Mark K. Gyandoh*
                                            Mark K. Gyandoh, Esquire
                                            (admitted *pro hac vice*)
                                            312 Old Lancaster Road
                                            Merion Station, PA 19066
                                            Tel: (610) 890-0200
                                            Fax (717) 233-4103
                                            Email: markg@capozziadler.com

**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
(admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103
Email: donr@capozziadler.com

Counsel for Plaintiffs and
the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2021 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  /s/ *Mark K. Gyandoh*
Mark K. Gyandoh

EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHAMBERS OF
MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST. ROOM 4066
NEWARK, NJ 07101
973-297-4903

December 30, 2020

<u>VIA ECF</u>

## **LETTER ORDER**

Re:    **Daniel Silva, et al. v. Evonik Corporation, et al.**
       **Civil Action No. 20-2202**

Dear Litigants:

Before the Court is Defendants Evonik Corporation's ("Evonik"), President of Evonik Corporation's (the "President"), Board of Directors of Evonik Corporation's (the "Board") and Evonik Investment Committee's (the "Investment Committee" and together with Evonik, the Board, and the President, "Defendants") Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 15. Plaintiffs Daniel Silva and Rhonda Allen ("Plaintiffs") oppose the Motion. ECF No. 17. For the reasons explained below, the Motion is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND[1]

This putative ERISA class action arises out of Defendants' selection and maintenance of investment options offered by the Evonik Corporation 401(k) Savings Plan, a defined contribution plan[2] available to full-time employees of Evonik. See generally Compl; see also Declaration of Carla D. Macaluso ("Macaluso Decl.") Ex. 1 (the "Plan"), ECF No. 15.3.[3]

Participants in the Plan may direct their contributions into any of fifteen investment options selected at the discretion of the Investment Committee, whose members are appointed by the President. Compl. ¶¶ 21-22, 30, 44. Prudential Retirement (the "Recordkeeper") provides account statements and other administrative services to Plan participants and serves as the Plan's

---

[1] The facts are drawn from the Complaint, ECF No. 1, and documents integral to the Complaint. See Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3rd Cir. 2006).

[2] "[A] 'defined contribution plan' . . . promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 250 n.1 (citing 29 U.S.C. § 1002(34)).

[3] As Plaintiff's Complaint arises out of the Plan, it is integral to the Complaint and can be considered on a motion to dismiss. See, e.g., Lees v. Munich Reinsurance Am., Inc., No. 14-2532, 2015 WL 1021299, at *4 n.1 (D.N.J. Mar. 9, 2015) (considering description of plan covered by ERISA in motion to dismiss claim arising out of the plan).

recordkeeper.[4]  Id. ¶ 116.  Prudential Bank and Trust (the "Trustee") holds the Plan's assets in trust.  Id. ¶¶ 5, 25.  Plaintiffs generally allege that Defendants have failed to adequately monitor the Plan to ensure that its investment options and recordkeeping costs were prudent in terms of expense, when compared to similar options with lower costs.[5]  Id. ¶¶ 5-7.

On February 28, 2020, Plaintiffs filed the two-count Complaint alleging violations of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").  Plaintiffs contend that (1) the Investment Committee and Board breached the fiduciary duties of loyalty and prudence imposed by 29 U.S.C. § 1104(a) in their selection and maintenance of investments and recordkeeping services, id. ¶¶ 130-36 ("Count I"); and (2) Evonik, the President, and the Board breached their respective duties to monitor other fiduciaries of the Plan, id. ¶¶ 137-43 ("Count II").  Plaintiffs, former Evonik employees who participated in the Plan during their employment, bring this action on behalf of all participants and beneficiaries of the Plan from February 28, 2014 to present (the "Class Period").  Id. ¶¶ 13, 14, 50.  They seek, among other things, damages and injunctive relief.  Id. at 45-46.

Defendants filed in the instant Motion on May 29, 2020, arguing that (1) Plaintiffs lack standing to seek injunctive relief; and (2) the Complaint fails to state a claim upon which relief can be granted.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1)

To resolve a Rule 12(b)(1) motion, the Court first determines whether the motion presents a "facial" or "factual" attack.  See Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014).  A factual attack is an argument that "the facts of the case . . . do not support the asserted jurisdiction."  Id. at 358.  In reviewing a factual attack, the Court may "consider and weigh evidence outside the pleading to determine if it has jurisdiction."  Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).  Here, the Motion presents a factual attack because it asserts that undisputed evidence outside the Complaint demonstrates that Plaintiffs lack Article III standing to seek injunctive relief.  See Def. Mem. at 29, ECF No. 15.1.

### B.  Rule 12(b)(6)

In resolving a Rule 12(b)(6) motion to dismiss, the Court accepts all pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted).  To survive, the claims must be facially plausible, meaning that the pleaded facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).    The allegations must be "more than labels and conclusions,

---

[4] Plaintiff defines "recordkeeping" as a "catchall term" for the administrative services provided to participants of a defined contribution plan.  Compl. ¶ 116.

[5] Plan expenses are paid first from Plan assets, and then by Evonik as a last resort.  Compl. ¶¶ 46-49.

and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

## III.   ANALYSIS

### A.   Standing to Seek Injunctive Relief

Defendants first launch a limited attack on Plaintiffs' standing, arguing that as former participants in the Plan, they have no right to seek prospective injunctive relief.  The Court agrees.

A plaintiff must separately demonstrate Article III standing for each type of relief sought. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).  In a class action seeking prospective relief, at least one named plaintiff must demonstrate that he is personally "likely to suffer future injury from the defendant's conduct."  McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 (3d Cir. 2012) (citation and quotation marks omitted); see id. at 224-25 (holding that former customers who cancelled magazine subscriptions and had no intention to re-subscribe lacked standing to seek injunction against future consumer fraud violations).

Defendants have presented undisputed evidence that Plaintiffs, former Evonik employees, are no longer invested in any fund offered by the Plan.  See Macaluso Decl. Exs. 3-6; see also Pl. Opp. at 5 (arguing that Defendants denied Plaintiffs access to certain documents because they each "requested full distributions from their Plan accounts; therefore both of them are no longer participants in the Plan").[6]  Plaintiffs therefore no longer participate in the Plan and cannot reasonably expect to participate in the Plan in the future, meaning there is no likelihood of future injury from Defendants' conduct.

Arguing in favor of standing, Plaintiffs rely on cases holding that ERISA permits a plaintiff suing on behalf of a plan to seek "relief under [ERISA's civil enforcement provision] that sweeps beyond his own injury"—once Article III standing is established.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 593 (8th Cir. 2009); Cassell v. Vanderbilt Univ., No. 16-2086, 2018 WL 5264640, at *3 (M.D. Tenn. Oct. 23, 2018).[7]  But ERISA may not be used to establish constitutional standing in the first instance.  See generally Thole v. U.S. Bank N.A., 140 S. Ct. 1615 (2020).  Plaintiffs claim for injunctive relief is accordingly dismissed for lack of standing.

### B.   Fiduciary Status

Defendants next argue that the Complaint fails to allege that the Board acted as a fiduciary with respect to the conduct alleged in the Complaint, including the selection of Plan investments and recordkeeping services (Count I) and the monitoring of other fiduciaries (Count II).  The Court agrees as to Count I but concludes that Count II may proceed against the Board.

---

[6] Defendants' evidence is consistent with allegations in the Complaint that Plaintiffs "participated in the Plan" only "during [their] employment."  Compl. ¶¶ 13-14.  Still, as the Complaint does not specifically allege that Plaintiffs have divested from the Plan, the Court construes Defendants' argument as a factual attack on jurisdiction and properly considers the unrefuted evidence outside the Complaint.  See Gould, 220 F.3d at 178.

[7] This becomes relevant, for example, where a plaintiff invested in some, but not all, of a defined contribution plan's allegedly imprudent investments.  See, e.g., Cassell, 2018 WL 5264640, at *3.  In such case, the plaintiff has Article III standing based on his own investments, and ERISA permits him to challenge other investments on behalf of the plan.  Id.  Defendants here do not dispute any aspect of Plaintiffs' standing to seek backwards-looking relief stemming from the alleged mismanagement of the Plan.

3

To state a claim for breach of fiduciary duty under ERISA, Plaintiff must allege that "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan." Sweda v. Univ. of Pa., 923 F.3d 320, 327-28 (3d Cir. 2019) (quoting Leckey v. Stefano, 501 F.3d 212, 225-26 (3d Cir. 2007)).

An entity is a fiduciary to the extent it "maintain[s] any authority or control over the management of the plan's assets, management of the plan in general, or maintain[s] any responsibility over the administration of the plan." Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1994); see also 29 U.S.C. § 1002(21)(A). Further, an entity may "qualify as a fiduciary with respect to certain actions, but not with respect to others." Pietrangelo v. NUI Corp., No. 04-3223, 2005 WL 1703200, at *5 (D.N.J. July 20, 2005) (citation omitted). The Court must therefore ask "whether [the entity] is a fiduciary with respect to the particular activity in question." Renfro v. Unisys Corp., 671 F.3d 314, 321-22 (3d Cir. 2011) (citing Srein v. Frankford Trust Co., 323 F.3d 214, 221 (3d Cir. 2003)). As this requires a "fact sensitive inquiry," a determination of fiduciary status is often premature on a motion to dismiss. In re Schering-Plough Corp. ERISA Litig., No. 03-1204, 2007 WL 2374989, at *7 (D.N.J. Aug. 15, 2007).

Count I alleges that the Board had the fiduciary duty to manage the assets of the Plan in a prudent manner and for the sole and exclusive benefit of Plan participants. Compl. ¶ 132. The Complaint, however, does not allege that the Board had any direct role in selecting investments or recordkeeping services for the Plan. See Compl. ¶ 30 (alleging that the Investment Committee was responsible for selecting investments); Plan § 12.10 (granting Investment Committee the authority to contract for recordkeeping services). Count I is therefore dismissed as to the Board and may proceed only against the Investment Committee.

Count II asserts that the Board had the duty to monitor other fiduciaries, a duty which ERISA imposes on those with the authority to appoint and remove plan fiduciaries. Graden v. Conexant Sys., Inc., 574 F. Supp. 2d 456, 466 (D.N.J. 2008) (collecting cases). Plaintiff identifies two potential sources for such duty. First, Plaintiff alleges that the Board acted as a Plan fiduciary because it had the authority to appoint and monitor the Trustee. Compl. ¶¶ 25-27. However, the conduct challenged in the Complaint does not relate to this authority. For example, Plaintiffs have not challenged the fees charged by the Trustee or any aspect of the Trustee's conduct. See id. ¶ 26 ("[T]he Trustee had 'exclusive authority and discretion to manage and control the Trust Fund, except to the extent that the Investment Committee exercises its authority to direct investment of all or a portion of those assets.'") (citing Plan § 12.15) (emphasis added).[8] Consequently, any fiduciary duty the Board may have with respect to the Trustee falls outside the scope of this litigation.

Second, though the Board does not have the authority to appoint or remove members of the Investment Committee, the Complaint alleges that the Board performed "some of [Evonik's] Plan-related fiduciary functions, including monitoring the activities of the [Investment]

---

[8] The Plan also authorizes the Trustee to "designate agents or others to carry out certain of the administrative responsibilities in connection with management of the Trust Fund." Plan § 12.15. Plaintiff does not allege that this provision authorizes the Trustee to select the recordkeeping services available to Plan participants, which appears to be the province of the Investment Committee. Id. § 12.10.

4

Committee along with the President."[9]  Compl. ¶ 24; see also Charles v. UPS Nat'l Long Term Disability Plan, 145 F. Supp. 3d 382, 397 (E.D. Pa. 2015) (holding that a "fiduciary may delegate its fiduciary responsibilities to non-fiduciaries, thereby making persons not named as fiduciaries subject to liability under ERISA") (citing Marx v. Meridian Bancorp, Inc., F. App'x 645, 650 (3d Cir. 2002)).  Plaintiff also alleges that the Investment Committee was required to "submit such . . . reports as the Board of Directors shall request," suggesting that the Board was assigned at least some discretion in overseeing the Investment Committee's general activities. Compl. ¶ 24 (citing Plan § 12.12).  While further factual development is needed to ascertain the precise scope of the Board's role, these allegations adequately plead the Board's fiduciary status with respect to the monitoring of the Investment Committee.  Dismissal of Count II against the Board would be premature.

### C.    Duty of Prudence

Defendants further contend that Plaintiffs have failed to plausibly allege that the Investment Committee has breached the duty of prudence imposed by ERISA.  The Court disagrees.

ERISA imposes "a fiduciary standard that is considered 'the highest known to the law.'" Sweda, 923 F.3d at 333 (citation omitted).[10]  Among other things, a fiduciary has the duty to "monitor investments and remove imprudent ones" and "understand and monitor plan expenses." Id. at 328 (citing Tibble v. Edison Int'l, 135 S.Ct. 1823, 1826, 1828-29 (2015) ("Tibble III")). With respect to expenses, "fiduciaries [m]ust also consider a plan's 'power to obtain favorable investment products.'"  Id. at 329 (quoting Tibble v. Edison Int'l, 843 F.3d 1187, 1198 (9th Cir. 2016) ("Tibble IV")) (alterations omitted).

The Court must ultimately assess whether the Investment Committee breached its duty of prudence by looking to its "process rather than results" and inquiring whether it "employed the appropriate methods to investigate and determine the merits of a particular investment." Id. (citing In re Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996)).  To survive a motion to dismiss, however, Plaintiffs need not "directly allege how [Defendants] mismanaged the Plan," so long as there is "substantial circumstantial evidence" to permit the Court to "reasonably infer that a breach had occurred."  Id. at 332 (citation and quotation marks omitted).  At the same time, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." Hay v. Gucci Am., Inc., No. 17-7148, 2018 WL 4815558, at *7 (D.N.J. Oct. 3, 2018) (citing Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)).  A plaintiff relying on circumstantial evidence must therefore "'provide a sound basis for comparison—a meaningful benchmark'—to show a prudent fiduciary in like circumstances would have selected a different fund."  Pinnell v. Teva Pharm. USA, Inc., No. 19-5738, 2020 WL 1531870, at *4 (E.D. Pa. Mar. 31, 2020) (quoting Meiners v. Wells Fargo & Co., 898 F.3d 820, 822 (8th Cir. 2018)).

Moreover, the Court may not parse the Complaint "piece by piece to determine whether each allegation, in isolation, is plausible."  Sweda, 923 F.3d at 331 (citing Braden, 588 F.3d at

---

[9] Defendants do not dispute that the Complaint adequately alleges that Evonik, the President, and the Committee are fiduciaries for purposes of the conduct alleged in Count II.  See Compl. ¶¶ 17-23, 30-32.

[10] Section 404(a)(1)(B) of ERISA requires a plan fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

5

598). Instead, the Court employs a "holistic approach" by considering all well-pleaded, non-conclusory allegations, including the "range of investment options," "reasonableness of fees," "selection and retention of investment options," and "practices of similarly situated fiduciaries." Id. (citing Renfro, 671 F.3d at 327). The Court must also remain mindful that "[m]any allegations concerning fiduciary conduct . . . are inherently factual question[s]." Id. at 329 (citation and quotation marks omitted).

With these principles in mind, the Court turns to the specific allegations in the Complaint.

### 1. Failure to Investigate or Select Investments with Lower Expenses

Plaintiffs principally contend that the Plan's investment options have stayed relatively unchanged since 2013, despite the availability of alternative investments with lower expenses. Compl. ¶ 99-100. Applying Sweda's pleading standards, the Eastern District of Pennsylvania recently held in Pinnell v. Teva Pharmacy that a complaint plausibly alleged an imprudence claim through allegations that a plan "maintained expensive investments despite the availability of identical but lower-cost alternatives" accompanied by specific comparisons between the plan's investments and the alternatives. 2020 WL 1531870, at *5; see also Sweda, 923 F.3d 332 & n.7 (reversing dismissal of complaint that offered "specific comparisons between returns on Plan investment options and readily available alternatives" and "directly compared fees on options included in the Plan with readily available lower-cost options").

Viewed holistically, the Complaint's allegations likewise provide circumstantial evidence and "meaningful benchmarks" sufficient to withstand the instant Motion. See Pinnell, 2020 WL 1531870, at *4 (citing Meiners, 898 F.3d at 822).[11] Plaintiffs allege that (1) the Plan offered mutual funds in a higher cost share class, despite the availability of lower cost share mutual funds that were identical in every way except for their lower cost, id. ¶¶ 103-08; (2) Defendant's failed to investigate the availability of collective trusts or separate accounts, which are "materially similar but cheaper alternatives" to the mutual funds in the Plan, id. ¶¶ 109-13; and (3) the Plan maintained three actively managed funds, despite the comparable returns and lower costs offered by passively managed funds, id. ¶¶ 114-15. Citing news articles, academic scholarship and specific examples of cheaper investment alternatives, Plaintiffs contend that a prudent fiduciary would have fully investigated each of the above options and selected investments with cheaper costs. See, e.g., Compl. ¶¶ 82-87, 90-94. More generally, Plaintiffs allege that most of the investment options in the Plan charged higher-than-average fees, with reference to median fees published by the Investment Company Institute and the fees of alleged comparators. Id. ¶¶ 100-02, 112-13.

Defendants' arguments to the contrary are unavailing. First, Defendants argue that Plaintiffs do not adequately allege why their proposed alternatives are comparable. But an inquiry into "whether the alternative funds Plaintiff[s] suggest[ ] are apt comparisons" is a question of fact unsuitable for resolution on a motion to dismiss. Nicolas v. Trustees of Princeton Univ., No. 17-3695, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017). The Court is satisfied that Plaintiffs have sufficiently alleged comparators at this time.

---

[11] Defendants conspicuously fail to distinguish Pinnell from the facts of the instant case, merely arguing that it is a non-binding District Court opinion. See Defs. Reply at 2-4, ECF No. 18. While this is true, Pinnell is nonetheless highly persuasive due to its thoughtful analysis and application of binding Third Circuit precedent to a similar complaint.

Second, Defendants argue that the fees for Plan investments alleged in the Complaint are inflated, as documented by disclosures issued to Plan participants during the Class Period.  See Macaluso Decl. Exs. 11-12 (the "Fee Disclosures").[12]  Defendants acknowledge that the fees documented in the Fee Disclosures still exceed the comparator and benchmark fees alleged in the Complaint, but they argue that such difference is de minimis and does not plausibly suggest a breach of the duty of prudence.

The Court disagrees because there is no "categorical benchmark" to determine whether fees are excessive.  Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618, 636 (D.N.J. 2010).  Indeed, even relatively minor cost savings can add up significantly over the length of an investment because participants lose "not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  Tibble IV, 843 F.3d at 1198.  Rather, the relevant inquiry is whether the Investment Committee prudently investigated cheaper alternative investments, regardless of the degree of savings.  Accordingly, any "initial miscalculation based on lack of information" does not defeat Plaintiff's claim.  Pinnel, 2020 WL 1531870, at *6.

Finally, Defendants argue that even accepting Plaintiffs' factual assertions as true, the Investment Committee's alleged failure to consider alternative investment options with lower fees does not constitute a breach of duty.  Courts outside this Circuit appear divided as to whether certain aspects of the Complaint would be enough to state a claim standing alone, such as the maintenance of actively managed funds[13] or the failure to investigate collective trusts.[14]  On the other hand Plaintiffs' cost-share allegations are well-supported by authority demanding that a plan fiduciary specifically consider a plan's bargaining power to obtain "substantially identical" investment products with lower costs.[15]  Sweda, 923 F.3d at 328-29 (citing Tibble IV, 843 F.3d at 1198); see also Davis v. Wash. Univ. in St. Louis, 960 F.3d 478, 483 (8th Cir. 2020) (holding that

---

[12] The parties dispute whether Plaintiffs, who are no longer participants in the Plan, had access to the Fee Disclosures when preparing the Complaint.  See Def. Mem. at 14; Pl. Opp. at 11.  While the Court therefore questions whether the nonpublic Fee Disclosures may be properly considered on a motion to dismiss, it need not address this issue.  Even accepting the lower figures cited by Defendant, the Complaint states a claim.

[13] Compare Martin v. CareerBuilder, LLC, No. 19-6463, 2020 WL 3578022, at *4, (N.D. Ill. July 1, 2020) ("[P]laintiffs and courts cannot use ERISA to paternalistically dictate what kinds of investments plan participants make where a range of investment options are on offer."), with Marshall v. Northrop Grumman Corp., No. 16-6794, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) (finding question of material fact as to whether defendants breached fiduciary duty by "fail[ing] to adequately weigh the costs and benefits of an active management strategy against a passive management strategy").

[14] Compare Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 212 (D. Mass. 2020) ("[T]here is no fiduciary duty to investigate alternatives to mutual funds."), with In re M&T Bank Corp. ERISA Litig., No. 16-375, 2018 WL 4334807, at *8-9 (W.D.N.Y. Sept. 11, 2018) (denying motion to dismiss claim that "defendants breached their fiduciary duties by failing to consider collective investment trusts and separate accounts" and holding that any "factual disputes regarding this theory are for another day").

[15] To the extent Defendants argue that Plaintiffs must allege additional facts, such as whether the higher cost share class offered any additional benefits, the Court disagrees.  Plaintiffs need not "rule out every possible lawful explanation" for the challenged conduct in the Complaint.  Sweda, 923 F.3d at 326 (citing Braden, 588 F.3d at 597).  For purposes of this Motion, Plaintiffs have adequately alleged that the lower cost share funds classes "are identical to the mutual funds in the Plan in every way except for their lower cost."  Compl. ¶ 103.

7

a "failure of effort [or] competence" in negotiating lower-cost alternatives "is enough to state a claim for breach of the duty of prudence").

At this early stage in the litigation, and in line with <u>Sweda</u>, the Court declines to parse the Complaint to assess whether each individual allegation plausibly suggests a breach of the Investment Committee's duty to prudently select investments. 923 F.3d at 331. Viewed in its entirety, the Complaint states a claim. <u>See</u> <u>Pinnell</u>, 2020 WL 1531870, at *4.

## 2.    Failure to Monitor Recordkeeping Fees

Separately from their claim of imprudent investment, Plaintiffs allege that the Investment Committee breached its duty of prudence by failing to monitor or control the Plan's recordkeeping expenses. Compl. ¶¶ 116-29.

A plan fiduciary's failure to reduce recordkeeping costs through negotiation or the solicitation of competing bids may in some cases breach the duty of prudence. <u>See</u> <u>Sweda</u>, 923 F.3d at 332 (observing that recordkeeping claim may be supported by allegations that a fiduciary failed to determine whether a recordkeeper's pricing was competitive or adequately leverage the Plan's size to reduce fees) (citing <u>Tussey v. ABB, Inc.</u>, 746 F.3d 327, 336 (8th Cir. 2014)); <u>Nicolas</u>, 2017 WL 4455897, at *4 (denying motion to dismiss imprudence claim alleging that defendants failed to "conduct a competitive bidding process" or "use significant bargaining power to negotiate lower fees" and "contracted with two recordkeepers, creating an inefficient and costly structure"); <u>Pinnell</u>, 2020 WL 1531870, at *5 (finding allegation that "Defendants failed to monitor or control the Plan's recordkeeping expenses, citing to case law demonstrating per-participant fees for a jumbo plan should peak at less than $50" relevant to imprudence claim).

Like in <u>Pinnel</u>, Plaintiffs' allegations plausibly allege an imprudence claim. The Complaint asserts that despite the general trend of recordkeeping costs decreasing over time, the Plan's costs increased during the Class Period. <u>Id.</u> ¶¶ 124, 127. Plaintiffs further allege that the Plan's recordkeeping costs ranged from $70.39 to $228.66 per participant for each year of the Class Period, while the average cost for smaller plans was significantly lower.[16] <u>Id.</u> ¶¶ 124-25, 127 n.17. They also cite a Department of Labor study indicating that a plan's recordkeeping costs should decrease as the number of participants increase. <u>Id.</u> ¶¶ 126-27. Finally, Plaintiffs maintain that notwithstanding rising recordkeeping costs, the Investment Committee failed to take any steps to negotiate lower costs or solicit competing bids through a Request for Proposal process. <u>Id.</u> ¶¶ 123-24.

Defendants again challenge the veracity of the figures cited by Plaintiffs, contending that the Plan's public Form 5500 demonstrates that the alleged cost of $70.39 to $228.66 per participant refers to the Plan's total administrative expenses, including payments to law firms and other expenses that have no relation to "recordkeeping." <u>See</u> Malacuso Decl. Exs. 14-17, 22.

---

[16] The Complaint relies on data compiled by the <u>401k Averages Book</u> published by Pension Data Source, Inc. and case law discussing average recordkeeping fees. <u>See e.g.</u>, <u>George v. Kraft Foods Glob., Inc.</u>, 641 F.3d 786, 798 (7th Cir. 2011) (finding question of material fact as to whether fiduciaries acted prudently in continuing to renew recordkeeper's contract without soliciting competitive bids based in part on expert testimony that the subject plan should have paid "between $20 and $27 per participant per year, rather than the $43 to $65" it paid in recordkeeping services). Defendants concerns as to the accuracy of the benchmark figures cited by Plaintiffs, Defs. Reply at 12 n.14, may be addressed through discovery.

Plaintiffs counter that any error of fact can be attributed to their lack of access to itemized data concerning the Plan's recordkeeping costs, and that the Complaint nonetheless adequately alleges that the Investment Committee failed to respond to increasing recordkeeping fees during the Class Period. Plaintiffs also allege that recordkeeping expenses represent "by far" the largest administrative expense incurred by a plan. Compl. ¶ 118.

Again, the Court concludes that any "initial miscalculation based on lack of information" does not appear to be significant enough to thwart Plaintiffs' claim at the pleading stage, particularly when considered alongside the Complaint's other allegations of imprudence by the Investment Committee.[17] Pinnel, 2020 WL 1531870, at *6. Defendants do not assert an alternative figure for the Plan's recordkeeping costs, and to the extent they can conclusively demonstrate that such fees were prudent in light of prevailing market conditions or otherwise show that the Investment Committee engaged in a prudent process, they may do so on a motion for summary judgment. Sweda, 923 F.3d at 329 (noting that the "reasonableness of compensation for services" is an "inherently factual question[ ]") (citation and quotation marks omitted).

Defendants also argue that Plaintiffs have failed to allege the specific services offered by the Recordkeeper or that the same services were available at a lower price. Plaintiff has, however, alleged that nearly all recordkeepers in the marketplace perform the same core group of services.[18] See Compl. ¶ 116. Further questions concerning the scope of services offered by the Recordkeeper and potential comparators are factual issues that require further development. See, e.g., Kruger v. Novant Health, Inc., 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015) (holding that the "services provided" by a plan's recordkeeper and "how the fees charged to the Plan were excessive in light of those services . . . are the types of facts warranting discovery"); Krueger v. Ameriprise Fin., Inc., No. 11-2781, 2012 WL 5873825, at *20 (D. Minn. Nov. 20, 2012) (same).

Consequently, Plaintiffs have also stated a valid imprudence claim with regards to the Investment Committee's management of recordkeeping fees.

### D.     Duty of Loyalty

Count I alleges that in addition to breaching its duty of prudence, the Investment Committee also breached the ERISA-imposed duty of loyalty. Defendants contend that Plaintiffs have failed to allege an independent breach of the duty of loyalty and may not maintain their disloyalty claim based solely on allegations of imprudence. The Court agrees with Defendants.

ERISA requires a plan fiduciary to "discharge his duties . . . for the exclusive purpose of providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). To state a claim for breach of the duty of

---

[17] While not fatal to Plaintiffs' claim, the Court agrees with Defendant that the apparent exaggeration of data in the Complaint is problematic. Plaintiffs acknowledge that they had access to the Form 5500 when preparing the Complaint and that the Form 5500 reports only total "professional fees" without drawing a distinction between recordkeeping and other expenses. Pl. Opp. at 5, 8. Plaintiffs' representation that the range cited in the Complaint represents solely recordkeeping fees therefore evinces, at best, a failure of adequate investigation. Compl. ¶ 124.

[18] Plaintiff specifically alleges that these services include the "provision of account statements," "claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO14 processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services." Compl. ¶ 116.

loyalty, Plaintiffs must plausibly allege that the Investment Committee made decisions for the purpose of benefitting itself or a third party. See Nicolas, 2017 WL 4455897, at *3. Accordingly, a plaintiff may not simply "recast" a claim of imprudence as an independent claim of disloyalty without additional facts suggesting an improper motive or financial benefit. See id.; Allen v. Wells Fargo & Co., 967 F.3d 767, 777 (8th Cir. 2020).

Excluding conclusory allegations, the Complaint asserts only that affiliates of Prudential served as Trustee and Recordkeeper, that Prudential managed a number of investments offered by the Plan, and that Defendants failed to negotiate lower recordkeeping costs. Compl. ¶¶ 5, 44, 116, 124. The Court agrees with Defendants that the mere fact that Prudential managed many of the Plan's investments does not imply disloyalty by the Investment Committee. Cf. Hecker, 556 F.3d 575 at 586 ("[M]any prudent investors limit themselves to funds offered by one company and diversify within the available investment options."). The Court further concludes that Defendants' alleged failure to renegotiate recordkeeping costs—an integral part of Plaintiff's imprudence claim—may not simply be repackaged as a disloyalty claim without additional allegations. See Nicolas, 2017 WL 4455897, at *3.

Count I is therefore dismissed without prejudice to the extent it alleges a breach of the duty of loyalty.

### E.      Duty to Monitor Other Fiduciaries

Count II alleges that Evonik, the President, and the Board (the "Monitoring Defendants") breached their duty to monitor the Investment Committee with regards to the conduct alleged in Count I. Defendants maintain that the Complaint does not plausibly state a monitoring claim. The Court disagrees.

Persons with authority to appoint and remove plan fiduciaries have an ERISA-imposed duty to monitor those fiduciaries. Graden, 574 F. Supp. 2d at 466. At minimum, an appointing authority must "at reasonable intervals" review the performance of its appointees "in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." Id. (citing 29 C.F.R. § 2509.75-8 at FR-17). A monitoring claim must derive from the appointee's independent breach of duty. In re Schering-Plough Erisa Litig., No. 08-1432, 2010 WL 2667414, at *7 (D.N.J. June 29, 2010).

Defendants argue that Plaintiffs have failed to plead any non-conclusory facts describing how the Monitoring Defendants failed to monitor the Investment Committee. But to the contrary, Plaintiffs have alleged that Defendants did not have any system in place for monitoring the Committee's performance. Compl. ¶ 141. This allegation, taken as true, plausibly suggests a breach of the duty to monitor.[19]

---

[19] Some courts have also held that an appointing authority is not subject to liability unless placed on notice of the underlying breach. See, e.g., Scalia v. WPN Corp., 417 F. Supp. 3d 658, 671 (W.D. Pa. 2019). The Complaint does not expressly allege that the Monitoring Defendants knew of the Investment Committee's imprudent conduct, but as the investments selected for the Plan were known and made available to all full-time employees of Evonik, Compl. ¶ 36, "the Complaint could fairly be read to imply that the Monitoring Defendants knew or should have known that those they appointed were breaching their fiduciary duties," In re Honeywell Int'l, No. 03-1214, 2004 WL 3245931, at *15 (D.N.J. Sept. 14, 2004) (quotation marks omitted).

The Court denies Defendants' Motion with respect to Count II.[20]

**IV.    CONCLUSION**

      For the reasons stated above, Defendants' Motion to Dismiss, ECF No. 15 is **GRANTED in part** and **DENIED in part**. Count I is **DISMISSED** as to the Board of Directors of Evonik Corporation. Count I is **DISMISSED** as to the Investment Committee to the extent it asserts a breach of the duty of loyalty. Plaintiffs claim for injunctive relief is **DISMISSED** for lack of standing. The Motion is otherwise **DENIED**. To the extent Plaintiffs can cure the deficiencies identified in this order, they may file an amended pleading within thirty (30) days.

        **SO ORDERED.**

        */s Madeline Cox Arleo*
        **MADELINE COX ARLEO**
        **UNITED STATES DISTRICT JUDGE**

---

[20] Defendants also argue that there is no predicate breach on which to base a failure to monitor claim. This argument fails in light of the Court's conclusion that the Complaint states a plausible claim for breach of the duty of prudence.

11

Stephen Q. Wood
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, UT 84121
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,*
   *Board of Directors of Barrick Gold of North America,*
   *Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>        Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Case Number:  2:20-cv-00275-TC<br><br>Judge Tena Campbell |

Pursuant to DUCivR 7-1(b)(4), Defendants Barrick Gold of North America, Inc. ("BGNA"), the Board of Directors of Barrick Gold of North America, Inc. (the "Board"), and Barrick U.S. Subsidiaries Benefits Committee (the "Committee") (BGNA, the Board, and the Committee are collectively, "Defendants"), hereby submit their response to Plaintiffs' Notice of Supplemental Authority (the "Notice," Dkt. No. 31).

1.      In the Notice, Plaintiffs argue that an unpublished decision from the United States District Court for the District of New Jersey—*Silva, et al v. Evonik Corp., et al*, No. 2:20-cv-02202-MCA-MAH (D.N.J. Dec. 30, 2020) (the "*Evonik* Decision")—is "analogous" to the claims at issue here and "like this matter, alleges breaches of fiduciary duty in violation of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)." (Dkt. No. 31, Notice at 2.)  In the Notice, Plaintiffs quote from and cite to the *Evonik* Decision in an attempt to draw similarities between the *Evonik* Decision and the First Amended Complaint filed by Plaintiffs. (*See e.g.*, Dkt. No. 31, Notice at 3 ("As in *Evonik*, Plaintiffs' Complaint here alleges near analogous—if not identical—facts […].").)

2.      As an initial matter, this Court should set aside Plaintiffs' Notice because it runs afoul of DUCivR 7-1(b)(4).  Rule 7-1(b)(4) provides guidelines for instances in which it is appropriate for a party to submit supplemental authority.  The rule states:

> When ***pertinent and significant authorities*** come to the attention of a party after the party's memorandum has been filed, or after oral argument but before decision, a party may promptly file a notice with the court and serve a copy on all counsel, setting forth the citations. ***There must be a reference either to the page of the memorandum*** or to a point argued orally to which the citations pertain, but the notice must state, ***without argument***, the reasons for the supplemental citations.

(DUCivR 7-1(b)(4) (emphasis added).)

3.      Plaintiffs' Notice fails to comply with DUCivR 7-1(b)(4) because there is no citation in the Notice to any page or argument from Plaintiffs' memorandum in opposition to Defendants' Motion to Dismiss.  (Dkt. No. 31, Notice at 2-3.)  Indeed, the only citations Plaintiffs

improperly include in the Notice are to paragraphs from the First Amended Complaint. (Dkt. No. 31, Notice at 3.)

4.      Plaintiffs' Notice also violates DUCivR 7-1(b)(4) because it improperly includes argument. The Local Rule is clear that the party submitting any supplemental authority is to state the reason for the supplemental authority, but must do so "without argument."

5.      In the Notice Plaintiffs improperly argue that the holding in *Evonik* is "like here" referring to allegations in the First Amended Complaint and argue that "[a]s in *Evonik*, Plaintiffs' Complaint here alleges near analogous—if not identical—fact comparisons to specific examples of lower cost funds and alternatives, and citations to various articles, academic scholarship, and the median fees published by the Investment Company Institute and the fees of alleged competitors." (Dkt. No. 31, Notice at 3.) Plaintiffs' attempts to argue and draw analogies between the First Amended Complaint and the *Evonik* Decision are inappropriate and made in violation of DUCivR 7-1(b)(4).

6.      Nonetheless, to the extent this Court considers Plaintiffs' improper Notice, Defendants dispute Plaintiffs' imputed importance and mischaracterizations of the court's holding in *Evonik*.

7.      In the Notice, Plaintiffs argue that the *Evonik* Decision is "analogous" because it denies a motion to dismiss that involves a complaint with "near analogous—if not identical— facts." But a review of the *Evonik* Decision dictates otherwise.[1] (Dkt. No. 31, Notice at 3.)

---

[1]  Defendants note that to the extent this Court is persuaded by Plaintiffs' argument in the Notice that the claims here are analogous to those decided in the *Evonik* Decision, then the holding in the *Evonik* Decision dismissing the plaintiffs' claims for breach of the duty of loyalty should also occur here. (Dkt. No. 31-1, Ex. A *Evonik* Decision, at 9-10 (noting that in order to plausibly allege a breach of the fiduciary duty of loyalty, the plaintiffs must claim that the investment committee made decisions for the purpose of benefitting itself or a third party and that "[e]xcluding

8.       It is clear from the *Evonik* Decision that the court denied the defendants' motion to dismiss because the plaintiffs in that case actually plead examples of cheaper, alternative investment options.  (Dkt. No. 31-1, Ex. A *Evonik* Decision at 7.)  Contrary to *Evonik*, as set forth in Defendants' briefing on its Motion to Dismiss, the investment options available under the Plan are actually cheaper than the purportedly lower-cost alternatives identified by Plaintiffs in the First Amended Complaint.  (Dkt. No. 24, Memo at 14-17; Dkt. No. 28, Reply at 7.)  Furthermore, as shown in the moving papers, the Plan documents demonstrate that the Committee had a robust process in place for reviewing and selecting Plan investments and in fact followed that robust process, as made clear by the modifications to the Plan's investment options.  (Dkt. No. 24, Memo at 21 and fn. 10; Dkt. No. 28, Reply at 8.)  Accordingly, unlike the complaint allegations found to be sufficient in *Evonik*, Plaintiffs' conclusory "inferences" regarding the Committee's purported "failure to investigate" fail where there is no support for the assertion in the Plan documents or any other source.

9.       Moreover, unlike *Evonik*, where there does not appear to be any evidence of the defendants' efforts to reduce or monitor recordkeeper fees, the Plan documents at issue here make clear that Committee and the recordkeeper Fidelity amended the Trust Agreement seventeen times, including a transition from a revenue-sharing recordkeeping fee to a flat per participant recordkeeping fee in January 2017, and then a further amendment to reduce the flat per participant amount.  (Dkt. No. 28, Reply at 9.)  This precludes Plaintiffs from plausibly alleging that there can be any inference that the Committee failed to monitor the Plan's recordkeeping fees, and makes this case inapposite to *Evonik*.

---

conclusory allegations" there are no allegations regarding such conduct.).)  The same is true for Plaintiffs' claims regarding a purported breach of the duty of loyalty here.  (Dkt. No. 24, Memo at 8-10; Dkt. No. 28, Reply at 3-5.)

WHEREFORE, for the reasons stated herein, Plaintiffs' Notice should be set aside for its procedural deficiencies.  To the extent the Court considers Plaintiffs' improper Notice, the holding in *Evonik* is readily distinguishable from the issues and arguments raised in Defendants' Motion to Dismiss and reply brief.

DATED:  January 15, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By     */s/ Stephen Q. Wood*
_____

Stephen Q. Wood
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2021, I filed with the Clerk of Court a true and correct copy of the foregoing **Defendants Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee's Response in Opposition to Plaintiffs' Notice of Supplemental Authority** via the CM/ECF System which sent notification to:

ISOM LAW FIRM PLLC
David K. Isom, Esq.
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
david@isomlawfirm.com

CAPOZZI ADLER, P.C.
Donald R. Reavey, Esq.
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com

CAPOZZI ADLER, P.C.
Mark K. Gyandoh, Esq.
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com

/s/ *Stephen Q. Wood*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

COLE MATNEY and PAUL WATTS,
individually and on behalf of all others
similarly situated,

                    Plaintiffs,

          v.

BARRICK GOLD OF NORTH AMERICA,
INC., BOARD OF DIRECTORS OF
BARRICK GOLD OF NORTH AMERICA,
INC., BARRICK U.S. SUBSIDIARIES
BENEFITS COMMITTEE, and JOHN
DOES 1-30.

                    Defendants.

**Case No.: 2:20-cv-00275-TC**

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs Cole Matney and Paul Watts (together, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Notice of Supplemental Authority pursuant to DUCivR 7-1(b)(4) submitting, (1) *Savage v. Sutherland Global Services, Inc.*, 2021 WL 726788 (W.D.N.Y. Feb. 25, 2021) (attached hereto as Exhibit A) and (2) *McCool v. AHS Management Company, Inc.*, 2021 WL 826756 (M.D. Tenn. March 4, 2021) (attached hereto as Exhibit B). Both decisions support Plaintiffs' arguments in pages 10 to 13 of Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 25) with respect to Defendants' failure to select identical lower cost alternatives. *See Savage*, 2021 WL 726788, at *7; *McCool,* 2021 WL 826756, at *5.

Dated: March 24, 2021                    Respectfully submitted,


**CAPOZZI ADLER, P.C.**


*/s/ Mark K. Gyandoh*          _
Mark K. Gyandoh, Esquire
(admitted *pro hac vice*)
Gabrielle Kelerchian, Esquire
(*pro hac vice* to be requested)
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey, Esquire
(admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103


Counsel for Plaintiffs and
the Putative Class

2

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 24, 2021 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:   <u>*/s/ Mark K. Gyandoh*</u>
        Mark K. Gyandoh, Esq.

# EXHIBIT A

2021 WL 726788
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Ashley SAVAGE, David Leidlein, Ronald Cohen, and James Sherburne, individually and as representatives of
similarly situated persons, and on behalf of the Plan, Plaintiffs,
v.
SUTHERLAND GLOBAL SERVICES, INC., et al., Defendants.

6:19-CV-06840 EAW
|
Signed 02/25/2021

**Attorneys and Law Firms**

Adam Thomas Sanderson, Michael J. Lingle, Annette M. Gifford, Thomas & Solomon LLP, Rochester, NY, for Plaintiffs.

Kevin Joseph Mulvehill, Luke Bennett Kalamas, Alissa M. Fortuna-Valentine, Phillips Lytle LLP, Rochester, NY, for
Defendants Sutherland Global Services, Inc., Shilpa Konda, Lori D'Ambrosio.

Erika N.D. Stanat, Jessica N. Clemente, Harter, Secrest & Emery LLP, Rochester, NY, for Defendant CVAGS, LLC.

Kevin Joseph Mulvehill, Alissa M. Fortuna-Valentine, Phillips Lytle LLP, Rochester, NY, for Defendants Diane Mohorter,
Kathleen DeCann.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiffs Ashley Savage, David Leidlein, Ronald Cohen, and James Sherburne (collectively, "Plaintiffs") bring this
putative class action individually and on behalf of the Sutherland Global Services, Inc. 401(k) Plan (the "Plan"), and all other
similarly situated participants and beneficiaries of the Plan, against Sutherland Global Services, Inc., CVGAS, LLC d/b/a
Clearview Group, Shilpa Konda, Diane Mohorter, Lori D'Ambrosio, Kathleen Decann, and John Does 1-20 (collectively,
"Defendants"). (Dkt. 1). Plaintiffs contend Defendants violated the Employment Retirement Income Security Act
("**ERISA**"), 29 U.S.C. § 1001 *et seq.*, by breaching their **fiduciary duties** by failing to properly minimize the reasonable **fees**
and expenses incurred by the Plan. (*Id.*). Presently before the Court is a motion to dismiss filed by defendant CVGAS, LLC d/
b/a Clearview Group ("Clearview"). (Dkt. 24). For the following reasons, Clearview's motion to dismiss is denied.

**BACKGROUND AND PROCEDURAL HISTORY**

The Court will briefly summarize Plaintiffs' claims; however, familiarity with the relevant facts is assumed for purposes of this Decision and Order. According to the complaint, Plaintiffs are former employees of Sutherland Global Services, Inc. ("Sutherland") and participated in Sutherland's 401(k) Plan. (Dkt. 1 at ¶¶ 1, 7-10). Sutherland provides process transformation services, including human resources management, operational analytics, robotic process automation, and cloud services, and is the sponsor of the Plan pursuant to 29 U.S.C. § 1002(16)(B). (*Id.* at ¶¶ 13-14). Clearview is the "investment manager" of the Plan pursuant to 29 U.S.C. § 1002(38) and was delegated responsibilities in connection with the Plan, including the responsibility to select and monitor investment options to be included in the Plan. (*Id.* at ¶¶ 27-28).

During the proposed class period Plaintiffs invested in funds, including T. Rowe Price Target Date mutual funds. (*Id.* at ¶ 11). Plaintiffs allege that Defendants breached their **fiduciary duties** by failing to defray the Plan's **fees** and expenses. (*Id.* at ¶ 85). Specifically, Plaintiffs allege that Defendants selected and retained retail class shares of target-date mutual funds (including the T. Rowe Price funds) with 12b-1 **fees** for the Plan, when identical investor or institutional class shares of the same funds were available without a 12b-1 fee. (*Id.* at ¶¶ 85-117, 147).

**PROCEDURAL HISTORY**

Plaintiffs filed their complaint on November 13, 2019. (Dkt. 1). The complaint alleges three causes of action: (1) **breach** of **fiduciary duty**; (2) failure to monitor **fiduciaries**; and (3) other remedies for **breach** of **fiduciary duty**. (*Id.* at 21-31). The complaint also contains class action allegations. (*Id.* at 19-21). On April 2, 2020, defendants Sutherland, Lori D'Ambrosio, Kathleen DeCann, Shilpa Konda, and Diane Mohorter filed an answer to the complaint. (Dkt. 23). Clearview filed the instant motion the same day. (Dkt. 24). Clearview raises several arguments in support of its motion to dismiss, including: (1) Plaintiffs have failed to exhaust their administrative remedies; (2) Plaintiffs' claims are untimely; and (3) Plaintiffs have failed to state claims for **breach** of **fiduciary duty**, failure to monitor, and for other remedies for **breach** of **fiduciary duty**. (Dkt. 24-15 at 11-31). Clearview also moves to strike Plaintiffs' demand for a jury trial. (*Id.* at 31).

**DISCUSSION**

**I. Legal Standard**

**A. Rule 12(b)(6)**

**\*2** "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, ––– U.S. ––––, 137 S. Ct. 2279, 198 L.Ed.2d 703 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

APP 255

**B. Consideration of Materials Attached to Clearview's Motion**

In connection with its motion to dismiss, Clearview has submitted more than 2,600 pages of exhibits which, according to a Declaration and Notice to Admit filed by its counsel, includes the Plan Document and Adoption Agreement, the Sutherland Global Services Summary Plan Description, Sutherland Global Services Form 5500 for years 2013 through 2018, an Investor Bulletin from the Securities and Exchange Commission ("SEC") titled "How **Fees** and Expenses Affect Your Investment Portfolio," dated February 2014, T. Rowe Price Funds, Inc. prospectuses for 2015 and 2020, and a U.S. Department of Labor Employee Benefits Security Administration publication titled, "Understanding Retirement Plan **Fees** and Expenses," dated December 2011. (Dkt. 24-1). Clearview contends that, in the **ERISA** context, courts consider plan documents incorporated by reference into the complaint and other federally-regulated filings or government authorities' public statements, and that courts often take judicial notice of plan prospectuses, summary plan descriptions, Form 5500 filings, and other similar documents. (Dkt. 24-15 at 10-11). Clearview asks that the Court take judicial notice of these documents, pursuant to Federal Rule of Evidence 201. (Dkt. 24-1).

Plaintiffs do not dispute the authenticity of these documents, but argue that even if the Court considers them, they would only be considered for the fact that they contain certain statements, and not to prove the truth of such statements. (Dkt. 34 at 16). Plaintiffs further contend that the documents Clearview cites "only raise additional factual questions, further demonstrating the need for discovery and, thus, these documents should not be used to resolve Plaintiffs' claims at the pleading stage." (*Id.*).

Aside from the Form 5500s and the SEC investor bulletin, which were cited in the complaint, none these documents were attached to or specifically referenced in the complaint. Further, other than general assertions regarding admissibility, Clearview does not make any meaningful argument as to why the Court should consider the 2,600 pages it submits in connection with the motion to dismiss.

Pursuant to Rule 201, a court may take judicial notice of any fact that is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b). While it is true that "[c]ourts regularly take notice of publicly available documents including regulatory filings ... these documents may only be considered for the fact that they contain a statement therein but not to prove the truth of the statement." *Cunningham v. Cornell Univ.*, No. 16-CV-6525(PKC), 2017 WL 4358769, at *3-4 (S.D.N.Y. Sept. 29, 2017). The SEC bulletin, Department of Labor publication, and T. Rowe Price prospectuses are publicly-available documents, and the SEC bulletin and Form 5500s were referenced in the complaint, and therefore the Court will take judicial notice of those documents. The complaint does not specifically reference the Plan Document and Adoption Agreement or the Plan Summary, and Clearview does not contend that these are publicly-available documents. Rather, in its reply brief, Clearview makes the conclusory statement that these documents are "integral." (Dkt. 36 at 9 n.6). The Court need not reach the issue because, as further explained below, even considering the documents, dismissal is not warranted at this stage of the litigation.

**II. <u>Administrative Exhaustion</u>**

**\*3** Clearview's first argument is that Plaintiffs' claims must be dismissed for failure to exhaust because they did not follow the claims procedures set forth in the Plan before filing suit. (Dkt. 24-15 at 11). Clearview points to language in the Plan requiring mandatory exhaustion of claims procedures, including:

> [t]he exhaustion of the claims procedures is mandatory for resolving every claim and dispute arising under this Plan. As to such claims and disputes: (1) no claimant shall be permitted to commence any legal action to recover Plan benefits or to enforce or clarify rights under the Plan under Act § 502 or § 510 or under any other provision of law, whether or not statutory, until the claims procedures set forth in Subsections (a) and (b) above have been exhausted in their entirety ...

(*Id.* at 12; *see also id.* at 12-13 (noting in bolded language in the Summary Plan Description that "[a] claimant has no right to commence any legal action to recover Plan benefits or to enforce or clarify rights under the Plan under **ERISA** I 502, **ERISA** h 510, or any other provision of law, whether or not statutory, until the Plan's claims procedures have been exhausted in their entirety.")). Plaintiffs contend that they are asserting statutory violations of **ERISA**—not violations requiring interpretation of the underlying provisions of the Plan itself—and therefore they were not required to exhaust administrative remedies. (Dkt.

34 at 16).

While "[c]ourts uniformly require exhaustion for claims based on violations of contractual rights protected by **ERISA**, such as denial of benefits," *Shamoun v. Bd. of Trustees*, 357 F. Supp. 2d 598, 602 n.3 (E.D.N.Y. 2005), the Second Circuit has not specifically addressed whether exhaustion is required for statutory-based claims under **ERISA**, *see De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 558 (E.D.N.Y. 2003). However, the Second Circuit has acknowledged that district courts with the circuit have "routinely" not applied the exhaustion requirement when a plaintiff alleges a statutory **ERISA** violation. *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005).[1] As explained by the district court in *Diamond v. Local 807 Labor-Mgmt. Pension Fund*:

> there is a distinct trend among the district courts in this circuit. In general, "[d]istrict courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory **ERISA** violation," *Nechis*, 421 F.3d at 102 (quoting *De Pace*, 257 F. Supp. 2d at 558), while continuing to require exhaustion for claims alleging violations of the terms of a benefit plan. *See Role [v. Johns Hopkins Bayview Medical Center]*, 2008 WL 465574, at *3 ("[D]istrict courts within this circuit have drawn a distinction between claims relating to violations of the terms of a benefit plan, and claims relating to statutory violations of **ERISA**, finding that the former, but not the latter, claims must be administratively exhausted."); *Park v. Trustees of 1199 SEIU Health Care Employees Pension Fund*, 418 F. Supp. 2d 343, 358 (S.D.N.Y. 2005) ("District courts within this Circuit, however, have permitted claims for statutory violations of **ERISA** even though administrative remedies were not exhausted."); *Shamoun*, 357 F. Supp. 2d at 603 n.3 ("The Second Circuit has yet to address the issue, but courts in this circuit hold that there is no exhaustion requirement for statutory claims under **ERISA**.").

**\*4** 2014 WL 527898, at *6 (E.D.N.Y. Feb. 7, 2014), *aff'd*, 595 F. App'x 22 (2d Cir. 2014); *see also Falberg v. Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910(ER), 2020 WL 3893285, at *6 (S.D.N.Y. July 9, 2020) ("[i]n the absence of controlling authority, courts in this Circuit have repeatedly dispensed with any exhaustion requirement for statutory **ERISA** claims"); *McCulloch v. Bd. of Trustees of SEIU Affiliates Officers and Emps. Pension Plan*, No. 14 Civ. 9348 (PGG), 2016 WL 9022578, at *6 (S.D.N.Y. Mar. 31, 2016) ("This Court agrees that exempting statutory claims from the exhaustion requirement best serves **ERISA's** purposes."), *aff'd*, 686 F. App'x 68 (2d Cir. 2017). The claims raised by Plaintiffs do not involve interpretation of the terms of the Plan; rather, they concern Defendants' alleged statutory violations through improper administration of the Plan. The Court agrees with the majority of district courts that "while plan **fiduciaries** may have expertise in interpreting the terms of the plan itself, statutory interpretation is the province of the judiciary." *De Pace*, 257 F. Supp. 2d at 557.

Clearview does not argue that Plaintiffs have alleged violations of the Plan, as opposed to statutory violations. Rather, Clearview argues that the cases cited by Plaintiffs do not include a plan provision specifically referencing the requirement of administrative exhaustion for statutory claims. (*See* Dkt. 36 at 7). However, Clearview does not cite any case indicating that the specific exhaustion provision in the Plan warrants a different result. Rather, the majority of the courts of appeal in other circuits, and the district courts in the Second Circuit, have concluded that a claim based on a statutory violation of **ERISA**, as opposed to a plan-based claim, does not require administrative exhaustion, and this Court agrees. Plaintiffs have alleged violations of the **ERISA** statute, for which the Court—not the Plan administrators—has expertise. As they are pleaded in the complaint, Plaintiffs' claims do not require interpretation of Plan documents, and in view of the persuasive authority cited above, Clearview has not met its burden to establish that dismissal is appropriate on the grounds of administrative exhaustion. Accordingly, Clearview's motion to dismiss on this basis is denied.

### III. Timeliness of Plaintiffs' Claims

Clearview next asserts that Plaintiffs' claims must be dismissed as untimely. (Dkt. 24-15 at 15). Specifically, Clearview contends that the Plan contractually shortened the statute of limitations, such that a plaintiff cannot bring an action on any matter pertaining to the Plan, unless suit is commenced "before the earlier of (1) 30 months after the claimant knew or reasonably should have known of the principal facts on which the claim is based, or (2) six months after the claimant has exhausted the claims procedure under this Plan." (*Id.*; *see also id.* at 16 (citing Summary Plan Description, which states in bold "[a]ny lawsuit, action, or proceeding concerning the Plan – including one concerning Plan benefits, **ERISA** § 502, **ERISA** § 510, or any other provision of law, even if not statutory – is forever barred unless you commenced the action in the proper forum before the *earlier* of: (i) 30 months after the claimant knew or reasonably should have known of the principal facts on which the claim is based, or (ii) six months after the claimant exhausted the Plan's claims procedure under this Plan.")). The Court does not determine whether the Plan contractually shortened the statute of limitations because even if the contractual limitations period applies, Defendants have not met their burden of showing that the instant cause of action is

time barred.[2]

**\*5** "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). "[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint. *Id.* Here, it is not clear from the face of the complaint that Plaintiffs' claims should be dismissed as untimely because the complaint does not allege when Plaintiffs acquired knowledge of Defendants' alleged **breach** of their **fiduciary duties**. The Second Circuit has held that for the statute of limitations to begin to run under **ERISA** § 1113, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual **breach** of **duty** upon which [they sued]." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001) (alterations in original) (citation omitted); *see Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-Cv-9329 (SHS), 2014 WL 4851816, at \*3 (S.D.N.Y. Sept. 30, 2014) ("Even where a plaintiff has reason to believe that defendants have violated **ERISA**, he might not know all the facts material to his claim.... Clearly what matters are the facts plaintiffs possess, not the facts they suspect or could discover.").

Clearview has not shown that Plaintiffs had knowledge 30 months before they filed their lawsuit, *i.e.*, before May 13, 2017, of the investor class shares upon which their claims rely. While Clearview argues that the Form 5500 fee disclosures from as early as 2013 and the fund prospectuses put Plaintiffs on notice of the **fees** and expenses for the T. Rowe Price funds (Dkt. 24-15 at 18-19), that is not sufficient. For example, the documents on which Clearview relies do not demonstrate that the Plan was eligible for lower-fee share classes, if or when Plaintiffs reviewed the fund prospectuses, or that Plaintiffs otherwise were specifically aware of the availability of identical share classes with lower **fees**. "Plaintiffs could not have known that the **fees** were **excessive**, and thus a basis for an **ERISA** claim, without the relevant comparison point for assessing excessiveness: **fees** for comparable funds." *Leber*, 2014 WL 4851816, at \*5; *Lutz v. Kaleida Health*, No. 1:18-CV-01112 EAW, 2019 WL 3556935, at \*7 (W.D.N.Y. Aug. 5, 2019) (denying motion to dismiss based on statute of limitations where defendants argued that fee disclosures from 2012 placed the plaintiffs on notice of fund **fees** and expenses because "[t]he Plans and fee disclosures do not disclose the existence of investor class shares with no 12b-1 **fees**"); *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at \*4 (S.D.N.Y. Oct. 13, 2016) (denying the motion to dismiss based on the statute of limitations because "the Complaint explicitly alleges that Plaintiffs did not have knowledge of the comparison of Plan costs and investment performance versus other available alternatives, comparison to other similarly-sized plans, information regarding other available share classes, and information regarding separate and collective trusts until shortly before this suit was filed.... Defendants have not shown that it is clear from the face of the Complaint or any judicially noticed court filings that Plaintiffs actually knew of the fee or performance data for the comparable alternative funds more than three years before the commencement of this suit" (internal quotations and citation omitted)). Accordingly, Defendants have not met their burden of showing that the limitations period expired prior to Plaintiffs' filing their complaint, and the Court rejects the statute of limitations defense, at least at this stage of the litigation.

## IV. **Plaintiffs Have Adequately Pleaded Their Claims**

### A. Breach of Fiduciary Duty

Clearview next argues that Plaintiffs have failed to state a claim for **breach** of **fiduciary duty**. (Dkt. 24-15 at 21). "To state a claim for **breach** of **fiduciary duty** under **ERISA**, a plaintiff must allege facts which, if true, would show that the defendant acted as a **fiduciary**, breached its **fiduciary duty**, and thereby caused a loss to the plan at issue." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 730 (2d Cir. 2013) ("*PBGC*") (citing 29 U.S.C. § 1109(a), and *Pegram v. Herdrich*, 530 U.S. 211, 225-26, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)); *see also Laboy v. Bd. of Trustees of Bldg. Service 32 BJ SRSP*, 513 F. App'x 78, 79 (2d Cir. 2013) ("To state a claim for **breach** of a **fiduciary duty**, a plaintiff must allege that (1) the defendant was acting as a **fiduciary** of the plan, (2) the defendant breached that **duty**, and (3) the **breach** caused harm to the plaintiff."). Here, Plaintiffs have alleged that Clearview owed them **fiduciary duties** under the Plan (Dkt. 1 at ¶¶ 26-29); that it breached its **fiduciary duties** by improperly selecting and retaining the T. Rowe Price mutual funds, due to that class of mutual funds charging a 12b-1 fee, when identical class shares did not charge a 12b-1 fee (*id.* at ¶¶ 100-17); and as a result, the Plan incurred administrative expenses, including expenses exceeding $695,000 by 2018 (*id.* at ¶¶ 97-99).

**\*6** "[A] claim for a **breach** of **fiduciary duty** under **ERISA** may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the **ERISA fiduciary**—if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable **fiduciary** that the investment at issue was improvident." *PBGC*, 712 F.3d at 718 (alteration in original) (quotation omitted). Several courts, including courts in this Circuit, have found allegations that "defendants breached their **fiduciary duties** by selecting specific retail funds over

lower-cost, but otherwise identical, institutional funds ... are sufficient to survive [a] motion[ ] to dismiss." *Cunningham*, 2017 WL 4358769, at *8 (citation omitted) (collecting cases); *see also In re M&T Bank Corp.* **ERISA** *Litig.*, No. 16-CV-375 FPG, 2018 WL 4334807, at *2, *7 (W.D.N.Y. Sept. 11, 2018) (holding allegations that "the Plan failed to use its bargaining power as a large institutional investor to obtain the lowest-cost class of shares available" were sufficient to state a **breach** of **fiduciary duty** claim under **ERISA**); *see also Moreno*, 2016 WL 5957307, at *6 ("These specific allegations regarding **excessive fees** from which Defendants stood to gain is sufficient to support the inference that the process used by the defendants who were Plan **fiduciaries** to select and maintain the Plan's investment options was 'tainted by failure of effort, competence, or loyalty.' ").

Clearview contends that "fee-sharing arrangements between service providers and third-party managers do not in-and-of-themselves create a violation of **ERISA**." (Dkt. 24-15 at 27-28). It cites to cases from the Seventh Circuit Court of Appeals, including *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020) and *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), which note that such a fee arrangement may be beneficial to different groups of participants, and argues that Plaintiffs' conclusory allegations that selection the T. Rowe Price funds was imprudent is insufficient to support a claim for a **breach** of **fiduciary duty**. *Divane* is distinguishable, because the district court had granted dismissal of the complaint after more than one year of discovery and after the plaintiffs had sought leave to file an amended complaint. 953 F.3d at 985-86. Further, the holding in *Loomis* that a **fiduciary** does not **breach** its **duty** simply by offering two classes of funds (both retail and institutional), is distinguishable from Plaintiffs' claims that Defendants breached their **fiduciary duties** by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds, which are sufficient to survive a motion to dismiss. *See Cunningham*, 2017 WL 4358769, at *7-8 ("[T]o the extent plaintiffs claim that the Plans' menu of investment options should have included lower-cost options such as 'lower-cost insurance company variable annuities and insurance company pooled separate counts,' this Court agrees that plaintiffs' claims are foreclosed by the principles set out in *Loomis, Hecker, Renfro*, and *Tibble II* .... However, to the extent plaintiffs claim that defendants breached their **fiduciary duties** by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds, these allegations are sufficient to survive the motions to dismiss." (internal citations omitted)); *see, e.g.,* Dkt. 1 at ¶ 107 ("The different share classes of a mutual fund, such as the T. Rowe Price funds and other funds, are identical in all ways except that the retail shares have a 12b-1 fee, resulting in a higher annual operating expense and lower return for the retail class investors."); *id.* at ¶ 116 ("The Plan did not receive any additional services or benefits based on the use of more expensive share classes; the only consequence was higher costs for the Plan's participants.").

*In re M&T Bank Corp.* **ERISA** *Litig.*, 2018 WL 4334807, is instructive as to this issue. There, the plaintiffs alleged that the defendants "had the opportunity to switch from more expensive fee share classes ... to lower fee share classes" for several investment options, including T. Rowe Price funds. *Id.* at *7. The court denied the defendants' motion to dismiss, noting that the plaintiffs did "not have actual knowledge of Defendants' decision-making processes in selecting investment options for the plan, nor need they possess such knowledge." *Id.* Instead, it was "sufficient for Plaintiffs to allege 'facts that, if proved, would show that an adequate investigation would have revealed to a reasonable **fiduciary** that the investment at issue was imprudent.' " *Id.* (quoting *PBGC*, 712 F.3d at 718).

**\*7** Similarly, Plaintiffs' allegations are sufficient to state a **breach** of **fiduciary duty** claim. Plaintiffs allege that the same shares are available to Defendants without any 12b-1 **fees**, and that Defendants breached their **fiduciary duties** by instead choosing share class options that caused the Plans to pay **fees**. (Dkt. 1 at ¶¶ 102-16). The Court finds that, in light of the case law discussed above, it "may reasonably infer from what is alleged that [Defendants'] process was flawed." *PBGC*, 712 F.3d at 718 (quotation omitted).

Regarding Clearview's contention that Plaintiffs have failed to "include sufficient specific factual allegations to demonstrate that Defendants' conduct was imprudent under the circumstances" (Dkt. 24-15 at 22-25), the Court is unpersuaded by this argument. The Second Circuit has found that "**ERISA** plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," and accordingly an omission in the complaint of the **fiduciary's** "knowledge, methods, or investigations at the relevant times.... is not fatal to a claim alleging a **breach** of **fiduciary duty**." *PBGC*, 712 F.3d at 718. Instead, "a claim for a **breach** of **fiduciary duty** under **ERISA** may survive a motion to dismiss ... if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable **fiduciary** that the investment at issue was imprudent." *Id.* (alteration, quotation, and citation omitted); *see Moreno*, 2016 WL 5957307, at *6 (holding an **ERISA** claim for **breach** of **fiduciary duty** survives if based on "circumstantial factual allegations" the "process was flawed"); *Cunningham*, 2017 WL 4358769, at *12 (same). As discussed above, the Court finds Plaintiffs' allegations sufficiently state a **breach** of **fiduciary duty** claim. The specific arguments advanced by Clearview— such as that **fees** may not be **excessive** considering the circumstances of the Plan—are arguments to be potentially advanced on summary judgment following discovery, and not at this stage of the case.

Because Plaintiffs have alleged that "the only consequence was higher costs for the Plans' participants" (Dkt. 1 at ¶ 116),

their claims are sufficient to survive a motion to dismiss. "While it may turn out that defendants had legitimate and prudent reasons for making the challenged investments available to participants," or that the retail and investment share classes were not truly identical, "accepting the Complaint's allegations as true and drawing all reasonable inferences in favor of the plaintiffs, plaintiffs' allegations are sufficient, at this stage, to survive a motion to dismiss." *Cunningham*, 2017 WL 4358769, at \*8. Accordingly, Clearview's motion to dismiss is denied on this basis.

### B. Failure to Monitor and Other Remedies for Breach of Fiduciary Duty

Clearview also argues that Plaintiffs' claims for **breach** of their **duty** to monitor and other remedies for **breach** of **fiduciary duty** must fail because the complaint fails to state any claim for **breach** of **fiduciary duty** by any Defendant. Clearview further contends that the failure to monitor claim is inconsistent with the **breach** of **fiduciary duty** claim because "the essence of a failure to monitor claim is that the defendants failed to monitor the plan **fiduciaries** they appointed and that a **breach** of **fiduciary duty** was committed by those appointed **fiduciaries**." (*See* Dkt. 24-15 at 29-30).

As explained above, the Court disagrees with Clearview's position that the complaint fails to state a claim for **breach** of **fiduciary duty**. Regarding the failure to monitor claim, while **ERISA** does not specifically recognize a claim for failure to monitor, "[a]n appointing **fiduciary's duty** to monitor his appointees is well-established," and courts have recognized such a claim. *In re Polaroid* **ERISA** *Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N. Y 2005). The complaint contains allegations that Defendants (including Clearview) breached their **duty** to monitor by failing to ensure that, to the extent they delegated any of their **fiduciary duties**, they failed to properly monitor their appointees' consideration and investigation of investment options. (Dkt. 1 at ¶¶ 28, 164-165). Although Clearview contends that the failure to monitor claim is inconsistent with the **breach** of **fiduciary duty** claim, Plaintiffs may allege alternative theories of liability, and it may come to light that Clearview delegated its responsibilities to other defendants or non-parties. As explained above, "**ERISA** plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *PBGC*, 712 F.3d at 718; *see also In re M&T Bank* **ERISA** *Litig.*, 2018 WL 4334807, at \*11 ("because the appropriate **ERISA** mandated monitoring procedures vary according to the nature of the plan at issue and other facts and circumstances, an analysis of the precise contours of the defendants' **duty** to monitor at this stage is premature" (citation omitted)). Whether Plaintiffs can substantiate their claims remains to be seen, but dismissal is not required at this stage of the litigation.

### V. Plaintiffs' Demand for a Jury Trial

**\*8** Defendants also ask that the Court strike Plaintiffs' jury demand because the only relief sought by Plaintiffs is equitable in nature. (Dkt. 24-15 at 31; Dkt. 36 at 15). The law surrounding jury trials in **ERISA** cases is complex. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ("The kind of restitution that petitioners seek, therefore, is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred upon respondents."); *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-CV-282 (JCH), 2012 WL 162361, at \*5 (D. Conn. Jan. 19, 2012) ("*Great-West* reconfigured the legal landscape of restitution, and has been interpreted to permit jury trials on **ERISA** claims when such claims are legal rather than equitable in nature." (quotations and citation omitted)). Clearview has not identified any prejudice that would result from allowing the jury demand to remain at this stage of the litigation. Accordingly, given the complex nature of the issue and the lack of prejudice to Defendants, the Court declines to resolve the motion to strike, and instead denies Clearview's motion without prejudice. *See Taupita Inv., Ltd. v. Benny Ping Wing Leung*, No. 14 Civ. 9739 (PAE), 2017 WL 3600422, at \*13 (S.D.N.Y. Aug. 17, 2017) ("[T]his issue is better resolved following discovery and resolution of any motions for summary judgment.... The Court accordingly denies the motion to strike plaintiffs' jury demand without prejudice[.]"); *see also Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1257 (2d Cir. 1996) (ruling on a "previously adjourned" motion to strike after ruling on a motion for summary judgment).

### CONCLUSION

For the foregoing reasons, Clearview's motion to dismiss the claims in Plaintiffs' complaint (Dkt. 24) is denied, and Clearview's motion to strike Plaintiffs' jury demand is denied without prejudice.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 726788

| Footnotes |
|---|
| 1 | The majority of other circuit courts of appeal have recognized a distinction between plan-based claims and statutory-based claims, including the Third, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits. *See Diamond v. Local 807 Labor Mgmt. Pension Fund*, 595 F. App'x 22, 24-25 (2d Cir. 2014). The Seventh and Eleventh Circuits have applied the exhaustion doctrine to both plan-based and statutory-based claims, "reasoning that regardless of the nature of the **ERISA** claim, administrative review enables plan administrators to apply their expertise and assemble a factual record that will assist in resolving those claims that are eventually litigated, and further serves to reduce the number of frivolous lawsuits." *See De Pace*, 257 F. Supp. 2d at 557-58. Clearview also cites *Radford v. Gen. Dynamics Corp.*, 151 F.3d 396 (5th Cir. 1998) for the proposition that exhaustion is required for **breach** of **fiduciary duty** claims, but the *Radford* court did not specifically decide that issue and, in any event, it is inconsistent with subsequent Fifth Circuit precedent, including *Milofsky v. Am. Airlines, Inc.*, 442 F.3d 311, 313 (5th Cir. 2006). |
| 2 | The statute of limitations on which Clearview relies is the *contractual* statute of limitations, not the statutory statute of limitations which, for **breach** of **fiduciary duty** claims under **ERISA**, is the earlier of six years after the date of the last action which constituted a part of the **breach** or violation, or three years after the earliest date on which the plaintiff had actual knowledge of the **breach** or violation. *See* 29 U.S.C. § 1113. In *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 134 S.Ct. 604, 187 L.Ed.2d 529 (2013), the Supreme Court found that parties could contract to a particular limitations period, "[a]bsent a controlling statute to the contrary." *Id.* at 105, 134 S.Ct. 604. Clearview cites to *Hewitt v. W. & S. Fin. Grp. Flexible Benefits Plan*, No. 17-5862, 2018 WL 3064564 (6th Cir. Apr. 18, 2018), an unpublished decision from the Sixth Circuit, which held that the limitations period in § 1113 provides only a "default rule," and not a controlling statute of the contrary, as defined by *Heimeshoff*. (*See* Dkt. 24-15 at 17). Plaintiffs distinguish *Hewitt* in their response, arguing that *Hewitt* was brought pursuant to § 1132(a)(1)(B), and not §§ 1132(a)(2) and (a)(3). (Dkt. 34 at 20 n.6). As explained above, the Court does not reach the issue of whether the contractual statute of limitations applies in this instance, because even if it did apply, Clearview still has failed to meet its burden to show that dismissal is warranted on the face of the complaint. |

| **End of Document** | © 2021 Thomson Reuters. No claim to original U.S. Government Works. |

# EXHIBIT B

McCool v. AHS Management Company, Inc., Slip Copy (2021)

2021 WL 826756, 2021 Employee Benefits Cas. 77,859

2021 WL 826756
United States District Court, M.D. Tennessee,
Nashville Division.

Mark MCCOOL, Shawn MacDonald, and Warren
Harlan, individually and on behalf of all others
similarly situated, Plaintiffs,
v.
AHS MANAGEMENT COMPANY, INC., et al.,
Defendants.

No. 3:19-cv-01158
|
Filed 03/04/2021

**Attorneys and Law Firms**

Donald R. Reavey, Mark K. Gyandoh, Capozzi Adler,
P.C., Harrisburg, PA, Gabrielle P. Kelerchian, Capozzi
Adler, P.C., Merion Station, PA, Nicholas Daniel Waite,
Law Offices of Nicholas D. White, PLLC, Nashville, TN,
for Plaintiffs.

Benjamin I. Friedman, Caroline A. Wong, Eric S.
Mattson, Mark B. Blocker, Sidley Austin LLP, Chicago,
IL, Joseph F. Welborn, III, K&L Gates LLP, Nashville, TN, Kevin C.
Baltz, Butler Snow LLP, Nashville, TN, for Defendants.

**MEMORANDUM**

WILLIAM L. CAMPBELL, JR., UNITED STATES
DISTRICT JUDGE

**\*1** Pending before the Court is Defendants' Motion to
Dismiss (Doc. No. 34). Plaintiffs filed a Response in
Opposition (Doc. No. 46), and Defendants filed a Reply
(Doc. No. 52).

On June 19, 2020, Defendants filed a Notice of
Supplemental Authority in support of their Motion to
Dismiss (Doc. No. 53), and Plaintiffs filed a Response
(Doc. No. 54). On July 6, 2020, Defendants filed a Notice
of Supplemental Authority (Doc. No. 58), and Plaintiffs
filed a Response and their own Notice of Supplemental
Authority (Doc. No. 59), which Defendants responded to

(Doc. No. 60). On August 3, 2020, Plaintiffs filed a
Notice of Supplemental Authority (Doc. No. 62), and
Defendants filed a Response (Doc. No. 64). On October
13, 2020, Defendants filed a Notice of Supplemental
Authority (Doc. No. 67), and Plaintiffs filed a Response
(Doc. No. 68). On November 2, 2020, and November 6,
2020, Plaintiffs file Notices of Supplemental Authority
(Doc. Nos. 69, 70), and Defendants filed a Response
(Doc. No. 72). On December 9, 2020, Defendants filed a
Notice of Supplemental Authority (Doc. No. 73), and
Plaintiffs filed a Response (Doc. No. 74). On January 4,
2021, and January 5, 2021, Plaintiffs filed Notices of
Supplemental Authority (Doc. Nos. 81, 82), and
Defendants filed a Response and their own Notice of
Supplemental Authority (Doc. No. 85), which Plaintiffs
responded to (Doc. No. 86).

For the reasons set forth more fully below, Defendants'
Motion will be **GRANTED** in part and **DENIED** in part.

**I. FACTUAL BACKGROUND AND PROCEDURAL
HISTORY**

This case arises from allegations that the Ardent Health
Services Retirement Savings Plan (the "Plan") has not
been managed with loyalty or prudence, in violation of
the Employee Retirement Income Security Act
("ERISA"). Plaintiffs, individually and on behalf of a
purported class, brought this action under 29 U.S.C. §
1132(a)(2), for breach of fiduciary duties by Defendants
with regard to the Plan. The named Plaintiffs are
participants in the Plan, and the Defendants are all alleged
to be fiduciaries of the Plan.

The Plan is a defined contribution, individual account,
employee benefit plan under ERISA. (Doc. No. 22 ¶ 39).
The Amended Complaint alleges that, at the end of the
plan year 2018, the Plan had a total of 28,074 participants
or beneficiaries and $777,862,319 in assets. (Doc. No. 22
¶¶ 50, 52). Plaintiffs contend that Defendants violated
ERISA by breaching their fiduciary duties by imprudently
selecting and monitoring Plan investments and
recordkeeping fees (Count I) and by failing to monitor
other fiduciaries (Count II). On March 26, 2020,
Defendants moved to dismiss the First Amended
Complaint under Rule 12(b)(1) for Plaintiffs' lack of
Article III standing and Rule 12(b)(6) for failure to state a
claim. (Doc. No. 34). Through their pending motion,
Defendants also ask the Court to strike Plaintiffs' jury
demand. (Doc. No. 35 at 30-35).

McCool v. AHS Management Company, Inc., Slip Copy (2021)

2021 WL 826756, 2021 Employee Benefits Cas. 77,859

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(1)

A motion to dismiss for lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Forest City Residential Mgmt., Inc. ex rel. Plymouth Square Ltd. Dividend Hous. Ass'n v. Beasley*, 71 F. Supp. 3d 715, 722–23 (E.D. Mich. 2014) (citing *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008)). "Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), aff'd sub nom. *Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Gentek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 511.

**\*2** However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject-matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6), permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id.* at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).

### C. Rule 39(a)

Federal Rule of Civil Procedure 39(a) stipulates that if a jury trial is demanded, it must be provided unless "the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). The court, in determining whether a party is entitled to a jury trial, should apply a two-part test consisting of "(1) a historical determination, which considers whether the modern statutory cause of action most nearly resembles historical actions in law or equity, and (2) an examination of the nature of the relief sought." *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 882-83 (6th Cir. 1997); *see Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 659 (6th Cir. 1996) ("[t]he second inquiry [regarding the nature of relief sought] is more important").

## III. ANALYSIS

McCool v. AHS Management Company, Inc., Slip Copy (2021)
2021 WL 826756, 2021 Employee Benefits Cas. 77,859

## A. Standing

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing at the pleading stage, a plaintiff must allege facts plausibly demonstrating that: (1) he has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61). Plaintiffs with claims arising under ERISA are not absolved from showing that the elements of Article III standing are met.[1] *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d, 581 (6th Cir. 2016). In order to claim the interests of others to establish Article III standing, "the litigants themselves still must have suffered an injury in fact, thus giving them a sufficiently concrete interest in the outcome of the issue in dispute." *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013)) (internal quotation marks omitted).

**\*3** Defendants argue that Plaintiffs lack standing to assert claims related to funds in which they did not invest. (Doc. No. 35 at 14). Specifically, Defendants contend that Plaintiffs cannot show injury-in-fact as a result of the alleged misconduct related to funds in which they did not invest because the "value of their individual accounts" could not have been "impaired" by any alleged underperformance of funds in which they did not invest. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be "particularized," it must affect the plaintiff in a personal and individualized way. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 581 (6th Cir. 2016) For an injury to be "concrete," the injury must actually exist. *Id. at 582*.

Courts have recognized that a plaintiff who is injured in his or her own plan assets - and thus has Article III standing - may proceed under Section 1132(a)(2) on behalf of the plan or other participants even if relief sought sweeps beyond his own injury. *See Cassell v. Vanderbilt Univ.*, No. 3:16-CV-2086, 2018 WL 5264640, at \*3 (M.D. Tenn. Oct. 23, 2018) (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir.

1998) (disagreeing with determination that plaintiff could not represent a class of participants invested in plans other than his own); *Clark v. Duke Univ.*, 2018 WL 1801946 at \* 4 (M.D. N.C. Apr. 13, 2018); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (plaintiff may seek relief under Section 1132(a)(2) "that sweeps beyond his own injury")). Section 1132(a)(2) does not provide a remedy for individual injuries distinct from plan injuries." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). A plaintiff who brings suit under Section 1132(a)(2) for breach of fiduciary duty does so in order to seek recovery on behalf of the plan. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d, 584 (6th Cir. 2016); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007) ("Plaintiffs cannot bring suit under § 1132(a)(2) to recover personal damages for misconduct, but rather must seek recovery on behalf of the plan.").

Plaintiffs allege that Defendants failed independently to evaluate investment options and adequately to monitor those investments, resulting in injuries to the Plan. To the extent this allegedly imprudent practice of Defendants resulted in investment in allegedly imprudent funds, participants in those funds were injured. Plaintiffs challenge the practice by which investments were chosen and monitored. Plaintiffs have satisfied the requirements of Article III because they have alleged actual injury to their own Plan accounts, fairly traceable to Defendants' conduct, a causal connection between Defendants' actions and Plaintiffs' losses, and the likelihood that their injuries will be redressed by a favorable judgment. *See Cassell v. Vanderbilt Univ.*, No. 3:16-CV-2086, 2018 WL 5264640, at \*4 (M.D. Tenn. Oct. 23, 2018). Additionally, Plaintiffs' allegations concerning record-keeping fees challenge the practices of Defendants, not specific funds. Plaintiff assert, for example, that Defendants failed to adequately monitor revenue sharing. These are allegations of an imprudent process that allegedly injured all Plan participants, including Plaintiffs, when a portion of those fees were charged to individual accounts. Plaintiffs have standing to bring these claims related to record-keeping fees. *See id. at \*3*. Accordingly, the Court will deny Defendants' motion to dismiss for lack of standing.

## B. ERISA

ERISA governs employee benefit plans and establishes both the obligations of plan fiduciaries and the remedies

APP 265

McCool v. AHS Management Company, Inc., Slip Copy (2021)

2021 WL 826756, 2021 Employee Benefits Cas. 77,859

for any breaches of their duties. *Tullis v. UMB Bank*, 515 F.3d 673, 676 (6th Cir. 2008). It is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans. *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018) (citing *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 425 (6th Cir. 2002)). The statute accomplishes this purpose by imposing fiduciary duties of prudence and loyalty on plan fiduciaries. *Id.* Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon them under ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach" and for such other equitable remedial relief as the court deems appropriate. 29 U.S.C. § 1109(a).

### 1. Fiduciary Duty of Loyalty

**\*4** Under ERISA's duty of loyalty, a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). "To state a loyalty-based claim under ERISA, a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Cassell*, 285 F. Supp. 3d at 1062. "[T]o implicate the concept of loyalty, a plaintiff must allege plausible facts supporting an inference that a fiduciary acted *for the purpose of* providing benefits to itself or some third party." *Id.* (emphasis in original).

In the present case, the Court finds that Plaintiffs have not alleged sufficient facts to show that Defendants engaged in transactions involving self-dealing or that otherwise involved or created a conflict between Defendants' fiduciary duties and personal interests. Even though Plaintiffs allege that Transamerica benefitted from Defendants' alleged mismanagement, the Amended Complaint fails to allege plausible facts supporting an inference that Defendants *acted for the purpose of* providing benefits to Transamerica, any other third party, or to themselves. Even if those third parties are considered "parties of interest," as defined in ERISA, in order to show that Defendants breached the fiduciary duty of loyalty, Plaintiffs must sufficiently allege that Defendants acted for the purpose of benefitting those third parties or themselves. When claims do not support an inference that the defendants' actions were for the

purpose of providing benefits to themselves or someone else and simply had that incidental effect, loyalty claims should be dismissed. *See Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1062 (M.D. Tenn. 2018) (citing *Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at \*6 (S.D.N.Y. Aug. 25, 2017) ("an act which has the effect of furthering the interests of a third party is fundamentally different from an act taken with that as a goal.")).

Considering the Amended Complaint as a whole, the claims allege that Defendants followed an imprudent process, not that they acted disloyally. The facts alleged in the Amended Complaint assert that Defendants failed to manage and make decisions for the Plan in a prudent manner, not that Defendants engaged in self-dealing or acted for the purpose of benefitting a third party. Plaintiffs argue that Defendants selected high-cost investments with revenue sharing in order use a portion of the fees to pay Transamerica its inflated fees support a strong inference that Defendants' actions were taken to save itself costs at the expense of Plan participants, and/or to favor its recordkeepers over the Plan participants. (Doc. No. 46 at 30). However, Plaintiffs do not sufficiently allege that Defendants acted for the purpose of furthering Transamerica's interests. *See, e.g., Cassell*, 285 F. Supp. 3d at 1062–63. Accordingly, Defendants' Motion to Dismiss will be granted as to Plaintiffs' claims for breach of the duty of loyalty.

### 2. Fiduciary Duty of Prudence

Under ERISA's duty of prudence, a fiduciary is required to discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "The test for determining whether a fiduciary has satisfied his duty of prudence is whether the fiduciary, at the time he engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Cassell*, 285 F. Supp. 3d at 1061 (citing *Pfeil v. State Street Bank and Trust Co.*, 806 F.3d 377, 384 (6th Cir. 2015)). The Court must focus on whether the fiduciary engaged in a reasonable decision-making process, consistent with that of a prudent person acting in a like capacity. *See id.* Because the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily

McCool v. AHS Management Company, Inc., Slip Copy (2021)

2021 WL 826756, 2021 Employee Benefits Cas. 77,859

be context specific. *Id.* (citing *Pfeil*, 806 F.3d at 385).

### a. Count I

**\*5** Count I alleges that Defendants breached their fiduciary duties by imprudently selecting and monitoring Plan investments and recordkeeping fees. As an initial matter, the Court notes that "[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018) (citing *White v. Chevron*, 2016 WL 4502808 at \*14 (N.D. Cal. Aug. 29, 2016)). Similarly, "[w]hether fees are unreasonable is an issue that should be taken up at summary judgment." *Id.* at 1066 ("The reasonableness of fees is a defense and does not have to be pleaded by the Plaintiffs."). Moreover, at the motion to dismiss stage, it is not Plaintiffs' burden to rule out every possible lawful explanation for the allegedly high fees charged in administering the Plan. *Id.* (citing *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1329 (N.D. Ga. 2017)). Here, Plaintiffs allege that Defendants not only failed to monitor or control the record-keeping fees, but also that Defendants' investment selection and monitoring processes were imprudent. Plaintiffs allege that the Plan failed to switch to identical lower-fee share class mutual funds, maintained expensive actively managed mutual funds, and failed to make any significant changes to the funds for the entire class period. (Doc. No. 22 ¶¶ 103, 107-110, 121-123).

"Nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund, which might, of course, be plagued by other problems." *Cassell*, 285 F. Supp. 3d at 1066 (citation omitted). "In addition, nothing in ERISA requires plan fiduciaries to include any particular mix of investment vehicles in their plan." *Id.* (citing *In re Honda of America Mfg., Inc. ERISA Fees Litigation*, 661 F.Supp.2d 861, 866 (S.D. Ohio 2009)). "Nonetheless, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Id.* (citing *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1311 (11th Cir. 2015) (citing *Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

The allegations in this count all require examination of particular circumstances, specific decisions and the context of those decisions. *See Cassell*, 285 F. Supp. 3d at 1067. There are numerous factors that a prudent fiduciary must consider besides the amount of the fees. As noted by

Defendants, numerous courts have recognized that fiduciaries have latitude to value investment features other than price (and, indeed, are required to do so). (*See* Doc. No. 35 at 18); *see White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at \*10 (N.D. Cal. Aug. 29, 2016) (collecting cases). Accordingly, the appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss. These issues are better suited for summary judgment, when discovery is complete and the record is more developed. *See Cassell*, 285 F. Supp. 3d at 1067.

### b. Count II

Count II alleges that the Board of Directors failed to monitor the performance of the Committee Defendants or have a system in place for doing so, failed to take action as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions, failed to monitor the processes by which Plan investments were evaluated, and failed to remove Committee members who continued to maintain imprudent investments fees. (Doc. No. 22 ¶¶ 147-150). An appointing fiduciary has an ongoing fiduciary duty to monitor its fiduciary appointees. *See In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 863 (N.D. Ohio 2006). Plaintiffs' allegation that the Board of Directors failed to take any action to monitor the Committee Defendants is sufficient to state a claim for breach of the duty to monitor under a notice pleading standard. *See In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 477 (S.D.N.Y. 2005) (allegation that fiduciary failed to take any steps to monitor appointees stated claim for breach of fiduciary duty). Accordingly, Defendant's Motion to Dismiss the claims against the Board of Directors will be denied.

### C. Jury Demand

Defendants argue that other courts have agreed that ERISA breach of fiduciary duty claims are equitable and therefore that there is no right to a jury trial. (Doc. No. 35 at 30-32). Relying on out-of-circuit authority, Plaintiffs argue that there had been a recent gradual acceptance that a jury trial may be appropriate in ERISA cases. (Doc. No. 46 at 32-33).

**\*6** The United States Court of Appeals for the Sixth Circuit has consistently held that ERISA claims are

McCool v. AHS Management Company, Inc., Slip Copy (2021)

2021 WL 826756, 2021 Employee Benefits Cas. 77,859

equitable in nature and thus not eligible for a jury trial. *See Jammal v. Am. Family Ins. Co.*, 914 F.3d 449, 452 n.1 (6th Cir. 2019) (noting that "Plaintiffs seeking relief under ERISA generally have no right to have their claims decided by a jury."); *see, e.g.,* 🔖 *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 616 (6th Cir. 1998) (holding that an ERISA claim is equitable in nature and thus not eligible for a jury trial); *Bair v. Gen. Motors Corp.*, 895 F.2d 1094, 1096–97 (6th Cir. 1990) (same). Accordingly, Plaintiffs cannot rely on ERISA to support their request for a jury trial, and any right to trial by jury must arise under the Seventh Amendment. *See Howard v. Prudential Ins. Co. of Am.*, 248 F. Supp. 3d 862, 868 (W.D. Ky. 2017). The Sixth Circuit, however, has determined that "the Seventh Amendment does not

guarantee a jury trial in ERISA ... cases." *Id.* (quoting 🔖⚠ *Reese v. CNH Am. LLC*, 574 F.3d 315, 327 (6th Cir. 2009)). As such, Defendants' motion will be granted as to their request to strike Plaintiffs' jury demand.

An appropriate order will enter.

### All Citations

Slip Copy, 2021 WL 826756, 2021 Employee Benefits Cas. 77,859

### Footnotes

[1]    Plaintiffs must also have statutory standing to bring a claim under ERISA. 🔖 29 U.S.C. § 1132(a)(2). Because Plaintiffs are participants and/or beneficiaries under the Plan, they meet that test.

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Stephen Q. Wood (12403)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, UT 84121
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,
     Board of Directors of Barrick Gold of North America,
     Inc., and Barrick U.S. Subsidiaries Benefits Committee*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>      Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br><br>Case Number:  2:20-cv-00275-TC<br><br>Judge Tena Campbell |

Pursuant to DUCivR 7-1(b)(4), Defendants Barrick Gold of North America, Inc. ("BGNA"), the Board of Directors of Barrick Gold of North America, Inc. (the "Board"), and Barrick U.S. Subsidiaries Benefits Committee (the "Committee") (BGNA, the Board, and the Committee are collectively, "Defendants"), hereby submit their response to Plaintiffs' Notice of Supplemental Authority (the "Notice," Dkt. No. 34).

In the Notice, Plaintiffs claim that unpublished decisions from the United States District Court for the Western District of New York—*Savage v. Sutherland Global Services, Inc.*, No. 19-cv-06840 EAW, 2021 WL 726788 (W.D.N.Y. Feb. 25, 2021) (the "*Savage* Decision")—and the United States District Court for the Middle District of Tennessee—*McCool v. AHS Management Company, Inc.*, No. 39-cv-01158, 2021 WL 826756 (M.D. Tenn. March 4, 2021) (the "*McCool* Decision")—purportedly "support Plaintiffs' arguments in pages 10 to 13 of Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint" and specifically "with respect to Defendants' failure to select identical lower cost alternatives." (Dkt. No. 34, Notice at 1.)

Defendants do not object to the fact that the Notice brings recent unpublished decisions to the Court's attention. However, Defendants do dispute that either the *Savage* Decision or the *McCool* Decision support Plaintiffs' arguments in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

The *Savage* Decision is inapposite because as the opinion makes clear, the plaintiffs in *Savage* identified and alleged the existence of a lower cost identical, institutional fund. *Savage*, 2021 WL 726788 at *7. Contrary to *Savage*, as set forth in Defendants' briefing on its Motion to Dismiss, the investment options available under the Plan are actually cheaper than the purportedly

lower-cost alternatives identified by Plaintiffs in the First Amended Complaint. (Dkt. No. 24, Memo at 14-17; Dkt. No. 28, Reply at 7.)

The *McCool* Decision is similarly distinguishable as the court's basis for denying the motion to dismiss is based solely upon recent authority from the same court in which it has found that the arguments raised in the *McCool* motion to dismiss are better suited for resolution on a motion for summary judgment. *McCool*, 2021 WL 826756 at * 5 (noting that "[t]hese issues are better suited for summary judgement" and citing to *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1067 (M.D. Tenn. 2018)). No such recent authority exists here.

Accordingly, for the reasons stated herein, to the extent the Court considers Plaintiffs' Notice, the holdings in *Savage* and *McCool* are readily distinguishable from the issues and arguments raised in Defendants' Motion to Dismiss and reply brief.

DATED:  April 1, 2021                    QUINN EMANUEL URQUHART & SULLIVAN,
                                         LLP

                                    By     */s/ Stephen Q. Wood*
                                         _____
                                         Stephen Q. Wood
                                         2755 E. Cottonwood Parkway, Suite 430
                                         Salt Lake City, Utah 84111
                                         Telephone: (801) 515-7300
                                         stephenwood@quinnemanuel.com

                                         John B. Quinn (*admitted pro hac vice*)
                                         865 S. Figueroa Street, 10th Floor
                                         Los Angeles, CA 90017
                                         Telephone: (213) 443-3000
                                         johnquinn@quinnemanuel.com

                                         Lazar P. Raynal (*admitted pro hac vice*)
                                         Kaitlin P. Sheehan (*admitted pro hac vice*)
                                         191 N. Wacker Drive, Suite 2700
                                         Chicago, IL 60606
                                         Telephone: (312) 705-7400
                                         lazarraynal@quinnemanuel.com
                                         kaitlinsheehan@quinnemanuel.com

                                         *Attorneys for Barrick Gold of North America,*
                                         *Inc., Board of Directors of Barrick Gold of North*
                                         *America, Inc., and Barrick U.S. Subsidiaries*
                                         *Benefits Committee*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 1st day of April, 2021, I filed with the Clerk of Court a true

and correct copy of the foregoing **Defendants Barrick Gold of North America, Inc., Board of**

**Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits**

**Committee's Response in Opposition to Plaintiffs' Notice of Supplemental Authority** via the

CM/ECF System which sent notification to:

> ISOM LAW FIRM PLLC
> David K. Isom, Esq.
> 299 South Main Street, Suite 1300
> Salt Lake City, Utah 84111
> david@isomlawfirm.com
>
> CAPOZZI ADLER, P.C.
> Donald R. Reavey, Esq.
> 2933 North Front Street
> Harrisburg, PA 17110
> donr@capozziadler.com
>
> CAPOZZI ADLER, P.C.
> Mark K. Gyandoh, Esq.
> 312 Old Lancaster Road
> Merion Station, PA 19066
> markg@capozziadler.com

/s/ *Stephen Q. Wood*

5

**Linda Gussler**

| | |
|---|---|
| **From:** | utd_enotice@utd.uscourts.gov |
| **Sent:** | Monday, April 5, 2021 4:07 PM |
| **To:** | ecf_notice@utd.uscourts.gov |
| **Subject:** | Activity in Case 2:20-cv-00275-TC Matney et al v. Barrick Gold of North America et al Notice of Hearing on Motion |

**This is an automatic e-mail message generated by the CM/ECF system. If you need assistance, call the Help Desk at (801)524-6100.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**US District Court Electronic Case Filing System**

**District of Utah**

### Notice of Electronic Filing

The following transaction was entered on 4/5/2021 at 2:06 PM MDT and filed on 4/5/2021

| | |
|---|---|
| **Case Name:** | Matney et al v. Barrick Gold of North America et al |
| **Case Number:** | 2:20-cv-00275-TC |
| **Filer:** | |
| **Document Number:** | 36(No document attached) |

**Docket Text:**

**NOTICE OF ZOOM HEARING ON MOTION re: [24] MOTION to Dismiss for Failure to State a Claim : (Notice generated by Chris Ford) Zoom Motion Hearing set for 5/21/2021 at 10:30 AM in Judges Chambers before Judge Tena Campbell. (cff)**

**2:20-cv-00275-TC Notice has been electronically mailed to:**

David K. Isom    david@isomlawfirm.com

Stephen Q. Wood    stephenwood@quinnemanuel.com, anthonyquinn@quinnemanuel.com, calendar@quinnemanuel.com, lisahewitson@quinnemanuel.com

John B. Quinn    johnquinn@quinnemanuel.com

Mark K. Gyandoh    markg@capozziadler.com, lindag@capozziadler.com

Donald R. Reavey    donr@capozziadler.com, lindag@capozziadler.com

Lazar Pol Raynal    lazarraynal@quinnemanuel.com

Kaitlin P. Sheehan    kaitlinsheehan@quinnemanuel.com

**2:20-cv-00275-TC Notice has been delivered by other means to:**

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click [here](#) to report this email as spam.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) **Case No.: 2:20-cv-00275-TC** ) |
| BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30. | ) ) ) ) ) ) ) |
| Defendants. | ) |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs Cole Matney and Paul Watts (together, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Notice of Supplemental Authority of recent decisions in analogous ERISA matters, *Jones v. Coca-Cola Consolidated, Inc.*, No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551 (W.D.N.C. March 31, 2021) (attached hereto as Exhibit A) and *Davis v. Magna International of America, Inc.*, No. 2:20-cv-11060-NGE-RSW, 2021 WL 1212579 (E.D. Mich. March 31, 2021) (attached hereto as Exhibit B). *Jones* and *Davis*, like this matter, allege breaches of fiduciary duty in violation of ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2). Both decisions support pages 10 to 19 of Plaintiffs' brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 25) ("Plfs. Mem.") with respect to Plaintiffs' arguments that Count I of the Amended Complaint states a plausible claim for breach of fiduciary duties. *See Jones,* 2021 WL 1226551, at *4-5; *Davis*, 2021 WL 1212579, at *2, 5-6, 8. Additionally, both cases support page 25 of Plfs. Mem. with respect to Plaintiffs' argument that

1

APP 276

the Amended Complaint alleges sufficient facts to state a claim for failure to monitor. *See Jones,* 2021 WL 1226551, at *5; *Davis*, 2021 WL 1212579, at *11. Finally, *Jones* supports pages 20-24 of Plfs. Mem. with respect to Plaintiffs' argument that Count I of the Amended Complaint plausibly alleges that Defendants breach their fiduciary duties in failing to monitor the Plan's recordkeeping fees. *See Jones,* 2021 WL 1226551, at *9-11.

Dated: April 9, 2021                    Respectfully submitted,

                                        **CAPOZZI ADLER, P.C.**

                                        */s/ Mark K. Gyandoh*
                                        Mark K. Gyandoh, Esquire
                                        (admitted *pro hac vice*)
                                        Gabrielle Kelerchian, Esquire
                                        (*pro hac vice* to be requested)
                                        312 Old Lancaster Road
                                        Merion Station, PA 19066
                                        Tel: (610) 890-0200
                                        Fax (717) 233-4103
                                        Email: markg@capozziadler.com

                                        Donald R. Reavey, Esquire
                                        (admitted *pro hac vice*)
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        (717) 233-4101
                                        Fax (717) 233-4103

                                        Counsel for Plaintiffs and
                                        the Putative Class

2

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 9, 2021 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:   *<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh, Esq.

# EXHIBIT A

2021 WL 1226551
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina.

CHEYENE **JONES** AND SARA J. GAST, Individually and as representatives Of a class of similarly situated
persons, on Behalf of the **COCA-COLA CONSOLIDATED**, INC. 401(K) PLAN, Plaintiff,
v.
**COCA-COLA CONSOLIDATED**, INC., THE BOARD OF DIRECTORS OF **COCA COLA CONSOLIDATED**,
INC., THE CORPORATE BENEFITS COMMITTEE OF **COCA COLA CONSOLIDATED**, INC.; and DOES No.
1-20, Whose Names Are Currently Unkown, Defendants.

DOCKET NO. 3:20-cv-00654-FDW-DSC
|
Filed 03/31/2021

ORDER

Frank D. Whitney United States District Judge

**\*1** THIS MATTER is before the Court on Defendants **Coca-Cola Consolidated**, Inc. ("**Consolidated**"), the Board of
Directors of **Coca-Cola Consolidated**, Inc. ("Directors"), and the Corporate Benefits Committee of **Coca-Cola
Consolidated**, Inc.'s ("Benefits Committee") Motion to Dismiss Plaintiff's Complaint. (Doc. No. 14). Having considered the
Motion, the Court hereby DENIES Defendants' Motion to Dismiss.

### I. BACKGROUND

This case arrived before the Court as a class action suit alleging breach of fiduciary duties under the Employee Retirement
Income Security Act ("ERISA"). (Doc. No. 1, ¶ 1).[1] Named Plaintiffs Cheyenne **Jones** ("**Jones**") and Sara J. Gast ("Gast")
are former employees of **Coca-Cola**. Id. **Jones** is a current participant in the **Coca-Cola Consolidated**, Inc. 401(k) Plan ("the
Plan"), while Gast is a former participant. Id. at ¶¶ 9-10. The Plan is a defined contribution plan and is a qualified tax-
deferred vehicle under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k). Id. at ¶ 2. As of December 31,
2019, the Plan had 10,170 participants with account balances and assets totaling $784 million. Id. at ¶ 4.

### A. The Plan Overall

During the times relevant to the Complaint, the Plan ran similar to most other 401(k) plans. Id. at ¶ 19. Participants directed
the investment of their contributions into various options offered by the Plan, such as mutual funds, collective investment
trusts, and **Coca-Cola** Company common stock. Id. The majority of administrative expenses incurred by the Plan were paid
by the participants via a reduction in their investment income. Id. Defendants are alleged fiduciaries of the Plan and were
responsible for crafting the Plan lineup of investment options. Id. at ¶ 25. Herein lies the majority of Plaintiffs' Complaint—
Defendants breached their fiduciary responsibilities by mismanaging the Plan lineup. Id.

### B. The Plan Lineup

The bulk of Plaintiffs' Complaint concerns the Fidelity Freedom Funds ("Active Suite"). Id. at ¶¶ 24-41. The Plan has offered the Active Suite since 2009. Id. at ¶ 25. The Active Suite is a suite of target date funds designed to offer an "all-in-one" retirement solution by having investment managers shift the portfolio of underlying funds to become more conservative as the target retirement date approaches. Id. at ¶ 24. The Active Suite invests predominantly in actively-managed Fidelity mutual funds. Id. at ¶ 26. Fidelity also offers a similarly functioning, target date fund suite called Fidelity Freedom Index Funds ("Index Suite"). Id. at ¶ 25. The main difference between the Active Suite and the Index Suite is their underlying investments. Id. at ¶ 26. The Active Suite invests in actively-managed Fidelity mutual funds. Id. at ¶ 26. The Index Suite invests in Fidelity funds that track market indices. Id. Plaintiffs set forth three primary issues with Defendants' choice to offer the Active Suite instead of the Index Suite. Id. at ¶¶ 28-41. First, Plaintiffs allege the Active Suite is too "high-risk" to be suitable for the plan participants. Id. at ¶¶ 28-34. Second, Plaintiffs allege the Active Suite has higher fees than the Index Suite. Id. at ¶ 35. Third, Plaintiffs allege that other plan fiduciaries and investors lost faith in the Active Suite. Id. at ¶ 38. Plaintiffs have similar issues with the Carillon Eagle Small Cap Growth Fund Class R5 ("Carillon Fund") and the T. Rowe Price Mid-Cap Value Fund ("T. Rowe Fund"). Id. at ¶¶ 43-46.

### C. Other Issues with the Plan

**\*2** Separate from the Plan's lineup offerings and the investment fees charged by the funds, Plaintiffs allege the record-keeping and administrative costs of the Plan were excessive. Id. at ¶ 47-50. The Plan paid Fidelity $59 per participant for record-keeping services alone, but given the size of the Plan, Plaintiffs allege that Fidelity's services were worth $14-$21 per participant. Id. at ¶ 48. Finally, Plaintiffs also allege the overall expense ratio of the entire menu of investment options was negligently expensive because total plan costs for participants were double that of similarly situated plans. Id. at ¶¶ 51-55.

Plaintiffs filed their Complaint on November 24, 2020 against the above-named Defendants. See (Doc. No. 1). On January 14, 2020, Defendants **Coca-Cola Consolidated**, Inc., the Board of Directors of **Coca-Cola Consolidated**, Inc., and the Corporate Benefits Committee of **Coca-Cola Consolidated**, Inc. filed a motion to dismiss. See (Doc. No. 14). The motion has been fully briefed and is ripe for review.

## II. STANDARD OF REVIEW

### A. Subject Matter Jurisdiction

Rule 12(b)(1) provides for dismissal of claims against all defendants where a court lacks jurisdiction over the subject matter of the lawsuit. Lack of subject matter jurisdiction may be raised at any time either by a litigant or the court. Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884). The ability of a court to independently address subject matter jurisdiction is important to finality inasmuch as a litigant, even one who remains silent on the issue of jurisdiction, may wait until they receive an adverse judgment from a district court and raise the issue of subject matter jurisdiction for the first time on appeal, thereby voiding the judgment. Capron v. Van Noorden, 2 Cranch 126, 127, 2 L. Ed. 229 (1804). The Federal Rules of Civil Procedure anticipate this issue and provide that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court *must* dismiss the action." Fed. R. Civ. P. 12(h)(3) (emphasis added).

Article III standing is an essential part of subject-matter jurisdiction. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). To establish Article III standing, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." Thole v. U.S. Bank N.A., 140 S. Ct. 1615, 1618, 207 L. Ed. 2d 85 (2020) (citing Lujan, 504 U.S. at 560-61). "In a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiff." Dreher v. Experian Info. Sols., Inc., 856 F. 3d, 343 (4th Cir. 2017) (internal quotations omitted). "There must be a named plaintiff with constitutional standing to assert each claim." Clarke v. Duke Univ., No. 16-1044, 2018 WL 1801946, at *7 (M.D.N.C. Apr. 13, 2018) (citing DiamlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006). "Absent constitutional standing, a federal court does not have subject matter jurisdiction." Id.

**B. Failure to State a Claim**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when the pleading party fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal "sufficiency of a complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); accord E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).

**\*3** A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive only if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

**III. ANALYSIS**

Plaintiffs' Complaint contains three counts: (1) breach of fiduciary duty; (2) failure to monitor fiduciaries and co-fiduciary breaches; and (3) liability for knowing breach of trust. However, prior to addressing Plaintiffs' claims, the Court first determines whether Plaintiffs have standing to bring this case. See Mansfield, 111 U.S. at 382.

**A. Standing**

In their Motion to Dismiss, Defendants argue both named Plaintiffs lack standing due to a lack of injury-in-fact. Id. at pp. 4-6. Defendants argue that, in an ERISA § 502(a)(2) case, "in order to claim 'the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in dispute.' " Thole, 140 S. Ct. at 1620 (internal citation omitted). The Supreme Court in Thole found that the plaintiffs had not suffered an injury-in-fact but were careful to limit their holding: "of decisive importance to this case, the plaintiffs' retirement plan is a defined-benefit plan, not a defined-contribution plan." Id. at 1618. Because the plaintiffs were participants in a defined-benefit plan, rather than a defined-contribution plan, they were guaranteed "a fixed payment each month *regardless of the plan's value or its fiduciaries' good or bad investment decisions.*" Id. at 1616-17 (emphasis added). Therefore, the Supreme Court determined there was no injury-in-fact to the plaintiffs because "the outcome of this suit would not affect [the plaintiffs'] future benefit payments." Id. at 1619.

However, with a defined-contribution plan, where future benefit payments *would* be affected by the outcome of a lawsuit, courts are more likely to find an injury-in-fact sufficient for Article III standing. *See id.* at 1618 ("[In] a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts and the benefits can turn on the plan fiduciaries' particular investment decisions."). For example, the Fourth Circuit has previously held that participants in defined-contribution plans suffer an injury-in-fact when alleging that a fiduciary's breach has negatively impacted their accounts. In re Mut. Funds Inv. Litig., 529 F.3d 207, 216 (4th Cir. 2008) ("If the plaintiffs' allegations are true, they suffered injury in that their retirement accounts were worth less than they would have been absent the breach of duty, and this injury was caused, as the plaintiffs have alleged, by the fiduciaries' misconduct."); Pender v. Bank of Am. Corp., 788 F.3d 354, 367 (4th Cir. 2015) (Ruling in a defined-contribution suit alleging fiduciary breaches: "For standing purposes, plaintiffs incurred an injury in fact, i.e., an invasion of a legally protected interest, because they 'suffered an individual loss.' ").

**\*4** Here, Plaintiffs allege injury to their individual 401(k) accounts in the form of excessive record-keeping and administrative costs as well as an expensive overall investment menu endured by each Plan participant. (Doc. No. 1, ¶¶ 47-55). These injuries are alleged to be the result of Defendants' breach of fiduciary duty, failure to monitor, and breach of trust. Therefore, "if the plaintiffs' allegations are true, they suffered injury in that their retirement accounts [are] worth less they would have been absent the breach[s]". In re Mut. Funds Inv. Litig., 529 F3d at 216. The Court accordingly finds that Plaintiffs have Article III standing to assert their claims as they have properly alleged they suffered an injury-in-fact.

**B. Count I: Breach of Fiduciary Duty**

In order to allege a breach of fiduciary duty under ERISA, Plaintiffs must show that: (1) the Plan is governed by ERISA; (2) Defendants were fiduciaries of the Plan; and (3) Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the Plan. In re MedStar ERISA Litig., CA No. RDB-20-1984, 2021 WL 391701 at *16-17 (D. Md. Feb. 4, 2021).

The first two elements to allege a breach of fiduciary duty under ERISA are met. It is undisputed at this point that the Plan is governed by ERISA and Plaintiffs have alleged that each Defendant is a fiduciary with supporting factual allegations. See (Doc. No. 14, pp. 11-16). All that remains for the Court to decide is whether Plaintiffs sufficiently alleged the third requirement to state a claim for breach of fiduciary duty under ERISA: whether Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the Plan.

ERISA requires fiduciaries to craft a plan's lineup "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use" in the same circumstances. 29 U.S.C. § 1104(a)(1)(B). "Courts 'measure fiduciaries' investment decisions and disposition of assets' against the prudent person standard." Falberg v. Goldman Sachs Group, Inc., 2020 WL 3893285, at *20 (S.D.N.Y. July 9, 2020) (citing Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 419, 134 S. Ct. 2459, 189 L. Ed. 2d 457 (2014)). "In determining whether fiduciaries have breached their duty of prudence, we ask whether the individual trustees, at the time they engaged in the challenged [actions], employed the appropriate methods to investigate the merits of the investment and to structure the investment." Tatum v. RJR Pension Inv. Comm., 761 F. 3d 346, 356 (4th Cir. 2014).

Here, Plaintiffs allege Defendants breached their fiduciary duties in three distinct ways, all of which have the potential to independently satisfy the third element of Plaintiffs' claim: (1) the overall investment menu contained costs that were imprudent,[2] (2) the Plan's record-keeping and administrative fees were imprudent,[3] and (3) specific funds in the Plan lineup were imprudent.[4] (Doc. No. 1).

**\*5** Courts in this circuit have found a fiduciary breach when it was alleged that a plan failed to utilize a cheaper investment option that offers identical underlying investments. See Kruger v. Novant Health, Inc., 131 F. Supp. 3d 470, 476-78 (M.D.N.C. 2015). Plaintiffs here allege a failure to utilize a cheaper investment option when Defendants failed to select available collective trusts and the least expensive available share class. (Doc. No. 1, ¶¶ 52-55). Additionally, Plaintiffs assert that the underlying investments are identical when selecting a collective trust or different share class. Id. at ¶¶ 53, 55. Therefore, the Court finds Plaintiffs' factual allegations regarding Defendants' alleged failure to utilize cheaper investments that offer identical underlying investments sufficiently states a claim for breach of fiduciary duty.

Because Plaintiffs' first allegation in support of Count I is sufficient to state a claim for relief, the Court accordingly declines to address Defendants' remaining arguments and DENIES Defendants' Motion to Dismiss Count I.

**C. Count II: Failure to Monitor**

Plaintiffs allege Defendant Coca-Cola failed to adequately monitor the Administrative Committee. (Doc. No. 1, ¶ 81). "[Fiduciary] authority 'carries with it a duty to monitor appropriately those subject to removal.'" MedStar, 2021 WL 391701 at *23 (quoting Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996)). Defendants first argue this claim fails because a failure-to-monitor claim is not an independent ground for relief and depends upon an underlying breach of fiduciary duty claim. (Doc. No. 15, p. 16). However, because the Court has already established that Plaintiffs have stated a claim for breach of fiduciary duty, this argument fails.

Second, Defendants argue Plaintiffs have not alleged facts sufficient to make a threshold showing that the monitoring fiduciary failed to "review the performance of its appointees at reasonable intervals in such manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards." In re Calpine Corp., No. C-03-1685 SBA, 2005 WL 1431506 at *6 (N.D. Cal. Mar. 31, 2005). However, Plaintiffs alleged just that,[5] and at this stage in the litigation "an analysis of the precise contours of the defendants' duty to monitor... is premature." In re M&T Bank Corp. ERISA Litig., No. 16-CV375 FPG, 2018 WL 4334807 at *31 (W.D.N.Y. Sep. 11, 2018) (internal citations omitted).

As a result, Plaintiffs have sufficiently alleged a claim for failure to monitor, and Defendants' Motion to Dismiss is DENIED

with regard to Count II.

### D. Count III: Knowing Breach of Trust

The Fourth Circuit has not yet formally recognized a claim for knowing breach of trust. Gordon v. CIGNA Corp., 890 F.3d 463, 476 (4th Cir. 2018). However, the Fourth Circuit has stated that if such a cause of action were to exist, "an essential element of such a claim would be the defendant's knowing participation in a breach by a fiduciary." Id. In MedStar, a knowing breach of trust claim survived a motion to dismiss where there were allegations that the defendants were in a position to know of the alleged breaches of fiduciary duty. MedStar, 2021 WL 391701 at **24-25. The facts here are similar to those in MedStar in that Plaintiffs allege Defendants' roles and relationships would place them in a position to know of nonfeasance or malfeasance of the others. Compare (Doc. No. 1, ¶¶ 11-14) with MedStar, 2021 WL 391701 at **3-5. Therefore, this Court finds that, just as in MedStar, "given the allegations with respect to the roles and relationships of the Defendants identified in the Complaint, dismissing their claim under Count III at this time would be premature." MedStar, 2021 WL 391701 at **24-25.

**\*6** As a result, Plaintiffs have sufficiently stated a claim for a knowing breach of trust and Defendants' Motion to Dismiss is DENIED with regard to Count III.

### IV. CONCLUSION
IT IS THEREFORE ORDERED that Defendants Motion to Dismiss (Doc. No. 14) is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 1226551

| Footnotes |
|---|
| 1 | The background described herein is taken from Plaintiff's Complaint, (Doc. No. 1), and all allegations are treated as true for purposes of ruling on the pending motion. Nothing described in this section—or this Order—should be construed as the Court making any findings of fact. |
| 2 | Failing to utilize a cheaper investment option that offers identical underlying investments independently constitutes a breach of one's duties of prudence and/or loyalty under ERISA. See Kruger v. Novant Health, Inc., 131 F. Supp. 3d 470, 476-78 (M.D.N.C. 2015). |
| 3 | Alleging that excessively high fees were charged to plan participants can independently constitute a breach of one's duties of prudence and/or loyalty under ERISA. See Turpin v. Duke Energy Corp., No. 3:20-CV-00528-RJC-DSC, 2021 WL 828480 at **8-9 (W.D.N.C. Mar. 4, 2021). |
| 4 | Allegations that a selected fund was an imprudent choice can independently constitute a breach of one's duties of prudence and/or loyalty under ERISA. See MedStar, 2021 WL 391701 at **18-22. |
| 5 | Plaintiffs allege "**Coca-Cola** is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Benefits Committee." (Doc. No. 1, ¶ 81). Plaintiffs also allege Defendants failed to review the performance and fiduciary processes of the appointees of the Administrative Committee. Id. at ¶ 85. |

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Linda Gussler**

| | |
|---|---|
| **From:** | utd_enotice@utd.uscourts.gov |
| **Sent:** | Thursday, April 22, 2021 1:22 PM |
| **To:** | ecf_notice@utd.uscourts.gov |
| **Subject:** | Activity in Case 2:20-cv-00275-TC Matney et al v. Barrick Gold of North America et al Notice of Hearing on Motion |

This is an automatic e-mail message generated by the CM/ECF system. If you need assistance, call the Help Desk at (801)524-6100.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**US District Court Electronic Case Filing System**

**District of Utah**

## Notice of Electronic Filing

The following transaction was entered on 4/22/2021 at 11:21 AM MDT and filed on 4/22/2021

| | |
|---|---|
| **Case Name:** | Matney et al v. Barrick Gold of North America et al |
| **Case Number:** | 2:20-cv-00275-TC |
| **Filer:** | |
| **Document Number:** | 38(No document attached) |

**Docket Text:**
**AMENDED NOTICE OF ZOOM HEARING ON MOTION re: [24] MOTION to Dismiss for Failure to State a Claim : (Notice generated by Chris Ford) Motion Hearing RESET for 5/27/2021 at 10:30 AM in Judges Chambers before Judge Tena Campbell. (cff)**

**2:20-cv-00275-TC Notice has been electronically mailed to:**

David K. Isom     david@isomlawfirm.com

Stephen Q. Wood     stephenwood@quinnemanuel.com, anthonyquinn@quinnemanuel.com, calendar@quinnemanuel.com, lisahewitson@quinnemanuel.com

John B. Quinn     johnquinn@quinnemanuel.com

Mark K. Gyandoh     markg@capozziadler.com, lindag@capozziadler.com

Donald R. Reavey     donr@capozziadler.com, lindag@capozziadler.com

Lazar Pol Raynal     lazarraynal@quinnemanuel.com

Kaitlin P. Sheehan    kaitlinsheehan@quinnemanuel.com

**2:20-cv-00275-TC Notice has been delivered by other means to:**

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

Stephen Q. Wood (12403)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, UT 84121
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Defendants Barrick Gold of North America, Inc.,*
   *Board of Directors of Barrick Gold of North America,*
   *Inc., and Barrick U.S. Subsidiaries Benefits Committee*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE, and JOHN DOES 1-30.<br><br>      Defendants. | **DEFENDANTS BARRICK GOLD OF NORTH AMERICA, INC., BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC., AND BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br><br>Case Number:  2:20-cv-00275-TC<br><br>Judge Tena Campbell |

Pursuant to DUCivR 7-1(b)(4), Defendants Barrick Gold of North America, Inc. ("BGNA"), the Board of Directors of Barrick Gold of North America, Inc. (the "Board"), and Barrick U.S. Subsidiaries Benefits Committee (the "Committee") (BGNA, the Board, and the Committee are collectively, "Defendants"), hereby submit their response to Plaintiffs' Notice of Supplemental Authority (the "Notice," Dkt. No. 37).

In the Notice, Plaintiffs claim that unpublished decisions from the United States District Court for the Western District of North Carolina—*Jones v. Coca-Cola Consolidated, Inc.*, No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551 (W.D.N.C. March 31, 2021) (the "*Jones* Decision")—and the United States District Court for the Eastern District of Michigan—*Davis v. Magna International of America, Inc.*, No. 2:20-cv-11060-NGE-RSW, 2021 WL 1212579 (E.D. Mich. March 31, 2021) (the "*Davis* Decision")—purportedly support various arguments in Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (the "Opposition"). (Dkt. No. 37, Notice at 1.) Specifically, Plaintiffs argue that both the *Jones* Decision and the *Davis* Decision support pages 10-19 and 25 of Plaintiffs' Opposition and that the *Jones* Decision supports pages 20-24 of Plaintiffs' Opposition. (Dkt. No. 37, Notice at 1-2.)

Defendants do not object to the fact that the Notice brings recent unpublished decisions to the Court's attention. However, Defendants do dispute that either the *Jones* Decision or the *Davis* Decision support Plaintiffs' arguments in their Opposition or are applicable to this matter.

The *Jones* Decision is inapposite because as the opinion makes clear, the court's basis for denying the motion to dismiss is its reliance on authority from a court in the same district in which it found that the arguments raised in the *Jones* motion to dismiss can state a claim for breach of fiduciary duty. *Jones*, 2021 WL 1226551, at *5 (stating "[c]ourts in this circuit have found a fiduciary breach when it was alleged that a plan failed to utilize a cheaper investment option that

offers identical underlying investments" and citing to *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 475-78 (M.D.N.C. 2015)).  Moreover, the *Jones* Decision is also inapplicable because as set forth in Defendants' briefing on its Motion to Dismiss, the investment options available under the Plan are actually cheaper than the purportedly lower-cost alternatives identified by Plaintiffs in the First Amended Complaint.  (Dkt. No. 24, Memo at 14-17; Dkt. No. 28, Reply at 5-8.)

The *Davis* Decision is similarly distinguishable because as the opinion makes clear, the plaintiffs in *Davis* identified and alleged the existence of lower cost identical funds.  *Davis*, 2021 WL 1212579, at *8.  Contrary to *Davis*, as set forth in Defendants' briefing on its Motion to Dismiss, the investment options available under the Plan are actually cheaper than the purportedly lower-cost alternatives identified by Plaintiffs in the First Amended Complaint.  (Dkt. No. 24, Memo at 14-17; Dkt. No. 28, Reply at 5-8.)  Plaintiffs also argue that the *Davis* Decision supports their argument in the Opposition that they have adequately pled that Defendants "breach[ed] their fiduciary duties in failing to monitor the Plan's recordkeeping fees."  (Dkt. No. 37, Notice at 2.) But as the court in *Davis* notes, the investment consultant and recordkeeper were the same company—Principal Financial—which creates a situation that courts have found to be "rife with potential conflicts of interest."  *Davis*, 2021 WL 1212579, at *10.  No such conflict of interest exists here.  Additionally, unlike in *Davis*, the Plan documents here make clear that the Defendants consistently evaluated the recordkeeping fee paid to Fidelity and negotiated reductions.  (Dkt. No. 24, Memo at 6-7; Dkt. No. 28, Reply at 8-9.)

Accordingly, for the reasons stated herein, to the extent the Court considers Plaintiffs' Notice, the holdings in *Jones* and *Davis* are readily distinguishable from the issues and arguments raised in Defendants' Motion to Dismiss and reply brief.

DATED:  April 22, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____ */s/ Stephen Q. Wood* _____
Stephen Q. Wood
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84111
Telephone: (801) 515-7300
stephenwood@quinnemanuel.com

John B. Quinn (*admitted pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com

Lazar P. Raynal (*admitted pro hac vice*)
Kaitlin P. Sheehan (*admitted pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com

*Attorneys for Barrick Gold of North America, Inc., Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of April, 2021, I filed with the Clerk of Court a true

and correct copy of the foregoing **Defendants Barrick Gold of North America, Inc., Board of**

**Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits**

**Committee's Response in Opposition to Plaintiffs' Notice of Supplemental Authority** via the

CM/ECF System which sent notification to:

> ISOM LAW FIRM PLLC
> David K. Isom, Esq.
> 299 South Main Street, Suite 1300
> Salt Lake City, Utah 84111
> david@isomlawfirm.com
>
> CAPOZZI ADLER, P.C.
> Donald R. Reavey, Esq.
> 2933 North Front Street
> Harrisburg, PA 17110
> donr@capozziadler.com
>
> CAPOZZI ADLER, P.C.
> Mark K. Gyandoh, Esq.
> 312 Old Lancaster Road
> Merion Station, PA 19066
> markg@capozziadler.com

/s/ *Stephen Q. Wood*

5